**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
**KAPLAN**, *et al.*,                   )
                                        )
          **Plaintiffs**,               )          **Civ. No. 09-646 (RWR)**
                                        )
     **v.**                             )
                                        )
**HEZBOLLAH**, *et al.*,                )
                                        )
          **Defendants.**               )
_____ )


**FINDINGS OF FACT AND MEMORANDUM OF LAW**
**WITH RESPECT TO DAMAGES[1]**


**I.      PROCEDURAL HISTORY**

        This is an action brought pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. §2333,

the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., and this Court's

supplemental jurisdiction, 28 U.S.C. § 1367, on behalf of Americans citizens and several foreign

citizens who were harmed as the result of rockets and missiles fired by the Hezbollah terrorist

organization ("Hezbollah") with the aid and support of the Democratic People's Republic of

Korea (hereinafter "North Korea").

        Plaintiffs commenced this action on April 8, 2009. An amended complaint was filed on

December 15, 2009.

        Default was entered by the clerk of the Court against defendant North Korea on May 21,

2010.

_____
        [1] References to exhibits herein, unless otherwise noted, refer to the exhibits filed by plaintiff
simultaneously with the submission of their proposed findings of fact and conclusions of law.

On November 29, 2010, the Court directed plaintiffs to serve defendant Hezbollah via international courier delivery to Hezbollah's television station, Al-Manar television, pursuant to Federal Rule of Civil Procedure 4(f)(3). Dkt. # 22.

On December 31, 2010, plaintiffs effected delivery on Al-Manar television, Al-Nour radio and the Lebanese Media. Defendant, Hezbollah has failed to serve an answer, a motion to dismiss or otherwise appear in this matter.

On February 9, 2011, the clerk of this Court entered default against defendant, Hezbollah. Dkt. # 30.

By failing to respond to plaintiffs' complaint, the "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint." *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) citing *Trans World Airlines, Inc. v. Hughes,* 449 F.2d 51, 63 (2d Cir.1971), *rev'd on other grounds,* 409 U.S. 363 (1973). Indeed, it is well established that where a defendant has defaulted, the facts set forth in the plaintiffs' complaint are deemed to have been admitted. FED. R. CIV. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."); *Klapprott v. United States*, 335 U.S. 601, 604 (1949); *O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938, 940 (7th Cir. 2011); *"R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 125 (2d Cir. 2008); *DirecTV, Inc. v. Oliver*, 503 F.3d 847, 851 (9th Cir. 2007).

As a result, this Court is empowered to enter a default judgment against the defendants pursuant to Fed. R. Civ. P. 55(b)(2). *See Flynn v. Jocanz, Inc.*, 480 F. Supp. 2d 218, 220 (D.D.C. 2007).   Plaintiffs now bring this Findings of Fact and Conclusions of Law to address the damages inflicted upon them by the defendant Hezbollah's willful conduct.

## II.     THE PARTIES

The plaintiffs are U.S. citizens and non-citizens who were harmed as the result of waves of rocket attacks on numerous cities and other population centers of Northern Israel carried out by defendant Hezbollah between July 12 and August 14, 2006 (hereinafter the "Hezbollah Rocket Attacks"). The details of the attacks and of plaintiffs' injuries are set forth below.

Defendant Hezbollah is a terrorist organization based in Lebanon. Its declared goal is the eradication of the State of Israel and its population through terrorist attacks targeting its civilian population.

Defendant North Korea is a foreign state within the meaning of 28 U.S.C. § 1603 that was designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)) in 1988 and was so designated within the six month period before this action was filed. North Korea, through its officials, employees and agents, provided defendant Hezbollah with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), which enabled, facilitated and caused the rocket attacks that resulted in the plaintiffs' injuries. North Korea's liability for the Hezbollah Rocket Attacks is addressed separately.

## III.     JURISDICTIONAL STATEMENT

Before entering a default judgment against Hezbollah this Court must ensure that it has both subject matter jurisdiction over plaintiffs' claims and personal jurisdiction over the defendant. *See Mwani v. Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) (analyzing jurisdiction over defaulting terrorist organization); *Rubin v. Hamas-Islamic Resistance Movement*, 2004 WL 2216489, *2 (D.D.C. Sept. 27, 2004) (analyzing both subject matter and personal jurisdiction prior to entry of a default judgment against the terrorist organization Hamas); *Estates of Ungar*

*ex rel. Strachman v. Palestinian Authority*, 304 F. Supp. 2d 232, 247 (D.R.I. 2004) (same). As detailed below, this Court has both subject matter jurisdiction over plaintiffs' claims and personal jurisdiction over Hezbollah.

## I.      Subject Matter Jurisdiction

This Court has subject matter jurisdiction over the American plaintiffs' claims because they pled a federal cause of action pursuant to the ATA, 18 U.S.C. § 2333(a).[2] The ATA states:

> (a) **Action and Jurisdiction.—** Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

With regards to the meaning "international terrorism", the ATA defines this term as follows[3]:

> "(1) the term "international terrorism" means activities that--
>
> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended—

---

[2] Additionally, this Court has subject-matter jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. §§ 1330 and 1605A(a), which creates a cause of action against North Korea and other state sponsors of terrorism; however, plaintiffs' claims against North Korea were submitted previously in a separate but related filing.
[3] See 18 U.S. C. § 2331(1)

(i)      to    intimidate    or    coerce    a    civilian    population;

(ii)     to influence the policy of a government by intimidation or coercion; or

(iii)    to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C)      occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;"

Thus, subject matter jurisdiction is proper under the ATA because the American plaintiffs were injured by an act of international terrorism as defined by 18 U.S.C. § 2331, and their claims raise a federal question under 28 U.S.C. § 1331.

## II.      Personal Jurisdiction

Personal jurisdiction is also proper over defendant Hezbollah. Hezbollah is classified as a Foreign Terrorist Organization ("FTO") in the United States. *See* 62 Fed. Reg. 52650 (Oct. 8, 1997). Plaintiffs properly served Hezbollah by delivering process to a representative entity of the organization, Dkt. # 28, and because plaintiffs' ATA claims arise under federal law, service of process on Hezbollah is sufficient to establish personal jurisdiction over it pursuant to Fed. R. Civ. P. 4(k)(2). Rule 4(k)(2) authorizes jurisdiction over a defendant if (1) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (2) exercising jurisdiction is consistent with the U.S. Constitution and laws.

Here, defendant Hezbollah is an FTO with no formal presence in the United States, but exercising jurisdiction over it is still consistent with the U.S. Constitution and laws. First,

Hezbollah is subject to general jurisdiction in this country because, as numerous congressional hearings have noted, Hezbollah has extensive contacts with the United States. For instance, the U.S. House Committee on Homeland Security held a hearing on March 21, 2012 titled "Iran, Hezbollah, and the Threat to the Homeland," which found that "Counterterrorism officials consider Hezbollah fundraising cells to be prevalent across the United States."[4] At the time, the chairman of the Committee, Congressman Peter King stated that Hezbollah currently has hundreds, possibly even thousands of operatives present in the United States engaged upon the terrorist organizations behalf.[5] Similarly, the FBI Counterterrorism Division's Section Chief for International Terrorism Operations testified on September 28, 2006 before two U.S. House committees on international terrorism and stated: "Within the United States, Hezbollah associates and sympathizers have engaged in a wide range of criminal activities, to include money laundering, credit card fraud, immigration fraud, food stamp fraud, bank fraud, and narcotics trafficking."[6] These findings are sufficient to establish general jurisdiction over Hezbollah for purposes of this default judgment. *See Mwani*, 417 F.3d at 7 (plaintiffs need only make a prima facie showing of jurisdiction in default judgment cases).

Second, there is also specific jurisdiction over Hezbollah because it intentionally fired numerous rockets into Israel where there was an extremely high probability that American citizens would be harmed. As the Seventh Circuit noted, "Americans are frequent visitors to and sojourners in Israel [and] many U.S. citizens live in Israel." *Boim v. Holy Land Found'n for*

---

[4] http://homeland.house.gov/sites/homeland.house.gov/files/Investigative_Findings_Iran_Hezbollah_Threat.pdf

[5] http://www.c-span.org/Events/House-Hearing-Examines-Iran-Hezbollah-Terror-Threat-to-US/10737429235-1/

[6] *Hezbollah's Global Reach* : Joint Hearing Before the Subcommittee on International Terrorism and Nonproliferation and the Subcommittee on the Middle East and Central Asia of the Committee on International Relations, House of Representatives, One Hundred Ninth Congress, second session, September 28, 2006, at p. 16, available at: http://purl.access.gpo.gov/GPO/LPS77892.

*Relief and Devel.*, 549 F.3d 685, 694 (7th Cir. 2008). Thus, Hezbollah and its associates "had 'fair warning' that their activities would 'subject [them] to the jurisdiction' of the United States.'" *Mwani*, 417 F.3d at 13. (citation omitted). Indeed, it was completely foreseeable that a massive rocket attack on Israeli cities was very likely to injure Americans and that, therefore, Hezbollah's attacks "should suffice to cause the defendant. . . to 'reasonably anticipate being haled into' an American court." *Mwani v. Bin Laden*, 417 F.3d 1, 14 (D.C. Cir. 2005) (quoting *Burger King Corporation v. Rudzewicz*, 471 U.S. 462, 474 (1985) and holding Rule 4(k)(2) authorized personal jurisdiction over terrorist mastermind Osama Bin Laden and the al Qaeda terrorist organization in a civil case arising from a terrorist bombing that was likely to harm Americans). *See also Morris v. Khadr*, 415 F. Supp. 2d 1323, 1336 (D.C. Utah 2006) quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980) ("Because injury in the United States undeniably is a foreseeable effect of a terrorist attack purposefully directed at this country's citizens, terrorism inherently is the sort of 'conduct and connection with' the United States that should cause a foreign terrorist to 'reasonably anticipate being hauled into court' here").

Accordingly, this Court has subject matter jurisdiction over the ATA claims of American citizens against defendant Hezbollah pursuant to 18 U.S.C. § 2333, and it also has personal jurisdiction over Hezbollah pursuant to Fed. R. Civ.P. 4(k)(2).

## III.     Supplemental Jurisdiction

1.     Moreover, pursuant to 28 U.S.C. § 1367(a), this Court has subject matter over the claims of the two non-Americans, Michael Fuchs and Danielle Sauter, whose injuries similarly arise from the Hezbollah Rocket Attacks. Section 1367 states that the district courts "shall have

supplemental jurisdiction over all . . . claims that are so related to [the existing] claims in the action within such original jurisdiction that they form part of the same case or controversy." This "pendent jurisdiction" arises wherever there is a claim authorized under federal law and another that is so closely related to the first that it "comprises but one constitutional 'case.'" *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966). In other words, the two claims "must derive from a common nucleus of operative fact." *Id.*; *see also Price v. Wolford*, 608 F.3d 698, 702-03 (2010).

Here, the "same nucleus of operative fact" test is clearly satisfied. The non-Americans in this action and their American counterparts all seek redress from damages resulting from the same set of facts: 2006 Hezbollah rocket attacks on Israeli cities. *See Biton v. Palestinian Interim Self-Government Authority*, 310 F. Supp.2d 172, 183 (D.D.C. 2004) (granting supplemental jurisdiction for additional claims derived from a terror attack); *McRaven v. Sanders*, 577 F.3d 974, 984 (8th Cir. 2009) (granting supplemental jurisdiction for a claim derived from the same series of events as the federal claims); *Lindsay v. Government Employees Ins. Co.*, 448 F.3d 416, 424 (D.C. Cir. 2006) (granting supplemental jurisdiction where "members of [two distinct] classes performed the same [actions] for the same [defendant] and were deprived . . . as a result of the same action taken by [the defendant]"); *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 290 & n.1 (4th Cir. 2007) (granting supplemental jurisdiction for claims derived from "the same interrelated series of events or transactions" that gave rise to the federal claims); *see also In re Thornburg Mortg., Inc. Securities Litigation*, 683 F. Supp. 2d 1236, 1254 (D.N.M. 2010) (finding supplemental jurisdiction because "[t]he claims arising from the September and January offerings appear to be part of the same common nucleus of operative fact as the claims arising from the May and June 2007 offerings, as all are related to the same series of SEC filings by the

same company, and so the claims all appear to be part of the same case or controversy.").

Moreover, Section 1367(a) expressly permits joinder of additional parties on the basis of supplemental jurisdiction. To be clear, joinder under the supplemental jurisdiction statute is available even if the plaintiff requesting joinder has no independent basis for original federal jurisdiction. *Biton*, 310 F. Supp.2d at 183 ("This provision embodies 'the practice of 'pendent party' jurisdiction, allowing the joinder of a party even though there is no independent federal question jurisdiction over that party's claims.'" (quoting *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 98 (D.D.C. 2003)); *see also Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 549, 552-54, 558-59 (2005) (holding that supplemental jurisdiction is available in diversity cases even for plaintiffs who do not satisfy the amount in controversy requirement).

Because the discretionary elements of Section 1367(c) are not applicable, this Court should entertain jurisdiction. Section 1367(c) states that district courts may decline to exercise supplemental jurisdiction only when certain stated elements are satisfied. They are:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)     the district court has dismissed all claims over which it has original jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c).

None of the above elements are present nor relevant to the instant proceeding and, as such, this Court may not "decline to exercise supplemental jurisdiction." *Id.*; *Lindsay v. Government Employees Ins. Co.*, 448 F.3d 416, 421 (D.C. Cir. 2006). Importantly, the claims by

the two non-American plaintiffs simply restate the claims by the American plaintiffs and do not raise any additional state law questions or predominate over the questions presented by the American plaintiffs. The district court clearly has jurisdiction over the claims of the American plaintiffs and has not—nor should it—dismiss those. And, to the extent that compelling circumstances should motivate this Court's decision relating to pendant party jurisdiction, they should compel the court to *accept* jurisdiction. Non-American plaintiffs have suffered tremendously at the hands of defendant Hezbollah and would have no recourse in any other court of law anywhere in the world. Moreover, these non–federal claims do not complicate or delay the outcome of the litigation in any significant way such that dismissing them from the litigation will serve no legitimate interest—it will merely add to their suffering by denying them their day in court.

## IV.    BACKGROUND

### I.    Hezbollah

Hezbollah is a radical Islamic terrorist organization, which was established in Lebanon in 1982, and which views the United States, the State of Israel and other Western countries as its enemies. Hezbollah has sought, as an official and publicly-stated policy to destroy the State of Israel and murder or expel its Jewish residents. Since its founding and until July 12, 2006 (and until the present day), Hezbollah has sought to achieve its goals through the use of terrorist attacks on Jewish civilians in Israel and elsewhere which have killed hundreds of innocent civilians and wounded hundreds of others. Hezbollah has used terrorism against Jewish civilians in Israel and elsewhere in order to coerce, intimidate and influence the Israeli government and public, and thereby ultimately bring about the destruction of the State of Israel and the murder or

expulsion of its Jewish population. Moreover, defendant Hezbollah has carried out numerous terrorist attacks against American targets which have killed hundreds of U.S. citizens and wounded hundreds more. The terrorist attacks committed by Hezbollah between 1982 and July 12, 2006, included, inter alia, the following:

a.      The July 19, 1982 kidnapping of American University president David S. Dodge in Beirut;

b.      The April 18, 1983 car bomb attack on the United States Embassy in Beirut in which 63 people were killed;

c.      The October 23, 1983 truck bomb attack on the U.S. Marine barracks in Beirut in which 241 American military personnel were killed;

d.      The September 20, 1984 car bomb attack on the U.S. Embassy annex in Beirut in which two Americans and 22 others were killed;

e.      The March 16, 1984 kidnapping and murder of William Buckley, a CIA operative working at the U.S. Embassy in Beirut;

f.      The April 12, 1984 attack on a restaurant near the U.S. Air Force Base in Torrejon, Spain in which eighteen U.S. servicemen were killed and 83 people injured;

g.      The December 4, 1984 terrorist hijacking of a Kuwait Airlines plane in which four passengers were murdered, including two Americans;

h.      The June 14, 1985 hijacking of TWA Flight 847 in which Robert Stethem, a U.S. Navy diver, was murdered. Other American passengers were held hostage before being released on June 30, 1985;

i.      The February 17, 1988 kidnapping and subsequent murder of U.S. Marine Col. William Higgins;

j.      The March 17, 1992 bombing of the Israeli Embassy in Buenos Aires that killed 29 people and injured over 200;

k.      The July 18, 1994 bombing of the Jewish community center in Buenos Aires that killed 86 people and injured over 200;

l.      The November 28, 1995 bombardment of towns in northern Israel with rockets aimed at Jewish civilians;

m.      The March 30, 1996 bombardment of northern Israeli towns with 28 rockets. A week later, Hezbollah fired 16 additional rockets, injuring 36 Israelis;

n.      The August 19, 1997 bombardment of northern Israel with dozens of rockets aimed at Jewish civilians;

o.      The December 28, 1998 bombardment on northern Israel with dozens of rockets aimed at Jewish civilians;

p.      The May 17, 1999 bombardment on northern Israel with dozens of rockets aimed at Jewish civilians;

q.      The June 24, 1999 bombardment on northern Israel, killing 2 people;

r.      The April 9, 2002 launching of rockets into northern Israeli towns; and

s.      The August 10, 2003 firing of shells that killed a 16-year-old Israeli boy and wounded other Israelis.

The courts of the United States have published numerous decisions finding that Hezbollah was responsible for carrying out terrorist attacks. Hezbollah has been designated by the United States Government as a Specially Designated Terrorist ("SDT") continuously since 1995, as a Foreign Terrorist Organization ("FTO") continuously since 1997, and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001.

## II.      The Hezbollah Rocket Attacks

During the Hezbollah Rocket Attacks perpetrated between July 12, 2006 and August 14, 2006, defendant Hezbollah fired almost 4,000 thousand rockets into northern Israel. The rockets fired by Hezbollah were specifically aimed towards Israeli population centers with the intent of murdering and grievously injuring civilians. The majority of the almost 4,000 rockets launched during the Hezbollah Rocket Attacks were the highly inaccurate "Katyousha" missiles (220mm rockets) which contain more than 200 hundred pounds of explosives as well as thousands of 6mm steel spheres (sometimes referred to as ball bearings) that sprayed out upon impact with great force and were intended to murder and grievously maim anyone caught in the vicinity of the explosion. Defendant Hezbollah also fired numerous cluster munitions rockets loaded with explosives into Israeli cities that, upon impact, dispersed 3mm steel spheres over a wide footprint. These spheres are devastating anti-personnel weapons specifically intended to penetrate human flesh and organs within a wide radius of the rockets.[7]  Defendant Hezbollah intentionally carried out the Hezbollah Rocket Attacks utilizing the material support and resources provided by the North Korean defendants.  As noted above, the North Korean defendants' liability for the Hezbollah Rocket Attacks has been addressed separately and these Proposed Findings of Facts and Memorandum of Law will focus on the damages incurred by the plaintiffs as a result of defendant Hezbollah's violations of law and tortuous conduct. The plaintiffs were harmed by the Hezbollah Rocket Attacks, as detailed below.

---

[7] Human Rights Watch Report: *Civilians under Assault: Hezbollah's Rocket Attacks on Israel in the 2006 War*, http://www.hrw.org/reports/2007/iopt0807/index.htm

# V.      MEDICAL EVALUATIONS

In evaluating the injuries inflicted upon the plaintiffs by defendant Hezbollah, the opinions of two medical experts, Drs. Rael D. Strous and Alan Friedman, were sought.

## I.      Dr. Rael D. Strous, M.D.

Dr. Rael D. Strous, M.D. ("Dr. Strous") examined a number of the Plaintiff members who have submitted declarations in this case, and his expert opinion of such Plaintiffs will be included below where relevant.

## Professional Qualifications

Dr. Strous is a Medical Doctor specializing in psychiatry. He is currently employed as Director of the Chronic Inpatient Unit of the Be'er Yaakov Mental Health Center located in Be'er Yaakov, Israel. He also currently serves as an Associate Professor of Psychiatry at the Sackler Faculty of Medicine at the Tel Aviv University.

Dr. Strous received his medical degree in 1989 from the University of Witwatersrand in Johannesburg, South Africa. Between 1992 and 1996, he performed his residency in psychiatry at the Albert Einstein College of Medicine in the Bronx, New York. In 1996, Dr. Strous served as Chief Resident at the Bronx Psychiatric State Hospital. From 1996 through 1998, he performed a clinical research fellowship in psychopharmacology at the Commonwealth Research Center of the Harvard Medical School.

Before embarking on his career in psychiatry, Dr. Strous served as an emergency room doctor and as a general physician in pediatrics and trauma.

Dr. Strous has over 100 peer reviewed research publications to my name including

several in the field of chronic post traumatic stress disorder ("PTSD").

Based on his education and experience, Dr. Strous has provided expert testimony in numerous United States court cases including in *Rubin v. Islamic Republic of Iran*, Civil Action No. 01-1655 (RMU), in the case of *Ben Haim v. Islamic Republic of Iran*, Civil Action No. 02-01811 (RCL), in the case of *Saperstein v. Palestinian Authority,* Civil Action No. 0420225-(CIV), in the case of *Shatsky v. Syrian Arab Republic*, Civil Action No. 02-cv-02280 (RJL-AK), in the case of *Gilmore v. Palestinian Authority*, Civil Action No. 01-cv-00853 (GK), in the case of *Biton v. Palestinian Authority*, Civil Action No. 01 CV 382 (RWR) and in the case of *Leibovitch v. Syrian Arab Republic*, Civil Action No. 08-cv-01939 (WTH).

A copy of Dr. Strous' curriculum vitae is set forth as Exhibit "V.1-A."

In order to better understand the psychological evaluations and diagnoses set forth by Dr. Strous below, he has summarized for the Court three types of psychiatric disorders most commonly found among the Plaintiff members: Post Traumatic Stress Disorder, Dysthymia and Anxiety Disorder.

**Post-Traumatic Stress Disorder**

Post-Traumatic Stress Disorder ("PTSD") is a condition which develops from having witnessed or otherwise been exposed to life-threatening events, and is characterized by a distinct variety of symptoms, such as: avoidance, re-experiencing the event, and hyper-vigilance. Avoidance is the active escape from situations that the PTSD victim associates with an event; in the case of the Hezbollah Rocket Attacks a common such situation was rockets falling around one's residence. Re-experiencing is reliving the memory of the event. Hyper-vigilance is the result of the brain being overactive by sensory inputs, and usually is exhibited by is a cluster of symptoms that includes exaggerated startle response, inability to fall asleep and inability to stay

asleep.

PTSD victims often suffer from difficulty sleeping as a result of their hyper-vigilance. PTSD victims' fears and memories make it difficult to fall asleep and to stay asleep. This lack of restful sleep brings with it other consequences.

Patients with PTSD have dreams that are more vivid and intense than those of healthy people. The stimuli that cause the most stress to PTSD victims tend to recur in their dreams. Therefore individuals whose systems have been stressed by their experiences of being subjected to rocket fire, the sights, sounds and fears experienced during such experiences are likely to recur more frequently in their dreams than will other thoughts. Thus, PTSD victims often suffer from debilitating nightmares.

Another symptom commonly associated with PTSD is an exaggerated stress response. This is caused by PTSD victims' inability to distinguish between truly threatening stimuli and non-threatening stimuli. These victims also have great difficulty shutting down the stress response once the threat, real or perceived, has ended. By contrast, healthy people filter out stimuli to distinguish truly threatening stimuli from non-threatening stimuli. If stimuli appear initially to be threatening, a normal individual may have a "fight or flight" or other exaggerated initial response. However, most people are also able to shut down this stress response when the stressful event has ceased to occur.

Some have proposed that PTSD patients' exaggerated response to stimuli appears to be a result of a "sensory gating deficit." Many PTSD victims are not able to screen out normally inhibited stimuli (such as loud sounds and sirens, so the environment of such an individual can become a mind-boggling barrage of inputs which they cannot be processed normally. This results in exaggerated startle response, over-reaction to stimuli, including stimuli that would be

perceived by normal individuals to be *non*-threatening. Going into a "fight or flight" response when faced with normal everyday stimuli is extremely taxing on one's system, as one's entire body is enlisted in such a stress response - the pain stimuli throughout the body are temporarily depressed, the heart is excited and pumps faster, the rate of respiration increases, and glucose is pulled from the cells and channeled by the bloodstream to the muscles in need. The inability to appropriately regulate this stress response is fraught with problems. Continuous stress response causes digestive, respiratory, cardiac, immune system and reproductive system problems, and generally trigger a host of other problems, including: (a) Depression (a form of depression called "dysthymia" is common among PTSD sufferers), (b) Anxiety Disorder, (c) Low Attention (having a low threshold for attention or orientation), (d) Constriction of Affect, and (e) Difficulty Learning and Remembering (most often due to a physiological change in brain activity, referred to as a shrinkage of the hippocampus, which is caused by PTSD).

One known treatment to control PTSD symptoms problem is the use of anxiolytic medications. These medications "calm down" the system, reduce the damaging memories, and thus stop the overstimulation of the brain. But these medications have their own issues like side effects, and they do not work for all patients.

The effects of PTSD are severe. Patients are easily distractible due to their exaggerated response to stimuli. Individuals face considerably lowered employment prospects and increased likelihood of difficulty in forming and maintaining interpersonal relationships; for instance, PTSD victims have a much higher rate of divorce compared to non-victims. For those who are married or who are able to marry and have children, the stress of childrearing is greatly compounded. The inability to relax and have a good time is extremely common with PTSD patients. Some have suggested that PTSD patients who have not recovered five years after the

event are unlikely to completely recover.

## Dysthymia

Dysthymia is a chronic, "mild" form of depression. However, referring to it as "mild" is misleading, because it can last for years and it can be just as debilitating as a more acute episode of major depression (clinical depression)**, e**ven leading to thoughts of, or attempts at, suicide. Many of the symptoms of dysthymia are the same as those of major depression; however, in general they tend to be less severe or intense, though this is not a bedrock rule. Dysthymia also is associated with certain symptoms that may not occur with major depression. The hallmark of dysthymia is the length of time for which it persists. In adults, dysthymia is diagnosed when the symptoms continue for two or more years; in children or teens, the symptoms last for a year or more. Dysthymia is a serious condition that needs to be treated. Dysthymia may manifest itself in the following symptoms: sad moods, difficulty falling asleep or sleeping too much, increased or decreased appetite or weight, feelings of worthlessness, feelings of hopelessness, thoughts of suicide, anxiety, decreased motivation, loss of interest (anhedonia), irritability or anger, restlessness (especially in children) and certain physical symptoms.

## Anxiety Disorder

Anxiety disorder is a general term which includes several different forms of mental illness including abnormal and pathological fear and anxiety. Emotions found in anxiety disorders range from simple nervousness to bouts of intense terror. Anxiety disorder may markedly affect a person's function and quality of life and can be debilitation and lead to a lack of control over one's life. It is often rather difficult to treat anxiety disorder, and many patients

suffer a great deal in several aspects of their lives.

## II.    Dr. Alan Friedman, M.D.

Dr. Alan Friedman, M.D. (Dr. Friedman") examined Plaintiffs Chaim Kaplan and Michael Fuchs who have submitted a declaration in this case, and his expert opinion of such Plaintiffs will be included below where relevant.

Dr. Friedman is a Medical Doctor with extensive experience treating victims of violent trauma, including gunshot wounds, and administering pain management therapy in a variety of hospital and clinical settings in the United States and Israel. He also specializes in Physical Medicine and Rehabilitation, Internal Medicine, and nerve injuries.

Dr. Friedman received his M.D. from the Albert Einstein College of Medicine, Bronx, New York in 1993 and he is board certified, *inter alia*, by the American Board of Physical Medicine and Rehabilitation. He was previously board certified by the American Board of Internal Medicine. Dr. Friedman is also certified as a specialist in Rehabilitation Medicine in Israel, and is licensed to practice medicine by the States of New York and New Jersey as well as Israel. Dr. Friedman was elected as a Fellow of the American Academy of Physical Medicine and Rehabilitation in 2001, and he is a full member of the American College of Physicians/American Society of Internal Medicine, a member of the Israeli Society of Rehabilitation and Physical Medicine, the Israeli Society of Sports Medicine, & the Israeli Society of Musculoskeletal Medicine.

