# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHAIM KAPLAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 09-00646 (RCL) |
| | ) | |
| HEZBOLLAH, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | | |
| CHAIM KAPLAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 10-00483 (RCL) |
| | ) | |
| THE CENTRAL BANK OF THE | ) | |
| ISLAMIC REPUBLIC OF IRAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT OF SPECIAL MASTER
## PURSUANT TO ORDER OF REFERENCE
## REGARDING THE RAPPEPORT FAMILY

This action is brought by Laurie and Margalit Rappeport under 28 U.S.C. § 1605A

seeking damages for injuries sustained on July 13, 2006 as a result of a barrage of rockets fired

by Hezbollah from Lebanon into northern Israeli towns including the city of Safed ("Tzfat").

Under the Administrative Plan Governing Special Masters, and pursuant to the provisions of

Federal Rule of Civil Procedure 53, the Special Master has received testimony and reviewed

documentary evidence to assist in determining any damages to which Laurie and Margalit

Rappeport may be entitled.

**BACKGROUND**

On July 12, 2006, Hezbollah launched a surprise attack against Israel killing eight Israeli Defense Force soldiers and kidnapping two others at the Israeli/Lebanese border.  Israel responded with airstrikes against Hezbollah-held positions in Southern Lebanon; Hezbollah retaliated with katyusha rockets and mortars fired against Israeli communities located close to the border, including the city of Tzfat. A United Nations-brokered cease-fire took effect on August 14, 2006.  *See* U.S. Congressional Research Services, *Lebanon: The Israel-Hamas-Hezbollah Conflict* (RL3356, Updated September 15, 2006) by Jeremy M. Sharp.  *See also http://www.mfa.gov.il/mfa/foreignpolicy/terrorism/hizbullah/pages/hizbullah%20attack%20in%20northern%20israel%20and%20israels%20response%2012-jul-2006.aspx* (last viewed December 4, 2015).

**<u>The Islamic Republic of Iran</u>**

The statutory scheme underpinning actions against the Islamic Republic of Iran have been exhaustively recounted in *In re: Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31 (D.D.C. 2009), obviating the need for recapitulation.  This Court repeatedly has found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for facilitating, financing and providing material financial and logistical support to help carry out attacks on United States citizens.  *See, e.g.*, *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp. 2d 229 (D.D.C. 2006); *Peterson v. Islamic Republic of Iran*, 264 F.Supp. 2d 46, 61 (D.D.C. 2003) ("*Peterson I*"); *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007); *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44 (D.D.C. 2012).  This Court found so in this case, as well.  *See* Memorandum Opinion (July 23, 2014), at 2 (Case No. 1:10-cv-00483 (ECF No. 54)) ("July 23 Memorandum").

**The Democratic People's Republic of Korea**

In 1988, the State Department designated the Democratic People's Republic of Korea ("North Korea") as a "state sponsor of terrorism," see *Notice, Determination Pursuant to Section 6(j)of the Export Administration Act of 1979; North Korea*, 53 Fed. Reg. 3477 (Feb. 5, 1988), a designation subsequently rescinded on June 26, 2008. *See Certification of Rescission of North Korea's Designation as a State Sponsor of Terrorism*, 73 Fed. Reg. 37351. Courts have held North Korea responsible for offering direct support to terrorist organizations that have carried out attacks in Israel. S*ee, e.g., Calderon-Cardona v. Dem. People's Republic of Korea*, 723 F. Supp. 2d 441, 452 (D.P.R. 2010); *Massie v. Government of Democratic People's Republic of Korea* 592 F.Supp.2d 57 (D.D.C. 2008). In its Memorandum Opinion, this Court found that North Korea provided "material aid to Hezbollah in three ways: weapons, training, and tunnels to help carry out the attacks." July Memorandum, at 6.

