# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| **CHAIM KAPLAN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 09-00646 (RCL)** |
| ) | |
| **HEZBOLLAH, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

---

| | |
|---|---|
| **CHAIM KAPLAN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 10-00483 (RCL)** |
| ) | |
| **THE CENTRAL BANK OF THE** ) | |
| **ISLAMIC REPUBLIC OF IRAN, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

---

## REPORT OF SPECIAL MASTER
## REGARDING YAIR MOR

This action is brought by Yair Mor under 28 U.S.C. § 1605A seeking damages for injuries sustained on July 13, 2006 as a result of a barrage of rockets fired by Hezbollah from Lebanon into northern Israeli towns including the city of Safed ("Tzfat"). Under the Administrative Plan Governing Special Masters, and pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received testimony and reviewed documentary evidence to assist in determining any damages to which Yair Mor may be entitled.

**BACKGROUND**

On July 12, 2006, Hezbollah launched a surprise attack against Israel killing eight Israeli Defense Force soldiers and kidnapping two others at the Israeli/Lebanese border.  Israel responded with airstrikes against Hezbollah-held positions in Southern Lebanon; Hezbollah retaliated with katyusha rockets and mortars fired against Israeli communities located close to the border, including the city of Tzfat. A United Nations-brokered cease-fire took effect on August 14, 2006.  *See* U.S. Congressional Research Services, *Lebanon: The Israel-Hamas-Hezbollah Conflict* (RL3356, Updated September 15, 2006) by Jeremy M. Sharp.  *See also http://www.mfa.gov.il/mfa/foreignpolicy/terrorism/hizbullah/pages/hizbullah%20attack%20in%20northern%20israel%20and%20israels%20response%2012-jul-2006.aspx* (last viewed December 4, 2015).

### The Islamic Republic of Iran

The statutory scheme underpinning actions against the Islamic Republic of Iran have been exhaustively recounted in *In re: Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31 (D.D.C. 2009), obviating the need for recapitulation.  This Court repeatedly has found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for facilitating, financing and providing material financial and logistical support to help carry out attacks on United States citizens.  *See*, *e.g.*, *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp. 2d 229 (D.D.C. 2006); *Peterson v. Islamic Republic of Iran*, 264 F.Supp. 2d 46, 61 (D.D.C. 2003) ("*Peterson I*"); *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007); *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44 (D.D.C. 2012).  This Court found so in this case, as well.  *See* Memorandum Opinion (July 23, 2014), at 2 (Case No. 1:10-cv-00483 (ECF No. 54)) ("July 23 Memorandum").

**The Democratic People's Republic of Korea**

In 1988, the State Department designated the Democratic People's Republic of Korea ("North Korea") as a "state sponsor of terrorism," s*ee Notice, Determination Pursuant to Section 6(j)of the Export Administration Act of 1979; North Korea*, 53 Fed. Reg. 3477 (Feb. 5, 1988), a designation subsequently rescinded on June 26, 2008. *See Certification of Rescission of North Korea's Designation as a State Sponsor of Terrorism*, 73 Fed. Reg. 37351. Courts have held North Korea responsible for offering direct support to terrorist organizations that have carried out attacks in Israel. S*ee, e.g., Calderon-Cardona v. Dem. People's Republic of Korea*, 723 F. Supp. 2d 441, 452 (D.P.R. 2010); *Massie v. Government of Democratic People's Republic of Korea* 592 F.Supp.2d 57 (D.D.C. 2008). In its Memorandum Opinion, this Court found that North Korea provided "material aid to Hezbollah in three ways: weapons, training, and tunnels to help carry out the attacks." July Memorandum, at 6.

## PROCEDURAL HISTORY

Based on the events which took place in Israel in July 2006, Plaintiffs filed a complaint on April 8, 2009 against Hezbollah under the Antiterrorism Act, 18 U.S.C. § 2333(a) and against North Korea under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c) (Case No. 1:09-cv-00646 (ECF No.1)). On March 23, 2010, Plaintiffs filed a second complaint, this time against the Central Bank of the Islamic Republic of Iran; Bank Saderat, Iran; Bank Saderat, PLC and the Islamic Republic of Iran, alleging these entities provided "extensive material support and resources to Hezbollah, that caused, enabled and facilitated" the Hezbollah rocket attacks injuring Plaintiffs and seeking damages under 28 U.S.C. §§1605A(c) and (d) and 18 U.S.C. § 2333(a) (Case No. 1:10-00483 (ECF No. 3)). This Court subsequently dismissed the statutory claims against Hezbollah on August 20, 2013, (09-646 (ECF No. 50)), and against Bank Saderat

of Iran and Bank Saderat, PLC on November 5, 2010 (10-483 (EFC No. 16)).  On August 20,

2015, plaintiffs voluntarily dismissed their common-law claims against Hezbollah (09-646 (ECF

No. 63)).

