UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAIM KAPLAN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 09-00646 (RCL) |
| ) | |
| HEZBOLLAH, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

| | |
|---|---|
| CHAIM KAPLAN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 10-00483 (RCL) |
| ) | |
| THE CENTRAL BANK OF THE ) | |
| ISLAMIC REPUBLIC OF IRAN, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**REPORT OF SPECIAL MASTER
PURSUANT TO ORDER OF REFERENCE
REGARDING MIKIMI STEINBERG**

This action is brought by Mikimi Steinberg pursuant to 28 U.S.C. § 1605A seeking damages for injuries sustained on July 13, 2006 as a result of a barrage of rockets fired by Hezbollah from Lebanon into northern Israeli towns including the city of Safed ("Tzfat") where the family resided. Under the Administrative Plan Governing Special Masters, and pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received testimony and reviewed documentary evidence to assist in determining any damages to which Ms. Steinberg may be entitled.

**BACKGROUND**

On July 12, 2006, Hezbollah launched a surprise attack against Israel killing eight Israeli Defense Force soldiers and kidnapping two others at the Israeli/Lebanese border.  Israel responded with airstrikes against Hezbollah-held positions in Southern Lebanon; Hezbollah retaliated with katyusha rockets and mortars fired against Israeli communities located close to the border, including the city of Tzfat.  A United Nations-brokered cease-fire took effect on August 14, 2006.  *See* U.S. Congressional Research Services, *Lebanon: The Israel-Hamas-Hezbollah Conflict* (RL3356, Updated September 15, 2006) by Jeremy M. Sharp.  *See also* http://www.mfa.gov.il/mfa/foreignpolicy/terrorism/hizbullah/pages/hizbullah%20attack%20in%20%20northern%20israel%20and%20israels%20response%2012-jul-2006.aspx (last viewed December 4, 2015).

**The Islamic Republic of Iran**

The statutory scheme underpinning actions against the Islamic Republic of Iran have been exhaustively recounted in *In re: Islamic Republic of Iran Terrorism Litigation*, (659 F.Supp.2d 31 (D.D.C. 2009), obviating the need for recapitulation.  This Court repeatedly has found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for facilitating, financing and providing material financial and logistical support to help carry out attacks on United States citizens.  *See*, *e.g.*, *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp. 2d 229 (D.D.C. 2006); *Peterson v. Islamic Republic of Iran*, 264 F.Supp. 2d 46, 61 (D.D.C. 2003) ("*Peterson I*"); *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007); *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44 (D.D.C. 2012).  This Court found so in this case, as well.  *See* Memorandum Opinion (July 23, 2014), at 2 (Case No. 1:10-cv-00483 (ECF No. 54)) ("July 23 Memorandum").

### The Democratic People's Republic of Korea

In 1988, the State Department designated the Democratic People's Republic of Korea ("North Korea") as a "state sponsor of terrorism," s*ee Notice, Determination Pursuant to Section 6(j)of the Export Administration Act of 1979; North Korea*, 53 Fed. Reg. 3477 (Feb. 5, 1988) – a designation that was subsequently rescinded on June 26, 2008. *See Certification of Rescission of North Korea's Designation as a State Sponsor of Terrorism*, 73 Fed. Reg. 37351. Courts have held North Korea responsible for offering direct support to terrorist organizations that have carried out attacks in Israel. S*ee, e.g., Calderon-Cardona v. Dem. People's Republic of Korea*, 723 F. Supp. 2d 441, 452 (D.P.R. 2010); *Massie v. Government of Democratic People's Republic of Korea* 592 F.Supp.2d 57 (D.D.C. 2008). In its Memorandum Opinion, this Court found that North Korea provided "material aid to Hezbollah in three ways: weapons, training, and tunnels to help carry out the attacks." July Memorandum, at 6.

## PROCEDURAL HISTORY

Based on the events which took place in Israel in July 2006, Plaintiffs filed a complaint on April 8, 2009 against Hezbollah under the Antiterrorism Act, 18 U.S.C. § 2333(a) and against North Korea under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c) (Case No. 1:09-cv-00646 (ECF No.1)). On March 23, 2010, Plaintiffs filed a second complaint, this time against the Central Bank of the Islamic Republic of Iran; Bank Saderat, Iran; Bank Saderat, PLC and the Islamic Republic of Iran, alleging these entities provided "extensive material support and resources to Hezbollah, that caused, enabled and facilitated" the Hezbollah rocket attacks injuring Plaintiffs and seeking damages under 28 U.S.C. §§1605A(c) and (d) and 18 U.S.C. § 2333(a) (Case No. 1:10-00483 (ECF No. 3)). This Court subsequently dismissed the statutory claims against Hezbollah on August 20, 2013, (09-646 (ECF No. 50)), and against Bank Saderat of Iran and Bank Saderat, PLC on November 5, 2010 (10-483 (EFC No. 16)). On August 20,

2015, plaintiffs voluntarily dismissed their common-law claims against Hezbollah (09-646 (ECF No. 63)).

