UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHAIM KAPLAN, et al.,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 09-00646 (RCL) |
| ) | |
| **Hezbollah, et al,** ) | |
| ) | |
| Defendants. ) | |
| ) | |

| | |
|---|---|
| **CHAIM KAPLAN, et al.,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 10-00483 (RCL) |
| ) | |
| **THE CENTRAL BANK OF THE** ) | |
| **ISLAMIC REPUBLIC OF IRAN, et al,** ) | |
| ) | |
| Defendants. ) | |
| ) | |

**REPORT OF SPECIAL MASTER
PURSUANT TO ORDER OF REFERENCE
REGARDING THE GREENBERG FAMILY**

This action is brought by Theodore and Moreen Greenberg pursuant to 28 U.S.C. § 1605A seeking damages for injuries sustained on July 13, 2006 as a result of a barrage of rockets fired by Hezbollah from Lebanon into northern Israeli towns including the city of Safed ("Tzfat") where the family resided. Under the Administrative Plan Governing Special Masters, and pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received testimony and reviewed documentary evidence to assist in determining any damages to which Theodore and Moreen Greenberg may be entitled.

**BACKGROUND**

On July 12, 2006, Hezbollah launched a surprise attack against Israel killing eight Israeli Defense Force soldiers and kidnapping two others at the Israeli/Lebanese border.  Israel responded with airstrikes against Hezbollah-held positions in Southern Lebanon; Hezbollah retaliated with katyusha rockets and mortars fired against Israeli communities located close to the border.  A United Nations-brokered cease-fire took effect on August 14, 2006.  *See* U.S. Congressional Research Services, *Lebanon: The Israel-Hamas-Hezbollah Conflict* (RL3356, Updated September 15, 2006) by Jeremy M. Sharp.  *See also* *http://www.mfa.gov.il/mfa/foreignpolicy/terrorism/hizbullah/pages/hizbullah%20attack%20in%20%20northern%20israel%20and%20israels%20response%2012-jul-2006.aspx* (last viewed December 4, 2015).

**The Islamic Republic of Iran**

The statutory scheme underpinning actions against the Islamic Republic of Iran have been exhaustively recounted in *In re: Islamic Republic of Iran Terrorism Litigation*, (659 F.Supp.2d 31 (D.D.C. 2009), obviating the need for recapitulation.  This Court repeatedly has found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for facilitating, financing and providing material financial and logistical support to help carry out attacks on United States citizens.  *See*, *e.g.*, *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp. 2d 229 (D.D.C. 2006); *Peterson v. Islamic Republic of Iran*, 264 F.Supp. 2d 46, 61 (D.D.C. 2003) ("*Peterson I*"); *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007); *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44 (D.D.C. 2012).  This Court found so in this case, as well.  *See* Memorandum Opinion (July 23, 2014), at 2 (Case No. 1:10-cv-00483 (ECF No. 54) ("July 23 Memorandum").

**The Democratic People's Republic of Korea**

In 1988, the State Department designated the Democratic People's Republic of Korea ("North Korea") as a "state sponsor of terrorism," s*ee Notice, Determination Pursuant to Section 6(j)of the Export Administration Act of 1979; North Korea*, 53 Fed. Reg. 3477 (Feb. 5, 1988) – a designation that was subsequently rescinded on June 26, 2008. *See Certification of Rescission of North Korea's Designation as a State Sponsor of Terrorism*, 73 Fed. Reg. 37351. Courts have held North Korea responsible for offering direct support to terrorist organizations that have carried out attacks in Israel. S*ee, e.g., Calderon-Cardona v. Dem. People's Republic of Korea*, 723 F. Supp. 2d 441, 452 (D.P.R. 2010); *Massie v. Government of Democratic People's Republic of Korea* 592 F.Supp.2d 57 (D.D.C. 2008). In its July Memorandum, this Court found that North Korea provided "material aid to Hezbollah in three ways: weapons, training, and tunnels to help carry out the attacks" in 2006. July Memorandum, at 6.