From July 1993 through June 1996, Dr. Friedman did a residency in Internal Medicine at North Shore University Hospital, Cornell Medical School in Manhasset, New York. Thereafter, from July 1996 through June 1999, he did his residency in Physical Medicine and Rehabilitation

at the Kessler Institute for Rehabilitation, UMDNJ/New Jersey Medical School in Newark, New Jersey.

Dr. Friedman's residency training in Rehabilitation Medicine involved substantial evaluation and treatment of trauma victims, including gunshot and shrapnel wounds, Traumatic Brain Injury, Spinal Cord Injury, peripheral nerve injuries, and pain management and other therapies associated therewith.

Currently, Dr. Friedman divides time between his work in my private practice in New York & New Jersey, and Laniado Hospital in Netanya, Israel – where he is currently the Department Head for a new Rehabilitation Medicine Unit. In both locations, Dr. Friedman has focused on the evaluation and treatment of numerous types of nerve injuries. Due to the prevalence of terrorism in Israel, during the past seven years, while working at Hadassah University Hospital in Jerusalem, Israel, Dr. Friedman evaluated and treated over a hundred trauma victims, many of whom suffered gunshot and/or shrapnel wounds.

Over the course of his career, including his residency and current work, Dr. Friedman has evaluated and treated hundreds of trauma victims, including both blunt and penetrating trauma. Penetrating trauma is anything that entails a significant penetration or laceration of the body. Examples include gunshot wounds, stabbings, and blast wounds among others. Blunt trauma usually results from a fall or having been struck with a blunt object (such as a pipe), but is no less serious. Either of these may result in anything from a slight or superficial wound to death. The spectrum entails Traumatic Brain injury (TBI) or Spinal Cord injury (SCI), and multiple fractures, and each of these may, accordingly, affect the patient's functional status in myriad ways. Much of the training in Physical Medicine and Rehabilitation focuses on these injuries and their resultant outcomes. As such, much of Dr. Friedman's time is and has been

spent diagnosing and treating these types of injuries. Many of the consultations and Electrodiagnostic tests that I perform on a daily basis involve patients with trauma. The evaluation and treatment consist of physical therapy, splints, assistive devices for ambulation or daily tasks, and medications.

Dr. Friedman has provided expert testimony in numerous United States court cases including in *Ungar v. Palestinian Authority*, CA No. 00-CV-105L) (the United States District Court for the District of Columbia), *Stern v. Islamic Republic of Iran*, C.A. 00- CV- 2602 (RCL) (the United States District Court for the District of Columbia), *Rubin v. Islamic Republic of Iran*, C.A. 01-CV-1655 (RMU) (the United States District Court for the District of Columbia), *Saperstein v. Palestinian Authority,* C.A.04-CV-20225-(PAS) (United States District Court in the Southern District of Florida), *Knox v. Palestine Liberation Organization*, C.A. 03-CV-4466(VM)(THK), (United States District Court, the Southern District of New York), *Biton v. Palestinian Authority,* C.A. 01-CV-0382 (RMC) (United States District Court for the District of Columbia), *Shatsky v. Syrian Arab Republic*, C.A. 02-CV-2280 (RJL) (United States District Court for the District of Columbia) and *Ben Haim v. Islamic Republic of Iran*, C.A. 00-CV-02602 (RCL) (United States District Court for the District of Columbia), *Wultz v. Islamic Republic of Iran ,* Civil Action 08-cv-1460 (RCL) (United States District Court for the District of Columbia).

A copy of Dr. Friedman's curriculum vitae is set forth as Exhibit "V.2-A."

## VI.     PLAINTIFFS' DAMAGES FROM THE HEZBOLLAH ROCKET ATTACK

### 1.     Chaim Kaplan.

Chaim Kaplan (only for purposes of this Section VI(1) and (2), "Chaim"), a U.S. citizen

(Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 1), was born in the northern Israeli city of Tzfat on October 28, 1974. Today he resides in the city of Tzfat with his family. (Exhibit A, ¶1 and 2) Chaim married his wife, Rivka Kaplan (only for purposes of this Section VI(1) and (2), "Rivka"), also a U.S. citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit ), on November 19, 1998. (Exhibit A, ¶4) Chaim and Rivka are the parents of eight children: Mushka, aged 12, Reuven Arye, aged 11, Menachem Mendel, aged 9, Chana, aged 8, Efraim Benyamin, aged 5, Shaina, aged 4, Yechezkel Yehuda, aged 2, and Devora Leah, aged 4 months. The oldest five of the Kaplan children were alive at the time of the Hezbollah Rocket Attacks. (Exhibit A, ¶5) Chaim and Rivka bring this action individually and on behalf of their respective minor children (as set forth above).

In the summer of 2006, Chaim was running a sleep-away summer camp for over 200 boys from abroad. (Exhibit A, ¶6) On the morning of July 13, 2006, Chaim was at the sleep-away camp located in the outskirts of Tzfat when he suddenly heard explosions nearby. He could see smoke and fire emanating from Mt. Meron, which is located approximately 5 miles from the campus. He quickly learned from news reports that the fire was the result of an unexpected rocket attack on Northern Israel perpetrated by Hezbollah in Lebanon. Chaim, along with and the other camp administrators, quickly assembled to determine how to get the children under their charge to a safer area for the next few days until the threat of more Hezbollah rockets would hopefully abate. (Exhibit A, ¶7)

Before Chaim had time to find an alternative camp site, he was startled by a series of thundering explosions - rockets being launched by Hezbollah into Tzfat and neighboring civilian population centers. (Exhibit A, ¶8)

Chaim immediately received a phone call from his wife Rivka, who was home in the city

with their five children. She and their children were all completely hysterical, obviously in shock from the trauma of being attacked. Chaim could hear his terrified children screaming in the background. A Hezbollah rocket had landed right next to the Kaplan home. Upon impact the rocket had exploded into thousands of fragments of shrapnel, which came flying through the kitchen window (where Rivka just moments before had been preparing dinner). Smoke from the explosion was quickly filling their apartment. The shrapnel had become lodged in several of the walls of the Kaplan home (including right above the couch on which one of the Kaplan boys had just been sitting), and glass had shattered everywhere and was strewn throughout the home. (Exhibit A, ¶9)

Chaim quickly made his way home. He and Rivka did not feel safe at home, so they moved the children across street to a relative's house. Later that evening Chaim drove into town, further to instructions provided by city authorities, in order to facilitate a planned visit to their home by insurance assessors scheduled for the next day. (Exhibit A, ¶10-11) As Chaim was driving home from the middle of town, he again suddenly heard a series of loud explosions which sounded like they were moving increasingly close to him. Chaim was very frightened both for himself and for the safety of his family. Then, suddenly, Chaim heard a loud whistle and a tremendous explosion. Then Chaim could not hear anything, and he knew that something "terrible" had occurred. He describes his harrowing experience:

> "I quickly realized that a missile had hit right next to the driver's side of my car. All of the windows of the car had shattered, and I felt a hard impact to the left side of my head. All of a sudden I noticed blood pouring from head onto my face and hands. I was very scared and did not know how badly I was hurt. I did not want to move but I was worried that I needed to seek emergency medical attention. I did not want to wait for an ambulance because

I did not know how long it might take and I was seriously bleeding from my head. I am not sure how I did it, but I managed to drive myself a little distance until I could proceed no longer as I had trouble seeing. I was able to stop the car and get out myself. A passing car, was full of people fleeing the city, saw me standing there covered in blood,. They stopped, picked me up and took me straight to the emergency room at the hospital."

(Exhibit A, ¶12)

For the next two hours the doctors at the hospital meticulously picked out glass and metal fragments from Chaim's eye, and they bandaged cuts to his face and hands. Chaim had trouble hearing out of his left ear, as the rocket exploded right next to the driver side of his car, and he was very afraid that his eyes and ears were seriously damaged. Chaim was also in shock and very worried about the safety of his family. The rocket attacks were continuing, and Chaim was scared that no one was going to be at home with his family to ensure their well being. Chaim was also concerned that when he did not arrive home they would panic and be scared that he had been killed. (Exhibit A, ¶13)

Rivka found Chaim at the hospital, and she stayed with him until he was discharged at approximately 1:00 am to make room for the large number of newly wounded victims of the Hezbollah Rocket Attacks who had arrived to the hospital. The rocket attacks were killing and injuring many people and every hospital bed was needed. (Exhibit A, ¶14 and Exhibit B, ¶16)

When Chaim and Rivka arrived home, they decided that they needed to leave Tzfat right away. With so many rockets landing on the city, Chaim was praying that they would have time to get out of the vicinity alive. Chaim told Rivka that they did not have time to pack or make preparations, but rather had to leave at once without delay. Chaim was not feeling well enough to travel but he was determined to get his family to a safer place as soon as possible. (Exhibit A,

¶15)

The Kaplans were forced to flee their home for the next six weeks, for the balance of the Hezbollah Rocket Attacks. They had to just leave everything in their home just as it was, and move in with friends in Jerusalem for the next six weeks until the Hezbollah Rocket Attacks ended. The apartment the Kaplans moved into was very crowded, but they had no other choice. Thousands of families from the northern cities within range of the Hezbollah Rocket Attacks were fleeing their homes and taking shelter wherever they could find it. Two large families sharing one already small living space was hardly comfortable, but the Kaplans were grateful at least to be safe from more Hezbollah rockets. (Exhibit A, ¶16)

Since the end of the Hezbollah Rocket Attacks, the Kaplans have struggled in various ways to cope with the traumatic events they experienced while being the targets of rockets fired on concentrations of civilian populations like their city Tzfat. The Kaplan children have suffered various psychological problems as a result of coming under attack from the Hezbollah Rocket Attack. (Exhibit A, ¶17)

Since the day Chaim was injured by a Hezbollah rocket, he has suffered from lingering injuries and trauma. Chaim lost a significant part of my hearing in my left ear. He is also plagued by an intense and constant itching in this ear, which neither medication nor therapy has been able to alleviate. It is a constant, nagging problem. Chaim also is constantly hearing echoes out of his left ear - background noises are amplified and reverberate, and interfere with his ability to clearly hear people speaking and other important sounds. He also cannot enjoy moments of tranquility and quiet, as even "white" noise causes annoying reverberations in his ear. (Exhibit A, ¶18)

Chaim's injuries have significantly impacted his ability to perform his duties as a community Rabbi. Being a community leader, Chaim often needs to be on the phone with

congregants and the hearing damage he sustained as a result of the rocket attack has made it harder for him to communicate by telephone. Chaim also has struggled with public speaking (he does not realize that he must speak much louder than he thinks) and he has trouble hearing questions from the audience. The doctors have informed Chaim that he needs to have an operation to attempt to improve his hearing and his related symptoms, but as no result is guaranteed he is apprehensive to undergo such a serious procedure. (Exhibit A, ¶19)

Dr. Friedman recently performed an extensive physical examination of Chaim, after which he detailed the extent of Chaim's injuries and their effects on his life. (Exhibit B, ¶14) The first part of this examination was to record Chaim's past medical history. To this end, Dr. Friedman referred to the emergency room notes of Ziv Hospital in Tzfat, Israel, dated July 14, 2006, as well as to Chaim's other medical reports. (Exhibit B, ¶11)

At Ziv Hospital, Chaim was diagnosed with an internal left eye hemorrhage, a foreign body in his inner left eyelid, a left corneal abrasion, a left corneal foreign body, a laceration of his nose, and a laceration of his left shoulder and hand. (Exhibit B, ¶11) Glass fragments were removed from Chaim's left eye, his nose injury was sutured, and his shoulder and hand injuries were bandaged. Chaim followed up at Hadassah University Hospital in Jerusalem, Israel, to remove his sutures (he had, after sustaining his injuries, relocated out of the war zone). (Exhibit B, ¶13)

Dr. Freidman further relates that Chaim's hearing loss was evaluated on July 15, 2007, which revealed that he suffered from tympanic membrane A type in the left ear and type C in the right ear, and, rather significantly, a 40-decibel hearing loss on the left side. A further audiology examination dated April 16, 2012, revealed a "moderate" conductive hearing loss on the left side, normal right hearing, and a tympanogram type A in the left ear - reflective of inner-ear

muscle imbalance or eardrum scarring. This evaluation demonstrated that the 40 decibel hearing loss in Chaim's left has not improved from the date he suffered such injury. (Exhibit B, ¶11) Dr. Friedman states that Chaim continued to have pain in the left ear, and decreased hearing and tinnitus, and that he reports undergoing numerous evaluations but that no specific treatment was instituted. (Exhibit B, ¶13)

Dr. Friedman's examination revealed that at this time Chaim continues to suffer from moderate hearing loss in the left ear and that he also endures ongoing, mechanical low back pain. (Exhibit B, ¶14)

Regarding Chaim's hearing loss, Dr. Friedman specifically states:

> "He [Kaplan] still has diffuse hearing loss, but this is worse in the left. He has tinnitus which is worse in the left ear, which has partially improved. His most recent audiology examination was on April 16, 2012, with a diagnosis of moderate decreased hearing in the left ear." (Exhibit B, ¶14)

> ...Having reviewed the latest audiology test with an audiologist, the following statements can be made: His hearing loss is more severe than would be expected from his age alone. Similarly, if it was solely due to a perforated tympanic membrane it should have repaired itself by this time. There has been no improvement in his hearing since the testing done in 2007 until the test of April 2012. Both display the 40 decibel loss in the left ear. Ossicular discontinuity suggests that the ossicular chain (the 3 bones of the middle ear) were somehow dislocated. (Exhibit B, ¶30)

> This injury can be expected to remain unchanged – or worsen with time – unless surgery is performed. He will likely have difficulty localizing the source of sounds, differentiating speech in noisy

environs, and have social difficulties with speakers on his left side. The functional implications include difficulty localizing sirens while driving (or walking), as well as being unable to perform certain jobs. He may need hearing aide/s at a younger age than he would have otherwise." (Exhibit B, ¶31)

Dr. Friedman further states that Kaplan also started suffering low back pain approximately six months following his injury. Dr. Friedman explains that Chaim's back pain is intermittent and radiates up to the mid-back region, but not to his extremities, and that colder weather increases the pain, but there are no specific exacerbating positions or relieving positions. (Exhibit B, ¶15) Dr. Friedman determines that: "His [Chaim's] back pain is likely to ebb and flow, but will make it difficult for him to obtain any employment which requires repetitive lifting or bending. Similarly, he may develop early spinal arthritis or spinal stenosis, with resultant weakness and sensory symptoms (or worse)." (Exhibit B, ¶32)

The Hezbollah Rocket Attacks also caused Chaim and his family lingering psychological trauma. Chaim still gets tense and startled anytime he hears planes fly overhead, thinking that there must be some escalation of tensions and that another war is imminent. Similarly, when Chaim hears news reports about the hostilities in the South of Israel (like when rockets are being shot at Israeli cities from Gaza), these events make the Kaplans relieve their experiences of being human targets for Hezbollah. These feelings of trauma require Chaim to calm himself down before he can continue on with his regular routine. (Exhibit A, ¶20)

The Kaplan children, Muska Kaplan, Reuven Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan, have been similarly traumatized from the attacks. They had trouble sleeping for a long time after the Hezbollah Rocket Attacks ended, and they still don't like to be alone even at home. The Kaplan children were very jumpy, especially from any kind of loud noise, for

about a year after the Hezbollah Rocket Attacks ended, and they still many years later become startled easily and become anxious easily from small things. These several years since the Hezbollah Rocket Attacks have only partially managed to alleviate the difficult emotional trauma the Kaplans still harbor. Chaim comments, "It [this trauma] is something my family carries with them every day." (Exhibit A, ¶21)

Specifically, the Kaplan children have been affected as follows:

Plainitff Mushka Kaplan (only for purposes of this Section VI(1) and (2), "Mushka"), is a U.S. citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 3), aged 6 years old at the time of the Hezbollah Rocket Attacks, has experienced the most profound emotional trauma or all the Kaplan children. Since the rocket exploded right next to the Kaplan home on the first day of the Hezbollah Rocket Attacks, Mushka has become introverted, which has been a marked departure from her usual bubbly self. For the six weeks the Kaplan's were forced to be away from their home, Mushka lost interest in food. But even after the Kaplans returned home, Mushka's demeanor remained changed. She suffers from insomnia and night terrors, and she shows little interest in socializing with other children her age. Rather, Mushka generally wants to stay at home, close to Rivka. (Exhibit A, ¶18)

Plaintiff Reuven Arye Kaplan (only for purposes of this Section VI(1) and (2), "Reuven"), is a U.S. citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 4) aged 5 at the time of the Hezbollah Rocket Attacks, has become so clingy to Rivka that it impacts his daily living – making it difficult for Reuven to go to school or socialize. To this day, Reuven has been obsessed with safety: when going out he always asks if there is a bomb shelter close by, he has memorized evacuation plans and safety procedures, and he becomes extremely agitated if others are uncooperative in his safety preparation exercises. (Exhibit A, ¶19)

Plaintiff Menachem Mendel Kaplan (only for purposes of this Section VI(1) and (2), "Menachem"), is a U.S. citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 5), aged 4 at the time of the Hezbollah Rocket Attacks, has nightmares and trouble sleeping. Taking cues from his older siblings, he is clingy and introverted. Menachem seemed especially shaken when Chaim returned home from the hospital bandaged and bloodied, and is constantly anxious about his father's well-being. (Exhibit A, ¶20)

Plaintiff Chana Kaplan (only for purposes of this Section VI(1) and (2), "Chana"), is a U.S. citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 7), 2 years old at the time of the Hezbollah Rocket Attacks, also wakes from sleep in a panic. While Chana did not understand what was happening at the time, the effects on her have nonetheless been significant. It took Chana longer to become toilet trained than the other Kaplan children. Additionally, her home environment has totally changed, and she is worse because of it. Chaim's and Rivka's emotional traumas have impacted the character of the home – a change Chana may not recognize, but significantly impacts her nonetheless. (Exhibit A, ¶21)

Although just a baby at the time of the Hezbollah Rocket Attacks, Plaintiff Efraim Benyamin Kaplan (only for purposes of this Section VI(1) and (2), "Efraim"), is a U.S. citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 6), has also been affected by the trauma his family suffered. The impact of the war on the family has played a pivotal role in Efraim's development: his siblings and parents have been changed for the worse, and the home is now one of anxiety and trauma on a bad day, and a home focused on healing on a good day. (Exhibit A, ¶22).

**2.      Rivka Kaplan**.

Rivka is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 2) who was born in Morristown, New Jersey on April 3, 1976. (Exhibit C, ¶1) As stated above, Rivka and Chaim bring this action individually and on behalf of their respective minor children (as set forth above).

On July 13, 2006, the opening day of the Hezbollah rocket Attacks, Rivka was home with her five children (the youngest three Kaplan children had not yet been born). When the rockets starting hitting Tzfat, Rivka at first thought that the explosions were the sounds of Israeli jets breaking the sound barrier (these noises are not uncommon to residents of Northern Israel). But as the noises became louder and more frequent, she became concerned that they might be something more sinister, and walked out of the kitchen where she had been preparing lunch and quickly gathered her children. Rivka quickly herded the children into their home's reinforced security room.[8] (Exhibit C, ¶5)

Rivka and her children had entered their reinforced room just in time. Just as they crossed the threshold of the room, the Kaplans were suddenly shaken by an extremely loud explosion. The blast was so loud and violent that Rivka and her children were all shaken into a stunned state of shock. A Hezbollah rocket had exploded right next to their home, and burning shrapnel came whizzing through the kitchen window where Rivka had stood, just moments before, preparing dinner. Fragments of shrapnel also penetrated the wall over the couch, on which one of the Kaplan boys had just been reading. They were all in sheer terror and did not know what to do. While Rivka was certain that a rocket had hit their home, since they were holed-up in the shelter

---

[8] Every Israeli home built after the 1991 Gulf War is required to contain a dedicated reinforced room that serves as a bomb shelter, as mandated by law. In the event of a missile attack, a siren is supposed to sound in order to give residents sufficient warning to scramble to a bomb shelter or security room. No siren or warning signal had sounded at this time.

room there was no way to inspect and assess what damage had occurred. Rivka did not know whether to open the door and leave the building or stay locked inside. And they were of course all worried about Chaim, who at the time was away from home at work. (Exhibit C, ¶6)

The Kaplan children especially were very scared and screaming hysterically. Rivka tried staying composed because she knew that the kids were watching her, but it was not easy as she felt panic overwhelming her. Rivka recalls, "We all felt afraid for our lives and I envisioned the ceilings and walls collapsing on us. I feared what destruction awaited on the other side of the door." (Exhibit C, ¶7)

Smoke began to creep into the Kaplan home from the explosion just outside, and various objects in the home had fallen to the floor and shattered. The air had a terrible smell of burning chemicals and smoke. Rivka was very concerned that a fire was raging and afraid that they could die from smoke inhalation if they stayed locked in the room. (Exhibit C, ¶8)

Rivka immediately tried to call Chaim, who was out running a children's summer camp. She wanted to make sure that he was safe and tell him that their home had been hit by a rocket, and she wanted Chaim to come home to be with her and the children. When Rivka reached Chaim she told him about how the rocket had hit the house and about how shaken up they were. Chaim could hear the children crying and screaming and he understood they were all terrified. The police and emergency workers quickly arrived and Rivka swiftly moved her children outside to get to her mother-in-law's house (which is situated just across the street). Rivka was instructed not to touch anything in the house because it could be covered with chemicals or other flammable materials from the rocket. (Exhibit C, ¶9)

Chaim came rushing home and he surveyed all the damage to their house. He was very upset but yet tried to calm down the children. The Kaplan family stayed at the home of Chaim's

mother for the rest of the afternoon. As the children's bedtime neared, Rivka and Chaim decided that it would be best to go home for the night - they did not expect another rocket attack and they believed that the worst was behind them. (Exhibit C, ¶10)

After moving the children back to their home, Chaim decided to drive into town to pick up some forms from a governmental office that was still open, so that the property assessor who was scheduled to visit the next day would have what he needed to process our claim. They had been told to try and meet with them as quickly as possible. (Exhibit C, ¶11)

As Rivka put the children to bed, she tried to calm them by telling them that there was nothing to worry about and that there were not going to be any more loud noises - that they were safe and that everything was going to be alright. She hoped that Chaim would return home very quickly because she was still very shaken up from the afternoon's rocket explosion. (Exhibit C, ¶12)

Rivka's stomach turned when, within a minute of assuring her children in this manner, she heard the sound of new rockets exploding nearby. Rivka rushed the kids back into the reinforced room and they tensely waited and listed helplessly while Tzfat withstanding a prolonged bombardment. They heard near-by explosion after explosion and were horrified that the rockets were reaching so close to them again. Rivka was also terrified that Chaim might get caught up in the attacks while he was out in the street. She had no idea where the rockets were falling or where exactly her husband was. (Exhibit C, ¶13)

A few minutes later Rivka received a call from Chaim. He told her that he had almost been directly hit by a rocket near his car, that he had been injured and that he was being taken to the hospital. Before Rivka could respond with questions the phone line went dead. Rivka was very scared and nervous. Chaim had sounded terrible, and while he had tried to reassure her

during their brief conversation, Rivka understood that he was seriously injured. (Exhibit C, ¶14)

This obviously sent Rivka into a panic. She had no way to reach Chaim and was scared about his condition and horrified that more rockets were landing all around them. Rivka tried to calm the children in vain. They sensed that something had happened and kept demanding that their father come home to be with them. During a lull in the barrage of exploding rockets, Rivka darted out from the reinforced room quickly to gather a few provisions so that they could spend the night there more comfortably. Rivka was very nervous about Chaim and felt that she had to go the hospital to determine if he was alright. Rivka's sister-in-law had joined the children in the reinforced room, and Rivka had her watch the children once they fell asleep so that she could go locate Chaim in the hospital. Rivka then left her home with her five children asleep in the security room as she fearfully headed out into the midst of the rocket attacks to search for her injured husband. (Exhibit C, ¶15)

When Rivka arrived at the hospital, she managed to find Chaim in the emergency ward. His left eye and other parts of his head were heavily bandaged. Rivka was shocked to see Chaim this condition and was concerned about his eye and head. The emergency ward, like emergency wards all over northern Israel, was quickly filling up with people injured from the Hezbollah Rocket Attacks and there was a great deal of noise, sirens and confusion as the wounded were being brought in by ambulance and on stretchers. The hospital staff was trying heroically to treat the most serious cases and to free up beds and equipment for the incoming wounded. Rivka stayed with Chaim until he was discharged early the next morning - as space was needed for life threatening cases - and they went home together. (Exhibit C, ¶16)

Rivka and Chaim quickly realized that the rocket attacks were not going to be an isolated event, and they right away made plans to leave their home until the deadly barrages ceased. They

had no idea that it would be six long weeks until they were able to return to their home. The Kaplans stayed with friends during this period, which was a time of great confusion and uncertainty. The Kaplans did not know from day to day what would happen or when they might be able to return home. Rivka and Chaim were also very concerned for their children, who had already suffered significant trauma in being victim to numerous rocket attacks. And they were also fearful of what was happening to their apartment and property, and how their community and neighbors were surviving the ongoing Hezbollah missiles. (Exhibit C, ¶17)

When the rocket attacks finally came to an end, the Kaplans immediately returned home to try and rebuild their house and their lives. Since the Hezbollah Rocket Attacks ended, Rivka and her family have struggled in various ways to cope with the traumatic events they experienced at the hands of Hezbollah. The Kaplan children suffered significant and prolonged psychological trauma as a result of coming under repeated rocket attacks. (Exhibit C, ¶18)

Chaim's head and eye took a very long time to heal. He also suffered very serious hearing loss as a result of the rocket attack that almost killed him. Chaim still has trouble hearing and speaking. The injury to his ears greatly affects his ability to work, since speaking publicly and teaching are integral components of his job. His injuries also have created all sorts of difficulties for him in his private life. Chaim is frequently troubled by noises and ringing in his ear and he suffers terribly and complains frequently about this. Chaim also is bothered by a constant itch inside his ear. He has been to many doctors for treatment but nothing seems to improve his condition. Chaim's doctors have recommended surgery to attempt to alleviate some of his impairment, but he is afraid to undergo the operation for fear the injury could worsen. (Exhibit C, ¶19)

After the Hezbollah Rocket Attacks ended, the Kaplan children had trouble sleeping for a

long time, and when the Kaplans finally returned home, for many months afterwards the children did not want to be alone in a room by themselves. In fact, Rivka states that until this day they still don't like to be alone, even at home. For a long time, any kind of loud noise would trigger memories of the falling rockets and create much anxiety for them. The Kaplans have tried to reassure their children, but they are very nervous and worried about them. (Exhibit C, ¶20)

As set out above, the children of Rivka and Chaim Kaplan, plaintiffs Mushka, Reuven, Menachem, Chana and Efraim Kaplan, suffered and continue to suffer emotional distress and the psychological repercussions from having been subjected to defendant Hezbollah's missile attacks.

Rivka still gets tense thinking about the Hezbollah Rocket Attacks and how vulnerable her family still is. Not much has changed since the Hezbollah rockets struck their home, as far as their ability to defend against incoming rockets (they still have no ability to protect themselves other than to burrow inside a security room or bomb shelter when the warning sirens sound), and they know that it is only likely a matter of time before Hezbollah will rear its evil head and again decide to attack. (Exhibit C, ¶21).

**3.     Karene Ardstein.**

Karene Ardstein (only for purposes of this Section VI(3) and (4), "Karene"), is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 8) who was born in Columbus, Ohio in 1976 and lives in the northern Israeli city of Tzfat. (Exhibit D, ¶1 and 2) Karene met her husband Brian Ardstein (only for purposes of this Section VI(3) and (4), "Brian"), who is also an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 9), in Israel in 1996. (Exhibit D, ¶3) The Ardsteins have five children, four of whom were alive during the Hezbollah Rocket Attacks. Their oldest daughter, Mayan, a U.S. citizen

(Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 12) was severely traumatized by the Hezbollah missiles and has suffered significantly from serious resulting psychological effects, which have markedly altered the course of her life. (Exhibit D, ¶4) Karene and Brian bring this action individually and on behalf of their minor children daughter, Maayan Ardstein (as set forth above).