## PROCEDURAL HISTORY

Based on the events which took place in Israel in July 2006, Plaintiffs filed a complaint on April 8, 2009 against Hezbollah under the Antiterrorism Act, 18 U.S.C. § 2333(a) and against North Korea under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c) (Case No. 1:09-cv-00646 (ECF No.1)). On March 23, 2010, Plaintiffs filed a second complaint, this time against the Central Bank of the Islamic Republic of Iran; Bank Saderat, Iran; Bank Saderat, PLC and the Islamic Republic of Iran, alleging these entities provided "extensive material support and resources to Hezbollah, that caused, enabled and facilitated" the Hezbollah rocket attacks injuring Plaintiffs and seeking damages under 28 U.S.C. §§1605A(c) and (d) and 18 U.S.C. § 2333(a) (Case No. 1:10-00483 (ECF No. 3)). This Court subsequently dismissed the statutory claims against Hezbollah on August 20, 2013, (09-646 (ECF No. 50)), and against Bank Saderat of Iran and Bank Saderat, PLC on November 5, 2010 (10-483 (EFC No. 16)). On August 20,

2015, plaintiffs voluntarily dismissed their common-law claims against Hezbollah (09-646 (ECF No. 63)).

Neither North Korea nor Iran responded to the complaints and plaintiffs subsequently moved for entry of default on May 12, 2014 (09-646 (ECF No. 53) and 10-483 (ECF No. 51)). A hearing was convened on May 27, 2014 to determine defendants' liability during which plaintiffs produced expert witnesses who, in accordance with 28 U.S.C. § 1608(e) (requiring plaintiffs to establish their right to relief by "evidence that is satisfactory to the court"), attested to Iran's and North Korea's complicity in Hezbollah's 2006 attacks against Israel.  Based on this testimony, the Court entered judgment by default against the two nations (09-646 (ECF No. 57) and 10-483 (ECF No. 54)).

On October 1, 2014, the Court appointed the undersigned as special master to be governed by the Administrative Plan Governing Special Masters previously adopted in *O'Brien v. Islamic Republic of Iran*, Case No. 1:06-cv-0690 (RCL).  *See* 09-646 (ECF No. 58) and 10-483 (EFC No. 55)).  The court specifically directed the Special Master to issue reports recommending the amount of compensatory damages to which he believed each plaintiff was entitled and to "take and report on evidence of each plaintiff's qualification for relief under § 1605A(c) and the familial relationships between plaintiffs and victims of the rocket attacks in Israel committed between July 12, 2006 and August 14, 2006."  *Id*.

Pursuant to these directives, and in keeping with the Federal Rules of Evidence, the Special Master makes these findings and recommendations.

**FINDINGS OF FACT**

1.      Laurie Rappeport was born on March 29, 1958 in Detroit, Michigan.  A copy of her passport, filed with this Court on May 10, 2012, confirms that, at all relevant times, Laurie was a United States citizen.

2.      Laurie's daughter, Margalit, was born in Israel on April 15, 1996. A copy of her passport, filed with this Court on May 10, 2012, confirms that, at all relevant times, Margalit was a United States citizen.

3.       In July 2006, Hezbollah launched a series of rocket attacks against Israel.  One of the cities shelled was Tzfat, where Laurie and Margalit were residing.

**Testimony of Laurie Rappeport**

Laurie Rappeport provided her testimony by Declaration dated January 31, 2012.  In her Declaration, Laurie affirmed she is a U.S. citizen born on March 29, 1958 in Detroit, Michigan, who lived in Tzfat at the time of the Hezbollah attacks in July 2006.

According to her Declaration, Laurie was at work at the time of the initial barrage. Concerned with the safety of her nine-year old daughter, Margalit, who was home alone, Laurie immediately left work.  That evening, a rocket struck a house belonging to Laurie's neighbor. According to Laurie, the force of the explosion threw Margalit, who was playing outside in her tree house, to the ground.  The family dog dragged the screaming girl into the house.  Not realizing Margalit had been so close to an exploding rocket, Laurie examined her for any signs of injury, but found none.