Neither North Korea nor Iran responded to the complaints and plaintiffs subsequently

moved for entry of default on May 12, 2014 (09-646 (ECF No. 53) and 10-483 (ECF No. 51)).

A hearing was convened on May 27, 2014 to determine defendants' liability during which

plaintiffs produced expert witnesses who, in accordance with 28 U.S.C. § 1608(e) (requiring

plaintiffs to establish their right to relief by "evidence that is satisfactory to the court"), attested

to Iran's and North Korea's complicity in Hezbollah's 2006 attacks against Israel.  Based on this

testimony, the Court entered judgment by default against the two nations (09-646 (ECF No. 57)

and 10-483 (ECF No. 54)).

On October 1, 2014, the Court appointed the undersigned as special master to be

governed by the Administrative Plan Governing Special Masters previously adopted in *O'Brien*

*v. Islamic Republic of Iran*, Case No. 1:06-cv-0690 (RCL).  *See* 09-646 (ECF No. 58) and 10-

483 (EFC No. 55)).  The court specifically directed the Special Master to issue reports

recommending the amount of compensatory damages to which he believed each plaintiff was

entitled and to "take and report on evidence of each plaintiff's qualification for relief under §

1605A(c) and the familial relationships between plaintiffs and victims of the rocket attacks in

Israel committed between July 12, 2006 and August 14, 2006." *Id*.

Pursuant to these directives, and in keeping with the Federal Rules of Evidence, the

Special Master makes these findings and recommendations.

**FINDINGS OF FACT**

1.      Yair Mor was born on November 29, 1958 in Jerusalem.  A copy of his passport, filed with this Court on May 10, 2012 confirms that, at all relevant times, Mr. Mor was a United States citizen.

2.      At the time of the Hezbollah rocket attacks in July 2006, Yair Mor was living in the town of Rosh Pina.  Mr. Mor owned an art gallery in Tzfat.

**<u>Testimony of Yair Mor</u>**

Yair Mor provided his testimony by Declaration dated March 29, 2012.  In his Declaration, Yair affirms he was born in 1958 in Jerusalem, moved with his family to the United States in 1962, and returned to Israel in 1972.  He is married with three children, born in 1986, 1990 and 1991.  In July 2006, Yair lived in the town of Rosh Pina – approximately ten kilometers distance from Tzfat – and operated an art gallery and factory manufacturing "special artifacts" such as prayer shawls and yarmulkes.

According to his Declaration, "on the first day of the rocket attacks," Yair's "business was booming.  The dining room area on our balcony overlooking a beautiful view was packed with tourists."  He suddenly heard "three sharp, piercing whistling sounds and then three very loud booms."  Yair's patrons "became hysterical and began to panic."  In their panic, "tables were overturned and plates were shattered.  It was a very scary moment for all of us and everyone was stunned."  Yair recalls attempting to comfort the children and elderly and directing his patrons to the "reinforced and protected" factory area of his business where they remained until they were able to secure appropriate transportation.  Yair remained at the factory with a few employees; when the rocket fire intensified, he dismissed them and returned home to Rosh Pina.  Yair's business remained closed "until after the rocket barrages ended in the end of August."

Yair and his family also experienced rocket fire in Rosh Pina.  When one of the rockets shook the "entire house,"  Yair's family packed several suitcases and fled south to Tel Aviv where they stayed with various friends as well as in hotels.  Yair estimates that, during his stay, he spent "approximately 10,000 shekels a week (the equivalent of almost $3,000)."  According to Yair, "this extra 60,000 shekel (approximately $18,000) expenditure was acutely felt since my business was closed and I was not taking in any income."

During the second week of the war, Yair learned that a rocket had hit his business so he traveled back to Tzfat "under the cover of darkness" to assess the damage.  When he arrived, he was unable to "pull down the metal doors since they had been warped from the rocket impact." The windows were broken and "everything" inside his shop "was completely shattered."  He boarded the windows and left.  Yair believed his family's livelihood was "totally destroyed."  He recalls being "very upset throughout the duration of the rocket attacks about all the wreckage and felt frustrated that I couldn't get back up to Tzfat to try and access the destruction."  When Yair returned in August, he found "the works of art and glass shelving [] completely destroyed" and "the building sustained structural damage from the impact of the katyusha rocket."