Neither North Korea nor Iran responded to the complaints and plaintiffs subsequently moved for entry of default on May 12, 2014 (09-646 (ECF No. 53) and 10-483 (ECF No. 51)). A hearing was convened on May 27, 2014 to determine defendants' liability in which plaintiffs produced expert witnesses who, in accordance with 28 U.S.C. § 1608(e) (requiring plaintiffs to establish their right to relief by "evidence that is satisfactory to the court"), attested to Iran's and North Korea's complicity in Hezbollah's 2006 attacks against Israel. Based on this testimony, the Court entered judgment by default against the two nations (09-646 (ECF No. 57) and 10-483 (ECF No. 54)).

On October 1, 2014, the Court appointed the undersigned as special master to be governed by the Administrative Plan Governing Special Masters previously adopted in *O'Brien v. Islamic Republic of Iran*, Case No. 1:06-cv-0690 (RCL). *See also* 09-646 (ECF No. 58) and 10-483 (EFC No. 55)). The court specifically directed the Special Master to issue reports recommending the amount of compensatory damages to which he believed each plaintiff was entitled and to "take and report on evidence of each plaintiff's qualification for relief under § 1605A(c) and the familial relationships between plaintiffs and victims of the rocket attacks in Israel committed between July 12, 2006 and August 14, 2006." *Id*.

Pursuant to these directives, and, in keeping with the Federal Rules of Evidence, the Special Master makes these findings and recommendations.

**FINDINGS OF FACT**

1. Mikimi Steinberg was born on December 21, 1962 in Boston, Massachusetts. A copy of her passport filed with this Court on May 10, 2012 confirms that, at all relevant times, Ms. Steinberg was a United States citizen.

2. At the time of the Hezbollah rocket attacks in July 2006, Mikimi was residing in Tzfat, Israel.

**Testimony of Mikimi Steinberg**

Mikimi Steinberg provided her testimony by Declaration dated March 28, 2012. In her Declaration, Mikimi affirms she was born in Boston, immigrated to Israel in 1979 and has a daughter who was born in 1985. In July 2006, Mikimi was living in an apartment in Tzfat, working as "an occasional babysitter." At the time, her mobility was limited as she was "awaiting ankle surgery."

Mikimi recounts how, "just before the first katyusha rocket from Lebanon fell on Tzfat, my daughter Maya came to evacuate me from my rooftop apartment," where her inability to move about freely made her a "sitting duck." Mikimi states, "I feared for my life if I were to remain in my apartment by myself. I was afraid I would not be able to reach a shelter in time before a rocket fell." Mikimi moved in with her daughter who lived south of Tzfat. She believes her "foresight proved fortuitous," as she learned that, on the "last Friday of the war," her apartment had sustained "a direct hit by a katyusha rocket." Mikimi believes had she been home at the time, she would have been physically unable to find refuge in a bomb shelter in time and would have been killed. To Mikimi, this thought "is absolutely terrifying" as well as "extremely frightening and stress inducing."

Shortly after the war, Mikimi returned to her apartment to assess the damage. "The shock of returning to my apartment that I once felt safe in was overwhelming." A rocket had "broken through a wall" near her kitchen and exploded on the roof of a building one level below. When Mikimi saw the size of the hole in her apartment, it again occurred to her that she may not have made it out alive. Many of Mikimi's possessions were damaged in the blast including her bookcase, books, "special religious objects collection and many other personal belongings," toys she used for babysitting and her refrigerator.

According to Mikimi, the process of cleaning her apartment coupled with the thought that she would have been killed had she remained at home, left her with "feelings of depression." The damage to her apartment took "a great deal of time to fix" and she could not look at the hole in the wall: "It was too painful and frightening for me. I would start shaking just thinking about coming into the house and seeing the rocket's damage." Mikimi testified that hearing of a close friend injured by shards of glass "was very scary for me. It forever shattered the illusion that I am safe and protected in my own house." According to Mikimi, the image of the apartment after the rocket attack "returns all the time."

Mikimi testified that, following the war, she had to live in a hotel in Tzfat and then with a friend. While living in the hotel, she underwent surgery on her ankle which resulted in her confinement to a wheel chair for "several months." Mikimi had to return to her apartment periodically which proved "very difficult" for her. The rocket attacks damaged the elevator in her building, requiring her to use the steps to get to her ninth floor apartment. Her limited mobility required that she "sit down on the steps and go up them one at a time." According to Mikimi, "that struggle often led me to tears feeling very helpless and frustrated."

On the anniversary of the attacks, Mikimi "disassociates" herself from the event. "It is easier for me to cope with all the emotional stress and anxiety caused from the fact that my apartment was hit by a katyusha rocket and that perhaps I would have been killed in that attack."