**PROCEDURAL HISTORY**

Based on the events which took place in Israel in July 2006, Plaintiffs filed a complaint on April 8, 2009 against Hezbollah under the Antiterrorism Act, 18 U.S.C. § 2333(a) and against North Korea under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c) (Case No. 1:09-cv-00646 (ECF No.1)). On March 23, 2010, Plaintiffs filed a second complaint, this time against the Central Bank of the Islamic Republic of Iran; Bank Saderat, Iran; Bank Saderat, PLC and the Islamic Republic of Iran, alleging these entities provided "extensive material support and resources to Hezbollah, that caused, enabled and facilitated" the Hezbollah rocket attacks injuring Plaintiffs and seeking damages under 28 U.S.C. §§1605A(c) and (d) and 18 U.S.C. § 2333(a) (Case No. 1:10-00483 (ECF No. 3)). This Court subsequently dismissed the statutory claims against Hezbollah on August 20, 2013, (09-646 (ECF No. 50)), and against Bank Saderat


of Iran and Bank Saderat, PLC on November 5, 2010 (10-483 (EFC No. 16)). On August 20, 2015, plaintiffs voluntarily dismissed their common-law claims against Hezbollah (09-646 (ECF No. 63)).

Neither North Korea nor Iran responded to the complaints and plaintiffs subsequently moved for entry of default on May 12, 2014 (09-646 (ECF No. 53) and 10-483 (ECF No. 51)). A hearing was convened on May 27, 2014 to determine defendants' liability during which plaintiffs produced expert witnesses who, in accordance with 28 U.S.C. § 1608(e) (requiring plaintiffs to establish their right to relief by "evidence that is satisfactory to the court"), attested to Iran's and North Korea's complicity in Hezbollah's 2006 attacks against Israel. Based on this testimony, the Court entered judgment by default against the two nations (09-646 (ECF No. 57) and 10-483 (ECF No. 54)).

On October 1, 2014, the Court appointed the undersigned as special master to be governed by the Administrative Plan Governing Special Masters previously adopted in *O'Brien v. Islamic Republic of Iran*, Case No. 1:06-cv-0690 (RCL). *See* 09-646 (ECF No. 58) and 10-483 (EFC No. 55)). The court specifically directed the Special Master to issue reports recommending the amount of compensatory damages to which he believed each plaintiff was entitled and to "take and report on evidence of each plaintiff's qualification for relief under § 1605A(c) and the familial relationships between plaintiffs and victims of the rocket attacks in Israel committed between July 12, 2006 and August 14, 2006." *Id*.

Pursuant to these directives, and in keeping with the Federal Rules of Evidence, the Special Master makes these findings and recommendations.

**FINDINGS OF FACT**

1.      Theodore Greenberg was born on June 19, 1951 in Los Angeles, California. A copy of Mr. Greenberg's passport, filed with this Court on May 10, 2012 confirms that, at all relevant times, he was a United States citizen.

2.      Theodore Greenberg's wife, Moreen was born on December 15, 1947.  A copy of Ms. Greenberg's passport, filed with this Court on May 10, 2012 confirms that, at all relevant times, she was a United States citizen.

3.      In July 2006, Hezbollah launched a series of rocket attacks against Israel.  One of the cities shelled was Safed ("Tzfat"), where Theodore and Moreen were residing.

**Testimony of Theodore Greenberg**

Theodore Greenberg provided his testimony by Declaration dated March 29, 2012.  In his Declaration, Theodore affirms he is a U.S. citizen born on June 19, 1951 in Los Angeles, California.

At the time of the rocket attacks in 2006, Theodore was residing in Tzfat with his wife Moreen, where he had been operating an internet café he opened in 2002.  On the morning of July 13, 2006, Theodore recalls hearing the "whistling" of a katyusha rocket indicating the town was under attack.  "My first concerns were to take care of my customers and make sure that they were okay and also to find out where Moreen was since she was visiting friends in a nearby city that morning."  He spoke to Moreen who confirmed she was safe in the bomb shelter located in their apartment building.  After attending to the tourists who sought refuge in his café, Theodore returned home.  On the way, he observed Israeli medics evacuating a fatality of a direct rocket hit.  Despite his training as a medic, Theodore is haunted by the image to this day.

Theodore joined Moreen in their bomb shelter which, he recalls, was filled with anxious and frightened residents, many of whom were children. They later moved to the basement of the internet café where they remained for the next three weeks. Theodore recalls that, with residents fleeing to the south and tourists refusing to enter the city, Tzfat became a "ghost town" until the cease fire in August,  According to Theodore, "[t]his was the direct cause of my business' failure during the period of the rocket attacks and beyond." He estimates his average annual income prior to the attacks was $15,000 to $20,000.

Theodore remembers this time as "very stressful and anxiety provoking." He testified that, prior to the rocket attacks, he generally felt "unafraid." After the Hezbollah incursion, however, Theodore felt "very vulnerable." Although he served in the U.S. Navy on active duty for four years, Theodore admits he was "not prepared for living under the stress of this period of rocket attacks." This stress prompted him to start smoking again for the first time in years.