Karene is trained as a registered nurse and doula, but because of the trauma she suffered during the Hezbollah Rocket Attacks she has from that time been unable to pursue these professions. As such, her only income since that time has been from classes she teaches as a pottery teacher. (Exhibit D, ¶5)

In the early afternoon of July 13, 2006, the first day of the Hezbollah Rocket Attacks, Karene was in the kitchen of her home in Tzfat preparing a meal when a series of explosions rocked her house. The blasts were extremely loud and were simply terrifying. Brian had been outside standing very close to where one of the rockets exploded, and was badly shaken by what he had witnessed. A number of rockets had exploded just a few houses away from the Ardstein home, and their peaceful, residential neighborhood was suddenly cast into chaos. Twenty minutes later, another volley of rockets exploded in rapid succession near their home; the Ardsteins later learned that one of these rockets instantly killed one of our neighbors. As one can imagine, their entire neighborhood was hysterical at coming under these sudden and totally unexpected attacks. (Exhibit D, ¶6)

Karene was completely stunned that she and her family had only nearly averted becoming victims of a terrorist assault, and that the peacefulness of their idyllic life in Tzfat had been so suddenly and brutally shattered. She describes being caught in the middle of a rocket

attack as being "terrifying and surreal"[9] (Exhibit D, ¶6)

All of the Ardstein children, U.S. citizens (Exhibit FF, Tolchin Passport Declaration, Internal Exhibits 10,11) were obviously frightened by the rockets exploding around them, and were clinging on to Karene. But the Ardstein's oldest daughter Mayan, who was eight years old at the time, was completely hysterical. She was shrieking and crying at the same time, and could not be consoled. Karene was doing everything she could to calm down her children, and to keep herself calm, especially as she was four months pregnant at the time. (Exhibit D, ¶7)

After the second series of rockets hit near the Ardsteins, Brian and Karene decided that it was not safe for them to stay at home any longer (they did not have a bomb shelter and they did not know of any public shelter that could accommodate them), and thus that they needed to flee Tzfat immediately. The Ardsteins did not own a car, and thus jumped at the chance of a ride out of town when they saw their neighbors frantically packing up their car to head south. The neighbors were in such a hurry to flee the war zone that they didn't even take the time to replace the rear car seats that they had removed that morning while cleaning their car, so the Ardstein family piled in to the rear of the seat-less back seat so that both families could evacuate. (Exhibit D, ¶8)

The Ardsteins didn't have any close family living in Israel and they didn't want to burden anyone, so they really didn't know where they were going or what they were going to do. But after witnessing the trauma of a rocket attack on their home, they just knew that they had to jump at the chance of getting out Tzfat as soon as possible. Thus they left suddenly without even the most basic essentials - just some clothing and a little money - with no time to think about packing provisions for even a few days. In any event, the Ardsteins did not expect to be away for

---

[9] As Karene grew up in suburban Ohio and had never been near any military conflict, and being in the middle of a rocket attack was simply terrifying and surreal.

long, as they assumed that the rocket threat would be quickly neutralized by the Israel Defense Forces, and that they would be returning home in a few days. (Exhibit D, ¶9)

On their cramped car ride down south, the Ardsteins decided to stay with friends in Bat Ayin, a community located near Jerusalem where they had lived prior to moving to Tzfat. While the Ardsteins felt uncomfortable moving in with these friends, who had six children of their own, they really had nowhere else to turn. Exacerbating their discomfort was the fact that these friends were in a rather tight financial situation, and the Ardsteins didn't want to impose. They quickly found that something as simple as having breakfast was a great stress - 10 kids trying to equitably split up a pot of oatmeal was no simple task, and it made Karene embarrassed to be eating their friends' food. Karene did go to a local grocer to purchase some food with the little money she had, but this still felt to be inadequate. After a few days it became abundantly clear to Karene that they were imposing on the goodwill of their hosts, and the Ardsteins resolved to move on even though they had nowhere to turn. The entire north of the country was under attack and many government agencies tasked with helping those who had to flee the danger were completely overwhelmed by the magnitude of the crisis and thus were unable to help the Ardsteins. (Exhibit D, ¶10)

After two days the Ardsteins realized that the rocket attacks were not going to be over so quickly and, thus, that they were going to remain refugees for a while. They decided to go to the city of Ranana, where they heard that other refugees from the north had fled and where relatively inexpensive monthly rentals could be obtained. From Bat Ayin, the Ardsteins took a three hour bus ride to the city of Ranana, where they were able to rent a tiny apartment (it had only one small bedroom and was so small that it barely accommodated a single bed, with no room to spare). But even this rental was a stretch financially for the Ardsteins. They were able to borrow

$4,000 from Brian's parents in order to cover a month's rent and to pay for a few very basic necessities - like underwear for the kids (they fled Tzfat without even a change of underwear), soap, medicine and brushes for the kids (who had all contracted lice). The Ardsteins were able to conserve what little money remained by eating meals at a shelter for indigent families. This was terribly embarrassing for all of them, especially for Mayan, who feared that she might be seen by someone she knew. (Exhibit D, ¶11)

Brian was not well during this time. He was suffering terribly - to the point of being incapacitated - from the trauma of witnessing one of the rocket attacks and from being forced from their home. For the first two weeks of the ordeal Brian was unable even to just help out with the children, and Karene was becoming increasingly over-extended. There were just too many demands on her, and the pregnancy was sapping all of her remaining strength. Since the Ardsteins were not in their normal surroundings, their children had no friends to play with, and they needed constant attention[10]. Even the positive things about Ranana were difficult for Karene to navigate. While they now could benefit from the advantages of being in a relatively safe city, away from where the rockets were falling, full of parks with kids laughing and screaming in joy, the Ardstein children were too traumatized to appreciate this, and watching the carefree children run around made them feel even worse. (Exhibit D, ¶12)

Karene's health was continuing to falter. She was increasingly feeling very down, even depressed, and had extremely low energy. Karene was even finding it hard to breathe fluidly and she feared that the incredible stress she was under could affect her pregnancy. The anxiety she was under started causing heart palpitations, and then she started noticing drops of uterine bleeding, which was obviously alarming and made her concerned that there might be a serious

---

[10] The Ardsteins, like many religious parents in Israel, for faith-based reasons do not let their children watch television, so even this classic "babysitter" was unavailable.

problem with the pregnancy. As soon as she noticed this bleeding, Karene immediately made an appointment for an ultrasound in the nearby city of Bnei Brak. (Exhibit D, ¶13)

Karen calls this appointment "the single most devastating experience of my life." As the ultrasound was being conducted, Karene could see the outline of her baby on the monitor - it was really small, but she could clearly see the baby's hands and feet. Karene recalls, "After checking me, the technician just turned to me and stated dryly, 'There's no heartbeat....sorry'. Just like that. I felt like someone had just punched me hard in the stomach and I was gasping for breath. My head was spinning. I felt that there had to be some mistake and asked the technician to check again, but I was curtly given the same result. My baby was dead!" (Exhibit D, ¶14)

A doctor then appeared and informed Karene that she needed to undergo a necessary procedure after a miscarriage.[11] This required Karene to have general anesthesia, which was really difficult for her because she had always been a strong believer in natural birth and natural remedies. Karene then remembers "running outside, and then just breaking down on the street corner, sobbing uncontrollably." (Exhibit D, ¶15)

Karene further recalls, "I just felt so sick to know that I was walking around with my dead baby inside of me. And I felt so alone - Brian couldn't accompany me because someone had to stay with the kids. And I knew that he was barely managing even that. I couldn't even call him on my cell phone, because its battery had run out and in the haste of leaving our home we had forgotten to bring the chargers. So I was completely alone, and really scared." (Exhibit D, ¶16)

So Karene went to the home of someone she knew in Bnei Brak, a single woman who had a spare mattress on the floor for her, and she took some medication they had given her to

---

[11] This was called a "D&C", or dilate and curettage.

prepare for the operation. That night was extremely difficult for Karene - not just emotionally but also physically - as this medicine was meant to induce a labor-like response, and she stayed up most of the night suffering from terrible cramps. (Exhibit D, ¶17)

The next day Karene went to have the procedure, but she asked for them to check her one more time, because she just didn't want to believe that she had really lost the baby. But the second ultrasound unfortunately yielded the same result. After the procedure, Karen just remembers feeling horrible. She says, "It was a devastating loss. And I was so angry - if I had just been able to stay at home and take care of myself like I would have under normal circumstances, then I am sure I would have been fine. But all the extra trauma of surviving a rocket attack, being chased out of our home, being homeless and cash strapped, imposing on friends and eating in shelters, and having to take care of the children essentially all on my own - it was simply too much for me." (Exhibit D, ¶18)

Once Karene was discharged she rejoined Brian and her children in Ranana. Her recovery was less than ideal - she had to sleep on the single bedroom mattress with all of the kids on top of her, while Brian slept on a mattress in the kitchen. Karene then suddenly became very ill - she couldn't hold down any food and was vomiting repeatedly - and she spent the next few days not moving from the bed, with high fever and shivering. When Karene knew that she had to get medicine, she went to see a local doctor who diagnosed her with tonsillitis. Karene's first round of antibiotics did nothing, and then she was given a stronger type which worked but also made her very nauseous. And all during this time Karene continued to have heavy uterine bleeding, with heavy discharges of blood including big blood clots. (Exhibit D, ¶19)

Karene also at this time started experiencing post-partum depression, which she only later learned is not uncommon in cases like hers. But Karene had no idea at the time that this was

what was happening to her; she just knew that she was depressed and completely overwhelmed, and couldn't handle her children. Karene recalls the desperation she felt at this time by saying, "I just wanted them [her children] to go away. And, frankly, at times I just felt that I wanted to die." (Exhibit D, ¶20)

When the Hezbollah Rocket Attacks finally ended, the Ardstein family was finally able to return home. But that was not the end of their troubles. They owed a lot of money and at first had no money to get the kids new shoes or other necessities. Brian, a tour guide, had lost his entire income from the high season of his work - which usually was enough to take care of their needs for the entire year.

Aside from missing a huge part of their annual income, depression and anxiety lingered in both Karene and Brian. They both fought with depression and constant nervousness, the loss of their baby and their damaged relationship with each other due to the tremendous stress the whole ordeal had put on our marriage. (Exhibit D, ¶21)

Brian also became increasingly anxious about another rocket attack. He borrowed a large sum of money from the bank - that they are still paying off six years later - to build a bomb shelter under their home. Karene says that Brian became compulsive about this, because he is consumed by the notion that of protecting against the next Hezbollah Rocket Attacks so that they will never have to be refugees again. Karene explained, "He [Brian] is always stocking the room [private bomb shelter] with another can of tuna or bottled water. We could probably live down there for three years. I catch him all the time compulsively sneaking something else into the shelter, as if it's really needed. It's very sad to witness him fearfully storing supplies in anticipation of the next rocket attacks on our home." (Exhibit D, ¶22)

Another significant result of the rocket attacks was that Karene's professional ambitions

were squashed. From a young age, she had always dreamed of being a midwife. She took two extra years of nursing school with this objective specifically in mind, and then worked for a year after which she studied for a very challenging exam in order to get her midwife credentials. But Karene's nerves "are shot now", and she just cannot handle the stress of this type of work anymore. Her miscarriage also created certain long term images that continue to haunt her. So sadly, Karene feels that she is no longer capable of following through anymore with what, prior to the Hezbollah Rocket Attacks, had been one of her major life goals. (Exhibit D, ¶23)

The saddest consequence of the Hezbollah Rocket Attacks for the Ardsteins was the emotional decline of their daughter Mayan, who since the Ardsteins returned home following the Hezbollah Rocket Attacks has been caught in a "downward spiral". The entire episode of the war caused Mayan deep trauma at a very impressionable age, and this has unfortunately had a very significant influence on her life. At first she was just moody and extremely jumpy - edgy about noises and being alone - which Karene and Brian thought was a normal reaction to the trauma she experienced. Despite their encouragement, Mayan refused therapy and stayed very closed - never wanting to talk about her feelings. Since Karene and Brian didn't know how to relate to Mayan, they sent her to one of the best schools for counseling teens with issues like hers. To this day, Maya, who now is 15, no longer lives at home, but attends a boarding school that Karene and Brian feel is a better environment for her. (Exhibit D, ¶24)

But this new environment could not sufficiently help Mayan. Karene and Brian were horrified when Mayan recently attempted suicide, by slitting her wrists with a blade. She was rushed to the hospital and thankfully she is physically okay, but obviously Mayan continues to be a very hurt and damaged young woman. Karene and Brian knew she was struggling but did not realize the extent of her pain, and they are just completely distraught. (Exhibit D, ¶25)

There is no doubt in Karene's mind that Mayan would not be in such a dire circumstance today had it not been for the trauma she suffered during the Hezbollah Rocket Attack. (Exhibit D, ¶27)

Regarding the other Ardstein children, since they were very little at the time of the Hezbollah Rocket Attacks, Karene cannot point to a direct change in their behavior, but the effects of the Hezbollah Rocket Attacks undoubtedly dramatically influenced their lives. Prior to the Hezbollah Rocket Attacks, the Ardsteins were a happy and normally functioning family, and after the Hezbollah Rocket Attacks they became a trauma-struck family, with parents and an older sister changed almost beyond recognition. (Exhibit D, ¶28)

Dr. Strous examined Karene and stated, "Mrs. Erdstein displays some form of PTSD, depression and Adjustment disorder either currently or in the past as a result of being directly exposed to rocket fire and its aftermath with fleeing her home town and undergoing a miscarriage 2 weeks after leaving her home during the second Lebanon War. Based on my evaluation of Mrs. Erdstein, I believe that many of her symptoms with which she has been diagnosed are likely to be present in varying degrees for a significant time to come and while it is impossible to state for any absolute certainty, many of the symptoms may even be permanent." (Exhibit E, ¶22 and 23)

## 4.     Brian Ardstein

Brian is an American citizen who was born in Detroit, Michigan in 1970 and lives in the northern Israeli city of Tzfat. (Exhibit F, ¶1 and 2) As stated above, Brian and Karene bring this action individually and on behalf of their minor daughter, Maayan (as set forth above).

On the first day of the Hezbollah missiles, the Ardsteins were are home, and suddenly

heard several loud explosions in the vicinity, but did not give them much thought.[12] Later that afternoon, Brian was standing in the courtyard outside their home when a rocket suddenly passed right over his head. It passed by so close to Brian that he could actually feel the heat of the rocket on his skin. Brian describes this as a "surreal and terrifying experience." While it took Brian a moment to process what was happening, as soon as he realized what the rocket was he dove into a corner of the courtyard for cover. This rocket exploded a few houses away from where Brian had been standing and this explosion and several others which followed in short succession led him to realize that his family was now under fire from Hezbollah rocket volleys. (Exhibit F, ¶5)

Brian was in complete shock, and had trouble collecting himself. As a knee-jerk reaction, he ran up to his roof (admittedly, he says, "not a very smart reaction") to survey the scene and try to understand what was happening. There he observed a plume of smoke two stories high just down the road. (Exhibit F, ¶6)

Twenty minutes later another barrage of rockets again came right at the Ardstein home. This time, after the loud explosions made by impact, Brian heard complete silence, which was then followed by a very eerie sound - a neighbor wailing in grief. Brian said, "This was terrifying. As neither our home nor the homes of any of our neighbors had a bomb shelter, we didn't know what to do or where to go. So we simply huddled together and prayed that the rockets wouldn't land on us. It was a horrific feeling. We were too scared to leave the house and felt like we could be killed any moment. I was scared for my wife and children and felt that I could not simply leave them unprotected. Everyone was crying and fearful. We later found out that the wailing had come from a family member of one of our close neighbors who took a direct

---

[12] Residents of northern Israel often hear air force jets breaking the sound barrier, which can sound like an explosion, and the Ardsteins had no idea that a Hezbollah rocket attack on their home was possible, much less imminent.

hit from that rocket and was killed." (Exhibit F, ¶7)

When this second rocket barrage seemed to end, Brian with his wife Karene mutually concluded that the situation was too dangerous to remain unprotected at home, and that they had no choice but to get as far away from this danger as possible. They were just too vulnerable staying where we were, and the Ardstein children were terrified and wanted to go somewhere where there were no rockets. The Ardsteins had no choice but to flee their home. (Exhibit F, ¶8)

The Ardsteins noticed that one of our neighbors was quickly packing their car to head south, out of the range of Hezbollah rockets, and they agreed to squeeze the Ardstein family into the back of their car in order to get out of Tzfat as quickly as possible. Brian explains, "These neighbors were in such a hurry to leave that they didn't even replace their rear car seats, which had been removed earlier that day in order to vacuum out the car. So we also left in haste - bringing only a few essential clothing items, some money and our cell phones (though we forgot our cell phone charger, which would result in our being without working cell phones for the balance of the war). We never dreamt that we would be gone for more than one or two nights, and were confident that Hezbollah's threat would be repelled quickly by the Israeli government so that we could return back to our home in peace." (Exhibit F, ¶9)

The Ardsteins soon realized that we would be gone for much longer than just a few nights. They went to stay with old friends in the town of Bat Ayin, but quickly discovered that they were unintentionally being a big burden on them, as their small home was already filled to capacity with their large family. The Ardsteins then were able to rent a tiny apartment in the city of Ranana, but they had to eat meals in shelters for needy people because they were so low on money. The Ardsteins weren't supposed to take any of this food from the shelter with them, but Brian says that one of the men running the shelter could tell how needy they were and would

give them an extra loaf of bread to take with them. Brain says, " I was very troubled by this. I felt very embarrassed about not being able to work and be precluded from providing for my family. Having to be given food like a homeless family was emotionally devastating. I could see the negative impact it was having on my wife and children as well." (Exhibit F, ¶10)

Brian was completely in shock from the traumatic events he had witnessed firsthand and from the fact that my family had suddenly turned into a wandering group of refugees. He was completely on edge, and very anxious. If Brian heard a car door slam, he would jump right out of his seat. Brian says that he felt as if he was losing his mind, and that he was unable to function normally and felt like he needed to get away from Karene and the kids, as it was just too much pressure for him to try and figure out how to take care of his family under these desperate circumstances. Brian recalls, "For several days, I was very depressed and would just sleep for long periods of time and not get out of bed. On my worst days, I had trouble retaining a lucid thought, was confused by my surroundings, and unable to make decisions on my own. I became increasingly frustrated, short-tempered and angry. And whenever I was able to pull myself together and venture out, I would be extremely anxious and jumpy." (Exhibit F, ¶11)

To try and calm himself down, Brian started to smoke, which was a huge change of behavior for him because prior to this he had never smoked in his life. Six years later, Brian is still smoking to try and calm his nerves. (Exhibit F, ¶11)

The entire episode of being forced from their home and becoming wandering refugees was a debilitating experience, and is something that continues to affect them to this day. Brian explains, "A shattering consequence of the rocket attacks was that my wife had a miscarriage. This loss had a profound effect on my wife especially. Karene had been having a perfectly healthy pregnancy, but she was just too overextended by the trauma of being in a rocket attack

and having to flee, and then take care of all of the kids when they were anxious and upset and I was out of commission and not of very much help. The constant change of accommodations and many bus rides moving from town to town also certainly took their toll on her. I felt so guilty that I was unable to be with Karene during this traumatic time - that I couldn't even accompany her to her medical operation and that she had to struggle with this trauma on her own. But we had no one to watch the kids for us, and I was barely holding on in doing that for the few days that she left to have the operation. And even if I could have been there with Karene, I was in such a weak state emotionally that I doubt I would have been able to be the supportive husband that I really wanted to be." (Exhibit F, ¶12)

What was also extremely traumatic for Brian was the family's financial situation resulting from their forced evacuation, which he believes exacerbated a lot of their problems. I was used to his role as the family's bread winner as a tour guide. But the summer was high season for giving tours, and the Hezbollah Rocket Attacks obviously scared away an entire season's worth of tourist income. The Ardsteins would rely on Brian's summer tourist season income for the entire year, so to miss the season entirely was simply devastating financially. When the Ardsteins were forced to flee their home, they had almost no money left in the bank, and had been planning to generate much-needed income with a series of upcoming tours many of which had already been booked. All of these booked tours were obviously cancelled due to the rocket attacks, and tourist were very slow in returning to explore Israel's northern areas. (Exhibit F, ¶13)

On top of the huge blow of lost income, the Ardsteins financial situation became increasingly bleak as they were forced to incur many additional expenses that they could not afford, such as rent, new clothing, transportation, extra food, and the other sudden costs of being

forced out of their home. The Ardsteins did skimp wherever they could, by eating most of their meals at local soup kitchens, buying second hand clothing and renting the cheapest short-term apartment that they could find. But being so careful just wasn't enough - the Ardsteins just didn't have enough money to live on, and Brian had to borrow $4,000 from his parents just so they could get by during this trying time. (Exhibit F, ¶13)

But this loan caused considerable tension between Brian and his his parents, and to this day Brian's parents are upset that he has been unable to pay them back the $4,000 borrowed to help them get through this emergency situation. Brian also tried borrowing money from other relatives, but these efforts were unsuccessful and his frustration about this exacerbated his anxiety about their overall financial situation. Brian says, "I felt at the bottom of the barrel, and that no one was reaching a hand out to help us. The Israeli government didn't pay us one penny of support for all of the expenses we incurred during this time." (Exhibit F, ¶13)

When the Ardsteins were finally able to return home, things did not revert back to normal so quickly. They still had no money, and really didn't start to make a steady income until tourists started returning back up north, which took several months. And as Brian was determined that they should never be put in such a precarious situation again, he insisted that a bomb shelter be built under their home. The Ardsteins did not have the money to pay for this construction, but Brian somehow managed to get a bank loan for approximately $10,000 to build the shelter, which is roughly a quarter of the size of the Ardstein home. Brian has carefully stocked the shelter with emergency supplies and he keeps large plastic water bottles and old doors on the roof. Brian is now prepared for renewed Hezbollah rocket attack: "At the first sound of incoming fire I will run to fill up the bottles and place the doors in front of our windows, so at least now I'll be ready if need be. I have learned the hard way that we just can't be in a situation where we

are forced to flee our home again." (Exhibit F, ¶14)

Since the terrorist missile barrages, Brian has been making improvements psychologically with his fragile emotional state, though progress has been slow. He is more irritable and more easily frustrated than he was before the war. Additionally, Brian in general is less positive and friendly, and has difficulty concentrating. Brian says, "I still get flashbacks, though less often than I used to, about the rocket whizzing by my head, and I play out different scenarios in how I could have responded to this. I also strictly avoid all media, as I am afraid to listen to the TV and radio, and be subjected to the news, because I am afraid of hearing about something that will make me think back to the rocket attacks." (Exhibit F, ¶15)

The oldest Ardstein daughter Mayan, who is now 15, was very seriously traumatized by the Hezbollah Rocket Attack. Since the Ardsteins returned home after the Hezbollah Rocket Attack, Mayan became very tense, loud noises make her jumpy and cause her to act aggressively. (Exhibit F, ¶17) She refused therapy and kept her feelings bottled up inside, which is something Brian deeply regrets, because only recently has it become abundantly clear to him just how detrimental an impression the Hezbollah Rocket Attacks made on her. Mayan is an aspiring singer and has written one song, called "War", which is about the pain she feels about war. It is a beautiful song but Brian feels it is also heart-wrenching for him to hear, because he know which war she is referring to and how negative an impact the trauma she suffered during the Hezbollah Rocket Attacks has had on her short life. (Exhibit F, ¶16)

Because of her fragile psychological state, Mayan is no longer able to live at home. She lives at a boarding school that is better equipped to provide her the help she needs. But, unfortunately, Mayan had a big setback in her progress when, a few months ago, she attempted suicide. Brian and Karene are hopeful that Mayan now will get the professional help she has

always needed (but prior to the suicide attempt she refused to speak with a therapist) will enable her to come away from the brink. However, even the best case scenario for Mayan's recover is that a lot of work and time for healing is required before she can have any kind of normal life. (Exhibit F, ¶18)

Dr. Strous examined Brian and stated, "Mr. Ardstein displays some form of PTSD, depression and Adjustment disorder either currently or in the past as a result of being directly exposed to rocket fire and its aftermath of fleeing his home town during the second Lebanon War. Based on my evaluation of Mr. Ardstein, I believe that many of his symptoms with which he has been diagnosed are likely to be present in varying degrees for a significant time to come and while it is impossible to state for any absolute certainty, many of the symptoms may even be permanent." (Exhibit G, ¶22 and 23).

## 5.      Chayim Kumer

Chayim Yosef Kumer (only for purposes of this Section VI(5) and (6), "Chayim"), is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 13) who was born in Toronto, Canada on February 27, 1976. (Exhibit H, ¶1) He is a resident of Israel and live in the northern city of Tzfat, Israel. (Exhibit H, ¶2) Chayim's wife, Nechama Dina Kumer (only for purposes of this Section VI(5) and (6), "Nechama"), who is also an American (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit ) and whom Chayim met in Tzfat, were married on September 9, 1997. (Exhibit H, ¶3)

The Kumers have seven children, four of whom were alive during the Hezbollah Rocket Attacks perpetuated by the Shiite terrorist group against Israel. The oldest two Kumer children, Malka Kumer ("Malka") and Chana Liba Kumer ("Chana Liba"), were severely traumatized by the Hezbollah Rocket Attacks. (Exhibit H, ¶4)

Chayim is currently a teacher and musician, though during the Hezbollah Rocket Attacks he was working for a non-profit association. (Exhibit H, ¶5)

In the early afternoon of July 13, 2006, the first day of the Hezbollah Rocket Attack, Chayim was feeding his children lunch in the kitchen of their home when five rockets suddenly exploded nearby in rapid succession. Nechamam was at work so Chayim was alone with the children who were all hysterical, and he had to quickly determine by himself how to best take care of them in this extremely trying situation. Chayim describes the shock of the rocket attacks as "absolutely terrifying". (Exhibit H, ¶6)

As the rockets exploded around them, Chayim grabbed the children and sprinted to a communal bomb shelter, which was accessible from their basement[13]. In just a few minutes, an increasing number of neighbors fled to the shelter, and it became a scene of pandemonium - overcrowded with several large families (including many young children), all of whom were screaming, crying, and otherwise exhibiting signs of shock. Supplies of emergency food and water were very low, and there were very few mattresses there for the large number of people who had gathered. There was no bathroom or other facility for attending to personal needs, and everyone realized very quickly that the shelter could not accommodate them for an extended stay. (Exhibit H, ¶7 and 8)

Chayim was stunned from the shock of the attack. Although Hezbollah was notorious for targeting civil population centers, usually along the northern border with Lebanon, Chayim was utterly amazed that Tzfat had been targeted - as this was the first time that Hezbollah had fired

---

[13] Some older houses in Tzfat do not have their own reinforced rooms but rather have basement entrances to communal, underground bomb shelters. These bomb shelters are many decades old, and as there had not been a prior rocket attack on Tzfat for decades (and thus as a rocket attack was completely unexpected) this bomb shelter was not operational (but rather it was mostly used as a storage area for old items) and it was ill equipped to accommodate all of the fleeing community members.

rockets on the quiet city of Tzfat, no one had anticipated such a move. (Exhibit H, ¶9)

As chaotic as things were, while Chayim sat and waited in the shelter, for the first time he was able to shift focus from the safety of his children and he began feeling an overwhelming concern for Nechama. He wondered whether she was okay and why she was not home yet. Chayim feared the worst, but had no way of contacting Nechama and he could not leave the children to go look for her. Thankfully, she finally arrived at the shelter, hoping that this was where her family would be. Chayim was very relieved to see Nechama, but by then he was feeling woozy from the terrible stress of our situation and began to feel extremely claustrophobic by the congestion of so many people packed into one place and the tension around them, which was badly affecting them all. (Exhibit H, ¶10)

Chayim rationalized that the family would be just as safe back in their home (so long as they stayed in internal rooms, without any windows), and after a few hours they (as well as most of their neighbors) made the decision to return to their homes. Chayim and Nechama understood that leaving the shelter meant that their lives and those of their children would be in danger, and that they could be targeted by Hezbollah rockets at any time, but they felt that they had no choice but to return home since staying in the shelter was not a viable solution. Chayim recalls thinking what a terrible calculation this was for a parent and spouse to have to make. (Exhibit H, ¶11)

Chayim felt completely helpless. At first he thought that the attacks were a one-time phenomenon and would to stop in a few hours, but for three days he counted the minutes, minute by minute, until he finally realized that they were in the midst of a drawn-out war which seemed like it would never end. Recalling this realization, Chayim said, "I have never felt so vulnerable in my entire life." (Exhibit H, ¶12)

Chayim described enduring countless rocket attacks for the next six weeks as one of the

most horrible experiences of his life. The Kumer family had nowhere to go - no family or friends down south to whom they could flee, and no extra money for hotel rooms even if they could find one still unoccupied[14], and so they resigned themselves to staying at home. Over the course of the next six weeks, the Kumers were subjected to countless rocket fire attacks aimed at civilian houses by Hezbollah. These barrages occurred suddenly and without notice, which made the experience especially traumatic. Eventually a warning siren did ring to notify them of incoming rockets, but even this warning gave them not more than 30 seconds to get to a shelter or otherwise dive for cover. (Exhibit H, ¶13)

Chayim vividly recalls one particularly traumatic experience for him during this time - when he went to pray in his local synagogue. While Chayim was in the midst of praying, a wave of rockets started to rain down upon him and his fellow congregants. Chayim looked up and saw people scrambling everywhere, running for their lives and trying to reach the safety of a shelter. Chayim, however, was frozen with fear and was unable to move from his spot. Luckily, Chayim made it through this attack unhurt physically. However, he was deeply affected psychologically by this trauma. In fact, Chayim was so traumatized from this event that he could not return to his local synagogue for three years. Every time Chayim tried to enter the synagogue, he would hear in his mind the haunting whistle of the rockets and see scary images of that event flash in his mind, and Chayim would again relive the terror he felt as the rockets closed in around him. (Exhibit H, ¶14)

As the repeated rocket attacks continued over the course of the Hezbollah missiles, Chayim started experiencing serious bouts of anxiety. He says, "I felt like a duck waddling aimlessly in a field, with heavily armed and ruthless hunters pursuing me. I resigned myself that

---

[14] Many of their neighbors, who either knew families who could host them down south, or who had the means to stay in a hotel, eagerly took advantage of one of those scenarios.