Laurie recalls a heavy mist in the air at the time which she suspected to be gas from a ruptured pipe.  Concerned it would ignite, Laurie grabbed Margalit and ran outside and up a flight of stairs to the street above their house.  A rocket had exploded there earlier and medics

were attending to the injured.  Laurie and Margalit saw the body of a neighbor killed in that attack being loaded into an ambulance.  Laurie recalls the sight being "very shocking" to Margalit who became "even more distressed and scared."

Realizing the "entire city" was under attack, Laurie and Margalit "ran around the neighborhood not knowing exactly what to do or where to go."  They initially stayed at a public shelter and then moved to a friend's apartment with a fortified underground room for a few days. Laurie was uncertain whether to leave Tzfat as her son, who was serving in the army at the time, was scheduled to return home on leave.  Margalit, upset and traumatized, wanted to leave the city immediately.

 "With so many people being killed and injured from the massive rocket barrages," Laurie decided that she and Margalit "had better try to find some measure of safety." Accordingly, they left Tzfat and drove south to Tel Aviv where they stayed with friends for two weeks.  From Tel Aviv, they traveled to Jerusalem where they remained until the shelling ceased.

Laurie describes the apartments in which they stayed as "very crowded and small."  She remembers it as "a very frightening and uncomfortable time," during which she "did not know from day to day what would happen."  Laurie recounts how "the instability and uncertainty of our lives filled us with stress and tension."  Laurie's oldest daughter, who was also in the army at the time, returned to Tzfat and stayed alone in the family home.  Laurie's son also returned to Tzfat several times.  Notwithstanding her concern that two of her children were home without her, Laurie did not want to risk exposing Margalit to more rocket attacks.  She recalls how, "every day I woke up with this reoccurring and panicky feeling of not knowing what am I supposed to do first, what are my responsibilities and who I should take care of first."

Following the ceasefire, Laurie and Margalit returned to Tzfat.  Sometime after, Laurie received a telephone call from the administrators at Margalit's school, informing Laurie that Margalit "was angry, unruly and acting out in class; her teachers could not deal with her." Laurie testified that, prior to the rocket attacks, Margalit never misbehaved.  She attributes the change to the trauma Margalit suffered in July and August 2006.  Laurie testified that both she and Margalit sought psychological counseling, and that she enrolled Margalit in "drama therapy" to learn calming techniques, which appeared to improve Margalit's demeanor.

Laurie testified that, on the first anniversary of the attacks, she relived the entire event: "My whole life was suddenly thrown into confusion and uncertainty.  I continuously think about what happened, what I should have done, what I didn't do and what I would do next time.  These thoughts haunt me and leave me nervous and unsettled."  Seeing her neighbors, some of whom were injured and visibly scarred from the bombing, triggers disturbing memories.  For the "first couple of years" after the attack, Laurie became deeply sensitive to loud noises.  According to Laurie, her daughter remains traumatized.

### Report of Dr. Rael Strous re: Laurie Rappeport

Dr. Rael Strous, a psychiatrist at the Be'er Yaakov Mental Health Center and Associate Professor of Psychiatry at the Sackler Faculty of Medicine of the Tel Aviv University, submitted a Declaration dated January 30, 2012 in support of Laurie Rappeport's claims.  Dr. Strous has testified in similar cases in this circuit concerning the psychological trauma suffered by victims of terrorism.  *See Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56, 60 (D.D.C. 2006); *Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d 258, 267-78 (D.D.C. 2003).  Attached to his Declaration, Dr. Strous included a copy of his *curriculum vitae*; a psychiatric evaluation report of Laurie Rappeport; and two pre-evaluation forms Laurie completed at his request.

According to Dr. Strous, "Mrs. Rappeport displays some form of depression and anxiety disorder either currently or in the past as a result of being directly exposed to rocket fire and its aftermath with fleeing her home town during the second Lebanon war." He opines that "many of her symptoms with which she is diagnosed are likely to be present in varying degrees for a significant time to come and while it is impossible to state for any absolute certainty, many of the symptoms may even be permanent."