Yair testified that his gross income in 2005 was 1.9 million New Israeli Shekels ("NIS") "the equivalent to nearly $550,000."  Based on this figure, Yair estimates that he sustained a loss of "520,000 Shekels (approximately $150,000), based upon the prior year's income for the same time period (the duration of the war)" – an amount that does not take into account the "expected increase" in business he anticipated from the prior year "of an additional 20%-30%," which he estimates to be "104,000 -156,000 Shekels (approximately $30,000-$44,500);" the "six months" his business was "standing practically vacant until the tourists began returning to Tzfat," which Yair estimates to be "a minimum of 350,000 Shekels ($100,000);" or the "150,000 Shekel

(approximately $44,000)" the amount he continued to pay his skilled workers during the interim period.

In addition to his lost inventory which "amounted to approximately 95,000 Shekels (a little over $27,000)," the gallery sustained damage to the walls, doors and the "very expensive Marvin windows" which had "all been blown out from the impact of the rocket."  Unable to afford exact replacements, Yair states he was "unable to recreate the beautiful look" created by the originals.  As of the date he executed his Declaration in 2012, Yair did not have the funds to effect all the necessary repairs.

Beyond his economic losses, Yair testified: "[M]y family and I also went through a terrible ordeal which traumatized and affected us in many ways." He recounts how "difficult" it was "to forget the overwhelming fear I felt for my life and the lives of my loved ones, as well as the fear of losing everything I have worked for, my home and my business."  Yair believes "the worst thing of all was watching my children lose their sense of security."

**ANALYSIS**

Damages available under 28 U.S.C. § 1605(A)(c) include "economic damages, solatium, pain and suffering, and punitive damages."  To demonstrate an entitlement to these damages, "a plaintiff must prove that the projected consequences [of the defendant's actions] are 'reasonably certain' (i.e. more likely than not) to occur, [or that actual consequences have occurred,] and must prove the amount of damages by a 'reasonable estimate' consistent with [the D.C. Circuit's] application of the American rule on damages."  *Kim v. Democratic People's Republic of Korea* 87 F.Supp.3d 286, 289 (D.D.C. 2015) citing *Hill v. Republic of Iraq,* 328 F.3d 680, 681 (D.C.Cir. 2003).

Upon consideration of the facts presented, and in light of the aforementioned legal framework, the Special Master considers whether Yair Mor is entitled to compensatory damages for the pain and suffering he has endured.

### Pain and Suffering

In determining a proper damage award for Yair Mor, the Special Master is guided by prior decisions awarding damages to victims of terrorism, mindful of the inherent difficulty in "assess[ing] the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Valencia v. Islamic Republic of Iran*, 774 F.Supp.2d 1, 14 (D.D.C. 2010). The Special Master is equally mindful that previous damages awards, while instructive guidelines, "are not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010), and, therefore, "strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009) (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

Courts consider a "myriad of factors" when assessing damages for surviving victims of terrorist actions. These factors include: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson v. Islamic Republic of Iran* ("*Peterson II*"), 515 F.Supp.2d 25, 52 n. 26 (D.D.C. 2007) (citing *Blais*, 459 F.Supp.2d at 59). Calculating damages begins with the baseline assumption that persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Davis v. Islamic Republic of Iran*, 882 F.Supp.2d 7 (D.D.C. 2012) (citing *Peterson II*). This amount serves as a lodestar and can deviate upward in the presence of "severe instances of physical and psychological pain, such as where victims suffered relatively

more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," *Valore*, 700 F.Supp.2d at 84, or downward in the face of "minor shrapnel injuries or minor injury from small-arms fire." *Id.*

For victims who "suffer[ed] severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million." *Harrison v. Republic of S*udan, 882 F.Supp.2d 23, 49 (D.D.C. 2012) (citing *Valore*, 700 F.Supp.2d at 85). *See also Petersen II*, 515 F.Supp.2d at 56; *Brown v. Islamic Republic for Iran*, 872 F.Supp.2d 37, 42 (D.D.C. 2012); *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 47 (D.D.C. 2012).

Yair Mor's Declaration suggests that the primary source of his "mental anguish" was his loss of income.  In the six pages that comprise his sworn statement, Yair fails to capture the emotional impact the Hezbollah attack had on him and his family except in broad generalizations coupled with references to his business.   For example, Yair states that, "in addition to the substantial economic losses that the war caused me, my family and I also went through a terrible ordeal which traumatized and affected us in many ways."  Nowhere in his Declaration, however, does Yair attempt to describe this "trauma" or elaborate on the "many ways" his family was impacted.  Similarly unrevealing is Yair's statement attesting to his "difficult[y] []forget[ting] the overwhelming fear I felt for my life and the lives of my loved ones, as well as the fear of losing everything I have worked for, my home and my business."  These sparse references appear, at best, an afterthought and constrain the Special Master to recommend a downward departure from the $1.5 million baseline established in *Valore*.