**ANALYSIS**

Damages under the Foreign Sovereign Immunities Act ("FSIA") "may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. 1605A(c)(4). To demonstrate an entitlement to these damages, "a plaintiff must prove that the projected consequences [of the defendant's actions] are 'reasonably certain' (*i.e.* more likely than not) to occur, [or that actual consequences have occurred,] and must prove the amount of damages by a 'reasonable estimate' consistent with [the D.C. Circuit's] application of the American rule on damages." *Kim v. Democratic People's Republic of Korea* 87 F.Supp.3d 286, 289 (D.D.C. 2015) (citing *Hill v. Republic of Iraq,* 328 F.3d 680, 681 (D.C. Cir. 2003)).

Upon consideration of the facts presented, and in light of the aforementioned legal framework, the Special Master finds Mikimi Steinberg entitled to compensatory damages for the pain and suffering she has endured.

### Pain and Suffering

In determining a proper damage award for Mikimi Steinberg, the Special Master is guided by prior decisions awarding damages to victims of terrorism, mindful of the inherent difficulty in "assess[ing] the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Valencia v. Islamic Republic of Iran*, 774 F.Supp.2d 1, 14 (D.D.C. 2010). The Special Master is equally mindful that previous damages awards, while instructive guidelines, "are not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010), and, therefore,

"strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009) (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

Courts consider a "myriad of factors" when assessing damages for surviving victims of terrorist actions. These factors include: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson v. Islamic Republic of Iran* ("*Peterson II*"), 515 F.Supp.2d 25, 52 n. 26 (D.D.C. 2007) (citing *Blais*, 459 F.Supp.2d at 59). Calculating damages begins with the baseline assumption that persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Davis v. Islamic Republic of Iran*, 882 F.Supp.2d 7 (D.D.C. 2012) (citing *Peterson II*). This amount serves as a lodestar and can deviate upward in the presence of "severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," *Valore*, 700 F.Supp.2d at 84, or downward in the face of "minor shrapnel injuries or minor injury from small-arms fire." *Id.*

For victims, such as Mikimi Steinberg, who "suffer[ed] severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million." *Harrison v. Republic of Sudan*, 882 F.Supp.2d 23, 49 (D.D.C. 2012) (citing *Valore*, 700 F.Supp.2d at 85). *See Petersen II*, 515 F.Supp.2d at 56; *Brown v. Islamic Republic for Iran*, 872 F.Supp.2d 37, 42 (D.D.C. 2012); *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 47 (D.D.C. 2012).

The Special Master need not define the parameters of "severe emotional injury" or parse through abstract clinical definitions to conclude that Mikimi's experiences during and after the Hezbollah attacks were terrifying and traumatic. To engage in such an academic exercise would

only subvert the well settled proposition that "acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience[.]" *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002).

That said, the Special Master recommends a downward departure from the $1.5 million baseline established in *Valore*. The Special Master has no doubt that Mikimi suffered the stress and anxiety of being compelled to flee her home, of having her apartment damaged by rocket fire, and of sensing that her lack of mobility might have led to her death. However, unlike other claimants in this action who remained in Tzfat through the Hezbollah bombing and were professionally diagnosed with recognized psychological ailments, Mikimi's emotional state centers primarily around the state of her apartment and the thought of what "might have happened" had she remained. Mikimi did not have to care for and protect young children from repeated rocket barrages as did Brian and Karene Erdstein, Chaim Kaplan, or Chayim and Nechama Kumer, nor did she have to plot a strategic route every time she needed groceries as did Chayim Kumer and Moreen Greenberg.

Moreover, Mikimi's "trauma" contrasts vividly with the anguish described by other claimants such as Brian Erdstein who was diagnosed with "Chronic dysthymia (moderate)", "Adjustment Disorder with Depressed Mood" and "Partial PTSD" or Karene Erdstein who suffered from "Chronic dysthymia (moderate)", "Adjustment Disorder with Depressed Mood" and "Partial PTSD" or Jared Sauter who developed PTSD, "Depression," and "Adjustment disorder NOS" – all disorders directly attributable to the Hezbollah attacks. Mikimi presents no evidence that she suffered any recognizable disorder as a result of the Hezbollah attacks.

In short, notwithstanding the presumption that Ms. Steinberg suffered emotionally as a result of the Hezbollah bombings, fundamental fairness and parity do not permit an award equal to those whose lives were truly uprooted.

In light of the foregoing, the Special Master recommends Mikimi Steinberg receive Eight Hundred and Fifty Thousand Dollars ($850,000) as compensatory damages for pain and suffering.

Dated: March 23, 2016                                   Respectfully submitted,

                                                          By:*/s/ Alan L. Balaran*
                                                          Alan L. Balaran, Esq.
                                                          Special Master