Realizing that he and Moreen could not survive without the income generated from the internet café, Theodore traveled to Jerusalem where he found a job in telecommunications. Unable to commute daily between Tzfat and Jerusalem, Theodore rented an apartment in Jerusalem, returning to Tzfat on the weekends. Theodore recalls "pa[ying] approximately NIS 6,500 shekel ($1,500) for rent on my Jerusalem apartment" and incurring  "transportation expenses travelling back and forth to Tzfat to be with Moreen." While in Jerusalem, Theodore was constantly concerned about Moreen's safety. He believes he "failed" his wife and that "the marital strain we felt was like nothing we had experienced before." He worried about Moreen "constantly." Despite his best efforts to revive the internet café, the business never "got off the ground again." He testified that, "during the rocket attacks I suffered a business loss of "about $2,500 - $3,000."

Theodore describes being in constant fear of future attacks. He admits that "the upheaval in my life has never gone away and I have never returned to how I was before the rocket attacks."

**Testimony of Moreen Greenberg**

Moreen Greenberg provided her testimony by Declaration dated March 29, 2012. Moreen affirms she was born in Detroit, Michigan on December 15, 1947 and is a US citizen. She is married to Theodore Greenberg and is an artist who creates murals and illustrations.

According to her Declaration, on the morning of July 13, 2006, Moreen was visiting friends in the nearby city of Chazor, when she learned that a katyusha rocket fired from Lebanon had landed in Tzfat. Moreen immediately called her husband and "tried to convince him to close the shop and come home so that he could find safety during the bombing in a bomb shelter." Moreen returned to Tzfat and waited for Theodore in the communal bomb shelter located in their apartment building. Moreen remained in the shelter until the afternoon when she returned to her apartment. At approximately 2 p.m., Moreen heard another rocket go by and felt her entire apartment shake when it exploded. She recalls being "very frightened and raced in fear to the bomb shelter once again." At this point, and to her great relief, Theodore joined her in the bomb shelter. Later that day, Moreen and Theodore left the cramped shelter for the safety of the basement of the internet café.

Moreen testified that, "as a result of the War, my husband's internet café went out of business practically over-night." They transformed the café "into an aid center where we gave people shelter and enabled them to use our computers to check the news and update family and friends of their status." Three weeks later, Theodore took a job in Jerusalem. Moreen confirms Theodore's testimony that he rented an apartment for "approximately NIS 6,500 ($1,500)" and would return to Tzfat on the weekends.

Moreen testified that the war was very "stressful" and she felt "alone." She was nervous and anxious and felt badly for Theodore who was torn between the need to work and the need to remain in Tzfat to protect her. Moreen stated: "I had to keep myself from falling apart while he was not with me. I stayed indoors. I tried to keep calm."

Moreen was unable to work due to her anxiety and rarely left the apartment except to buy groceries at the only open vender which was across town. Moreen recalls steeling herself mentally to make this trip by mapping the available shelters on the route in case of further attacks. "I also had trouble looking at the color red . . . It was too strong of a color and it reminded me of blood. It caused me anxiety and fear." She recalled that she was always fully dressed, even when sleeping, in the event she had to evacuate in the middle of the night. Moreen still has difficulty talking about the war and admits she has become frightened of big cities and is anxious whenever she visits Theodore in Jerusalem.

**ANALYSIS**

Damages under the Foreign Sovereign Immunities Act ("FSIA") "may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. 1605A(c)(4). To demonstrate an entitlement to these damages, "a plaintiff must prove that the projected consequences [of the defendant's actions] are 'reasonably certain' (i.e. more likely than not) to occur, [or that actual consequences have occurred,] and must prove the amount of damages by a 'reasonable estimate' consistent with [the D.C. Circuit's] application of the American rule on damages." *Kim v. Democratic People's Republic of Korea* 87 F.Supp.3d 286, 289 (D.D.C. 2015) citing *Hill v. Republic of Iraq,* 328 F.3d 680, 681 (D.C. Cir. 2003).

Upon consideration of the facts presented, and in light of the aforementioned legal framework, the Special Master finds that Theodore and Moreen Greenberg are each entitled to

compensatory damages for the pain and suffering they have endured.  The Special Master further finds each are entitled to damages for loss of solatium.  Finally, the Special Master concludes that Theodore and Moreen Greenberg are entitled to no compensation for loss of income.