I might die at any moment. It is a most horrible feeling to know that at any moment a rocket can land on your home and kill you and your loved ones in one fell swoop, and that there is nothing you can do to prevent this from happening. I felt completely powerless and in overwhelming fear all the time." (Exhibit H, ¶15)

Chayim's psychological trouble started to manifest itself with physical symptoms as well. On three separate occasions during the Hezbollah Rocket Attack, Chayim's digestive system became blocked, which resulted in his experiencing searing pain above his stomach. Even worse, Chayim was unable to relieve himself by urinating or defecating, or even to throw up, and the pain increased and quickly became unbearable until he was writhing with pain on the ground. During each of these bouts of intense pain, Chayim had to be rushed to the hospital and be medicated, to enable his system to relax so that it could return to operating normally. He clearly recalls lying on a hospital bed for hours roiling in pain until he received mediation. Eventually Chayim's condition was diagnosed as a problem with his gallbladder that was caused by the state of psychological stress he was under. The extreme pain Chayim experienced during these episodes was sharp and unrelenting, and is something he will never forget. (Exhibit H, ¶16)

Chayim also started suffering from increased feelings of being trapped and constrained, which began during his traumatic initial experience with the first bomb shelter on the opening day of the Hezbollah Rocket Attack, but which has lingered until today. Even when Chayim changed jobs and began teaching at the school where he now works, he was unable to teach if the classroom door was not kept open. Crowded places also started to exacerbate his anxiety - Chayim prefers to avoid them altogether, but if he had to be in a crowded space then he always immediately plans an escape route and continues to recalculate various escape routes for so long as he remains there.   (Exhibit H, ¶17)

During the Hezbollah Rocket Attack, the Kumers also had to deal with extreme loneliness. Within the first 24 hours of the first rocket attack, they watched their neighbors flee one by one until their entire building had emptied. In fact, most Tzfat residents fled south, and Tzfat essentially turned into a ghost town for the next six weeks. The Kumers felt extremely isolated and vulnerable, and that no one would come to their aid (or even know what had occurred) should something happen to them. (Exhibit H, ¶18)

There was a complete break-down in government services, with no one providing directions or supplying providing assistance. Most of the members of the local government also had fled south. There were no governmental services - no trash pick-up, transportation services, regular doctors, banks, etc. Only a small local grocer was open, at intermittent times, and Chayim had to walk ten minutes each way just to get basic staples. While in normal circumstances walking ten minutes certainly is no big deal, Chayim explained that when one might very well find himself in the middle of a rocket attack at any moment, it becomes an extremely traumatic experience. He would plot out which buildings along the route had public bomb shelters and he figured out how far he would have to run to get to the nearest shelter if he suddenly found himself caught in a barrage of rockets. As a result of this situation, Chayim would wait until it was absolutely necessary - when they were completely out of essentials like diapers, toilet paper, milk and eggs - before he would risk going to the grocer. On one of these trips, as Chayim was returning from the grocer, Hezbollah rockets started raining down from the sky. He quickly scampered to the nearest communal bomb shelter - just as he had planned - and waited out the attack there. Chayim knew that his family would of course be worried sick about him, so as soon as there was a lull in the bombing he hurried home. (Exhibit H, ¶19)

Another challenge the Kumers had to face, which Chayim described as "something right

out of a science fiction movie", was that packs of large dogs roamed the Tzfat streets freely. There were no dog catchers left in Tzfat, and evidently many dog owners had simply left their dogs alone outside before fleeing south themselves. The dogs were all completely terrorized from the constant shelling and lack of daily structure - they were traumatized themselves - and they converged together and roamed through the streets howling and displaying other erratic and aggressive behavior. The presence of the packs of dogs running through the streets terrified the Kumer children almost as much as did the rockets. (Exhibit H, ¶20)

The Hezbollah rocket Attacks deeply affected Chayim in various way - the psychological damage he suffered from being subjected to six weeks of incessant rocket attacks affected him very much, and continues to affect him today, some six years later. For example, Chayim still cannot, to this day, listen to the radio. It is just too much of an anxiety provoking activity for him, and it fills him with fear about what scary event he may learn about. Furthermore, while Chayim now has been able to return to his local synagogue, he still tries to go to a different synagogue whenever possible. Although returning to his local synagogue (for the first time three years after the Hezbollah Rocket Attacks) was a big achievement for Chayim, whenever he is there he inevitably get flashbacks of the horrible experience he had there - being frozen in fear during a rocket attack while watching others run for cover, something he was unable to do. When Chayim experiences these flashbacks and other images, the sense of fear and foreboding he has is palpable, and he has to focus to actively push them out of his mind which requires a lot of concentration. Thus, Chayim's local synagogue is not the conducive place it used to be for him to focus on prayer. (Exhibit H, ¶21)

Chayim has sought and undergone a significant amount of professional counseling due to the trauma he experienced during the Hezbollah Rocket Attack. For the first six months after the

rocket attacks ended, Chayim saw a therapist once a week, and afterward continued to go for counseling, though on a less regular schedule. Once Chayim started to feel better he stopped going to therapy, but just a few months ago he realized that he is still suffering various lingering effects from the trauma and plans to schedule further counseling sessions. Chayim still experiences debilitating fear in certain circumstances, and needs to get this under control. (Exhibit H, ¶22)

The two oldest Kumer children, who were old enough to clearly understand the horror experienced six years ago during the Hezbollah Rocket Attack, have also had to undergo significant treatment and continue to be affected today from the trauma they experienced. Both Malka and Chana Liba still suffer, six years later, from the traumatic experience of living through the Hezbollah Rocket Attack, even after intensive counseling. They both were treated intensively with various therapies for six months after the Hezbollah barrages ended, and have continued to be counseled since them. Both girls have been diagnosed with degrees of Post Traumatic Stress Disorder (PTSD) and Anxiety, which manifests in panic attacks, their inability to sleep, nightmares, and an exaggerated stress responses. Additionally, they exhibit symptoms of low attention, and difficulty learning and remembering, and in various different ways continue to carry emotional and psychological baggage six years from the trauma of the Hezbollah Rocket Attack. (Exhibit H, ¶23)

Chayim said, "As a father, it has been especially difficult to watch my children suffer as a result of the terrorist attacks. My inability to protect them from the profound emotional impact of the attacks still gives me pangs of anxiety and guilt." (Exhibit H, ¶24)

Dr. Rael Strous, M.D. examined Chayim and stated, "Mr. Kumer displays some form of PTSD and Anxiety disorder either currently or in the past as a result of being directly exposed to

rocket fire and its aftermath during the second Lebanon War. Based on my evaluation of Mr. Kumer, I believe that many of his symptoms with which he has been diagnosed are likely to be present in varying degrees for a significant time to come and while it is impossible to state for any absolute certainty, many of the symptoms may even be permanent." (Exhibit I, ¶21 and 22)

### 6.      Nechama Dina Kumer

Nechama is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 14) who was born in Nashville, Tennessee on September 4, 1976. (Exhibit J, ¶1) She resides in Tzfat, Israel, and married Chayim on September 9, 1997. (Exhibit J, ¶2 and 3) Nechama and Chayim have seven children, four of whom were alive during the Hezbollah Rocket Attack perpetuated by the Islamic terrorist group Hezbollah against Israel. Chayim and their two oldest children, Malka and Chana Liba, were severely traumatized by the Hezbollah Rocket Attack. (Exhibit J, ¶4)

Nechama will never forget the day July 13, 2006, the first day of the Hezbollah missiles, which forever impacted her family. While Nechama feels fortunate that her family members all survived the rocket onslaught in which Hezbollah for six weeks mercilessly targeted civilian population centers in Northern Israel including their small city of Tzfat, her family hardly emerged unfazed and the trauma suffered by her family from the Hezbollah missiles continues to affect them in significant ways to this day. (Exhibit J, ¶5)

That July day started off normally enough. Even though a Hezbollah rocket had been fired at Mt. Meron[15] that morning, no one imagined that the relatively sleepy town of Tzfat also would be targeted. In fact, the attack on Mt. Meron was not a big news story, and no one seemed

---

[15] Mt. Meron, on which a major Israeli military installation is perched, lies approximately three miles from Tzfat.

concerned about it. Offices, schools and summer camps in Tzfat were not let out early and there was no talk of what to do in the event of a rocket attack on Tzfat, because no one had anticipated that it would happen. There was simply no preparation for an attack on Tzfat because there was no expectation that such a benign civilian center would be targeted by Hezbollah. (Exhibit J, ¶6)

The horrible nightmare began after the Kumer children came home from school and were eating lunch, when all of a sudden Chayim and the kids had to run for cover to the neighborhood communal shelter, which was not at all prepared for this type of threat. (Exhibit J, ¶7)

Nechama was at work when the first rockets hit, and actually heard them pass overhead and then land close to her office building. She happened to be in the bathroom at the time of impact, which was utterly terrifying, and she ran out of there as fast as she could. The building in which Nechama worked did not have a shelter, and she was very worried about Chayim and the children and wanted to get home immediately to be with them. She had no way of knowing whether they were okay or had been hurt, but she tried to keep bad thoughts out of her mind so that she wouldn't go crazy. Nechama was five months pregnant at the time and wanted to be sure to stay calm for herself as well as for the welfare of the baby she was carrying. (Exhibit J, ¶8)

Nechama made her way outside of the building and could see that everyone else was also streaming out of work to go home to their families. There were no taxis or buses, as the entire city had suddenly shut down. So Nechama started to walk home and luckily was able to hitch a ride from a passing car for most of the way. (Exhibit J, ¶9)

Nechama found Chayim and the kids in the building's shelter, just where she had hoped they would be. She was so thankful to see that they were all in one piece and that they were all together. This peace of mind was contrasted by the shelter, which was a rather chaotic scene. It was crowded and all around were hysterical people in shock, and overall mass confusion.

(Exhibit J, ¶10)

Coping with their new reality was hard for Nechama, but trying to explain their situation to their two oldest children was gut wrenching. At that time, Malka was 6 years old and Chana Liba was 5 years old. They were very precocious for their ages, and Chana Liba especially asked all kinds of questions that Nechama couldn't answer. They had a rather comprehensive dialogue about the situation - why Hezbollah would want to kill people in their homes who had done nothing to them, why all of the girls' friends were getting ready to flee down south and why the Kumers couldn't (the Kumers didn't have any family or friends with whom to stay, and hotels down south were too expensive for them, and in any event vacancies were difficult to find due to the massive numbers of families who fled from the north and needed accommodations). Nechama recalls, "I don't think I realized at the time how capable the two girls [Malka and Chana Liba] were to mentally and emotionally grasp most of what was going on, and therefore how traumatic the whole experience was for them. Having to live through hundreds of sirens and barrages of rockets over the next six weeks, many exploding nearby, in retrospect, it's no surprise that they suffered from post-trauma stress disorder and, to different degrees, are still suffering from this trauma to this day." (Exhibit J, ¶11)

While Nechama was concerned about her two oldest children, her biggest concern was that Chayim was not in a good state of mind and seemed to be deteriorating as the war dragged on. The hardest thing for Nechama to handle was that Chayim was having regular panic attacks and anxiety and that this was physically affecting him and the children. This, of course, worked against Nechama's efforts to try and make the kids feel as stable and secure as possible, which, given their situation, was already a losing proposition. But as Chayim's condition worsened, things became even harder for all of them. (Exhibit J, ¶12)

Chayim suffered both physically and emotionally for much of the war. He had excruciating, recurring abdominal pain which required him to be rushed to the hospital on three different occasions. These symptoms were a result of the psychological trauma he experienced during the Hezbollah Rocket Attacks. Twice, Chayim was caught outside of the home during rocket attacks and this devastated him. This happened once while he was at his local synagogue during which he was paralyzed with fear and could not bring himself to run for cover, even though he saw everyone else running around him scrambling to get to the nearest shelter. The second time Chayim was caught in a rocket attack was on his way back from the only market in the area that was still operational, where he had gone to get us essential supplies. The stress of being caught in a volley of rockets was just too much for him. Nechama had heard the expression "shell-shocked" before, but only after witnessing Chayim's response to the trauma could she truly understand its meaning. (Exhibit J, ¶13)

The Kumers experienced numerous other traumatic experiences. One day during the Hezbollah rockets, their beloved babysitter, who the girls simply adored, suddenly ran into their home screaming. Her building had suffered a direct hit by a rocket and now had a gaping hole in its side. She was in total shock. She spent that day with the Kumers, playing with the children and trying to forget about what she witnessed, but Nechama could tell that the Kumer girls understood the situation and were also shaken by how scared their babysitter was and how very close she had been to being hurt herself. It was hard for Malka and Chana Liba to digest that the house that they so often gone to for babysitting now was badly damaged from rocket fire. (Exhibit J, ¶14)

There was another strange phenomenon that was especially terrifying for the girls. Many people who had fled to the south and who could not bring their pets simply left their dogs

outside, and thus the city was full of canines roaming the streets in packs. The dogs were all traumatized from the constant shelling, and were acting strangely and aggressively. Many of the dogs seemed to be starving and appeared to be desperate for food. The people who remained in Tzfat had to be careful about the dogs in addition to the rockets whenever they ventured out. The Kumer girls were extremely afraid of going outside and coming face to face with these abandoned dogs. This made an additional lasting impression on them. (Exhibit J, ¶15)

Both Malka and Chana Liba still suffer, six years after the end of the Hezbollah Rocket Attacks, from the traumatic experience of living through the Hezbollah Rocket Attack, even after intensive counseling. They both were treated with various therapies for six months after the Hezbollah Rocket Attacks ended, and have continued to be counseled since them. (Exhibit J, ¶16, Exhibits K and L)

Both girls have been diagnosed with varying degrees of Post Traumatic Stress Disorder (PTSD) and Anxiety, which manifests in panic attacks, their inability to sleep, nightmares, and an exaggerated stress responses. Additionally, they exhibit symptoms of low attention, and difficulty learning and remembering. (Exhibit J, ¶17, Exhibits K and L)

Nechama reports that Malka's damage is rather severe, and that her ability to function socially has been significantly affected. Malka has, on a regular basis, anxiety and panic attacks. Nechama says, "She [Malka] had one just this week Malka went out of town for a wedding, and the entire time, during the eight hours she was gone, she was experiencing a panic attack. Even the fact that she was with her sister and surrounded by people she knows from the community didn't help calm her down. Malka called me numerous times telling me how nauseous she was, but the second she came home the nausea suddenly vanished. This condition obviously originates in her head. She was never like that before the war. She suffers from unexplained stomach aches.

Further, because she will not participate in any activities more than a block away from her home, her opportunities for socialization are severely limited. Additionally, her performance in school has suffered from the rocket attacks." (Exhibit J, ¶20, Exhibits K and L)

When Malka travelled with Nechama to America last summer, Malka was very uncomfortable and prone to panic attacks if she wasn't with Nechama all the time. Being away from home in general is very difficult for Malka, even if she is just sleeping at a friend's house. A couple of years ago Malka went to sleep-away camp for two and a half weeks, and she hated it because it was so difficult for her to fall asleep at night there. Prior to the Hezbollah Rocket Attacks, Malka would often have sleepovers with other children. Now, she is unable to do so, and when she tries to Chayim and Nechama always need to pick her up in the middle of the night because she experienced an episode of anxiety. Malka has a school trip coming up and she doesn't want to go because she is afraid of having a panic attack there. (Exhibit J, ¶21 and 22)

Nechama says that Chana Liba is also prone to anxiety and panic attacks. Nechama explains, "It was only a year ago when we finally got her [Chana Liba] and Malka to stop sleeping together in bed. They are both still scared to walk alone into a dark room, or the bathroom, by themselves. If they need to go to the bathroom at night they want an escort and for someone to stand outside the door while they use it. If we can't do this for them then they become very scared. Since we understood that the trauma they suffered has really been impeding on their quality of life and on their ability to function normally, we decided to hire a specialist in post-trauma disorder who is working with them now and teaching them new skills. We are bearing the expense of this therapy." (Exhibit J, ¶23)

Malka nor Chana Liba seldom talk about the Hezbollah Rocket Attacks explicitly, though sometimes they do make a direct association between a panic attack they are having and the

Hezbollah Rocket Attacks. (Exhibit J, ¶24)

In addition to the difficulty of watching her children suffer, Nechama has been burdened with the responsibilities of supporting what have become their extensive sets of special needs. From sleeping in the same bed with them, to frequently being woken up at night, to managing their anxieties on a day to day basis – it has been quite taxing on Nechama's physical, emotional and mental health. Malka, Nechama reports, cannot even bear to be left alone on one side of the apartment by herself, and rather must always be accompanied. Nechama laments, "This is not how we'd hoped our two beautiful daughters would grow up. It is extremely detrimental watching your children go throw such a thing and not being able to shield them from this trauma, nor calm their anxieties in the subsequent years." (Exhibit J, ¶25)

Dr. Rael Strous, M.D. conducted a psychiatric evaluation for Malka and Chana Liba, and he found that they both were significantly affected by the Hezbollah Rocket Attacks. Regarding his examination of both Malka and Chana Liba, Dr. Strous stated that each of them, "displays some form of PTSD and Anxiety disorder either currently or in the past as a result of being directly exposed to rocket fire and its aftermath during the second Lebanon War. Based on my evaluation of Ms. Kumer [separately each of Malka and Chana Liba], I believe that many of her symptoms with which she has been diagnosed are likely to be present in varying degrees for a significant time to come." (Exhibits K and L)

**7.      Laurie Rappeport**

Laurie Ann Sendler Rappeport (only for purposes of this Section VI(7) and (8), "Laurie"), is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 15) who was born in Detroit, Michigan on March 29, 1958 and who resides in Tzfat, Israel. (Exhibit

M, ¶1 and 2) She is the mother of five children: son Avishai was born January 1, 1986, daughter

Ariel was born September 7, 1987, daughter Yochi was born November 21, 1989, son Chaggai

was born September 24, 1992 and daughter, Margalit Chen, was born April 15, 1996 (only for

purposes of this Section VI(7) and (8), "Margalit"). (Exhibit M, ¶3) Laurie is bringing this action

individually and on behalf of Margalit.

At the time of the Hezbollah Rocket Attacks, Laurie was living in the northern city of

Tzfat with her children. She was working for an Israeli education program for students from

abroad, also located in Tzfat. (Exhibit M, ¶3)

In the afternoon of July 13, 2006, Laurie heard about the first rocket attacks near Tzfat

while she was at work. Her daughter, Margalit, who was nine at the time, was at home. Laurie

obviously was very concerned about Margalit and immediately returned home from work to be

with her. That afternoon, Laurie and Margalit remained around their home and anxiously

followed developments, waiting for instructions from government officials and trying to figure

out what they should do. No one at this time anticipated a prolonged war or even further attacks.

(Exhibit M, ¶4)

At approximately 7:00 pm, a series of rockets launched by Hezbollah landed close to

Laurie's home. One scored a direct hit on a neighbor's house. Laurie heard the sound of an

explosion and crashing glass as the windows of her home blow in. Laurie never expected that a

rocket would actually land close to her house, and its impact left her in shock. (Exhibit M, ¶5)

Margalit had been playing in a tree house in the yard when the rockets hit, and she had

been standing only 65 feet from the point of impact. The force of the rocket violently blew

Margalit out of the tree house, which was about six feet high, and threw her to the ground.

(Exhibit M, ¶6)

As Margalit lay on the ground, one of the family dogs grabbed her and dragged her quickly into the house. Margalit entered the house hysterically crying and screaming. Laurie had no idea what had happened to Margalit since she did not realize at first that one of the rockets had landed so close to her. Margalit obviously was very scared and shaken, but it was difficult for Laurie to determine what had happened to her because she was screaming. Laurie grabbed Margalit, inspected her and tried to assess if she had sustained any lasting physical injuries. (Exhibit M, ¶7)

Laurie then noticed a mist in the air just outside of their home. A water pipe had been cracked by the blast, and the water was blowing in all directions. At that time, however, Laurie did not realize that the mist was only water, and she feared that a gas pipe had been hit, that the gas was pouring out and that an explosion could occur at any moment. Laurie thus scooped up Margalit and ran in terror to the street above their home to escape what they believed was an imminent life-threatening situation. (Exhibit M, ¶8)

When they reached the street above their home, Laurie noticed that another rocket had landed there as well. Medical crews were already at work trying to assist the injured. A neighbor from that street had been killed by one of the rocket explosions, and the medics were evacuating his body on a stretcher. Margalit saw them loading the man into the ambulance. Laurie reports that witnessing this scene was especially shocking for Margalit, and it caused her to become even more distressed and scared. (Exhibit M, ¶9)

As Laurie came to realize that the entire city was under rocket attack and that no street was really safe, she grabbed Margalit and ran around the neighborhood in shock, not knowing exactly what to do or where to go. They found themselves at a public bomb shelter and stayed there for some time. Then Laurie contacted a friend who had a fortified, underground room in

her home, and Laurie and Margalit ran out of the public shelter to take refuge in the friend's private shelter, where they all stayed for the next few days. (Exhibit M, ¶10)

Laurie very much wanted to escape Tzfat with Margalit, but there were now rockets hitting civilian neighborhoods in the north of Israel almost every hour, and she did not know whether it was more dangerous to try to flee Tzfat and try to get out of range of the rockets than to stay in the shelter. Margalit was very frightened, upset and overall traumatized by the events she had witnessed, and she just wanted to get out of Tzfat as soon as possible. But Laurie also had her other children to worry about. Laurie's son Avishai was serving in the army and was scheduled to come home on a leave for the weekend, and she very much wanted to be there for him when he returned. (Exhibit M, ¶11)

On Saturday night, July 15, Laurie and Margalit left Tzfat and drove south near Tel Aviv to stay with friends. Laurie was told that the center of the country near Tel Aviv was probably out of the rockets' range and with so many people being killed and injured from the massive rocket barrages, she felt that it was worth the risk to flee and try to find some measure of safety. Laurie and Margalit stayed with these friends in Tel Aviv for two weeks. Then they moved into a Tel Aviv apartment with neighbors from Tzfat to who had also fled their home. Next, Laurie and Margalit moved close to Jerusalem to stay with other friends for a couple weeks. The rockets continued to hit cities all over the north of Israel and Laurie and Margalit could not return home. (Exhibit M, ¶12)

Moving around from place to place, without knowing what the next day might bring, was terribly taxing for Laurie and Margalit, and the instability and uncertainty created by the Hezbollah Rocket Attacksmade their daily lives filled with stress and tension. Margalit especially suffered from the tremendous shock she had experienced, and the inability to seek

refuge in a stable, familiar environment. (Exhibit M, ¶13)

Furthermore, the apartments that Laurie and Margalit lodged in were very crowded, and for several weeks they had to live with other families. In addition to paying over some of their very limited funds to the people with whom they were staying, Laurie incurred many extra costs and expenses as a result of not being able to return to their own home. (Exhibit M, ¶12)

While Laurie was focused on tending to the care of Margalit, she was also consumed with worry about the welfare of her other children. For the entire five week duration of the Hezbollah Rocket Attack, Laurie did not know which child she was supposed to take care of first, and struggled with where she was really supposed to be. Every day Laurie awoke with a reoccurring panic of being unsure about her priorities and knowing which child she should take care of first. (Exhibit M, ¶17)

Two of Laurie's children, Yochi and Chaggai, happened to be visiting the United States during the Hezbollah Rocket Attack, so at least they were relatively safe (although they were out of their mother's oversight for longer than she would have liked). They returned to Israel only once the ceasefire went into effect and the rockets stopped exploding. (Exhibit M, ¶18)

But Laurie's older daughter, Ariel, who was in the army at the time, didn't have a place to stay in the south. She had a dog in Tzfat that no one wanted to take care of, so Ariel ended up staying in Tzfat by herself with the dog for a couple of weeks. Laurie certainly didn't want Ariel to be by herself because she was afraid for her safety with the on-going rocket attacks and other dangers of a young women living in an abandoned city alone. Laurie was terribly worried about Ariel's safety, specifically how she was weathering the war up north by herself, and Laurie very much wanted to be with her. Laurie's son, Avishai, was also in the army at the time and when on leave he stayed in Tzfat as well. Laurie was worried about Avishai's safety and wanted to be

home to take care of him when he returned home on leave. Despite these strong motivations to return to Tzfat, Laurie felt that she could not subject Margalit to more trauma by returning home and having to face continued rocket attacks. (Exhibit M, ¶14 and 15)

After the Hezbollah Rocket Attacks ended, Laurie and Margalit returned to Tzfat. There had been a great deal of damage to their home and many of their belongings had been destroyed by the rocket attacks, and Laurie had to replace many of these possessions. (Exhibit M, ¶21)

Margalit resumed her studies, but almost immediately Laurie was contacted by Margalit's school because of behavioral issues Margalit was having, the first time such an event had occurred. School officials told Laurie that Margalit was angry, unruly and acting out in class, and that her teachers could not deal with her. Before the rocket attacks, Margalit had never had behavioral problems. Laurie understood that Margalit's change in behavior was a direct result of the traumatic experiences she had endured during the Hezbollah Rocket Attack. (Exhibit M, ¶19)

Laurie took Margalit to a therapist for crisis intervention and other treatment. Laurie also enrolled Margalit in drama therapy for several months, where she learned calming techniques to employ whenever she experienced fear, panic or other like emotions. Over time, there was a slight improvement in Margalit's behavior and symptoms. Laurie also went to therapy for some time to try and deal with the trauma she had experienced herself. (Exhibit M, ¶20)

Approximately one year after the end of the Hezbollah Rocket Attacks, Laurie had a powerful flashback of the trauma she experienced a year prior. She felt as if she was again reliving the trauma of being under fire at the hands of Hezbollah. Laurie again felt feelings of powerlessness, despair, confusion and uncertainty. She felt the crippling doubt of being unsure which of her children to care for, and guilt about what she should have done instead. These thoughts haunt Laurie to this day, and still leave her nervous and unsettled. (Exhibit M, ¶22)

Laurie stated that, to this day, whenever she sees certain neighbors whose house suffered a direct rocket hit with everyone inside, memories of the Hezbollah Rocket Attacks are triggered for her again. The children of this family had been friends with Margalit, and several of these children were badly hurt and now have physical scars and impairments. Laurie relives the trauma of the entire horrifying experience of the Hezbollah Rocket Attacks whenever she sees them, and experiences feelings of utter shock, fear and despair of what happened to her and Margalit during the Hezbollah Rocket Attacks. (Exhibit M, ¶23)

For the first few years after the Hezbollah Rocket Attacks, Laurie continued to be affected by sirens and other loud noises, and she would have to breathe deeply and calm herself whenever she heard them. These noises would conjure up very difficult thoughts. To this day, Laurie and Margalit experience lingering symptoms from the trauma they experienced during the Hezbollah Rocket Attacks. (Exhibit M, ¶24)

Laurie was evaluated by Dr. Strous, who declared that she "displays some form of depression and Anxiety disorder either currently or in the past as a result of being directly exposed to rocket fire and its aftermath with fleeing her home town during the second Lebanon War. Based on my evaluation of Mrs. Rappeport, I believe that many of her symptoms with which she has been diagnosed are likely to be present in varying degrees for a significant time to come and while it is impossible to state for any absolute certainty, many of the symptoms may even be permanent." (Exhibit N, ¶11 and 12).