Dr. Strous' evaluation notes indicate that the first few days of the war were "extremely stressful" for Laurie – especially watching her nine-year old daughter cope with the trauma of the rocket fire. Laurie reported "feeling depressed and anxious during the war which was expressed in poor sleep and increased appetite." Laurie further reported that her stress level increased when she realized her husband had intentionally stayed out of the country with his girlfriend until the war ended. Dr. Strous' notes indicate that Laurie "had counted on [her husband] coming back . . . so that they could divide up the family needs." Dr. Strous further indicated that a "major source" of Laurie's stress was "financial," as her salary was insufficient to cover the additional expenses incurred during her time away from home. According to Dr. Strous, despite her stress and anxiety, Laurie felt she had to "keep it together" for Margalit.

Dr. Strous reported that Laurie's anxiety did not end "immediately" with the cease fire and that she "had to deal with the after effects on her daughter which w[ere] particularly difficult due to the accompanying behavioral problems and acting out she exhibited at home and at school." In addition, one year after the war, Laurie's husband moved back to the United States, and left Laurie to "take care of everything and everyone." Dr. Strous notes Laurie's belief that the war aggravated their marital problems and ultimately led to the dissolution of their relationship and to their subsequent divorce. According to Dr. Strous: "Mrs. Rappeport

continues to report low mood.  She is reluctant to receive assistance for this low mood which does not appear to affect social function.  She is now divorced and being alone to cope with her children is not easy for her."

Dr. Strous diagnosed Laurie as suffering from "Dysthymia" and "Anxiety disorder (NOS)."

### Testimony of Margalit Rappeport

Margalit provided her testimony in a Declaration dated March 29, 2012.  Margalit recalls being home alone when the rocket attacks began and being joined by her mother where they "nervously awaited developments in the crisis."  She recalls playing in her tree house that evening when a rocket landed on a neighbor's house across the street.  She remembers hearing "a terrifyingly loud explosion and shattering glass," from the rocket which "landed about 65 feet away from me and the force of the explosion threw me out of the tree house, which was about six feet high."  Margalit confirms her mother's account that the family dog dragged her inside the house.  She remembers "being really scared and screaming as my mother tried to calm me down."

Margalit remembers seeing mist in the air outside and running with her mother up a staircase to the street above their house where Margalit noticed a man's body on a stretcher.  She testified: "that really shocked me.  I was terrified that the man had been killed and I was frightened my mother and I could be killed too.  I remember crying uncontrollably as I watched the medics and all the people move dazed through the streets."  Margalit and her mother eventually found a public bomb shelter before moving to an underground shelter in an apartment belonging to her mother's friend.

Margalit recounts how, on July 15, she and her mother left Tzfat, going first to Tel Aviv and then to Jerusalem where they stayed with friends in apartments she described as "very crowded and small."  According to Margalit: "it was horrible moving around from place to place. I never understood where we were going to be sleeping.  I did not like the instability, all the strangers and the uncertainty of what would happen next."

Upon their return to Tzfat, Laurie and Margalit found their house badly damaged. Margalit recalls throwing her personal belongings away so she "would not have to look at them every day and be reminded of the attacks."  Margalit testified that, upon returning to school, her mother was contacted frequently by school administrators to report Margalit's misbehavior. Testifying that she had never been in trouble before, Margalit felt she was "losing control of my situation."

Margalit recalls undergoing therapy "for crisis intervention" as well as "drama therapy" to learn calming techniques.  She admits "deal[ing] with stress differently than other children" and being "more morose," frightened, anxious and more nervous than her peers who appear "happier and more care-free."  Margalit testified that she has been diagnosed with anxiety disorder and depression and that anniversaries of the attack are always difficult, causing her to relive "the terrifying experiences."