The Special Master has no doubt that Yair Mor suffered the stress and anxiety of being compelled to flee his home and losing business.  However, unlike other claimants in this action who lived through the Hezbollah bombing, Yair's emotional center appears grounded primarily

in economic terms. The fact remains that, unlike other claimants, Yair relocated his family to safety in Tel Aviv. He was not compelled to remain in shelters, did not have to care for and protect young children from repeated rocket barrages as did Brian and Karene Erdstein, Chaim Kaplan, or Chaim and Nechama Kumer. Yair certainly did not have to plot a strategic route simply to get groceries as did Chayim Kumer and Moreen Greenberg.

Moreover, Yair's almost casual reference to the "trauma" he purportedly suffered contrasts vividly with the anguish described by other claimants such as Brian Erdstein who was diagnosed with "Chronic dysthymia (moderate)", "Adjustment Disorder with Depressed Mood" and "Partial PTSD" or Karene Erdstein who suffered from "Chronic dysthymia (moderate)", "Adjustment Disorder with Depressed Mood" and "Partial PTSD" or Jared Sauter who developed PTSD, "Depression," and "Adjustment disorder NOS" – all disorders directly attributable to the Hezbollah attacks.

In short, notwithstanding the presumption that Yair Mor suffered emotionally as a result of the Hezbollah bombings, fundamental fairness and parity do not militate in favor of an award equal to those whose lives were truly upended.

### Economic Damages

Economic damages can be recovered pursuant to section 1605A(c) and "as a general rule, lost earnings – past and future – are compensable damages." *Moradi v. Islamic Republic of Iran*, 7 F.Supp.3d, 57, 71 (D.D.C. 2015). Such damages must be proven "by a reasonable estimate," *Reed v. Islamic Republic of Iran,* 845 F.Supp.2d 204, 213 (D.D.C.2012), and may be proven by the submission of a forensic economist's expert report. *Roth v. Islamic Republic of Iran* (D.D.C. 2015) 78 F.Supp.3d 379, 402 citing *Belkin v. Islamic Republic of Iran,* 667 F.Supp.2d 8, 24 (D.D.C. 2009).

Although Yair went into considerable detail to delineate the losses he sustained as a result of the 2006 Hezbollah rocket attacks, he provided absolutely no documentation in support of his claim.  As stated, Yair seeks damages based on the fact that his gross income in 2005 was 1.9 million New Israeli Shekels ("NIS") "the equivalent to nearly $550,000" and that his projected income for 2006 would be "an additional 20-30%" in 2006.  He makes this claim, however, without submitting any tax returns, bank statements, certified accounting reports or any documents which might lend credence to his assumptions concerning future projections.  Yair estimates that he spent "approximately $18,000" on expenditures such as hotels while in Tel Aviv without supplying any receipts or credit card statements.  He further estimates he lost "a minimum of 350,000 Shekels ($100,000)" in income for the "six months" his business was "standing practically vacant until the tourists began returning to Tzfat" without any evidence to bolster his claim.  Yair estimates his lost inventory "amounted to approximately 95,000 Shekels (a little over $27,000)," without providing any receipts, ledgers, or inventory lists.  He claims to have paid his skilled workers "150,000 Shekel (approximately $44,000)" without appending any payroll records or bank statements.

In short, Yair has introduced no evidence supporting his claim for approximately $500,000 in economic damages.  His failure to do so is fatal to his claim as courts have uniformly been unsympathetic to unsupported claims for economic damages.  In *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216 (D.D.C. 2012), for example, this Court denied claims of economic harms where "plaintiffs [] failed to introduce any evidence of what costs specifically were incurred" and sought damages for a "lost business opportunity" based on a "speculative" conjecture and sought reimbursement for "travel expenses" without "any evidence supporting this claim."  *Id.*, at 30.  Similarly, in *Moradi v. Islamic Republic of Iran* 77 F.Supp.3d 57 (D.D.C.

2015), the court made clear that, "[u]nlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings with competent evidence."   In accordance with this precedent, the Special Master denies Yair Mor's claim for economic damages.

In light of the foregoing, the Special Master recommends that Yair Mor be awarded Eight Hundred and Fifty Thousand Dollars ($850,000) in compensatory damages for pain and suffering.

Dated:  March 23, 2016                                          Respectfully submitted,

                                                               By:*/s/ Alan L. Balaran*
                                                               Alan L. Balaran, Esq.
                                                               Special Master