### Pain and Suffering

In determining a proper damage award for Theodore and Moreen Greenberg, the Special Master is guided by prior decisions awarding damages to victims of terrorism, mindful of the inherent difficulty in "assess[ing] the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Valencia v. Islamic Republic of Iran*, 774 F.Supp.2d 1, 14 (D.D.C. 2010).  The Special Master is equally mindful that previous damages awards, while instructive guidelines, "are not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010), and, therefore, "strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009) (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

Courts consider a "myriad of factors" when assessing damages for surviving victims of terrorist actions.  These factors include: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson v. Islamic Republic of Iran* ("*Peterson II*"), 515 F.Supp.2d 25, 52 n. 26 (D.D.C. 2007) (citing *Blais*, 459 F.Supp.2d at 59). Calculating damages begins with the baseline assumption that persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Davis v. Islamic Republic of Iran*, 882 F.Supp.2d 7 (D.D.C. 2012) (citing *Peterson II*).  This amount serves as a lodestar and can deviate upward in the presence of "severe instances of physical and psychological pain, such as where victims suffered relatively

more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," *Valore*, 700 F.Supp.2d at 84, or downward in the face of "minor shrapnel injuries or minor injury from small-arms fire." *Id.*

For victims, such as Theodore and Moreen, who "suffer[ed] severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million." *Harrison v. Republic of Sudan*, 882 F.Supp.2d 23, 49 (D.D.C. 2012) (citing *Valore*, 700 F.Supp.2d at 85). *See Petersen II*, 515 F.Supp.2d at 56; *Brown v. Islamic Republic for Iran*, 872 F.Supp.2d 37, 42 (D.D.C. 2012); *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 47 (D.D.C. 2012).

The Special Master need not define the parameters of "severe emotional injury" or parse through abstract clinical definitions to conclude that Theodore and Moreen's experiences during the Hezbollah attacks were terrifying and traumatic. To engage in such an academic exercise would only subvert the well settled proposition that "acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror." *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002).

The record amply reflects that the two-month siege by Hezbollah was emotionally devastating for both Theodore and Miriam. Theodore describes being haunted having had to witness medics evacuate a dead body and being unprepared for the stress which accompanied living under a barrage of rockets. He recounts how he began smoking after having quit for many years due to the daily pressures and stress. He describes the anxiety of losing his business and his livelihood and having to leave his wife to find employment in Jerusalem. In constant fear of future attacks, Theodore has never recovered from the experience.

Moreen describes her stress and anxiety over living through the rocket barrage, of being separated from her husband and feeling "alone." She recounts her struggle not to "fall[] apart" as

well as her inability to work.  She describes her experiences remaining constantly indoors, carefully plotting her visits to the market by way of available shelters, sleeping while fully clothed in the event of an evacuation and her newly developed fear of big cities.

### Solatium Damages

Plaintiffs seek damages under 28 U.S.C. §§ 1605A(c) and (d) for harms and injuries resulting from Defendants' "extreme, wanton, willful and malicious" conduct  (09-646 (ECF No. 1) and 10-483 (ECF No. 3)), including "disfigurement; loss of physical and mental functions; extreme pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium" (10-483 (ECF No. 3)).

There is nothing in the record suggesting either that Theodore or Moreen seek redress for "disfigurement; loss of physical and mental functions; loss of guidance, companionship and society or loss of consortium."  Rather, it appears Theodore and Moreen are requesting solatium damages to compensate for the emotional trauma each suffered due to the harm inflicted on the other.

Theodore and Moreen's respective prayers for solatium raise issues of first impression in the context of the Foreign Sovereign Immunities Act.  To date, all solatium claims have been filed by family members not in proximity the terrorist activity.  Theodore and Moreen, however, were together during the attacks.  Each was a victim potentially entitled to recover for their own pain and suffering as well as a victim potentially entitled to recover for the emotional trauma they endured as a result of the "extreme and outrageous conduct" visited on the other.

Traditionally, solatium damages seek "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as well as the harm caused by the loss of the decedent's society and comfort."  *Roth v. Islamic*

*Republic of Iran*, 78 F.Supp.3d 379, 402 (D.D.C. 2015) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 25 (D.D.C. 2011)) (internal quotation marks and alterations omitted). Solatium awards have "also been applied to cases where the victim survived a terrorist attack." *Oviessi*, 768 F.Supp.2d at 26 n. 10. Unlike claims for lost wages a claim for solatium does not readily lend itself to quantification using "models and variable." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000) (*quoting Flatow v. Islamic Republic of Iran*, 999 F.Supp.2d 1, 32 (D.D.C. 1998)). Courts look for guidance, therefore, in "prior decisions." *Acosta v. The Islamic Republic of Iran*, 574 F.Supp.2d 15, 29 (D.D.C. 2008).