## 8.      Margalit Rappeport

Margalit is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 16) who was born in the northern Israeli city of Tzfat on April 15, 1996 and who continues today to live in Tzfat. Margalit was ten years old during the Hezbollah Rocket Attack.

Shortly after the first rockets fired by Hezbollah from Lebanon landed in Tzfat, Margalit was home alone, and her mother Laurie immediately returned home from work to be with Margalit. That afternoon, they nervously awaited developments about the crisis. Laurie listened to the news and tried to keep Margalit from being frightened.

Early that evening, a rocket launched by Hezbollah landed on a neighbor's house across the street from the Rappeport home. At the time, Margalit was outside playing in the tree house in the Rappeport yard. The rocket landed approximately 65 feet away from Margalit and the force of the explosion threw her out of the tree house, which was about six feet high, and through the air until she landed hard on the ground below. Margalit recalls only hearing a terrifying, loud explosion and shattering glass.

Margalit lay on the ground, frozen in shock, when one of the Rappeport family dogs grabbed her and began dragging her into the house. Margalit remembers being really frightened and screaming as Laurie tried to calm her down.

At the same time, Laurie suddenly noticed a mist filling the air just outside their home. Rocket fragments had cracked a water pipe and a mist was escaping in all directions. However, Laurie did not realize that the mist was only water and feared that a gas pipe had burst and that the escaping gas could blow up the entire block at any moment. Margalit recalls that Laurie grabbed her and raced outside, continuing to quickly run to the street above their property. But this change of scenery did not bring any relief from their terror - another rocket had landed on this street as well and medical crews were already scrambling around to assist the injured. One of the Rappeport's neighbors had been killed by the rocket, and his body was being removed on a stretcher. This was an especially traumatic scene for Margalit to witness. She vividly recalled the scene, "That really shocked me. I was terrified that the man had been killed and I was frightened

my mother and I could be killed too. I remember crying uncontrollably as I watched the medics and all the people move dazed through the streets."

Laurie quickly realized that the entire city was under rocket attack and that nowhere exposed was safe. But no one knew what to do, and Laurie held Margalit and they wandered the streets trying to find a safe place to stay. As Margalit had just had just been thrown by the impact of a landing rocket, she remembers being very frightened to be walking around the streets, completely exposed to the threat of another attack. They found a public bomb shelter and stayed there until moving in to a friend's home that had its own fortified, underground room, where they stayed for the next few days.

Margalit was very frightened by this experience and was desperate to leave Tzfat as soon as possible. A few days after the first attack, Laurie and Margalit were able to escape to Tel Aviv, where they stayed with friends for two weeks in a small apartment. But then they had to move and stay with other friends who had an even more cramped apartment. After this, they moved near Jerusalem to stay with other friends for a couple of weeks. All of these apartments that Margalit and Laurie stayed in were very small and crowded. Margalit recalls that it was "It was horrible moving around from place to place. I never understood where we were going to be sleeping. I do not like the instability, all the strangers and the uncertainty of what would happen to us next. But they had no choice - the rockets continued to hit cities all over the north of Israel and we could not return home."

During this time, Margalit recalls being very scared for the welfare of her two siblings who were in the army. Margalit felt very alone without any of her siblings being with them[16],

---

[16] Laurie's other two children were visiting relatives in the U.S. when the Hezbollah Rocket Attacks commenced. Because of the war these children extended their trip and did not return to Israel until after the missiles had stopped falling on northern Israel.

and she just wanted her entire family to be home together – safe and sound – the way things had been before the rockets began raining down on their home.

When Margalit and Laurie were finally able to return home, they discovered that their house had been badly damaged. And many of Margalits personal belongings and toys had been damaged and needed to be thrown away so that she would not have to look at them every day and be reminded of the Hezbollah Rocket Attack.

Shortly after Margalit returned to Tzfat and resumed her schooling, she began having trouble at school. Laurie was frequently contacted by the principal because of Margalits newfound "behavioral problems". The principal described Margalit as being "angry, unruly and acting out in class", and said that her teachers simply could not deal with her. Margalit recounts this period of her life by saying "I felt like I was losing control of my situation. This was all new for me – I was previously never in trouble at school. I remember always feeling afraid, and experienced severe stress during this period – never really being able to sleep well."

As a result of the trauma Margalit suffered during the Hezbollah Rocket Attacks, she began therapy for crisis intervention and also engaged in drama therapy to learn calming techniques for when she experienced fear, panic or other extreme emotions.

Margalit has developed self-knowledge over the years, so that she now understands that she relates to various situations differently than other children who did not directly experience the trauma of surviving a war. For example, she is much more "nervous and anxious" and "afraid" than her peers, who seem to be unfazed by everyday things that terrify her, such as hearing a plane flying overhead or a loud noise from construction or being in a closed space. Margalit says that this handicap impacts ordinary decisions in her daily life: taking public transportation, always having enough drinking water with her, hearing loud noises that other

friends don't notice, always being aware to ensure that a bomb shelter is nearby, needing to be aware of the whereabouts of her immediate family members, avoiding small spaces, and seeing physically scarred or otherwise impaired people (which reminds her of neighbors who were disfigured by an exploding rocket attack during the Hezbollah Rocket Attack). The anniversary of the Hezbollah Rocket Attacks is also still a particularly difficult time for Margalit each year, when she is especially reminded of her traumatic experiences.

In addition to being diagnosed with an anxiety disorder, Margalit has also been diagnosed with depression. This manifests in various ways, but is most markedly apparent when she is with her friends. Margalit explains that her friends "just seem happier and more care-free than I am able to be. On good days, I am just slightly more morose than my unaffected friends. On bad days, I have trouble getting out of bed and just feel terribly sad and overwhelmed."

Dr. Strous examined Margalit and diagnosed her as suffering from depression and anxiety disorder as a result of her experiences during the Hezbollah Rocket Attacks, specifically from the trauma of being a victim of rocket fire and having to flee her home for an extended period of time. Based on his evaluation of Margalit, Dr. Strous believes that many of her symptoms are likely to be present in varying degrees for a significant time to come and may even be permanent. (Exhibit P, ¶10 and 11).

### 9.     Michael Fuchs

Michael Fuchs (only for purposes of this Section VI(9), "Michael") is an Israeli citizen who was born in Haifa, Israel on November 22, 1957. (Exhibit Q, ¶1) He lives in the northern city of Netanya. (Exhibit Q, ¶2) His married his wife, Ronit Fuchs, on June 20, 1988. (Exhibit Q, ¶3) Michael and Ronit have five children, the youngest of which was two years old when

Michael was injured during the Hezbollah Rocket Attacks. (Exhibit Q, ¶4)

Michael is a former school principal who made a career change to business, helping to establish and operate a dish-import company. At the time of the Hezbollah Rocket Attacks, he was a co-owner of this business which had become, in a relatively short period, rather successful with approximately 200 clients. (Exhibit Q, ¶5)

Michael's work required him to travel to many different supermarkets and other retailers to pitch sales contracts for his company's products. In the morning of July 13, 2006, Michael was visiting Tzfat to pursue various business leads, and was caught in the first barrage of rocket attacks on that city which commenced the hostilities of the Hezbollah Rocket Attacks. (Exhibit Q, ¶6 and 7)

After visiting a number of supermarkets and after hearing reports of Hezbollah rockets being fired on Tzfat, Michael decided to cut his trip to Tzfat short and just visit one last supermarket on his way home. (Exhibit Q, ¶8)

As Michael was driving to the last supermarket for the day[17], he suddenly heard a very loud whistling noise and a massive explosion. A katyusha rocket launched by Hezbollah had exploded very close to Michael's car, propelling a fragment of the rocket through his windshield and into his shoulder. Michael recalls:

> "I was stunned by the force of the blast and the noise. I recall that I was driving down an alley and hearing explosions all around me, and then looking down at the dashboard of my car which was splattered with blood. I then remember looking over to my right and seeing my right arm was completely mangled and that where it connected to my body there was a large hole in my shoulder. It was terrifying and I went into shock. I thought I was going to die and

---

[17] This was at approximately 2:40pm.

would lose consciousness very quickly. I was losing a lot of blood and did not know if I could hold on. Somehow I was able to pull the car over and park in front of a school, before trying in vain to wrap a t-shirt around the wound in my shoulder to stop the bleeding. I then somehow was able to kick open my door and fall out of the car onto the street. I was panicked, in severe agony and my mind was racing. I did not believe I would survive my injuries." (Exhibit Q, ¶9)

Michael further described how he was gravely injured: "Despite it being July and the school in front of me being on holiday, there were thankfully people at the school that were ready to help out. The last thing I remember from the scene is lying on the ground screaming 'my arm!' and 'my arm is gone!' before I passed out next to my car... I remained unconscious upon arriving to the hospital." (Exhibit Q, ¶10)

Michael explained that later, in the hospital, he was told that two men heard him screaming in pain on the ground and responded - one of them called an ambulance to the scene and the other tried to stop the significant flow of blood oozing from the source of the wound - where his arm was still barely connected to his shoulder. (Exhibit Q, ¶11)

When the paramedics arrived, they evidently thought that Michael was dead, since they struggled to find a pulse. He had bled profusely and had lost an alarmingly large volume of blood. In the next few hours Michael required 22 units (bags) of blood to replenish his blood loss. He was among the first people injured in the first attacks on Tzfat and thus was luckily one of the first of the injured brought to the hospital. Fortunately for Michael, he had the full attention of all the hospital staff and all of the equipment he needed was available. (Exhibit Q, ¶12)

After the first Hezbollah missiles struck northern Israel, Michael's son Elya was

watching TV after returning home from school and saw an interrupted broadcast reporting rocket fire on Tzfat. Elya ran to ask Ronit where his father was, to which she responded that Michael was in Tzfat. When told of the news report from Elya, Ronit began calling Michael's cell phone repeatedly, only to meet a pre-recorded message each time. This was very unusual as he always had his phone switched on, so she contacted the police to find out if they had any information about who had been injured or where he was. (Exhibit Q, ¶13)

The hospital staff was not able to identify Michael at first, and he was admitted as "John Doe". The hospital later received a photograph of Michael from his wife, and was able to confirm his identity by comparing the wrinkles on his forehead in the photograph to those on the person they had lying unconscious in front of them. (Exhibit Q, ¶14)

Once Michael had been stabilized and his life was out of immediate danger, he regained consciousness. He recalls waking up in the hospital at approximately 2:00am and wondering why he was waking up in a hospital and why his arm was numb.[18] Michael also was absolutely stunned at how one minute he was just fine and driving along - going about his business in Tzfat - and what seemed like the next minute[19] and he had barely survived a rocket attack and was lying grievously wounded in a hospital ward with major injuries. (Exhibit Q, ¶15)

The medical staff at the hospital explained to Michael the extent of his injuries - part of the katyusha rocket ricocheted off of the ground after impact and blasted through his windshield into his shoulder. The burning rocket fragment had then cut into and detached his deltoid muscle. Thus Michael's arm was literally detached from the shoulder, hanging only by skin and flesh, and was completely limp. (Exhibit Q, ¶16)

---

[18] The head doctor later explained to Michael that the absence of pain at that time was due to the amount of endorphins his body released to numb the pain because of the severity of the trauma to his shoulder.

[19] This was actually approximately 12 hours later.

During the next few days, Michael needed to have several surgeries on his shoulder, mainly to remove bone and bomb residue from his shoulder and the surrounding area to avoid infection. The pain Michael began to experience in the hospital was almost unbearable, and he was in pure agony for many days. (Exhibit Q, ¶17)

After spending a week in the hospital in Tzfat, during which time Michael weathered ongoing rocket attacks from Hezbollah, it was determined that his medical situation was still very serious, and he was moved (under another barrage of rocket fire) to a large hospital in Tel Aviv for four further surgeries. (Exhibit Q, ¶18 and 19)

The medical staff at the Tel Aviv hospital wanted to amputate Michael's arm for fear that his arm would "die"[20] and the ensuing disease would spread to his vital organs including his heart. Michael recalls, "I have never been so scared or depressed in my life as I was when I heard this report. Despite these warnings, I refused the option of amputation. I did not know how I would live or function without two arms." (Exhibit Q, ¶20)

Michael became very depressed due to the severity of his injuries. He did not leave his bed for the entire first week of his hospitalization, and only gradually began moving slowly over the course of the next few weeks. It was a slow and very painful recovery. He had to re-learn how to talk and walk, and each stage of his recovery was an exhausting struggle. (Exhibit Q, ¶20 and 21)

Michael also had to depend on others to be dressed, fed and for other personal care needs. He found this reliance on others to be especially frustrating, as he had always been in a position of control his entire life – as a principal of a successful business and otherwise – and now he needed to be assisted by others on a daily basis. (Exhibit Q, ¶22)

---

[20] The doctors explained that Michael's arm might not be able to sustain blood flow to all of its extremities and its cells had a good chance of breaking down, and thus in their opinion amputation was necessary.

During this recovery Michael continued to be extremely vulnerable to infection and other dangers. One day Michael's body suddenly "shut down" and he almost died, as a result of the hospital staff failing to turn him over enough during his sleep to ensure a healthy blood flow to all of his vital organs. Michael lived with the fear of death each and every day during this period. When recalling this especially dark period, he says "I was never sure when I went to sleep if I would awake the next day." (Exhibit Q, ¶23)

After Michael was discharged from the hospital, he continued treatment at Israel's most prestigious rehabilitation center for his type of injury for an entire year, and he continues to this day to visit a rehabilitation center in Netanya twice a week for hydrotherapy. Michael's rehabilitation has been filled with numerous challenges and setbacks. For example, just after he was discharged from the hospital, Michael had to be re-admitted to receive two daily intravenous drip bags of antibiotics to fight an infection and numb his pain. (Exhibit Q, ¶24)

Today, some six years after sustaining his injuries, Michael has roughly only 10% of the pre-injury movement in his right hand, and he has been declared a clinical amputee. He required extensive and very painful rehabilitation just to regain that 10% movement. (Exhibit Q, ¶25)

Michael's disability has caused significant functional problems, as he was right-handed and he now finds what used to be simple tasks very challenging, including showering and dressing. Furthermore, after losing most the functionality in his right hand, Michael began relying on his left hand exclusively, which resulted in overuse and has caused infections and other problems in his left hand due to overuse. Michael's left hand has now been deemed also to be partially disabled by his doctors. (Exhibit Q, ¶26)

The attack and Michael's severe injuries also impacted him psychologically. Since the attack he has become angry and agitated very easily, which was not components of his

personality prior the attacks. Michael frequently feels frustrated and is not patient with his family or others. He feel stressful and troubled. Michael also has trouble sleeping and rarely is able to get to bed before 2:00 am. (Exhibit Q, ¶27)

When Michael does manage to sleep, he is woken regularly by vivid nightmares. He also on various occasions has fallen into serious bouts of depression and has needed the care of a specialist psychologist to help extricate him from these down times. The Hezbollah Rocket Attacks and Michael's resulting injuries have changed his entire life in a profound and unfortunate ways. He simply is no longer the same easy going and happy person he once was. Instead, he constantly focuses on his injuries and health problems, from which he experiences pain every single day. Michael says, "I have lost much of the joy of life I once knew. I experience pain from my injuries everyday." (Exhibit Q, ¶27)

While the Israeli Government initially paid for all of Michael's medical bills and rehabilitation costs, for the past two years his National Insurance payments have been terminated. The unfortunate truth is that he cannot commit to a full time job, mainly because he at regular intervals requires heavy doses of medication and often has unexpected bouts of shooting pain in his arm which is debilitating. Michael does try to be useful to my community - he volunteers to work with autistic children and gives lectures to the elderly - but he just cannot commit to a regular job schedule since he has no idea how his condition may escalate or otherwise impair him at any given time. (Exhibit Q, ¶28)

Finally, Michael's journey in building a successful business that already had some 200 clients and which was growing quickly, was cut short by the rocket attack. He assumes that had he not been injured and disabled, the business would have grown and his income would have correspondingly continued to increase. Michael attributes this significant lost business

opportunity and corresponding lost income to be another unfortunate consequence of his injuries. Each day Michael wakes up and continues to try and rebuild himself and get his life back to where it was prior to the rocket attack. (Exhibit Q, ¶29)

Dr. Strous had the opportunity to extensively examine Michael and declares, pursuant to 28 U.S.C. § 1746, that Michael displays some forms of PTSD, Dysthymia and Anxiety Disorder either currently or in the past "as a result of being directly exposed to rocket fire and his injuries (both physical and mental) in its aftermath during the [2006] War." Dr. Strous determined, based on his evaluation of Michael, that many of his symptoms "are likely to be present in varying degrees for a significant time to come and while it is impossible to state for any absolute certainty, many of the symptoms may even be permanent." Exhibit R, ¶22 and 23)

## 10.     Theodore Irwin Greenberg

Theodore Irwin Greenberg (only for purposes of this Section VI(10) and (11), "Ted") is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 17) who was born in Los Angeles, California on June 19, 1951. (Exhibit T, ¶1) He lives in Tzfat, Israel with his wife, Moreen Ellen Greenberg (Exhibit T, ¶1 and 2) only for purposes of this Section VI(10) and (11), "Moreen") who is also an American citizen. (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit )     Ted is a retired medical scientist and currently teaches English. (Exhibit T, ¶ 2)

At the start of the Hezbollah Rocket Attacks in July, 2006, Ted and Moreen were the owners of an internet café in Tzfat, which they had opened in 2002. (Exhibit T, ¶3)

On the morning of July 13, 2006, when the Hezbollah began targeting Tzfat with its deadly rockets, Ted was working in the internet café. Once he heard the distinctive whistling of

rockets overhead, Ted knew that he was under attack. One of the rockets landed about 300 feet from the Greenberg house and about 900 feet from the internet café. Ted's first concern was to take care of his customers and make sure that they were all okay, and also to find out where Moreen was since she was visiting friends in a nearby city that morning. (Exhibit T, ¶4)

Ted was able to contact Moreen, and his foremost fears for her were allayed when she told him that she had already returned to Tzfat and was safe in the bomb shelter of their apartment building. So Ted continued tending to the stranded tourists that sought shelter in his internet café and later that afternoon made it back to his home to be with Moreen. (Exhibit T, ¶5)

Along the way home, Ted witnessed the medical evacuation of a man who sustained a direct hit from a Hezbollah rocket. Even though Ted is a medic and has been trained to view emergency scenes such as this one in a medically professional manner, what he saw still haunts his memory to this day. Ted says, "The image of that grievously injured victim returns to me frequently and causes me a feeling of anxiousness." (Exhibit T, ¶6)

Ted and Moreen decided that since their building bomb shelter was too crowded with other scared and anxious residents, many of whom were children, they would stay in the basement of the internet café. The Greenbergs hoped that it would provide them with a measure of protection from any additional rockets. (Exhibit T, ¶7)

For the next three weeks, Ted and Moreen lived in the basement of their internet café business. Typically, the internet café business serviced residents of Tzfat and vacationing tourists. On average, the Greenbergs' annual income from the business ranged from $15,000-$20,000. (Exhibit T, ¶8)

Throughout the Hezbollah Rocket Attack, Tzfat became a ghost town. Residents who were able to flee for a safer place outside of Tzfat took advantage of such an option. The tourists,

understandably, also disappeared. Since no one was around, the Greenbergs had no business coming into their café, and this was the direct cause of the business' ultimate failure. Since there were no customers, the Greenbergs used the internet café during the Hezbollah Rocket Attacks as an aid center and they gave shelter and computer access to anyone in need. (Exhibit T, ¶9)

This period was very stressful and anxiety provoking for Ted. He recalls, "My outlook on life changed. I went from being unafraid to feeling very vulnerable. I realized that in the blink of an eye my entire life could be changed. Even though I had been on active duty in the United States Navy for four years, I was not prepared for living under the stress of this period of rocket attacks. As a result of the daily pressure I even resumed smoking again, a habit I had given up years earlier." (Exhibit T, ¶10)

Ted realized that he and Moreen could not go on financially without the income from the internet café, so he had to find a job that would enable him to pay the ongoing bills and expenses that were accumulating. (Exhibit T, ¶11)

Ted was only able to find a telecommunications job in Jerusalem. Since he could not commute back and forth to Tzfat on a daily basis[21], he needed to rent an apartment and stay in Jerusalem on weekdays. Thus Ted would return home to Tzfat to be with Moreen on Fridays for the Sabbath. Over the course of the rocket attacks, he paid $1,500 in rent on this Jerusalem apartment, and he also incurred additional transportation expenses travelling back and forth to Tzfat to be with Moreen. (Exhibit T, ¶12)

This upheaval in Ted's life was very stressful to him. Initially it was just the physical relocation from their home in Tzfat to the basement of their internet café. But the relocation Jerusalem was a much bigger step, and it entailed the emotional strain of having to be separated

---

[21] Tzfat is situated approximately 135 miles from Jerusalem.

from Moreen. (Exhibit T, ¶13)

Ted says that he worried about Moreen constantly during this separation, but had no choice as he needed to generate income for them. As the Hezbollah Rocket Attacks continued to rain down on Tzfat, life and its accompanying bills also continued and these bills needed to be paid one way or another. (Exhibit T, ¶14)

And this stress caused a marital strain like nothing Ted or Moreen had experienced before. Theodore explains, "In particular, my role as a husband was conflicted. No matter which choice I made, stay in Tzfat with Moreen and not have any income, or, generate income in Jerusalem and leave Moreen alone in harm's way, I felt that I had failed my wife. It was, and continues to be, extremely stressful and anxiety causing." (Exhibit T, ¶14)

The Hezbollah Rocket Attacks eventually ended, but life did not return to normal in Tzfat in time to revive the Greenberg's internet café business. They did try to jump start the business again while Ted was still working in Jerusalem. Moreen assumed responsibility for the business in Tzfat, but unfortunately it never became a profitable business again. On top of their expenses, during the Hezbollah Rocket Attacks the Greenbergs suffered a business loss of approximately $2,500-$3,000. (Exhibit T, ¶15)

The Hezbollah Rocket Attacks left Ted in a constant state of worry about the next period of rocket terrorism. Ted says, "The upheaval in my life has never gone away and I have never returned to how I was before the rocket attacks." (Exhibit T, ¶16).

## 11.     Moreen Ellen Greenberg

Moreen is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 18) who was born in Detroit, Michigan on December 15, 1947. (Exhibit U, ¶1) She is an

artist by trade and she creates murals and illustrations. (Exhibit U, ¶2)

On July 13, 2006, on the first morning of the Hezbollah Rocket Attacks, Moreen was visiting friends in the nearby city of Chazor. It was there that she received news that a rocket had been fired from Lebanon and had landed in Tzfat. Moreen was shocked since she never expected any rockets to land in Tzfat, and she was especially anxious and nervous since her husband Ted was at work at their internet café in Tzfat, and Moreen did not know whether or not he was safe. (Exhibit U, ¶3)

Moreen then took a taxi back to Tzfat and, once there, sought refuge in her building's bomb shelter. She tried to convince Ted to close the shop and come home so that he could be sheltered by their building's bomb shelter. (Exhibit U, ¶4)

Moreen stayed in the bomb shelter all morning with other residents of their building. It was a tense situation since they did not know what was happening, though it was touching to see how everyone came together during this time of crisis to keep everyone calm in the bomb shelter, especially the crying and scared children. (Exhibit U, ¶5)

Later that day, thinking that things had quieted down and it was safe to exit the bomb shelter, Moreen returned to her apartment. At around 2 p.m. that afternoon, Tzfat was again attacked by rockets. Moreen felt their entire apartment shake as a rocket hit the ground nearby, and she saw a flash before her eyes. She was very frightened and raced in fear to the bomb shelter once again. (Exhibit U, ¶6)

After this second attack, Ted returned home to be with Moreen. This was comforting to her since she had been constantly worried and anxious about him while he was at work, even though Moreen understood that Ted remained at work solely to assist the tourists that were stranded at the internet café during the rocket attacks. (Exhibit U, ¶7)

Though Ted and Moreen wanted to stay as close as possible to our apartment, the bomb shelter in their building was overly crowded with residents. Instead, they decided to pack up all of their essential belongings and stay in the basement of the internet café. They hoped that they would be safe in the basement that would double as a bomb shelter. (Exhibit U, ¶8)

As a result of the Hezbollah Rocket Attack, their internet café went out of business practically over-night. It relied upon income from local residents and mostly tourists, both of which were nonexistent as the rockets continued to fall on Tzfat. Since Ted and Moreen weren't able to conduct business, they did what good they could with the internet café and transformed it into an aid center - giving people shelter and enabling them to use the computers to check the news and update family and friends of their status. (Exhibit U, ¶9)

After about three weeks without any business in the internet café, Ted realized that he needed to find alternative employment. Despite the Hezbollah Rocket Attack, expenses still were piling up and bills needed to be paid. (Exhibit U, ¶10)

Ted found a telecommunications job in Jerusalem. Since the commute from Tzfat to Jerusalem was too long to do on a daily basis, Ted had to rent an apartment in Jerusalem. Thus Ted and Moreen would be separated the entire week and would only see each other when Ted returned to Tzfat on Friday for the Sabbath. Not only were they incurring an additional rent expense, which amounted to approximately $1,500, but they also now were incurring Ted's travel expenses as well. But without this job, the Greenbergs would have no income, so Ted had no choice but to take the job in Jerusalem. (Exhibit U, ¶11)

This period of separation which was caused by the Hezbollah Rocket Attacks was very stressful for Moreen. She recalls, "I was alone. I was constantly nervous and anxious not only for myself but also for my husband. My husband and I spoke on a daily basis while he was

employed in Jerusalem. He, too, was by himself all week and also felt very lonely. I felt his tension at not being able to be in Tzfat to protect me and this placed a huge emotional strain on our marriage. His emotions as a husband were conflicted between needing to provide for us as a family and being home in Tzfat with me during this very difficult period." (Exhibit U, ¶12)

Moreen further relates, "I had to keep myself from falling apart while he [Ted] was not with me. I stayed indoors. I tried to keep calm. Time felt like it passed exceedingly slow and I tried to make it go by quicker by helping others and by painting. However, I was under so much stress that I found that I was unable to paint myself or engage in other work." (Exhibit U, ¶13)

However, Moreen did have to venture outdoors to get food at the only open supermarket which was located across town. This was extremely challenging because she would have to work herself up psychologically for this task. Before she would leave home, Moreen would map out the route in her head and make sure that there would be shelters along the way which she could run into if the rocket warning sirens went off. (Exhibit U, ¶14)

Moreen also had trouble looking at the color red[22]. The Greenbergs had a bookcase that was painted red and she could not look at it. It was too strong of a color for her, and it reminded her of blood. This color caused Moreen anxiety and fear. (Exhibit U, ¶15)

At night Moreen slept fully dressed in her clothes. Moreen explained, "I did not want to be caught off guard if the rockets started falling in the middle of the night. I needed to be ready to run for my life at a moment's notice. I was scared and felt vulnerable and I was all alone without my husband as the rockets continued to fall all around me. It was a period of constant anxiety and the feeling of uneasiness pervaded everything I did and everywhere I went." (Exhibit U, ¶16)

---

[22] The name of the siren that signaled incoming rockets was called "Code Red".