### Report of Dr. Rael Strous re: Margalit Rappeport

Dr. Rael Strous' evaluation of Margalit is captured in a Declaration dated January 30, 2012, to which he has appended his *curriculum vitae* and evaluation notes.  In his Declaration, Dr. Strous observes that Margalit "displays some form of depression and anxiety disorder either currently or in the past as a result of being directly exposed to rocket fire and its aftermath with fleeing her home town during the second Lebanon war."  He opines that "many of her symptoms

with which she is diagnosed are likely to be present in varying degrees for a significant time to come and while it is impossible to state for any absolute certainty, many of the symptoms may even be permanent."

Dr. Strous' evaluation notes indicate that Margalit vividly recalls the rocket attacks. "She remembers her fear was intense and that she could not function initially . . . Her thoughts were confused and she felt disoriented and very fearful." According to Dr. Strous, Margalit has difficulty falling asleep, frequently wakes up during the night, feels anxious, and often cries. Dr. Strous notes that Margalit reported undergoing behavioral problems at school following the war for which she sought psychological treatment. He further notes that, in eighth grade, Margalit began treatment for Attention Deficit Hyperactivity Disorder, which, according to Margalit, "helped to some extent."

According to Dr. Strous, Margalit suffers from a "chronic anxiety disorder and behavioral disorder beginning in the aftermath of the 2nd Lebanon war in 2006" – disorders which have manifested as "sleep dysfunction, impaired appetite and anxiety." In his opinion, even with the psychological intervention, Margalit "appeared to demonstrate only moderate improvement." Dr. Strous diagnosed Margalit as suffering with Anxiety Disorder (NOS) and Attention Deficit Hyperactivity Disorder – disorders he links directly to the rocket attacks.

**ANALYSIS**

Damages under the Foreign Sovereign Immunities Act ("FSIA") "may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. 1605A(c)(4). To demonstrate an entitlement to these damages, "a plaintiff must prove that the projected consequences [of the defendant's actions] are 'reasonably certain' (*i.e.* more likely than not) to occur, [or that actual consequences have occurred,] and must prove the amount of damages by a

'reasonable estimate' consistent with [the D.C. Circuit's] application of the American rule on damages." *Kim v. Democratic People's Republic of Korea* 87 F.Supp.3d 286, 289 (D.D.C. 2015) (citing *Hill v. Republic of Iraq,* 328 F.3d 680, 681 (D.C. Cir. 2003)).

Upon consideration of the facts presented, and, in light of the aforementioned legal framework, the Special Master concludes both Laurie and Margalit Rappeport are entitled to compensatory damages for the pain and suffering they endured. The Special Master further finds that Laurie Rappeport is entitled to solatium damages.

### Pain and Suffering

In determining a proper damage award for Laurie and Margalit Rappeport, the Special Master is guided by prior decisions awarding damages to victims of terrorism, mindful of the inherent difficulty "assess[ing] the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Valencia v. Islamic Republic of Iran*, 774 F.Supp.2d 1, 14 (D.D.C. 2010). The Special Master is equally mindful that previous damages awards, while instructive guidelines, "are not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010), and, therefore, "strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009) (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

Courts consider a "myriad of factors" when assessing damages for surviving victims of terrorist actions. These factors include: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson v. Islamic Republic of Iran* ("*Peterson II*"), 515 F.Supp.2d 25, 52 n. 26 (D.D.C. 2007) (citing *Blais*, 459 F.Supp.2d at 59). Calculating damages

begins with the baseline assumption that persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Davis v. Islamic Republic of Iran*, 882 F.Supp.2d 7 (D.D.C. 2012) (citing *Peterson II*). This amount serves as a lodestar and can deviate upward in the presence of "severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," *Valore*, 700 F.Supp.2d at 84, or downward in the face of "minor shrapnel injuries or minor injury from small-arms fire." *Id.*

For victims, such as Laurie and Margalit Rappeport, who "suffer[ed] severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million." *Harrison v. Republic of S*udan, 882 F.Supp.2d 23, 49 (D.D.C. 2012) (citing *Valore*, 700 F.Supp.2d at 85). *See also Petersen II*, 515 F.Supp.2d at 56; *Brown v. Islamic Republic for Iran*, 872 F.Supp.2d 37, 42 (D.D.C. 2012); *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 47 (D.D.C. 2012).