Family members in direct lineal relationship are "presume[d] . . . to suffer compensable mental anguish[,] . . . and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Kim v. Democratic People's Republic of Korea*, 87 F.Supp.3d 286, 290 (D.D.C. 2015) (quoting *Oveissi*, 768 F.Supp.2d at 25). The presumption of mental anguish arises given terrorists' acknowledged aim of causing "the highest degree of emotional distress, literally, terror." *Stethem*, 201 F.Supp.2d at 89.

For family members of deceased victims of terrorism, this Court has established a framework whereby the amount of the award depends on the "'nature of the relationship' between the family member and victim," and "'the severity of the pain suffered by the family member.'" *Heiser,* 466 F.Supp. 2d at 269 (quoting *Haim*, 425 F.Supp.2d at 75). To lend uniformity to the analysis and avoid disparate awards, this Court suggested a framework for these awards, namely, $8 million for spouses; $5 million for parents and $2.5 million for siblings. *Id.* Children of a deceased victim typically receive an award of $3 million. *O'Brien*, 853 F.Supp.2d at 46–47.

For relatives of surviving victims who have been physically injured as a result of terrorist attacks, courts have applied a framework where "awards are 'valued at half of the awards to family members of the deceased' – $4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively," *Anderson v. Islamic Republic of Iran*, 839 F.Supp.2d 263, 266 (D.D.C. 2012) (quoting *Oveissi*, 768 F.Supp.2d at 26 n. 10 (D.D.C. 2011)), and $1.5 million for children. *Id.*, 839 F.Supp.2d at 266. Finally, this Court has held that relatives of surviving victims presenting with emotional trauma and no physical injury should receive amounts proportionally less than those with physical injuries, namely, $1 million for spouses; $850,000 for parents; $750,000 for children, and $500,000 for siblings. *See Davis v. Islamic Republic of Iran*, 882. F.Supp.2d 7, 16 (D.D.C. 2012).

The testimony given by Theodore and Moreen confirm the close bond between them. Theodore's Declaration confirms his anguish believing he "failed [his] wife," having to abandon her during the week to find work in Jerusalem, and being constantly concerned for her safety. Moreen's Declaration similarly confirms her suffering knowing her husband was torn between his need to work and his desire to protect her.

**Economic Loss**

Theodore and Moreen's repeated allusions to their business losses suggest they are asserting a claim for economic losses. Theodore estimates he suffered an immediate "business loss of about $2,500 - $3,000" as well as a projected business loss of "$15,000 to $20,000." He seeks remuneration for those amounts as well as for the $1,500 rental costs of the Jerusalem apartment and the undisclosed amount he expended in transportation costs commuting between Jerusalem and Tzfat.

Case 1:09-cv-00646-RCL   Document 69   Filed 03/23/16   Page 14 of 14

The Special Master finds that the economic damages sought by Theodore and Moreen Greenberg lack any evidentiary support and are, thus, "too speculative to credit." *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 230 (D.D.C. 2012).

As a general rule, "lost earnings – past and future – are compensable damages." *Moradi v. Islamic Republic of Iran*, 7 F.Supp.3d, 57, 71 (D.D.C. 2015). These losses, however, must be proven "by a reasonable estimate," *id.*, and independently substantiated. The Declarations supplied by Theodore and Moreen constitute the only evidence supporting their claim for lost income as a result of the Hezbollah attacks. They supply no records of past earnings, bank statements, tax returns, rent receipts or economic forecasts in support of these losses. Courts in this jurisdiction have held that, "[u]nlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings with competent evidence." *Id.* (citation omitted). The court's rationale in *Moradi* applies with equal force to the claims of Theodore and Moreen Greenberg. Accordingly the Special Master recommends that no damages for economic losses be awarded.

In light of the foregoing, the Special Master recommends that Theodore and Moreen Greenberg each be awarded One Million Five Hundred Dollars ($1,500,000) in compensatory damages for pain and suffering and each be awarded One Million Dollars ($1,000,000) for loss of solatium.

Dated: March 23, 2016                                    Respectfully submitted,

                                                         By:*/s/ Alan L. Balaran*
                                                         Alan L. Balaran, Esq.
                                                         Special Master

- 14 -