The Hezbollah Rocket Attacks did finally end, but its effects on Moreen and Ted continue to linger. For many months following the Hezbollah Rocket Attacks Moreen was still "scared, anxious and stressed out". (Exhibit U, ¶17) Ted had no internet café business to return to in Tzfat, as the financial loss during the Hezbollah Rocket Attacks was just too great for the business to recover. The tourists were still scared of rocket fire and did not return right away and then the tourist season ended for the year. As a result of the Hezbollah Rocket Attacks, the Greenberg's business suffered a $2,500-$3,000 loss, and thus Ted had to keep his job in Jerusalem. (Exhibit U, ¶17)

When Moreen would visit Ted in Jerusalem, she discovered that she had become afraid of the larger city. She was constantly afraid that a bomb would go off and kill either her or Ted, and she constantly felt vulnerable and anxious. (Exhibit U, ¶18)

Moreen still has difficulty talking about her experiences during the Hezbollah Rocket Attacks. When she begins speaking about them, she relives what happened to her and Ted, and it feels as if she is experiencing the trauma all over again. Moreen says, "I have to suppress my tears and feelings and compose myself just to be able to describe what happened. It has changed my life forever." (Exhibit U, ¶19).

**12.    Jared Ryan Sauter**

Jared Ryan Sauter (only for purposes of this Section VI(12) "Jared") is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 19) who was born in Los Angeles, California on June 19, 1951. Jared met his wife Danielle Sauter (for purposes of this Section VI(12) and (13) only, "Danielle") in Taos, New Mexico and they were married in 2003. They live in Moshav Hinanit, a town in Eastern Israel. (Exhibit V, ¶1 and 2)

Jared and Danielle are the parents of two daughters: Ariel, born on October 10, 2004 and Mikayla, born on March 3, 2011. (Exhibit V, ¶3) Jared is currently employed as an auto mechanic. (Exhibit V, ¶5)

In early 2006, Jared and Danielle made the decision to move to Israel. The Sauters came to Israel just before the outbreak of the Hezbollah Rocket Attacks. (Exhibit V, ¶4)

In July 2006, Jared, Danielle and Ariel (who was almost two years old at the time) were living in the Northern Israeli town of Rosh Pina. Jared was working as an agricultural landscaper and goat cheese maker, and was in the process of starting his own greenhouse construction and grey water system design and installation business. (Exhibit V, ¶6)

When the first rockets launched by Hezbollah began hitting northern Israeli population centers, Jared was at work and Danielle was at home taking care of Ariel. Jared was very concerned for the safety of Danielle and Ariel because the home they were renting did not have a bomb shelter and it was quite a distance to get to the nearest protected area. (Exhibit V, ¶7)

Jared rushed home and found a rather "panicked situation", and he did his best to calm his wife and young daughter who were terrified by the loud sounds of exploding rockets falling all around. Additional rockets continued falling that day all around them. Jared did not sleep at all that night out of fear that a rocket would hit their house. (Exhibit V, ¶8)

After an anxiety-ridden night that seemed like it would never end, the Sauters decided in the morning to evacuate Rosh Pina. Jared felt that he must get his wife and daughter out of harm's way as soon as possible. So Danielle packed a few bare necessities into their car and they left Rosh Pina as quickly as they could. (Exhibit V, ¶9)

The drive from Rosh Pina was very tense. Rockets were continuing to fall all around them. When sirens went off (indicating imminent incoming rockets), they took cover under

highway overpasses where several times they felt the earth shake from the rockets' impact. Jared says, "I was very scared that if a rocket fell nearby we could be killed right out on the highway. The sense of helplessness was overwhelming and I felt totally out of control. I had no idea of what was going to happen to us. What was worse was the feeling that I would be unable to protect my family." (Exhibit V, ¶10)

The Sauters sought refuge from the Hezbollah Rocket Attack sin the home of Danielle's aunt, where they stayed for two months. It was during this time that Jared and Danielle decided they could never return to live in Rosh Pina. The thought of moving back to the site of the rocket attacks they experienced caused them too much stress and anxiety. Jared explains, "Even thinking about it [moving back to Rosh Pina] filled me with feelings of fear. The experience we went through was life altering and I would not take my wife and daughter back there again." (Exhibit V, ¶11)

When the Sauters did briefly return to Rosh Pina to pack up their belongings for their new home, they were shocked to find that all of Jared's expensive tools and other equipment - the ones he had purchased for his new business of greenhouse construction and grey water system design and installation - had been stolen. Some of the stolen items were: a circular saw and table saw, a lawnmower, socket wrenches, weed eaters, electric pipe bending press, miter saw, chop saw, jig saw, trimmer, pneumatic nail gun, 20 pieces 10 feet on 2 inch steel pipe, 10 electric water pumps, 95 mm. clear plastic 100m, ¾ in. snap-on socket seat 5.5mm-24mm, ¾ in. ratchet, ½ in. socket set 8mm-32mm, ½ in. ratchet, combination wrench set 8mm-32mm. The combined estimated value of the stolen equipment was $15,000. (Exhibit V, ¶13)

Jared could not believe that this had happened to him. His dreams of opening up his own business had been stolen from him. Jared did not have any money to buy replacement equipment

and continue with his plans. Jared comments, "It was very upsetting and disappointing. The Hezbollah Rocket Attacks had thrown our financial situation into an upheaval." (Exhibit V, ¶14)

Further exacerbating the Sauters' financial situation was the fact that Jared could not find a decent paying job while he was a refugee during the Hezbollah Rocket Attacks. Though he was able to find odd jobs here and there, the Sauters ultimately had to live off our savings, approximately $10,000, which they quickly depleted. (Exhibit V, ¶15)

The Sauters settled in Even Yehuda, a city in central Israel, and Jared was only able to find a very low paying job as a mechanic. He again would have to start at the bottom and work his way up. Jared explains his feelings of frustration: "This was very stressful for me. I had my future dreams all planned out in my new business and now I had to start from square one. Instead of being able to move forward as planned I was concerned with the basics of putting food on the table for my family. I was unsure and scared as to how we would financially handle this unsettling situation." (Exhibit V, ¶16)

Shortly after the Hezbollah Rocket Attacks ceased, Jared began experiencing panic attacks which were set off by being in large crowds or hearing loud noises. He still suffers from the panic attacks today. His feelings of extreme anxiety manifest themselves with sudden fear and nervousness, as well as physical symptoms such as sweating and a racing heart. These symptoms continue to affect Jared's daily functioning and general quality of life. (Exhibit V, ¶17)

Jared also suffers from insomnia and from high stress, caused by the trauma of living through the Hezbollah Rocket Attack. Prior to the Hezbollah Rocket Attacks, Jared slept soundly, only waking up in the morning when his alarm clock would ring. But since the Hezbollah Rocket Attacks, Jared struggles to fall asleep and he wakes up easily with the slightest

noise. This in turn hinders his ability to work effectively, and Jared "constantly feel stressed out and irritable." As an auto mechanic, Jared needs to be well rested and able to function at full capacity since he is ultimately dealing with machines that directly impact people's safety. (Exhibit V, ¶18)

When the Hezbollah Rocket Attacks came to an end, Jared and Danielle met with a therapist to help Jared better handle his stress, insomnia and panic attacks. They spent approximately $5,000 on attending weekly sessions for the first several years. Financially unable to continue paying for such treatment, the frequency of their therapy has decreased to about one session every six months, just to make sure that Jared is not regressing in his steps towards recovery. (Exhibit V, ¶19)

The anniversary of the outbreak of the Hezbollah Rocket Attacks brings back many terrifying memories of being caught in, and then fleeing, the Hezbollah Rocket Attack. Jared tries, without success, to delete these memories from his mind, but he finds it very difficult to erase the feeling that nowhere is safe, and that he is totally helpless to physically protect his family. Jared says, "I try very hard to remember my life and that of my family before the rocket attacks disrupted our lives. I do my best everyday to move forward." (Exhibit V, ¶20)

Dr. Strous examined Jared and stated, "Mr. Sauter displays some form of PTSD, depression and Adjustment disorder either currently or in the past as a result of being directly exposed to rocket fire and its aftermath of fleeing his home town during the second Lebanon War. Based on my evaluation of Mr. Sauter, I believe that many of his symptoms with which he has been diagnosed are likely to be present in varying degrees for a significant time to come and while it is impossible to state for any absolute certainty, many of the symptoms may even be permanent." (Exhibit W, ¶22 and 23).

13.      **Danielle Sauter**

Danielle is an Israeli citizen who was born in Rio de Janeiro, Brazil on September 12, 1985. (Exhibit DD, ¶1) She is a resident of Israel and currently lives in Hinanit, a moshav in eastern Israel. (Exhibit DD, ¶2) Danielle met her husband Jared, who is an American citizen, in Taos, New Mexico, and they were married on November 26, 2003. (Exhibit DD, ¶3) Danielle and Jared have two daughters: Ariel Sauter (for purposes of this Section VI(19) only, "Ariel"), born on October 10, 2004, and Mikayla, born on March 3, 2011. (Exhibit DD, ¶5) Danielle is a homemaker who focuses on taking care of her daughters and their home. (Exhibit DD, ¶6)

In early 2006, Danielle and Jared made one of the biggest decisions of their lives when they chose to move to Israel. They arrived in Israel in June, 2006, one month before the outbreak of Hezbollah Rocket Attacks. (Exhibit DD, ¶4)

In the summer of 2006, Danielle, Jared and Ariel (who was almost two years old at the time) were living in the northern Israeli city of Rosh Pina. (Exhibit DD, ¶7)

On the first day of the Hezbollah Rocket Attacks, Danielle was home with Ariel when the emergency sirens began wailing in Rosh Pina, indicating that Hezbollah rockets were quickly approaching. Danielle recalls, "I was scared and nervous for our safety since our house did not have a bomb shelter and it was a great distance to the nearest one. The sound of the nearby explosions was horrifying. I did my best to keep my daughter calm when she became petrified by the rocket sirens and explosions." (Exhibit DD, ¶8)

Jared returned home from work as quickly as he could, and the Sauters spent the rest of that day and night together, frightened and unsure what would happen to them. Over the course of that sleepless night, they decided it was unsafe to stay in their home any longer and that they

have to evacuate Rosh Pina early the next morning. (Exhibit DD, ¶9)

The next morning, Danielle and Jared packed up their most critical belongings and fled Rosh Pina in their car as quickly as they could. The drive from Rosh Pina down south was one that Danielle says she will never forget. With rockets falling all around them, the Sauters sped away - literally running for their lives. When the emergency sirens started blaring, they had to take cover under highway overpasses, and several times felt the earth shake nearby due to the impact of falling rockets. Danielle was terrified. She says, "My sense of anxiety was overwhelming as I witnessed Jared's sense of helplessness. There was no way of hiding the fact that he had no idea what was going to happen to us. He felt vulnerable and ill-equipped to protect his family." (Exhibit DD, ¶10)

The Sauters sought refuge from the hostilities in the home of Danielle's aunt, where they stayed for two months (for the entire duration of the Hezbollah Rocket Attacks). It was a very stressful and uncertain period for them, and Danielle relates that "Staying in someone else's home while a war rages around yours created feelings of constant anxiety and instability for us. We decided that we could not return to living in Rosh Pina. I was too nervous and uncomfortable just thinking about moving back. I had no desire to renew our lease there. But we had to return to collect the rest of our belongings that we had left in our haste to flee for safety." (Exhibit DD, ¶11)

After the Hezbollah Rocket Attacks finally ended, Danielle and Jared were able to return to their apartment in Rosh Pina, where they discovered that Jared's brand new power tools and other equipment, recently purchased to launch a new business, had been stolen during their absence. The value of this equipment was approximately $15,000. (Exhibit DD, ¶12)

Danielle explains that the Hezbollah Rocket Attacks significantly affected the Sauter's

financial situation. Prior to the Hezbollah missiles, Jared had been employed as an agricultural landscaper and a goat cheese maker, and he had been planning to open up a new business dealing with greenhouse construction and grey water system design and installation. Jared had purchased the new equipment in order to start this new business. Now, says Danielle, "this was not going to happen." She further explains, "This was a great blow to us. The loss of $15,000 in equipment was not something that we were in a financial position to replace. Being displaced from our home and temporarily on the move, my husband was also not able to continue working at his prior jobs. He had to give up his dream of having his own business." (Exhibit DD, ¶13 and 14)

Danielle states that the financial drain caused by the Hezbollah Rocket Attacks were very stressful to the Sauters. At first, they used their meager savings (approximately $10,000) to live off of, but that soon was depleted and they quickly realized that Jared had to quickly find a new form of employment. Danielle states that Jared was devastated by the business setback and was further demoralized by the low paying job he was forced to take as a low-level mechanic. However, since they realized that they had no other choice, Jared relegated himself to taking this position. (Exhibit DD, ¶15)

Shortly after the Hezbollah Rocket Attacks, Danielle states that Jared started experiencing panic attacks which were exacerbated by being around large crowds or hearing loud noises, and that these panic attacks negatively affected his ability to function at work, and also affected his emotional ability to deal with everyday tasks and situations. Danielle also says that Jared has bouts of insomnia and difficulty falling and staying asleep, and that overall his personality has changed to one where he is frequently irritable. The Sauters believe that Jared's change in personality is due to the trauma he suffered during the Hezbollah Rocket Attacks. Danielle explains that Jared's change in behavior after the Hezbollah Rocket Attacks has taken a

significant toll on their marriage and created a significant amount of stress and uncomfortable feelings between them. Danielle says, "As a wife it is difficult to witness your husband feeling helpless and inadequate. We are constantly trying to work together to move on but the long lasting effects of the rocket attacks continue to plague us. Many days I feel depressed and anxious and unable to function properly." (Exhibit DD, ¶16)

Danielle relates that as a result of the marital stress she and Jared were experiencing, which stemmed from Jared's emotional fears and anxieties following the Hezbollah Rocket Attacks as well as the additional financial strain caused by the Hezbollah missiles, they began to go to weekly marriage therapy sessions. These sessions were very costly, and have put the Sauters further out of pocket by approximately an additional $5,000. While Danielle reports that this therapy has been somewhat helpful, she laments that it must be continued to make sure that they "stay on track", which is a rather expensive proposition. (Exhibit DD, ¶17)

In addition to the emotional and financial toll caused by their traumatic experiences during, and as a result of, the Hezbollah Rocket Attacks, Danielle has also suffered a deterioration of her health. She has undergone two surgeries since the ending of the Hezbollah missiles, one for a burst appendix and the other a removal of a femoral cyst. Both of these ailments, in particular the former, are commonly known to be stress induced (a cause that was substantiated by Danielle's hospital staff). (Exhibit DD, ¶18)

Danielle explains that she believes that her deteriorating physical and emotional health is a direct result of the trauma and resulting stress she experienced during and after the Hezbollah Rocket Attacks. She states, "The war has obviously affected me and certainly will continue to influence me, both directly and through my husband, for many years to come." (Exhibit DD, ¶19).

## 14.     Dvora Chana Kaszemacher

Dvora Chana Kaszemacher (only for purposes of this Section VI(14) and (15), "Dvora") is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 20) and was born in Baltimore, Maryland on June 20, 1950. (Exhibit X, ¶1) Dvora married her husband Jacob Kaszemacher (only for purposes of this Section VI(14) and(15), "Jacob") on March 1, 1987, and Jacob passed away on July 27, 2011. (Exhibit X, ¶3)

Dvora is the mother of five children, three of whom are Jacob's biological children from his first marriage: Avraham was born on January 9, 1970, Rivka was born December 6, 1973, Mordechai was born May 8, 1977, Miriam was born April 17, 1988 and Chaya (only for purposes of this Section VI(14) and (15), "Chaya", and later in Section VI(14) referred to also by her married name Chaya Alkareif) was born February 13, 1990**.** (Exhibit X, ¶4)

At the time of the Hezbollah Rocket Attacks in July, 2006, Dvora was living in the northern Israeli city of Tzfat (as she still does today) with Jacob and their youngest daughter Chaya. Most of Dvora's older children were married with families of their own, and also lived in Tzfat within close proximity to Dvora's and Jacob's home. (Exhibit X, ¶2 and 5)

On the first day of the Hezbollah Rocket Attack, Dvora was taken by surprise when the first rocket fell. She heard the whistling of the rocket and its explosion. Jacob, a Holocaust survivor, and Dvora were very concerned and scared about what this meant for them as a family and as a community. They began to think about whether we should leave or stay in Tzfat. (Exhibit X, ¶6)

Several more rockets fell in the vicinity of their home. During a brief lull in the rocket fire later that afternoon, one of Dvora's daughters-in-law called her to ask if the local grocery

store was still open despite the rocket fire. She needed to get bread and milk for her children and wanted to send her eight year old child to the store. Dvora refused to allow her to send an eight year old to the store because of the danger of the rocket fire. (Exhibit X, ¶7)

Dvora went to the store to make the purchase and fortunately returned home safely. The whole time she was out of the house, Dvora was scared that perhaps another rocket would fall. Dvora remembers thinking, "What would happen to me, what could happen to Chaya, who would take care of my husband, children and grandchildren? I remembered that as a child in the Vietnam and Cold War eras, we were taught in school what to do in the event of a bomb attack. Those lessons of forty years ago resurfaced as I recalled being told to find the nearest doorway or wall and make myself as compact as possible while trying to protect my vital organs by wrapping my arms around my body and neck." (Exhibit X, ¶8)

Upon returning home, Dvora asked Chaya and her friend to deliver the bread and milk to Dvora's daughter in law's home. After the girls left on this errand, Dvora was on the telephone with a friend when she suddenly heard "the sharpest, loudest and most piercing shrill of a whistle which was a katyusha rocket flying through the air and then impacting nearby." Dvora's immediate thoughts raced to her daughter Chaya. "Where was she? Had she arrived safely at my daughter in law, was she still alive? Trying to make sense of it all through the screams of my friend and her child over the telephone line and the screams from one of my older daughters in the house who was calling out to me to find out what had just happened and if I was okay, all I kept thinking about was Chaya. I was so very frightened that my daughter might have been injured. That sense of fear and being out of control is one that I will not easily forget." (Exhibit X, ¶9)

As it transpired, the rocket had in fact impacted very close to Chaya when she was on her

way to drop off the groceries. Fortunately, Chaya was not physically injured but she was very scared and shaken from the incident, having a rocket hit so close to her and feeling as if she was about to die. (Exhibit X, ¶10)

After this incident, Chaya became anxious and nervous. With most of her friends fleeing Tzfat for safety reasons, Chaya stayed mostly at home since the summer camp that she was supposed to attend had been cancelled. Within a week or two of being home with Dvora and Jacob during repeated rocket attacks, the fear, stress and insecurity of what could happen next was too much for Chaya to bear and she, too, went to stay with different friends in other, safer parts of the country. (Exhibit X, ¶11)

Chaya was a different person immediately after the incident with the rocket near-miss, and her change continued to persist when she returned home after the Hezbollah Rocket Attacks had ended. She became less ambitious in school, her ability to concentrate was significantly diminished and her zeal for life had been dampened. Chaya was supposed to attend a school in England but decided against it because she didn't want to be too far from the family. (Exhibit X, ¶12)

Not only did Chaya personally have a close call with the rocket, but she was also traumatized by watching her entire family frantically flee the city with their small children. Conflicted with leaving her older mother and Holocaust survivor father at home, Chaya repeatedly indicated that she felt guilt at deciding to leave her parents so that she could be further from the rocket fire. (Exhibit X, ¶13)

Dvora remained with Jacob in Tzfat during the entire Hezbollah Rocket Attacks. Jacob, who was an artist, had a gallery in Tzfat from which their entire family income was generated. With the onset of the Hezbollah Rocket Attack, the tourists disappeared overnight and so did

their income. The Kaszemacher thus were required to shut the gallery. Not only was this income necessary to support Dvora, Jacob and Chaya, but Jacob also helped financially support their older married children - one of whom had six children of his own and a pregnant wife. (Exhibit X, ¶14)

The financial stress from the gallery being closed, coupled with Jacob's distress about not being able to work, in addition to being an ongoing target of Hezbollah rockets, was something that affected Dvora greatly. Dvora also had to deal emotionally with not having her children near her and not being sure of their safety. Dvora spent many days trying to find her son accommodations down south for his large family. This also caused Dvora undue stress and worry since it was so hard to help from afar. (Exhibit X, ¶15)

During the Hezbollah Rocket Attack, Dvora and Jacob rarely left their home, and when they did it was only for essential reasons like to go to the grocery store, bank or synagogue. Several times during their outdoor ventures, the warning sirens which detected incoming rockets would sound. Dvora would follow emergency protocol but she was very nervous and scared for Jacob, since she did not know where he was and whether he was safe. Dvora explains, "He [Jacob] was not the type to follow emergency protocol. Being a Holocaust survivor shaped his attitude toward danger. I constantly feared that his not following emergency protocol when he was outside might cost him his life. The thought of losing him was petrifying." (Exhibit X, ¶16)

Dvora still, to this day, tries to push memories of the Hezbollah Rocket Attacks out of her mind. Dvora gets extremely stressed out talking about what happened to her and my family during this time. The thoughts and reminders of that period leave her feeling depressed at times. Whenever she hears civil defense sirens she gets anxious, and goes into "emergency" mode. She turns on radio, calls someone to see what has happened and asks herself whether this time it is

for real or just army drill. (Exhibit X, ¶17)

Dvora says that the impact of the Hezbollah missiles "was life altering for me and my family, the consequences of what happened will surely stay with us for the rest of our lives." (Exhibit X, ¶18)


**15.      Chaya (Kaszemacher) Alkareif**

Chaya (Kaszemacher) Alkareif is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 21) who was born in Tzfat, Israel on February 13, 1990. (Exhibit Y, ¶1) Chaya is married, is the mother one daughter, Shira, born February 23, 2011, and lives in Bnei Brak, Israel. (Exhibit Y, ¶2 and 3)

Chaya is a customer service representative at a call center for Isracard, an Israeli credit card company. (Exhibit Y, ¶4)

At the time of the Hezbollah Rocket Attacks in July, Chaya was sixteen years old and living with her mother Dvora and father Jacob in Tzfat. Chaya's married older brothers and sisters also lived in Tzfat, close to their parents' home. (Exhibit Y, ¶5)

When the first rockets of the Hezbollah Rocket Attacks fell in Tzfat on July 13, 2006, Chaya was at home waiting for camp to start since it was summer vacation. She recalls hearing a loud boom but did not fully understand the reality of what was happening. While she heard that this was the possible start of a war, she was a typical sixteen year old pre-occupied with regular teenage concerns of going out with friends and shopping for new clothes. (Exhibit Y, ¶6)

During the lull between the first and second rockets that fell that afternoon, Dvora asked Chaya to bring some milk and bread to her sister who lived close by. Chaya set out to deliver the groceries (that her sister needed for her children), and Chaya took a friend along on the errand.

(Exhibit Y, ¶7)

Before they set out, Dvora instructed them that if they heard a siren (which meant that a rocket was incoming), they should find a place to hide, make themselves as small as possible and cover their necks with their hands. Chaya was really scared by these instructions, and hoped that she would never need to use this advice. (Exhibit Y, ¶8)

Chaya and her friend were really frightened and were holding hands as they ran as fast as they could to reach the home of Chaya's sister. Chaya remembers repeatedly thinking to herself that they were going to be okay, and that they would drop off the groceries and make it back home safely. (Exhibit Y, ¶9)

Unfortunately, on their way, they heard the loud and unmistakable shrill whistle of an incoming rocket. Chaya recalls, "It was so close to us and I was so scared that I was going to die. We were in a narrow street and we frantically found a narrow side alley to run into for shelter. I had never been in such a stressful situation before; I had to decide in less than a split second where would be the safest place to hide. It felt as if my head was pulling in one direction but my legs were running in a different direction. My body was operating on automatic survival mode. As we crouched together, covering our bodies like my mother had instructed, with my friend actually on top of me, I looked around and saw that we had unknowingly placed ourselves right next to two gas canisters. I could not do anything; it was too late to run out and find another place to hide. At that point I thought that the rocket would land right on top of us and that we would just die on the spot as we exploded with the two gas canisters. I thought that it would be a horrible way to die, since my parents would not have my body to bury, but at least it would be quick and hopefully painless. In those split seconds I saw my entire life pass before my eyes and couldn't understand why I was only given sixteen years to live; that is how close to death I felt."

Chaya and her friend heard the bomb explode very close to them. Chaya turned her head slightly and could see the large plume of black smoke rising in the air. They jumped to their feet and raced for their lives back to the Kaszemacher home where Dvora, hysterically crying, had been frantically waiting for them because she had also had heard the whistling rocket and did not know whether Chaya was alive or dead. (Exhibit Y, ¶10, 11 and 12)

After this experience, Chaya was very scared and anxious every time she heard an incoming rocket. She was stressed out and was crying to her mother during much of the Hezbollah Rocket Attacks. Unlike most residents of Tzfat who had evacuated the city, they had nowhere to go. Chaya remained in her parent's house for the next several weeks while the Hezbollah Rocket Attacks was still going on around them on a daily basis. Chaya did not leave the house because she was too scared, and she moved her belongings to a part of the house that was partially underground in the hopes that this location would be safer in case a rocket landed on their house. (Exhibit Y, ¶13)

During this entire traumatic experience, Chaya had no one to talk to other than her parents. All of her friends had evacuated from Tzfat, and few had cell phones at that time. Chaya and her parents sat glued, day and night, to the computer and news to get daily updates as to the status of the Hezbollah Rocket Attacks. This only added to the stressful, anxious environment that had now unfortunately become their daily reality. (Exhibit Y, ¶14)

Chaya's father Jacob was an artist who had a gallery in Tzfat, but once the rockets started falling, the tourists stopped coming to the gallery and therefore Jacob had no income. Chaya noticed that her father, a Holocaust survivor, was stressed out by his lack of income. And Chaya realized that this would have repercussions for her since she would be unable in the future to ask for discretionary funds. (Exhibit Y, ¶15)

A few weeks into the Hezbollah Rocket Attacks, an opportunity presented itself for Chaya to leave the dangers of Tzfat and be with friends in Jerusalem, which was outside of the range of the rockets. While Chaya was very scared to remain in Tzfat, she did not want to leave her elderly parents all by themselves. Ultimately, Chaya chose to leave Tzfat but spoke to her parents many times each day to see how they were. Even though they told her that they were okay, Chaya feared that something had happened to them or to the house and that they were hiding it from her so that she wouldn't worry. (Exhibit Y, ¶16)

Being in Jerusalem away from the dangerous rockets exploding in Tzfat made Chaya feel better. There were people for her to talk to and these people were not stressed out from being under a constant bombardment of rocket fire. However, Chaya was constantly worried and anxious about her parents all the time. Fortunately the cease fire went into effect not long thereafter, and Chaya was able to return home. (Exhibit Y, ¶17)

Chaya says that she is a changed person since as a result of her experiences during the Hezbollah Rocket Attacks. She explains, "As I waited for the rocket to land thinking that I was going to be killed, I was robbed of my innocence. It made me understand that life is not so good all the time." She continues, "Even today, it is extremely difficult and painful for me to go back to Tzfat to visit with my parents and pass by the spot where I stood waiting to be killed. I am anxious, scared and nervous. I have panic attacks and start crying as I relive the entire experience from beginning to end. When I walk outside in Tzfat my senses and alertness are heightened as I scan the street thinking of where would be a good place to hide if a rocket should be fired again from Lebanon into Israel." (Exhibit Y, ¶18 and 19)

But Chaya's panic, fear and stress are not limited to when she is in Tzfat, but accompany her wherever she goes. Before the war, Chaya says that she was not afraid of anything. But now

she says that such innocence is a distant memory. Chaya explains, "I am scared when I hear alarms or loud noises that sound like bombs. My emotions just overwhelm me suddenly. I do not want to be left alone. I am afraid of thunder since it sounds too much like exploding bombs. I recall an episode when the electricity went off in my house and I just sat there crying and waiting for my husband to come to rescue me. No matter how many years have gone by since the war, I re-live everything on the anniversary date. The flashbacks are so frighteningly real; these are things that I fear I will carry with me for the rest of my life." (Exhibit Y, ¶20 and 21)


**16.   Avishai Reuveni**.

Avishai Reuvane (only for purposes of this Section VI(16) and (17), "Avishai") is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 22) who was born in Los Angeles, California on June 29, 1972. (Exhibit Z, ¶1) In 2003, Avishai married Elisheva Aron (only for purposes of this Section VI(16) and (17), "Elisheva"), two years after he and Elisheva both immigrated to Israel individually (each of them came to Israel alone, without any family or friends). (Exhibit Z, ¶4 and 5)