The Special Master need not define the parameters of "severe emotional injury" or parse through abstract clinical definitions to conclude that Laurie's and Margalit's experiences during the Hezbollah attacks were terrifying and traumatic. To engage in such an academic exercise would only subvert the well settled proposition that "acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience[.]" *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002).

During the two-month long siege of Tzfat, Laurie experienced a "reoccurring and panicky feeling of not knowing what am I supposed to do first" regarding her children. For "the first couple of years" following the attacks she was "very affected" by sirens and loud noises.

Laurie's personal trauma as a victim of terrorist attacks was exacerbated by Margalit's distress, her precarious financial situation and her marital discord – all of which she attributes directly to the rocket attacks.  Dr. Strous diagnosed Laurie with Dysthymia and Anxiety Disorder (NOS).

Margalit similarly suffered because of the Hezbollah attack.  She describes changes in her behavior, "losing control of [her] situation," being frightened more readily than her friends, and experiencing anxiety for which she was compelled to undergo therapy.  Based on these symptoms, Dr. Strous diagnosed Margalit as suffering from Anxiety Disorder NOS and Attention Deficit Hyperactivity Disorder – a diagnosis he attributes directly to the rocket attacks.

On this record, the Special Master finds both Laurie and Margalit Rappeport entitled to a damages award equal to the baseline to victims presenting with psychological trauma and no physical injury.

<strong>Solatium Damages</strong>

Plaintiffs seek damages under 28 U.S.C. §§ 1605A(c) and (d) for harms and injuries resulting from Defendants' "extreme, wanton, willful and malicious" conduct  (09-646 (ECF No. 1) and 10-483 (ECF No. 3)), including "disfigurement; loss of physical and mental functions; extreme pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium" (10-483 (ECF No. 3)).

There is nothing in the record suggesting either that Laurie or Margalit seek redress for "disfigurement; loss of physical and mental functions; loss of guidance, companionship and society or loss of consortium."  Rather, it appears Laurie and Margalit are requesting solatium damages to compensate for the emotional trauma each suffered due to the harm inflicted on the other.

Laurie and Margalit's respective prayers for solatium raise issues of first impression in the context of the Foreign Sovereign Immunities Act. To date, all solatium claims have been filed by family members not in proximity to the terrorist activity. Laurie and Margalit, however, were together during the attacks. Each was a victim potentially entitled to recover for their own pain and suffering as well as a victim potentially entitled to recover for the emotional trauma they endured as a result of the "extreme and outrageous conduct" visited on the other.

Traditionally, solatium damages seek "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as well as the harm caused by the loss of the decedent's society and comfort." *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379, 402 (D.D.C. 2015) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 25 (D.D.C. 2011)) (internal quotation marks and alterations omitted). Solatium awards have "also been applied to cases where the victim survived a terrorist attack." *Oviessi*, 768 F.Supp.2d at 26 n. 10. Unlike claims for lost wages a claim for solatium does not readily lend itself to quantification using "models and variable." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000) (*quoting Flatow v. Islamic Republic of Iran*, 999 F.Supp.2d 1, 32 (D.D.C. 1998)). Courts look for guidance, therefore, in "prior decisions." *Acosta v. The Islamic Republic of Iran*, 574 F.Supp.2d 15, 29 (D.D.C. 2008).