At the time of the Hezbollah Rocket Attacks, Avishai and Elisheva were attempting a reconciliation (they had divorced in 2005) and were living together in Tzfat. (Exhibit Z, ¶7) Avishai was working as a handyman, and was trying to establish himself as a plumber. (Exhibit Z, ¶8)

On July 12, 2006, when Hezbollah started shelling civilian areas in the north of Israel, it soon became very obvious to Avishai that this time it would be very different from previous attacks. For one thing, rockets began falling on Tzfat, which was unprecedented. (Exhibit Z, ¶9)

Avishai finds it difficult to accurately convey how it felt to be in Tzfat during the

Hezbollah Rocket Attacks. He says, "I find it difficult to describe the feeling that the sky is not safe; that at any given moment bombs can literally fall on your head. Those feelings were only intensified by the fact that we didn't have a bomb shelter in our house, nor one close by." (Exhibit Z, ¶10)

On the second day of the Hezbollah missiles, a Hezbollah rocket hit the roof of the house next to the Reuvane home. Avishai explains, "The noise was deafening. Smoke and debris entered our home in plumes. Although we obviously felt, and were, very unsafe in our home, we believed we did not have any viable options. Having a missile hit so close to us further deepened my anxiety and fear." (Exhibit Z, ¶11)

Avishai continues, "Later that day, I was in our home office, and another Katyusha rocket hit the neighbor's house directly adjacent to the wall I was standing next to. The intensity of the impact, which occurred less than ten feet from me, threw me up in the air and across the room, smashing me against the opposite wall. This caused me to lose consciousness and sustain several injuries." (Exhibit Z, ¶12)

When Avishai regained consciousness, and began slowly realizing what had happened, he was in a great shock, and started to feel intense pain as a result of his injuries. He experienced an overwhelming fear for his life, and the life of Elisheva. (Exhibit Z, ¶13)

After Avishai was injured, he and Elisheva decided that they could not stay another minute in Tzfat. They had resolved to leave immediately, even though it was already the evening, they didn't have a car of their own and it was unclear whether they would be able to find operating public transportation out of Tzfat at such an hour. Although it was obviously unsafe to expose themselves on the open roads, the Reuvanes took their chances, and luckily made their way down south to Jerusalem. Avishai explains the context of their decision to leave:

"The overwhelming sense of panic made it impossible for us to wait until morning, and we made the decision to flee at all costs. Even the realization that we had no place to go to didn't stop us. We were both relatively new to the country and didn't have family or many friends. Upon our departure from Tzfat, we couldn't find a decent place to stay and we couldn't afford paying for alternative housing since we had very little money. Our bank, which was located in Tzfat, was closed due to the on-going war and there was no one we could speak with about either taking out a loan or receiving an extension of credit on our account." (Exhibit Z, ¶14)

When they arrived in Jerusalem, Avishai felt a compelling urge to visit the Western Wall in the Old City. Following the horrific events of that day which left him battered both physically and emotionally, he felt the need to visit this holy place and pray. While walking in the Old City, Avishai encountered two Arab men, who started harassing him. They taunted Avishai as he walked away, seemingly determined to pick a fight. They started making offensive comments regarding the fact that he was Jewish, that rockets were falling on Israeli cities and his noticeable injuries. (Exhibit Z, ¶15)

After enduring continued taunting, Avishai felt something inside himself snap; he couldn't stop himself from reacting and ended up getting into a physical confrontation with them. All of the built up anxiety and tension simply overwhelmed him. (Exhibit Z, ¶16)

Avishai was never a violent man and his behavior that night was very out of character and totally inconsistent with anything he had done in the past. The enormous distress and tension of the preceding days had taken a toll on him, and his encounter with these men was the last straw. (Exhibit Z, ¶17)

Ultimately, Avishai paid a very heavy price for his reaction that night. He was arrested on account of the fight, and even though he explained the circumstances to the court, he was still

sentenced to a year in jail. (Exhibit Z, ¶18)

The time spent in jail was extremely hard for Avishai. He had never pictured himself as a criminal, and never before came anywhere close to committing a criminal act. Were it not for the horrifying experiences he had just experienced, Avishai would never have been in this situation. The thought of Elisheva having to deal with the situation she was in all alone made things even harder for Avishai. (Exhibit Z, ¶19)

Being in jail made it impossible for Avishai to properly recover from the trauma he had experienced. Being locked up and surrounded day and night by a bad crowd with no one to help him or talk to him about what he went through only caused his mental state to deteriorate further. (Exhibit Z, ¶20)

Since he was caught in the Hezbollah Rocket Attack, Avishai has been in a constant state of anxiety. The experience of having his life turned upside down so suddenly and so drastically causes him to live in constant fear, and he often wonders when something similar might happen again. (Exhibit Z, ¶21)

For years after the Hezbollah Rocket Attacks, Avishai has been unable to concentrate on the future and focus on rebuilding his life, both personally and professionally. He has made several attempts, but was never able to follow through with them effectively. (Exhibit Z, ¶22)

Since the Hezbollah Rocket Attacks, Avishai has become nervous, constantly on edge, and extremely sensitive to even minor things. This contrasts greatly to Avishais' personality prior to the Hezbollah Rocket Attacks, which was calm and even-tempered. In the past couple of years, Avishai has been receiving therapy and he does feel as though there has been an improvement, but there is still much work to be done. Avishai believes that his symptoms since the Hezbollah barrages mirror those associated with Post Traumatic Stress Disorder. For

instance, he overreacts to certain stimuli, has trouble regulating his responses to everyday situations, has trouble concentrating on and following through with basic tasks, his interpersonal relationships have suffered greatly (including the faltering of his reconciliation with Elisheva), and he is often depressed. (Exhibit Z, ¶23)

After Avishai was released from jail, he returned to live in Tzfat, because it was the only place he was familiar with in Israel. Further, since he and Elisheva are no longer together, and since the living expenses in Tzfat are much lower than they are in the center of Israel, Avishai felt as though he had no other realistic alternative than returning to Tzfat. Living in Tzfat is not easy, and Avishai is confronted on a daily basis with the fact that the Hezbollah rockets could be fired again on Tzfat at any moment. He says, "Walking around Tzfat, I still often look up at the sky frightened that they [Hezbollah rockets] might be coming down on me." (Exhibit Z, ¶24)

### 17.     Elisheva Aaron

Elisheva is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 23) who was born in Houston, Texas on February 11, 1973. (Exhibit AA, ¶1) She currently lives in Jerusalem. (Exhibit AA, ¶2) At the time of the outbreak of the Hezbollah Rocket Attacks, Elisheva was living with her then husband Avishai in Tzfat. (Exhibit AA, ¶7)

On July 12, 2006, when Hezbollah started firing rockets at civilian population centers in northern Israel, including Tzfat, Elisheva began feeling truly afraid for her and Avishai's well being. Sirens and explosions were heard constantly around them, and they didn't have a bomb shelter in their house or close by. Elisheva says that she "was utterly terrified". (Exhibit AA, ¶8)

On the second day of the Hezbollah Rocket Attacks, a rocket fired by Hezbollah from Lebanon hit the roof of the house next door. The explosion was devastating and everyone in the

area was shocked. Having a rocket hit so close to Elisheva only further deepened her anxiety and fear. (Exhibit AA, ¶9)

Later that day, when Avishai went into his home office, another rocket fell and struck their neighbor's house. The rocket hit the neighbor's house directly on the other side of the office wall where Avishai was located. The intensity of the impact, which occurred just less than ten feet from where Avishai was standing, threw him across the room and into the room's opposite wall. The impact knocked Avishai unconscious and he sustained several injuries as a result of this blow. The impact of this rocket also broke many of the windows in their home. (Exhibit AA, ¶10)

After Avishai was injured, Elisheva's and Avishai's sense of distress, and the overwhelming fear for their lives, led them to flee Tzfat in the middle of the night. They decided to go south to Jerusalem where the rockets couldn't reach them. (Exhibit AA, ¶11)

Since both Elisheva and Avishai were relatively new to Israel and did not have family or many friends, they had trouble finding a place to stay. Moreover, they could not afford to pay for alternative housing since they had very little money. Their bank, which was located in Tzfat, was closed due to the ongoing Hezbollah Rocket Attacks and there was no one they could speak with about either taking out a loan or receiving an extension of credit on their account. (Exhibit AA, ¶12)

The night they arrived in Jerusalem, their situation suddenly became even more unbearable. Avishai decided to go to the Old City and visit the Western Wall. He felt a compelling urge to visit this holy site and pray following the horrific events of that day. On his way to the Western Wall, Avishai encountered a couple of Arab men who were determined to harass and tease him. They made offensive comments about his being Jewish, the rocket attacks

in the north and his injuries. Avishai, who had always been a peace loving, calm, and completely non-violent person, lost control and engaged in a physical fight with the two men. This uncharacteristic response was obviously a knee-jerk reaction caused by the traumatic events of that stressful day. This event led to Avishai's arrest and ultimately to his year-long incarceration in an Israeli jail. (Exhibit AA, ¶13)

After Avishai's arrest, Elisheva's feelings of solitude and helplessness were almost too great to bear. On top of barely speaking Hebrew and not knowing anyone who could help or assist her, Elisheva's life partner suddenly had been thrown in jail and she was left to deal with the situation completely on her own. (Exhibit AA, ¶15) Elisheva moved into a friend's empty apartment in Jerusalem. Since the apartment was empty and unfurnished, she had to sleep on the floor for several weeks until the Hezbollah rocket Attacks ended. (Exhibit AA, ¶13)

Due to the trauma Elisheva experienced, she could not return to Tzfat even after the Hezbollah Rocket Attacks ended. She says, "I was constantly afraid of being killed in a terror attack. The feeling of safety and peace I once had there was now lost forever." (Exhibit AA, ¶16)

The Hezbollah Rocket Attacks left Elisheva with substantial financial difficulties. While she was in Jerusalem, not only were living expenses significantly higher than in Tzfat, but she also had to continue paying rent to her landlord in Tzfat. Worse, the Hezbollah Rocket Attacks left her without any income. (Exhibit AA, ¶17)

Before the Hezbollah Rocket Attacks began, Elisheva worked for a company in Tzfat that organized conventions primarily for visiting tourists. The Hezbollah Rocket Attacks brought tourism in Tzfat to a grinding halt, and the Tzfat branch of this company (which had previously been extremely successful, especially in the summer months) was forced to completely shut down. Tourists were afraid to go to Tzfat during the Hezbollah Rocket Attacks and even for

many months after it ended. Since Elisheva's employer was almost entirely dependent on tourism and a large portion of its annual income relied on its summer business, as a result of the great financial loss it suffered it could no longer afford to pay her salary. (Exhibit AA, ¶18)

The Hezbollah rocket Attacks in general took a great toll on Elisheva. She explains, "My family was destroyed. Avishai and I couldn't get back together after the year he spent in jail and all that had happened to us, even though we tried several times. He is a changed man – for the worse. I lost the sense of security I once had and suffered great emotional, financial and mental trauma. Unfortunately, due to my difficult financial state, and the time and energy it took to try and put my life back together by resettling in a new city and finding a new job, I was not able to seek psychological counseling or other professional help. Without this help, I continue to feel the effect of the trauma I underwent every day and probably will for many years to come." (Exhibit AA, ¶19)

## 18.    Yair Mor

Yair Mor (only for purposes of this Section VI(18) "Yair") is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 24) who was born in Jerusalem, Israel on November 29, 1958. (Exhibit BB, ¶1) In 1962, Yair's family moved to the United States, where Yair lived with his parents until 1972. (Exhibit BB, ¶3)

Yair is married and have three sons: Eden, born on December 12, 1986, Nadav, born on April 8, 1990 and Eli, born on March 7, 1991. (Exhibit BB, ¶4)

Yair is a resident of Israel and currently lives in Rosh Pina, Israel. (Exhibit BB, ¶2)

At the start of the Hezbollah Rocket Attacks, Yair was living in Rosh Pina and owned an art business in Tzfat. The business, which was started in 2000, consisted of an art gallery with a

restaurant/café and an adjoining factory area where we manufactured special artifacts that included hand-made "Talitot" (prayer shawls) and yarmulkes. (Exhibit BB, ¶5)

During the summer of 2006, Yair employed fourteen employees who worked among the three different work areas. Yair's business income is dependent on tourists who visit Tzfat during the peak summer tourist season. Sixty percent of his annual income is generated in those three short months of June, July and August. (Exhibit BB, ¶6 and 7)

The years prior to 2006 had shown successive growth in Yair's business, and 2006 was forecast to be very promising. In fact, Yair was expecting a growth of an additional 20-30% in comparison to the prior year, in which his gross income was approximately $550,000. At least through the first day of the Hezbollah Rocket Attacks, Yair says that "business was booming". But his dreams and expectations for growing profits were shattered when the first Hezbollah rocket landed in Tzfat. (Exhibit BB, ¶8)

Yair's restaurant/café has a balcony dining area overlooking a beautiful view. On the first day of the Hezbollah Rocket Attacks, this balcony was packed with tourists. All of a sudden, Yair and his patrons heard three sharp, piercing whistling sounds followed by three very loud booms.

Within seconds, the beautiful calm was shattered. Yair's customers became hysterical and began to panic. In their frenzy to find safety, tables were overturned and plates shattered on the floor. It was a very scary moment for everyone there. (Exhibit BB, ¶9 and 10)

As the factory area of Yair's property was the most reinforced and protected area, he directed all the of the tourists to move inside the factory, and Yair tried to comfort the hysterically crying children and elderly people. The group remained there for about half an hour, and then Yair made sure that all of the tourists were either on their buses or in taxis heading out

of Tzfat. (Exhibit BB, ¶11)

Since the tourists fled, it was not necessary for Yair to have all of his employees stay on that day, so the only employees that remained were the factory workers. But after several hours when the rocket attacks became more intense, Yair determined that it was too dangerous for anyone to stay where they were and he closed shop. Yair returned to Rosh Pina, and was not able to reopen the business until after the Hezbollah Rocket Attacks ended in the end of August. (Exhibit BB, ¶12)

Rosh Pina also proved to be unsafe for Yair and his family. They experienced numerous rocket attacks there and after one particular harrowing attack, which shook his entire house, Yair and his wife packed up several suitcases of belongings and left with their sons for what they hoped would be safer ground in Tel Aviv – a city further south in Israel and out of Hezbollah's range. (Exhibit BB, ¶13)

What they thought would be a short weekend of displacement turned into a six week odyssey. During this period, the Mor family stayed with different friends around the country, but also needed to stay in hotels since it was hard for a family of five to be accommodated in someone else's home. Yair really felt like they were an imposition, and felt uncomfortable taking advantage of other's hospitality for such a long period. (Exhibit BB, ¶14)

The expenses of this displacement were overwhelming. Between hotel bills, food and purchasing necessary items that they did not bring with them when they hastily evacuated Rosh Pina, Yair spent approximately $3,000 a week to take care of his family. This extra total expenditure of approximately $18,000 was acutely felt, especially since Yair's business was closed and he was not generating any income. (Exhibit BB, ¶15)

During the second week of the Hezbollah Rocket Attacks, Yair was informed that a

rocket had hit his restaurant/café. Under the cover of darkness, when there tended to be less of a chance of a rocket attack, Yair travelled back to Tzfat to assess the damage. (Exhibit BB, ¶16)

Indeed, Yair's business had been badly damaged by an exploding Hezbollah rocket. Yair was unable to open the pull-down metal doors to get into the premises, since they had been warped from the rocket's impact. The building's glass windows had been shattered and he was thus able to peer inside, and he saw that everything was completely shattered. Since the Hezbollah Rocket Attacks were still ongoing, there wasn't much more that he could do so he boarded up the windows to prevent animals or thieves from entering and left. Yair was very concerned about his business; it was the source of his family's livelihood and it now seemed to be totally destroyed. He was very upset throughout the duration of the Hezbollah Rocket Attacks about all of the wreckage and was extremely frustrated that he could not get back to Tzfat to try and more accurately assess the damage inflicted. (Exhibit BB, ¶17)

When the Hezbollah Rocket Attacks finally ended in August, Yair was able to return to Tzfat to ascertain the actual damage. The damage was severe. Not only were the works of art and glass shelving all completely destroyed, but the building itself had sustained structural damage from the forceful impact of the Hezbollah rocket. (Exhibit BB, ¶18)

Yair had sustained lost income of approximately $150,000 (based upon the prior year's income for the same time period). However, this amount does not take into account the rapid growth the business had undergone and the expected increase from the prior year of an additional 20%-30% (which was approximately an additional $30,000- $44,500). (Exhibit BB, ¶19)

Another significant factor to be considered in calculating Yair's business loss was the additional six months of lost income, when his business was standing practically vacant, until tourists began returning to Tzfat. The cessation of the Hezbollah Rocket Attacks did not for some

time lead to a revival of tourism to Tzfat. When the Hezbollah barrages commenced in July 2006, because of the uncertainty of how long it would last, people were already cancelling their November and December trips. Yair's projected loss from these additional months was approximately $100,000, again without taking into account business growth from the prior year (since these months are not during the high season). Furthermore, Yair lost inventory worth approximately $27,000. During the time period, while Yair was waiting for tourism and revenue to pick resume normal levels, he continued to pay the salaries of his skilled artisan workers who he had trained in his unique craft. Over the six month period after the Hezbollah Rocket Attacks ceased, Yair paid five workers approximately $7,300 per month, which added another approximately $44,000 in losses sustained as a result of the Hezbollah Rocket Attacks. (Exhibit BB, ¶19, 20, 24 and 25)

The most devastating physical damage, however, was the structural damage to the gallery which had been built to very high standards. The very expensive Marvin windows had all been blown out from the impact of the Hezbollah rocket. In addition, the rocket caused cracks throughout the walls and blew out and split in half a solid wooden door on the building's third floor. (Exhibit BB, ¶21)

When Yair replaced the shattered windows, he could not afford to use the expensive Marvin windows as he had originally. Instead, he had to use standard windows and thus he was unable to recreate the beautiful and unique look that the Marvin windows produced. (Exhibit BB, ¶22)

Many of the wall cracks still remain. Yair does not have the funds to make all necessary repairs, and thus he must live with them. This damage is not merely cosmetic; it also calls into question the soundness of the building's structure. Despite all the work and money spent on

repairs and replacement artwork, the gallery does not come close to resembling the grandeur of its former self. (Exhibit BB, ¶23)

In addition to the significant economical losses that the war caused Yair, the trauma suffered by him and his family members, which has affected them in many ways, was the worst fallout of the Hezbollah Rocket Attacks. Yair says, "It is difficult to forget the overwhelming fear I felt for my life and the lives of my loved ones, as well as the fear of losing everything I have worked for, my home and my business. I believe the worst thing of all was watching my children lose their sense of security. That feeling of safety, the feeling most people have in their homes and usually take for granted, was now stolen from my children and me and there is no telling when or if we will ever get it back." (Exhibit BB, ¶26, 27 and 28)

## 19.    Mikimi Steinberg

Mikimi Chochmat-Lev Steinberg (only for purposes of this Section VI(19) "Mikimi") is an American citizen (Exhibit FF, Tolchin Passport Declaration, Internal Exhibit 25) who was born in Boston, Massachusetts on December 21, 1962. (Exhibit CC, ¶1) In September 1979, when Mikimi was 16 years old, she moved to Israel by herself and has been living there ever since. (Exhibit CC, ¶2)

Mikimi has a daughter named Maya (only for purposes of this Section VI(18) "Maya") who was born on December 12, 1985. (Exhibit CC, ¶3) Maya currently lives in Kiryat Malachi, the same city she lived in during the Hezbollah Rocket Attacks, which was not within the range of the Hezbollah Rocket Attacks. (Exhibit CC, ¶4)

At the time of the Hezbollah Rocket Attacks, Mikimi was living by herself in a rooftop apartment in the northern Israeli city of Tzfat and was employed as an occasional babysitter.

(Exhibit CC, ¶5)

At that time, Mikimi was awaiting ankle surgery for a prior ankle injury that made it very difficult for her to get around. This surgery ended up being postponed because of the Hezbollah Rocket Attacks. (Exhibit CC, ¶6)

Just before the first Hezbollah rocket fell on Tzfat, Maya came to evacuate Mikimi from her rooftop apartment. Maya feared that Mikimi's limited mobility due to her ankle injury made her a sitting duck in the event that Hezbollah made good on its threats of hostilities, and Maya feared for Mikimi's life if she were to remain in her exposed apartment by herself. (Exhibit CC, ¶7)

So Mikimi moved in with Maya in her Kiryat Malachi apartment, from where they frightfully followed news of the Hezbollah Rocket Attacks. Mikimi did not know what was happening to her friends, apartment, and belongings that had remained in Tzfat while Hezbollah rained down rocket barrage after rocket barrage on her city. (Exhibit CC, ¶8)

Maya's foresight potentially saved Mikimi's life. On the last Friday of the Hezbollah Rocket Attacks, Mikimi was notified that her apartment had sustained a direct hit by a Hezbollah rocket. Had Mikimi been at home, it is clear that she would not have made it out of the apartment in time to reach a bomb shelter.[23] (Exhibit CC, ¶9)

Mikimi is terrified by the thought that she may have been killed had she been at home. Had Mikimi been in her apartment, the short warning time, coupled with her hobbling ankle injury, would have made it impossible for her to make it to safety before the rocket hit. Mikimi says, "To think that I might have been killed had I remained in my home is extremely frightening and stress inducing." (Exhibit CC, ¶10)

---

[23] In most cases there is very little time between when the siren goes off indicating that a rocket is incoming and the rocket's impact – often as little as ten seconds.

After the Hezbollah Rocket Attacks ended, Mikimi was able to return to Tzfat to ascertain the damage to her apartment. The rocket had broken thorough a wall near her kitchen; had its force been a little stronger it would have gone through her bedroom wall as well. (Exhibit CC, ¶11)

The shock of returning to her apartment that she once felt safe in was overwhelming for Mikimi. She recall, "I was welcomed by a large gaping hole in my apartment, and shattered glass and grey rubble strewn everywhere. When I saw the size and the location of the hole, it became clear to me that had I been home at the time of the attack, I probably wouldn't have made it out alive." (Exhibit CC, ¶12 and 13)

Many of Mikimi's belongings were also destroyed as a result of the rocket striking her apartment. Her bookcase was destroyed as well as many of her books, a special dreidel collection and other personal belongings. The toys that Mikimi used for her babysitting jobs were destroyed and her refrigerator was damaged. While these things could be replaced, it was the emotional damage that Mikimi found to be overwhelming. Having to put everything away and thinking that she could have been killed had she stayed at home was very stressful. Years later, Mikimi would still find remnants of the rocket's impact (shards of glass and brick rubble) and relive the emotional pain of the attack on her apartment. (Exhibit CC, ¶14)

In addition, Mikimi's friend who she would visit with and who lived two floors below her was injured by shattered glass when her windowpanes exploded from the impact of the Hezbollah rocket. This was very scary for Mikimi, and it forever shattered the illusion that she is safe and protected in her own house. (Exhibit CC, ¶15)

Since Mikimi's apartment was rendered uninhabitable as a result of the rocket attack, after the Hezbollah Rocket Attacks the Israeli government put her up in a hotel in Tzfat until her

apartment had been repaired. She lived in this hotel for about two and a half months and then with a friend for an additional month. (Exhibit CC, ¶16)

At the end of August, 2006, while Mikimi was residing in the hotel, she was finally able to undergo the ankle surgery that had been postponed due to the Hezbollah Rocket Attacks. During the long recovery period that followed her surgery, Mikimi's mobility was significantly limited and she had to use a wheelchair for several months. (Exhibit CC, ¶17)

While Mikimi was still not allowed to live in her apartment because of ongoing repairs, there were times when she needed to enter the apartment for various reasons. This period proved to be very difficult for her both physically and psychologically. (Exhibit CC, ¶18)

The impacting Hezbollah rocket had damaged the building's elevator and it had not yet been completely fixed. Getting up to her rooftop apartment on the ninth floor was very difficult after the ankle surgery, and in order to climb up the stairs Mikim had to sit down on the steps and go up them one at a time. That struggle often brought Mikimi to tears because she felt very helpless and frustrated. (Exhibit CC, ¶19)

The company contracted to fix all of the damaged houses in Tzfat was completely backed-up and the repair of Mikimi's home took a great deal of time. She was scared to be in the apartment alone until the wall damage was fixed. And she just could not look at the hole in the wall - it was too painful and frightening for her. Mikimi says, "I would start shaking just thinking about coming into the house and seeing the damage." (Exhibit CC, ¶20)

Mikimi does her best to disassociate herself from the anniversary of the Hezbollah Rocket Attacks, as doing so makes it a little easier for her to cope with the emotional stress and anxiety caused by the fact that her apartment was hit by a Hezbollah rocket and that, had she been in her apartment at the time of impact, she very well may have been killed in this attack.

(Exhibit CC, ¶21)

## VII.    DAMAGES UNDER 18 U.S.C. §2333

### 1.    Legislative History of 18 U.S.C. §2331 *et seq*.

In determining the type and scope of remedies available under 18 U.S.C. §2331 *et seq*., this Court must necessarily look to the legislative history and purpose behind these provisions.[24]

Sections 2331 *et seq*. were enacted as part of the Antiterrorism Act of 1990 ("ATA"), as an entirely new statutory tort.[25] The express goal of the ATA was to "create a new federal cause of action" and "a new civil remedy against terrorists." *Antiterrorism Act of 1990*, Hearing Before the Subcommittee on Courts and Administrative Practice of Committee on the Judiciary, United States Senate, 101st Congress, Second Session July 25 1990 ("Senate Hearing") at 34.

Congress passed the ATA as a direct response to the inadequacy of existing law,

. . . there are currently no laws expressly providing federal civil

remedies against these outrageous acts. Therefore this bill would

amend Title 18 United States Code Sections 2331 by providing a

---

[24] The decision of the United States District Court for the District of Rhode Island in *Ungar v. The Palestinian Authority*, 304 F. Supp. 2d 232 (D.R.I. 2004) provides an exhaustive analysis of the nature, scope and purpose of damages available under § 2333. This Court finds the thorough analysis in *Ungar* well supported and persuasive, and the discussion herein closely follows *Ungar*. Other decisions relevant to assessment of damages under 18 U.S.C. §2333 include *Boim v. Quranic Literacy Institute*, 2005 WL 433463 (N.D. Ill. 2005) (denying motion to set aside jury award of $156 million under § 2333 for the terrorist murder of 17 year-old American citizen David Boim); *Rubin v. Hamas*, 2004 WL 2216489 (D.D.C. 2004) (awarding nine Americans injured in a Hamas suicide bombing a total of $214.5 million under § 2333); *Linde v. Arab Bank*, 384 F.Supp.2d 571 (E.D.N.Y. 2005) (holding that intangible harm to American citizens resulting from acts of international terrorism is actionable under § 2333 in light of the Congressional purpose underlying the provision); *Biton v. Palestinian Authority*, 310 F.Supp.2d 172, 182 (D.D.C. 2004) (same).

[25] "Sections 2331 and 2333 were initially enacted in 1990 as the Anti-Terrorism Act of 1990, Pub.L. No. 101-519, §132, 104 Stat. 2250 (1990), but were repealed as the result of a technical deficiency. They were subsequently re-enacted as part of the Federal Courts Administration Act of 1992, Pub.L. No. 102-572, 106 Stat. 4506 (1992)." *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1009 (7th Cir. 2002).

> plaintiff a civil cause of action in United States District Court for
>
> injuries caused by acts of international terrorism.

Id. at 49.

The legislative history makes clear that the ATA was intended to be construed broadly in order to maximize its effectiveness in compensating victims of terrorism. Senator Grassley, the bill's co-sponsor, indicated that "it empowers victims with all the weapons available in civil litigation." *Antiterrorism Act of 1991*, Hearing Before the Subcommittee on Intellectual Property and Judicial Administration of the Committee on the Judiciary, House of Representatives, 102nd Congress, September 18 1992 at 10 (emphasis added). Thus, Congress intended that the full gamut of legal tools available in civil litigation would be harnessed to the task of providing remedies to victims of terrorism.