Family members in direct lineal relationship are "presume[d] . . . to suffer compensable mental anguish[,] . . . and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Kim v. Democratic People's Republic of Korea*, 87 F.Supp.3d 286, 290 (D.D.C. 2015) (quoting *Oveissi*, 768 F.Supp.2d at 25). The presumption of mental anguish arises given terrorists' acknowledged aim of causing "the highest degree of emotional distress, literally, terror." *Stethem*, 201 F.Supp.2d at 89.

For family members of deceased victims of terrorism, this Court has established a framework whereby the amount of the award depends on the "'nature of the relationship' between the family member and victim," and "'the severity of the pain suffered by the family member.'" *Heiser,* 466 F.Supp. 2d at 269 (quoting *Haim*, 425 F.Supp.2d at 75). To lend uniformity to the analysis and avoid disparate awards, this Court suggested a framework for these awards, namely, $8 million for spouses; $5 million for parents and $2.5 million for siblings. *Id.* Children of a deceased victim typically receive an award of $3 million. *O'Brien*, 853 F.Supp.2d at 46–47.

For relatives of surviving victims who have been physically injured as a result of terrorist attacks, courts have applied a framework where "awards are 'valued at half of the awards to family members of the deceased' – $4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively," *Anderson v. Islamic Republic of Iran*, 839 F.Supp.2d 263, 266 (D.D.C. 2012) (quoting *Oveissi*, 768 F.Supp.2d at 26 n. 10 (D.D.C. 2011)), and $1.5 million for children. *Id.*, 839 F.Supp.2d at 266. Finally, this Court has held that relatives of surviving victims presenting with emotional trauma and no physical injury should receive amounts proportionally less than those with physical injuries, namely, $1 million for spouses; $850,000 for parents; $750,000 for children, and $500,000 for siblings. *See Davis v. Islamic Republic of Iran*, 882. F.Supp.2d 7, 16 (D.D.C. 2012).

The testimony given by Laurie and Margalit coupled with the observations of Dr. Strous confirm the close bond between mother and daughter. There is no testimony, however, in the record which might support a finding that Margalit suffered vicariously from the trauma that befell her mother. The evidence, whether adduced directly from her testimony or indirectly through her statements to Dr. Strous, focuses solely on her personal trauma. Her mother's

emotional state is not mentioned. Notwithstanding the "presumption" that family members "suffer compensable mental anguish," *Kim*, 87 F.Supp.3d at 290, "[l]ines must be drawn in the award of this form of damages and one such line includes a situation like this, where *no* evidence is offered to show injury that an award of solatium damages might compensate." *Roth*, 78 F.Supp.3d at 406 (emphasis in original). Apropos of Margalit's claim, no such evidence exists.

Laurie, in comparison, testified extensively about the anxiety she experienced as a result of her daughter's trauma. She describes "observ[ing] her 9 year old daughter not being able to cope with the stress of being under daily rocket fire," knowing her daughter was only yards from an exploded shell, comforting Margalit after she observed the body of a neighbor killed in the attack, moving from one cramped location to another to ensure Margalit's safety, confronting her daughter's misbehavior at home and at school, and enrolling her daughter in therapy to assist her recovery. The Special Master therefore finds Laurie entitled to an award of solatium damages arising from the anguish she suffered due to Margalit's trauma, provided that award "not exceed" Margalit's pain and suffering awards." *Fain III v. Islamic Republic of Iran*, 885 F. Supp. 2d 78, 82 (D.D.C. 2012) (citing *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44 (D.D.C. 2012)).

In light of the foregoing, the Special Master recommends Laurie Rappeport and Margalit Rappeport each receive One Million Five Hundred Thousand Dollars ($1,500,000) as damages for pain and suffering. The Special Master further recommends Laurie Rappeport be awarded Eight Hundred and Fifty Thousand Dollars ($850,000) for loss of solatium.

Dated: March 23, 2016                     Respectfully submitted,

                                                  By:*/s/ Alan L. Balaran*
                                              Alan L. Balaran, Esq.
                                              Special Master