Indeed, the legislative history is replete with statements by the congressional sponsors and supporters of the ATA as well as representatives of the executive branch who testified in support of the bill, praising the wide scope and broad effect of the bill's provisions. Nothing in the history or purpose of the ATA suggests that it should be interpreted narrowly. The circuit court in discussing the purpose of §2333 noted that,

> [Its] history, in combination with the language of the statute itself,
>
> evidences an intent by Congress to codify general common law tort
>
> principles and to extend civil liability for acts of international
>
> terrorism to the full reaches of traditional tort law.

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1010 (7th Cir. 2002) (emphasis added).

**2.      The Class of Plaintiffs Under §2333**

As described above, the class of plaintiffs who may bring a civil action under §2333 is broad. The original language of §2333 "was intended to be broad enough to allow indirect victims, such as common carriers, to sue for damage to property, for indemnity and lost profits." Senate Hearing at 86. Yet, because the original language allowed compensation only for "any national of the United States" (possibly excluding family members of terrorism victims), the United States Department of Justice urged Congress to modify the text of the bill to explicitly allow suits by the family members of victims (as "survivors" and "heirs" of the victim). Senate Hearing at 8, 38. Thus,

> The Department supports legislation to provide a new civil remedy
> against terrorists and a federal forum for the <u>families and relatives</u>
> of victims to pursue claims for compensatory damages.

<u>Id</u>. at 34 (emphasis added).

Testifying before the Senate Subcommittee on Courts and Administrative Practice, Deputy Assistant Attorney General Steven R. Valentine specifically requested,

> . . . that this provision be amended to include, in addition to the
> individual directly affected, such additional parties as the estate of
> the decedent, survivors, and heirs. This will ensure that the bill is
> fully protective of the interests of all relevant parties to the civil
> suit.

<u>Id</u>. at 38.

In response to a question posed by Senator Thurmond about whether the suggested modification in the language of the bill would "make certain the ability of family members to file a lawsuit," Valentine responded, "It would make clear that which is already implied in the bill. It

would remove any doubt that anyone would have as to whether or not they could bring the litigation." *Id*. at 46.

Congress accepted the recommendation of the Department of Justice, and modified the language of §2333 to create a cause of action for "any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs . . . "

The expanded language of §2333 reflects the intention of Congress to allow the largest possible class of victims to be made whole. Hence, direct victims, family members (survivors and heirs) as well as those not traditionally considered terrorism victims (business and property owners) are able to recover under the act.

Moreover, and of special note in the instant case (with regard to the claims of plaintiffs Karen and Brian Ardstein), parents can recover for the loss of society of a stillborn fetus. Riley v. Koneru, 228 Ill. App.3d 883, 593 N.E.2d 788 (Ill. 1993). Permitting recovery for loss of society and companionship and for mental anguish is particularly appropriate in suits arising from acts of terrorism, and is consistent with the remedies available under other federal statutes allowing civil actions for terrorism and torture.[26] It fulfills the goal of allowing recovery to all those who are impacted by terrorism.[27] The circumstances surrounding the death of a victim of terrorism normally inflict severe mental anguish and suffering on the victim's survivors, thereby

---

[26] All of the federal provisions dealing with civil claims against terrorists and their sponsors recognize recovery by relatives of the victims. In addition to 18 U.S.C. §2333(a), both the Foreign Sovereign Immunities Act, 28 U.S.C. §1605(a) (7) and §1605 note, and the Torture Victim's Protection Act, 28 U.S.C. §1350 note (expanding claim beyond the direct victim to include "any person who may be a claimant in an action for wrongful death.") allow relatives of victims to seek damages.

[27] Congress clearly intended to allow all measures of damages to victims, as the bill "empowers victims with all the weapons available in civil litigation . . ." Remarks of Senator Grassley, Senate Journal p. S4511 April 16, 1991. (emphasis added). As noted above, the language of the ATA was specifically modified in order to clarify that claims of family members would be recognized.

mandating an appropriate remedy this type of action deserves a reply in damages that will fully compensate for the truly terrible emotional suffering of the surviving parents and siblings.

## VIII.   QUANTUM OF DAMAGES

### 1.      Default Judgment

It is well established that where a defendant has defaulted, all the facts set forth in the plaintiffs' complaint are deemed to have been admitted. FED. R. CIV. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."); *Klapprott v. United States*, 335 U.S. 601, 604 (1949); *O'rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938, 940 (7th Cir. 2011); *"R" Best Produce, Inc. v. DiSapio*, 540 F.3d 115, 125 (2d Cir. 2008); *DirecTV, Inc. v. Oliver*, 503 F.3d 847, 851 (9th Cir. 2007).

As set out above, defendant Hezbollah failed to respond to the plaintiffs' complaint and all allegations made therein are deemed to have been admitted by them. *See Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) citing *Trans World Airlines, Inc. v. Hughes,* 449 F.2d 51, 63 (2d Cir.1971), *rev'd on other grounds,* 409 U.S. 363 (1973).


### 2.      Specific Damages under the Antiterrorism Act

Beginning with the seminal ATA decision in *Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002), courts have ruled that recovery for pain and suffering is permissible under the ATA. Specifically, courts have held that those who have been injured by a terrorist attack and suffered pain (as well as the estates of the deceased as a compensation for the suffering that might have occurred prior to death) can both recover damages for pain and suffering.

Courts have also provided a broad basis for permitting the recovery of emotional damages under the ATA. In *Linde v Arab Bank,* 384 F.Supp.2d 571 (E.D.N.Y.2005), the court there held that plaintiffs need not be within the "danger zone" to be entitled to recover damages for emotional distress or loss of consortium caused by acts perpetrated against family members, even if they were not U.S. nationals.[28] Thus plaintiffs, all of whom were directly located in the "danger zone" (i.e., the civilian centers targeted by Hezbollah) during the Hezbollah Rocket Attacks and who each personally suffered directly from the terrorist acts perpetrated by Hezbollah, clearly may assert and recover on claims under the ATA.

Furthermore, courts have awarded damages under the ATA to both victims (and victims' estates) for lost earnings and economic loss. The plaintiffs are entitled to recover the present value of the economic losses resulting from their injuries and other damages, including wages, benefits and retirement pay, over their life expectancy. One way to determine such amounts is by looking at case law that has granted damages for pain, suffering or *solatium*, and apply similar standards to the ATA claims. Cases brought by other American victims of terrorist attacks under the Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. § 1602 *et seq*., are particularly instructive as to the measure of damages that many courts have used to assess awards for plaintiff victims of terror acts. We believe that gauging damages under the terms of the FSIA is particularly applicable in the instant case, as it seems equitable that both defendants named herein, Hezbollah sued under the ATA and the North Korean defendants who were sued pursuant to the FSIA, be held equally responsible for shouldering the obligations to compensate the plaintiffs.

---

[28] When the party seeking recovery is a family member, and not the injured party of a terrorist attack or the estate, the courts will look at the nature of the relationship to determine damages. Case law reveals that aggravating circumstances can create larger awards.

Moreover, it is also within this court's discretion to award plaintiffs prejudgment interest from the date of the commencement of the Hezbollah Rocket Attacks, until the date of final judgment, to be calculated by the average Prime Rate during such period. *Oldham v. Korean Air Lines Co.*, 326 U.S. App. D.C. 375, 127 F.3d 43, 54 (D.C. Cir. 1997) (quoting *Motion Picture Ass'n of Amer. v. Oman*, *Inc.*, 297 U.S. App. D.C. 154, 969 F.2d 1154, 1157 (D.C. Cir. 1992)); *see also Forman v. Korean Air Lines, Co.*, 318 U.S. App. D.C. 6, 84 F.3d 446, 450 (D.C. Cir. 1996).

After a calculation of all relevant damages, plus prejudgment interest, has been computed, then according to the ATA the total award for each Plaintiff is to be trebled.[29]

### 3.        Non-Federal Claims of Plaintiffs Michael Fuchs and Danielle Sauter

There are two potential sources of law for the claims brought by the non-American plaintiffs: the District of Columbia (the forum) and Israel (the plaintiffs' domicile). The District of Columbia's choice-of-law rules have been described as follows:

> The District of Columbia follows a modified "interest analysis" approach to choice of law. Under this approach, the first step is to determine whether a "true conflict" exists-that is, whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdictions is different. If there is a true conflict, the court must go on to determine which of the relevant jurisdictions has the "more substantial interest" in having its law applied to the case under review.

*GEICO v. Fetisoff*, 958 F.2d 1137, 1142 (D.C. Cir. 1992) (citations omitted).

---

[29] 18 U.S.C. § 2333(a)

Thus, as a "threshold inquiry," the first consideration is "whether more than one jurisdiction has a potential interest in having its law applied, and if so whether the law of the competing jurisdiction is different." *Wyatt v. Syrian Arab Republic*, 398 F.Supp.2d 131, 138 (D.D.C. 2005). When the laws of the two prospective jurisdictions are the same or if they produce the same result, than a "false conflict" exits. *Long v. Sears Roebuck & Co.,* 877 F. Supp. 8, 11 (D.D.C. 1995) accord *Boscoe v. Arlington County*, 738 F.2d 1352, 1360 (D.C. Cir. 1984).

Here there is no "true conflict" and so no need for a choice-of-law analysis; the relevant laws of D.C. and Israel are substantively identical and produce substantively identical results. The District of Columbia permits actions for battery (*Marshall v. Dist. of Columbia*, 391 A.2d 1374 (D.C. 1978)), assault (*District of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C. 2003)), and infliction of emotional distress (*Howard University v. Best*, 484 A.2d 958 (D.C. 1984)). So too, Israeli law allows for these same torts and damages, though denominated somewhat differently. *See* Declaration of Avraham Colthof submitted in *Haim v. Islamic Republic of Iran*, 02-cv-01811-RCL, (Exhibit EE ), *passim*.

Consequently, the Court need not choose between the application of D.C. or Israeli law, and can and should award the non-American plaintiffs damages for the physical and emotional harm they suffered as the result of being assaulted and battered by Hezbollah.

**4.      Guidance for Awarding Damages**

Quantifying the multiple layers of harm which plaintiffs have suffered is a difficult task. As guidance for determining the quantum of damages, the Court is aided by the dozens of civil terrorism decisions under ATA and especially the FSIA. In determining the appropriate amount of compensatory damages, the Court should look to prior decisions awarding damages for pain

and suffering, and to those awarding damages for solatium. *Haim v. Islamic Republic of Iran,* 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (Lamberth, J.). "While intervening changes in law have ruled many cases' reliance on federal common law improper, such findings need not disturb the accuracy of the analogy between solatium and intentional infliction of emotional distress." *Id.*

Prior FSIA cases provide clear guidance on awards to victims, who were injured in terrorist attacks. Surviving victims of terrorist attacks are generally awarded between $7 million to $15 million for their own pain and suffering. *Campuzano*, 281 F. Supp. 2d 258 (D.D.C. 2003) (awards ranging from $7 - $15 million to victims for past and future pain and suffering, loss of prospective income, and past medical expenses), *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) ($20 million for pain and suffering and mental anguish), *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) (26 injured survivors of the 1983 Beirut attack were awarded between $1.5 million and $12 million for battery).

More recently the district court in San Juan, Puerto Rico awarded compensatory damages of $15,000,000 to an American terrorist victim who suffered emotional injuries as a result of a shooting attack perpetrated in Israel by North Korea and a Japanese terrorist group brought under the FSIA. As the district court stated: "The Lod Airport Attack had a horrendous impact on Pablo and his family, all in addition to having been subjected to the JRA's violent attack, being injured, and having to deal with the murder of several friends. While Pablo luckily escaped significant physical harm from the shooting, he was reminded daily of coming under fire himself and watching innocent people be murdered. Pablo had been further victimized, as described above, by the severe impact on his marriage and relationship with his children. Pablo, by way of his estate, is therefore awarded $15,000,000 as compensatory damages." *Calderon-Cardona v. Democratic People's Republic of Korea*, **723 F. Supp. 2d 441 (D.P.R. 2010)**. The Court found

that the plaintiff's physical injuries were not significant and, thus, the gravamen of his claim was for the psychological injuries inflicted upon him as a result of the terrorist shooting. For these psychological injuries he was awarded $15,000,000.

Courts have also made significant awards to plaintiffs who endured the trauma and emotional impact of having a relative injured in a terrorist attack. *Kirschenbaum v. Islamic Republic of Iran*, 572 F. Supp. 2d 200 (D.D.C. 2008) ($2.5 million to each parent of injured U.S. citizen, parents suffered great emotional anxiety after hearing of the attack, endured the sight of their son with multiple open wounds, watched him suffer, and thereafter had to deal with the strain on their relationship with their son); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) ($3.5 million for pain and suffering to each parent of U.S. serviceman severely injured in Saudi terrorist bombing); *Campuzano*, 281 F. Supp. 2d 258 ($2.5 million to mother for loss of solatium and severe mental anguish from the physical and emotional changes to daughter); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) ($2.5 million for pain and suffering to parents of servicemen injured in 1983 Beirut bombing); *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008) ($8 million to spouses of deceased victims, $5 million to parents and children of deceased victims, and $2.5 million to siblings of deceased victims). In the recent *Calderon* decision against North Korea, the district court awarded $10,000,000 to the wife of a victim injured in that terrorist attack for the emotional trauma and suffering she endured as a result of her husband's injuries. *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441 (D.P.R. 2010). As noted above, this award was granted to compensate her primarily for the impact of the psychological injuries her husband suffered in the terrorist shooting.

The plaintiffs in the instant proceeding have all suffered ongoing anguish and emotional

distress as a result of the trauma inflicted upon them by defendant Hezbollah's actions during the Hezbollah Rocket Attacks. Plaintiffs' pain and suffering is obviously enormous, has been with them constantly since the opening day of the Hezbollah Rockets Attacks in the summer of 2006 and they will continue to experience the effects of this tragedy for the remainder of their lives.

## IX.     CLAIMS FOR RELIEF

## 1.     First Claim for Relief Against Hezbollah on Behalf of all American Plaintiffs: Action for International Terrorism Pursuant to 18 U.S.C. § 2333(a)[30]:

The actions of Hezbollah constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331. As required by § 2331, the actions of Hezbollah (1) constituted a violation of the criminal laws of the United States including, without limitation, the criminal provisions of 18 U.S.C. §§2332(c)(2) and 2332f, (2) were dangerous to human life by their nature and as evidenced by their consequences (at least 43 Israeli civilians were murdered by the Hezbollah Rocket Attack), (3) transcended national boundaries in terms of the means by which they were accomplished, the persons they appeared intended to intimidate or coerce, and the locales in which Hezbollah operates, and (4) were "intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion," in that the Hezbollah Rocket Attacks was intend to coerce, intimidate and influence the Israeli government and public.

The actions of defendant Hezbollah described herein therefore constitute "acts of

---

[30] While the American plaintiffs have also pled non-federal causes of action, because the ATA provides compensation for the full range of damages cognizable in tort, the plaintiffs' non-federal claims are effectively redundant. *See Ungar v. Palestinian Authority*, 325 F.Supp.2d 15, 67 (D.R.I. 2004) ("The court finds that no additional damages are due for the claims pled under Israeli law as the injuries sustained by the Plaintiffs are the same and have already been addressed by the [ATA] award recommended above.").

international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333. As a direct and proximate result of Hezbollah's conduct the plaintiffs suffered the injuries and harm described herein. defendant Hezbollah is therefore liable for all of plaintiffs' damages (with the exception of non-federal claimant Michael Fuchs and Danielle Sauter) in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

**2.      Second Claim for Relief Against All Defendants on Behalf of Plaintiffs Michael Fuchs and Danielle Sauter: Infliction of Emotional Distress Pursuant to Applicable Law**

The Hezbollah Rocket Attacks placed plaintiffs Michael Fuchs and Danielle Sauter in fear and apprehension of offensive and harmful contact, including the fear and apprehension of serious bodily injury or death.

Defendants Hezbollah's conduct was criminal in nature, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages. As a direct and proximate result of Hezbollah's conduct the plaintiffs suffered the injuries and harm described herein. Defendant Hezbollah is therefore liable for these plaintiffs' damages including punitive damages.

**3.      Third Claim for Relief Against Defendant Hezbollah on Behalf of Plaintiffs Michael Fuchs and Danielle Sauter: Assault Pursuant to Applicable Law**

Plaintiffs Michael Fuchs and Danielle Sauter were placed in fear of harmful physically contact including the apprehension of serious bodily injury or death by the rockets launched by defendant Hezbollah.

Defendant Hezbollah's conduct was criminal in nature, outrageous, extreme, wanton,

willful, malicious, and constitutes a threat to the public. As a direct and proximate result of Hezbollah's conduct these plaintiffs suffered the injuries and harm described herein. Defendant Hezbollah is therefore liable for all of these plaintiffs' damages including punitive damages.

4.      **Fourth Claim for Relief Against Defendant Hezbollah on Behalf of Plaintiff Michael Fuchs: Battery Pursuant to Applicable Law**

Plaintiffs Michael Fuchs was grievously physically struck by a rocket launched by defendant Hezbollah.

Defendant Hezbollah's conduct was criminal in nature, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages. Michael Fuchs was physically struck and grievously injured. As a direct and proximate result of Hezbollah's conduct the plaintiffs suffered the physical injuries and harm described herein. Defendant Hezbollah is therefore liable for all of plaintiffs' damages including punitive damages.

## SPECIFIC CLAIMS

The specific claims for relief of the plaintiffs is as follows:

1.      **Chaim Kaplan**

Plaintiff Chaim Kaplan is entitled to damages of $10,000,000 for the pain and suffering inflicted on him by Hezbollah, the result of which has harmed him on multiple levels, foremost of which is a permanent physical disability. Chaim further is entitled to damages of $10,000,000 for defendant Hezbollah's intentional infliction of emotional distress on him. The foregoing total of $20,000,000 is subject to prejudgment interest to the date a judgment is entered in this action.

Against defendant Hezbollah, Chaim shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

**2.      Rivka Kaplan and Minor Children Muska Kaplan, Reuven Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan**

Rivka Kaplan is entitled to damages of $5,000,000 for the pain and suffering inflicted on her by Hezbollah, the result of which has harmed her and her family on multiple levels, foremost of which is Hezbollah's intentional infliction of emotional distress. The foregoing total of $5,000,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Rivka shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

The minor children of plaintiffs Chaim and Rivka Kaplan; Mushka Kaplan, Reuven Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan are each entitled to damages of $5,000,000 for the pain and suffering inflicted on them by Hezbollah, the result of which has harmed them on multiple levels, foremost of which is Hezbollah's infliction of emotional distress. The foregoing total of $5,000,000 each is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Mushka Kaplan, Reuven Kaplan, Menachem Kaplan, Chana Kaplan and Efraim Kaplan shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

**3.      Karene Ardstein**

Plaintiff Karene Ardstein is entitled to damages of $8,000,000 for the pain and suffering

inflicted on her by Hezbollah, the result of which has harmed her on multiple levels, foremost of which is Hezbollah's intentional infliction of emotional distress resulting in significant harm to her and her children. This trauma resulted in, among other things, the death of Karene's unborn child and the attempted suicide of her oldest daughter. In addition, Karene is also entitled to $50,000 for lost income, loans and other expenses incurred as a direct result of the Hezbollah Rocket Attacks. The foregoing total of $8,050,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Karene shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

### 4.       Brian Ardstein and Minor Daughter Maayan Ardstein

Brian Ardstein is entitled to damages of $8,000,000 for the pain and suffering inflicted on him by Hezbollah, the result of which has harmed him on multiple levels, foremost of which is Hezbollah's intentional infliction of emotional distress resulting in significant harm to him and his children. This trauma resulted in, among other things, the death of Brian's unborn child and the attempted suicide of his oldest daughter. Brian is also entitled to $50,000 for lost income, loans and other expenses incurred as a direct result of the Hezbollah Rocket Attacks. The foregoing total of $8,050,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Brian shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

The Ardstein's minor daughter, Maayan Ardstein is entitled to damages of $5,000,000 for the pain and suffering inflicted on her by Hezbollah, the result of which has harmed her on

multiple levels, foremost of which is Hezbollah's infliction of emotional distress. The foregoing total of $5,000,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Maayan Ardstein shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

## 5.    Chayim Kumer

Chayim Kumer is entitled to damages of $6,500,000 for the pain and suffering inflicted on him by Hezbollah, the result of which has harmed him on multiple levels, foremost of which is Hezbollah's infliction of emotional distress on him and his daughters Malka and Chana Liba Kumer. The foregoing total of $6,500,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Chaim shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

## 6.    Nechama Kumer

Nechama Kumer is entitled to damages of $6,500,000 for the pain and suffering inflicted on her by Hezbollah, the result of which has harmed him on multiple levels, foremost of which is Hezbollah's infliction of emotional distress on her and her daughters Malka and Chana Liba Kumer. The foregoing total or $6,500,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Chaim shall also be awarded an amount that reflects that amount that is derived above trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

7.      **Laurie Rappeport**

Laurie Rappeport is entitled to damages of $6,500,000 for the pain and suffering inflicted on her by Hezbollah, the result of which has harmed her on multiple levels, foremost of which is Hezbollah's infliction of emotional distress on her and her daughter Margalit Rappeport. The foregoing total of $5,000,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Laurie shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

8.      **Margalit Rappeport**

Margalit Rappeport is entitled to damages of $6,500,000 for the pain and suffering inflicted on her by Hezbollah, the result of which has harmed her on multiple levels, foremost of which is Hezbollah's infliction of emotional distress. The foregoing total of $6,500,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Margalit Rappeport shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

9.      **Michael Fuchs**

Michael Fuchs is entitled to damages of $10,000,000 for the pain and suffering inflicted on him by Hezbollah, the result of which has harmed him on multiple levels, foremost of which is a permanent physical disability. Michael Fuchs is further entitled to damages of $10,000,000 for Hezbollah's intentional infliction of emotional distress and the assault he endured. The

foregoing total of $20,000,000 is subject to prejudgment interest to the date a judgment is entered in this action.

Moreover, in numerous previous civil terrorism cases the courts have awarded punitive damages to punish defendants and to deter future acts of terrorism. *Acosta v. The Islamic Republic of Iran*, 574 F.Supp.2d 15, 31 (D.D.C. 2008), *Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74, 89 (D.D.C. 2006); *Stern v. Islamic Republic of Iran,* 271 F.Supp.2d 286, 301 (D.D.C. 2003). *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441 (D.P.R. 2010).  Defendant Hezbollah's demonstrated and well known policy of engaging in terrorist attacks that target innocent civilians amply justifies the imposition of punitive damages against it.

Accordingly, the Court will also award Michael Fuchs punitive damages against defendant Hezbollah in the amount of twice the award of compensatory damages, i.e.: $40,000,000. Thus, the total award to Michael Fuchs is $ 60,000,000.


**10.     Thoeodore Greenberg**

Theodore Greenberg is entitled to damages of $5,000,000 for the pain and suffering inflicted on him by Hezbollah, the result of which has harmed him on multiple levels, foremost of which is Hezbollah's infliction of emotional distress. Theodore is also entitled to $5,000 for lost income and other expenses incurred as a direct result of the Hezbollah Rocket Attacks. The foregoing total of $5,005,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Theodore shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

## 11.     Moreen Greenberg

Moreen Greenberg is entitled to damages of $5,000,000 for the pain and suffering inflicted on her by Hezbollah, the result of which has harmed her on multiple levels, foremost of which is Hezbollah's infliction of emotional distress. Moreen Greenberg is also entitled to $5,000 for lost income and other expenses incurred as a direct result of the Hezbollah Rocket Attacks. The foregoing total of $5,005,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Moreen shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

## 12.     Jared Sauter

Jared Sauter is entitled to damages of $5,000,000 for the pain and suffering inflicted on him by Hezbollah, the result of which has harmed him on multiple levels, foremost of which is Hezbollah's intentional infliction of emotional distress. Jared Sauter is also entitled to $30,000 for lost income and other expenses incurred as a direct result of the Hezbollah Rocket Attacks. The foregoing total of $5,030,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Jared shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

## 13.     Danielle Sauter

Daneille Sauter is entitled to damages of $5,000,000 for the pain and suffering inflicted on her by Hezbollah, the result of which has harmed her on multiple levels, foremost of which is

Hezbollah's intentional infliction of emotional distress and the assault perpetrated against her. Danielle is also entitled to $30,000 for lost income and other expenses incurred as a direct result of the Hezbollah Rocket Attacks. The foregoing total of $5,030,000 is subject to prejudgment interest to the date a judgment is entered in this action.

Moreover, in numerous previous civil terrorism cases the courts have awarded punitive damages to punish defendants and to deter future acts of terrorism. *Acosta v. The Islamic Republic of Iran*, 574 F.Supp.2d 15, 31 (D.D.C. 2008), *Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74, 89 (D.D.C. 2006); *Stern v. Islamic Republic of Iran,* 271 F.Supp.2d 286, 301 (D.D.C. 2003). *Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441 (D.P.R. 2010).  Defendant Hezbollah's demonstrated and well known policy of engaging in terrorist attacks that target innocent civilians amply justifies the imposition of punitive damages against it.

Accordingly, the Court will also award Danielle Sauter punitive damages against defendant Hezbollah in the amount of twice the award of compensatory damages, i.e.: $10,060,000. Thus, the total award to Danielle Sauter is $15,090,000.

## 14.     Dvora Kaszemacher

Dvora Kaszemacher is entitled to damages of $5,000,000 for the pain and suffering inflicted on her by Hezbollah, the result of which has harmed her on multiple levels, foremost of which is Hezbollah's intentional infliction of emotional distress. The foregoing total of $5,000,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Dvora shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

### 15.     Chaya Kaszemacher

Chaya Kaszemacher is entitled to damages of $5,000,000 for the pain and suffering inflicted on her by Hezbollah, the result of which has harmed her on multiple levels, foremost of which is Hezbollah's intentional infliction of emotional distress. The foregoing total of $5,000,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Chaya shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

### 16.     Avishai Reuveni

Avishai Reuveni is entitled to damages of $5,000,000 for the pain and suffering inflicted on him by Hezbollah, the result of which has harmed him on multiple levels, foremost of which is emotional harm. Avishai is also entitled to $50,000 for lost income and other expenses incurred as a direct result of the Hezbollah Rocket Attacks. The foregoing total of $5,050,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Avishai shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

### 17.     Elisheva Aaron

Elisheva Aaron is entitled to damages of $5,000,000 for the pain and suffering inflicted on her by Hezbollah, the result of which has harmed her on multiple levels, foremost of which is Hezbollah's intentional infliction of emotional distress. Elisheva is also entitled to $50,000 for lost income and other expenses incurred as a direct result of the Hezbollah Rocket Attacks. The foregoing total of $5,050,000 is subject to prejudgment interest to the date a judgment is entered

in this action. Against defendant Hezbollah, Elisheva shall also be awarded an amount that reflects that amount that is derived above, trebled pursuant to the statutory mandate of 18 U.S.C. 2333(a).

## 18.    Yair Mor

Yair Mor is entitled to damages of $5,000,000 for the pain and suffering inflicted on him by Hezbollah, the result of which has harmed him on multiple levels, foremost of which is emotional harm. Yair is also entitled to $530,000 for lost income and other expenses incurred as a direct result of the Hezbollah Rocket Attacks. The foregoing total of $5,350,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Yair shall also be awarded an amount that reflects that amount that is derived above, plus prejudgment interest, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

## 19.    Mikimi Steinberg

Mikimi Steinberg is entitled to damages of $5,000,000 for the pain and suffering inflicted on her by Hezbollah, the result of which has harmed her on multiple levels, foremost of which is Hezbollah's intentional infliction of emotional distress. The foregoing total of $5,000,000 is subject to prejudgment interest to the date a judgment is entered in this action. Against defendant Hezbollah, Mikimi shall also be awarded an amount that reflects that amount that is derived above, plus prejudgment interest, trebled pursuant to the statutory mandate of 18 U.S.C. § 2333(a).

## X.     CONCLUSION

This Court possesses subject matter jurisdiction over this action and personal jurisdiction over the defendant Hezbollah. Plaintiffs have established to this Court's satisfaction, pursuant to 18 U.S.C. § 2333 and to other applicable law, that defendant Hezbollah is liable for damages for the terrorist rocket attacks it perpetrated during July and August 2006, which resulted in the grievous injuries inflicted upon the plaintiffs. Accordingly, plaintiffs' motion for default judgment shall be granted and judgment shall be entered in the amounts described above.

_____

U.S.D.J.