# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | | |
|---|---|---|
| **CHAIM KAPLAN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-00646 (RCL)** |
| | ) | |
| **HEZBOLLAH, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

| | | |
|---|---|---|
| **CHAIM KAPLAN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10-00483 (RCL)** |
| | ) | |
| **THE CENTRAL BANK OF THE** | ) | |
| **ISLAMIC REPUBLIC OF IRAN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## REPORT OF SPECIAL MASTER
## PURSUANT TO ORDER OF REFERENCE
## REGARDING THE CLAIMS OF
## CHAIM, RIVKA, MUSHKA, REUVEN, MENACHEM,
## CHANA AND EFRAIM KAPLAN

This action is brought by Rabbi Chaim Kaplan, Rivka Kaplan and five of their children –
Mushka, Reuven, Menachem, Chana and Efraim, under 28 U.S.C. § 1605A, who are seeking
damages for injuries sustained on July 13, 2006 as a result of a barrage of rockets fired by
Hezbollah from Lebanon into northern Israel.  Under the Administrative Plan Governing Special
Masters, and pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special
Master has received testimony and reviewed documentary evidence to assist in determining any
damages to which the members of the Kaplan family may be entitled.

**BACKGROUND**

On July 12, 2006, Hezbollah launched a surprise attack against Israel killing eight Israeli Defense Force soldiers and kidnapping two others at the Israeli/Lebanese border.  Israel responded with airstrikes against Hezbollah-held positions in Southern Lebanon; Hezbollah retaliated with katyusha rockets and mortars fired against Israeli communities located close to the border, including the city of Tzfat. A United Nations-brokered cease-fire took effect on August 14, 2006.  *See* U.S. Congressional Research Services, *Lebanon: The Israel-Hamas-Hezbollah Conflict* (RL3356, updated September 15, 2006) by Jeremy M. Sharp.

### The Islamic Republic of Iran

The statutory scheme underpinning actions against the Islamic Republic of Iran has been exhaustively recounted in *In re: Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31 (D.D.C. 2009), obviating the need for recapitulation.  This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for facilitating, financing and providing material financial and logistical support to help carry out attacks on United States citizens.  *See*, *e.g.*, *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 45-46 (D.D.C. 2012); *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007) ("*Valore I*"); *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp. 2d 229, 254 (D.D.C. 2006) (*Heiser I*); *Peterson v. Islamic Republic of Iran*, 264 F.Supp. 2d 46, 61 (D.D.C. 2003) ("*Peterson I*").  This Court found so in this case, as well.  *See* Memorandum Opinion (July 23, 2014), at 2 (Case No. 1:10-cv-00483 (ECF No. 54)) ("July 23 Memorandum").

**The Democratic People's Republic of Korea**

In 1988, the State Department designated the Democratic People's Republic of Korea ("North Korea") as a "state sponsor of terrorism." *See Notice, Determination Pursuant to Section 6(j) of the Export Administration Act of 1979; North Korea*, 53 Fed. Reg. 3477 (Feb. 5, 1988). The State Department subsequently rescinded that designation on June 26, 2008. *See Certification of Rescission of North Korea's Designation as a State Sponsor of Terrorism*, 73 Fed. Reg. 37351. Courts have held North Korea responsible for offering direct support to terrorist organizations that have carried out attacks in Israel. S*ee, e.g., Calderon-Cardona v. Dem. People's Republic of Korea*, 723 F. Supp. 2d 441, 452 (D.P.R. 2010); *Massie v. Government of Democratic People's Republic of Korea* 592 F.Supp.2d 57, 73 (D.D.C. 2008). In the July 23 Memorandum, this Court found that North Korea provided "material aid to Hezbollah in three ways: weapons, training, and tunnels to help carry out the attacks." July 23 Memorandum, at 6.

**PROCEDURAL HISTORY**

Based on the events of July and August, 2006, Plaintiffs filed a complaint on April 8, 2009 against Hezbollah under the Antiterrorism Act, 18 U.S.C. § 2333(a), and against North Korea under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c) (Case No. 1:09-cv-00646 (ECF No.1)). On March 23, 2010, Plaintiffs filed a second complaint, this time against the Central Bank of the Islamic Republic of Iran; Bank Saderat, Iran; Bank Saderat, PLC and the Islamic Republic of Iran, alleging these entities provided "extensive material support and resources to Hezbollah, that caused, enabled and facilitated" the Hezbollah rocket attacks. Plaintiffs are asking for damages under 28 U.S.C. §§1605A(c) and (d) and 18 U.S.C. § 2333(a) (Case No. 1:10-00483 (ECF No. 3)). This Court subsequently dismissed the statutory claims

against Hezbollah on August 20, 2013, (09-646 (ECF No. 50)), and against Bank Saderat of Iran and Bank Saderat, PLC on November 5, 2010 (10-483 (EFC No. 16)).  On August 20, 2015, plaintiffs voluntarily dismissed their common-law claims against Hezbollah (09-646 (ECF No. 63)).

Neither North Korea nor Iran responded to the complaints and plaintiffs subsequently moved for entry of default on May 12, 2014 (09-646 (ECF No. 53) and 10-483 (ECF No. 51)). A hearing was convened on May 27, 2014 to determine defendants' liability during which plaintiffs produced expert witnesses who, in accordance with 28 U.S.C. § 1608(e) (requiring plaintiffs to establish their right to relief by "evidence that is satisfactory to the court"), attested to Iran's and North Korea's complicity in Hezbollah's 2006 attacks against Israel.  Based on this testimony, the Court entered judgment by default against the two nations (09-646 (ECF No. 57) and 10-483 (ECF No. 54)).

On October 1, 2014, this Court appointed the undersigned as special master to be governed by the Administrative Plan Governing Special Masters previously adopted in *O'Brien v. Islamic Republic of Iran*, Case No. 1:06-cv-0690 (RCL).  *See* 09-646 (ECF No. 58) and 10-483 (EFC No. 55)) ("Order of Reference").  The Court specifically directed the Special Master to issue reports recommending the amount of compensatory damages to which he believed each plaintiff was entitled and to "take and report on evidence of each plaintiff's qualification for relief under § 1605A(c) and the familial relationships between plaintiffs and victims of the rocket attacks in Israel committed between July 12, 2006 and August 14, 2006."  *Id*.

Pursuant to these directives, and in keeping with the Federal Rules of Evidence, the Special Master makes these findings and recommendations.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1.      Chaim Kaplan was born on October 28, 1974.  A copy of his passport, filed with this Court on May 10, 2012, confirms that, at all relevant times, he was a United States citizen.

2.      Chaim's wife, Rivka, was born on April 3, 1976 in New Jersey.  A copy of her passport, filed with this Court on May 10, 2012, confirms that, at all relevant times, she was a United States citizen.

3.      Five of Chaim and Rivka's eight children, Mushka, Reuven, Menachem, Chana and Efraim, are plaintiffs in this action.  Copies of their passports, filed with this Court on May 10, 2012, confirm that, at all relevant times, each was a United States citizen.

4.      In July 2006, Hezbollah launched a series of rocket attacks against Israel.  One of the cities shelled was Tzfat, where the Kaplan family were residing.

**<u>Testimony of Rabbi Chaim Kaplan</u>**

Chaim provided his testimony by Declaration dated March 2012.  *See Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 163 (D.D.C. 2013) (accepting proof of damages under the Foreign Sovereign Immunities Act by affidavit and documentary evidence).  Chaim affirms he is a United States citizen who was born on October 28, 1974 and who currently resides, in Tzfat, Israel with his wife, Rivka.  The Kaplans have eight children – five of whom were born prior to the Hezbollah attack: Mushka, Reuven, Menachem, Chana, and Efraim.

According to his Declaration, Chaim was outside the Tzfat town center on the morning of July 13, 2006, "running a sleep-away camp for approximately 200 boys from abroad," when he heard explosions and observed smoke and fire from Mt. Meron, approximately five miles away. Chaim and the other camp administrators began making plans to move the children in their

charge to a safe area.  Chaim later heard loud rocket fire and saw smoke coming from the town center of Tzfat.  He received a telephone call from his wife, Rivka, who was "hysterical" and who reported that one of the missiles exploded "right next to" the family home and released "thousands of fragments of shrapnel" through the kitchen window where Rivka had just been standing and above the couch where one of their children had just been sitting.  Chaim reports hearing his children "screaming in the background."  He recalls, having to "control the panic [he] felt."

Once assured the children at his camp were safe, Chaim sped home and relocated his family to his mother's home immediately across the street.  His stated intent was to calm the children while trying to ascertain if their home was sufficiently sound for his family to return.  Several hours later, the Kaplan family returned to their house.  During the night, the children had difficulty sleeping, woke frequently during the night screaming, and were "very clingy."

The following evening, Chaim drove to Tzfat to collect forms he needed for the insurance appraiser who was arriving the following day to assess the damage to his house.  While driving home, Chaim heard loud explosions including "a loud whistle and a tremendous explosion."  He "was stunned and did not understand what had happened."  Chaim "quickly realized that a missile had landed right next to the driver's side of [his] car."  He felt something hit the left side of his head and, "all of a sudden[,] noticed blood pouring from [his] head onto [his] face and hands."  Chaim drove on but soon stopped when he realized his vision was too impaired to continue.  He abandoned the car and was picked up by a car containing people fleeing the bombing.  They took him to an emergency room where he called his wife.

Chaim recalls: "For the next two hours the doctors at the hospital meticulously picked out glass and metal fragments from my eye.  They also bandaged cuts to my face and hands.  I also

had trouble hearing out of my left ear, as the missile exploded right next to the driver side of my car." Chaim was concerned that neither his vision nor hearing would fully return. Chaim recalls, "the rocket attacks were continuing and [he] was scared that no one was going to be there with [his family] and ensure their well-being. [He] was also concerned that when [he] did not arrive home as expected the children would panic and worry that [he] had been killed."

The hospital discharged Chaim the following morning "to make room for the large number of other wounded who had arrived at the hospital." When he returned home, Chaim and his wife and children fled to a friend's apartment in Jerusalem where they lived in "cramped quarters" for the next six weeks.

Chaim testifies that he and his family continue to "struggle[] in various ways to cope with the traumatic events we experienced." He recounts how his daughter Mushka, then six years old, "experienced the most profound emotional trauma." Chaim observes that, "she has become introverted," suffers from "insomnia" and "night terrors," displays "little interest in socializing" with her friends, preferring to stay home "close to her mother." His son Reuven, who was five years old at the time of the attacks, is "obsessed with safety" and is "so clingy to his mother that it impacts his daily living – making it difficult for him to go to school or socialize." Chaim similarly describes his son Menachem, four years old at the time of the attacks, as "clingy and introverted," suffering from "nightmares," and "constantly anxious about [Chaim's] well-being." He observes that his daughter Chana, who was two years old at the time of the attacks, had difficulty toilet training, "wakes from sleep in a panic," and is impacted by the "emotional trauma" her parents and siblings experienced. Finally, Chaim notes that his son Efraim, "just a baby at the time," has been "affected" by his siblings and parents who "have been changed for the worse."

Chaim claims he lost "a significant part of my hearing in [his] left ear."  He hears "echoes" and "white noise" in that ear and complains that background noises are "amplified and reverberate" making it difficult for him to hear clearly.  Chaim notes that, as a result of his injuries, he has difficulty discharging his rabbinical duties, communicating by telephone, speaking publicly and hearing questions posed by his congregants.  He testifies that his doctors have advised him that his hearing would improve only through surgical intervention – an option Chaim declined because the doctors could not guarantee the results.  Chaim states he continues to suffer "psychological trauma."  He describes becoming "tense" when he hears planes flying overhead; when he learns of the possibility of future wars; and when he hears news reports concerning other hostilities.

On September 30, 2015, Chaim executed and supplied a Supplemental Declaration to calculate the "extent of [his] economic losses."  In his Supplemental Declaration, Chaim asserts that he was "severely injured" in the July 13, 2006 Hezbollah attack and, as a result of the physical and emotional injuries he sustained, his "ability to perform my duties as a Community Rabbi have been halted almost completely."

Three of the exhibits attached to the Supplemental Declaration were submitted in furtherance of Chaim's claim for economic damages.  As described by Chaim, they consist of: (1) an "income statement" from June 2006 purportedly showing that month's income as 8,500 NIS (New Israeli Shekel); (2) a "'106 Form' – the Israeli equivalent of an IRS Tax-Return Form" purportedly showing his income of 455 NIS in 2007; and (3) a "106 Form" for 2013 purportedly showing income of 2,590 NIS for that year.  Chaim proffers these documents to demonstrate that, since the Hezbollah incursion, he has "earned practically nothing each year."  Chaim states: "Because of the physical and emotional disabilities I suffered as a result of the Hezbollah terror

attack, I went from making an estimated 100,000 NIS a year before the attack of July 13, 2006,

to a maximum of 2,500 NIS a year after that date." He asserts that the attack left him

"permanently incapacitated," which resulted in a 97,500 NIS decrease in annual income.

Chaim calculates his lost income, as of July 27, 2015, to be $230,375.43. Chaim expects

he will be unable to earn an income for the remaining 25 years of his working life (the retirement

age of 66) and estimates his future lost income to be $639,931. Chaim concludes, "[t]his number

does not include any increases, raises or bonuses, which I surely would have received. I believe,

therefore, that it is the equivalent of a 'today's dollars' calculation."

**Summary of Medical Information Provided by Chaim Kaplan**

**Dr. Friedman re: Chaim Kaplan**

In support of his claim, Chaim submitted a Declaration dated April 29, 2012 executed by

Alan Friedman, M.D. Dr. Friedman is a specialist in "Physical Medicine and Rehabilitation,

Internal Medicine and nerve injuries," who practices both in the United States and Israel and is

fluent both in Hebrew and in English. His testimony has been accepted by this Court in a similar

FSIA action captioned *Stern v. Islamic Republic of Iran*, 271 F.Supp.2d 286, 288 (D.D.C. 2003).

Dr. Friedman reviewed Chaim's medical records, including the emergency room notes

and audiological exams performed in July 2007 and April 2012, and personally examined Chaim

on January 26, 2012. (The medical records, emergency room notes and audiological exam

results were not submitted for the Special Master's review.)

In his Declaration, Dr. Friedman confirms that the emergency room diagnosed Chaim

with "subconjunctival hemorrhage, conjunctival foreign body, corneal abrasion, and corneal

foreign body (all on the left), laceration of the nose, and laceration of the left shoulder." He

further confirms that Chaim's July 2007 auditory examination resulted in Chaim being diagnosed

with "tympanic membrane A type on the left and type C on the right, and a 40-decibel hearing loss on the left side" and that the audiology records from the examination conducted on April 16, 2012 indicated that Chaim suffers a "'moderate' conductive hearing loss on the left, normal right hearing, and a tympanogram type A on the left – reflective of ossicular discontinuity or tympanic membrane scarring.  There remains a 40 decibel hearing loss on the left."

Based on his examination of Chaim on January 26, 2012, Dr. Friedman concluded that, as a result of the exploding rocket, Chaim suffered a 40-decibel loss in his left ear which he does not expect to heal.  According to Dr. Friedman, "the functional implications" of Chaim's hearing loss "include difficulty localizing sirens while driving (or walking), as well as being unable to perform certain jobs."  He suggests Chaim may require one or more hearing aids at a younger age than he would have otherwise."  In his opinion, the damage to Chaim's hearing "can be expected to remain unchanged – or worsen with time – unless surgery is performed."

Dr. Friedman's report also indicates that Chaim complained of back pain six months after the rocket attack.  His examination of Chaim revealed a "full range of motion in the cervical and lumbosacral spines."  Nevertheless, Dr. Friedman opines that Chaim's back pain will continue intermittently, "mak[ing] it difficult for him to obtain any employment which requires repetitive lifting or bending."  In Dr. Friedman's view, Chaim "may develop early spinal arthritis or spinal stenosis, with resultant weakness and sensory symptoms (or worse)."

**Addendum to Dr. Friedman's Declaration**

On September 30, 2015, plaintiffs' counsel supplied the Special Master with an addendum to Dr. Friedman's initial Declaration.  In the addendum, Dr. Friedman indicates he was provided with an "updated hearing test that Mr. Kaplan underwent on December 22, 2013." Dr. Friedman states, "[t]his report once again details left ear hearing loss."  Neither the "updated

hearing test" nor the "report" were attached to Dr. Friedman's addendum nor submitted under separate cover to the Special Master.  Dr. Friedman states that the accompanying report details that Chaim suffers a "40-decibel hearing loss on the left side, a 'moderate' conductive hearing loss on the left, normal right hearing, and a tympanogram type A on the left – reflective of ossicular discontinuity or tympanic membrane scarring."  In Dr. Friedman's opinion, Chaim suffers from a "permanent partial neurosensory hearing loss in the left ear."

### Dr. Ronald Korman re: Chaim Kaplan

Plaintiff's counsel also submitted a one-paragraph memorandum dated June 7, 2015 from Dr. Ronald Korman, MBBS, FRACAP, addressed: "To Whom it May Concern."  In his memorandum, Dr. Korman, whose *curriculum vitae* and credentials were neither enclosed nor referenced, alludes to an "attached hearing test from April 16, 2012," which purportedly indicates that Chaim suffers from a "hearing loss of at least 50% in the left ear."  A copy of the April 16, 2012 hearing test was not attached to Dr. Korman's memo and was never submitted for the Special Master's review.

### Testimony of Rivka Kaplan

Rivka Kaplan submitted her testimony by Declaration dated January 31, 2012.  Rivka affirms she is a United States citizen born in New Jersey on April 3, 1976; that she married Rabbi Chaim Kaplan on November 19, 1998; and that the couple resides in Tzfat, Israel with their eight children.

Rivka recalls hearing the Hezbollah missiles land near her home.  She gathered her children and guided them into the "reinforced security room" installed in their house.  Upon entering the security room, Rivka "was shaken by an extremely loud noise and explosion."  She recounts how: "Burning shrapnel came whizzing through the kitchen window where I had stood

preparing dinner just moments before" and fragments landed on the wall above the couch where one of her sons had just been reading.  Rivka remembers her children "were very scared and screaming hysterically" as the family waited to leave the security room."

When Rivka and her children emerged, they found their house filled with the smell "of burning chemicals and smoke."  Rivka contacted her husband, Chaim, who insisted on returning home from the summer campground where he was working nearby.  She recalls Chaim telling her "not to touch anything in the house because it could be covered with chemicals from the missile or flammable materials."  In the interim, emergency workers arrived and Rivka and the children evacuated to her mother-in-law's house where they stayed until the children's bed time. After determining another missile attack that night was unlikely, the family returned home. Shortly thereafter, Chaim went to collect some insurance forms he needed for the appraiser who was due the following day.

That evening, Rivka was calming her children and getting them ready for bed when, she heard the sound of "new missiles exploding nearby."  Rivka and the children again locked themselves in the security room.  Rivka recalls being frightened Chaim might become caught in the rocket fire as he was driving home from town.  A few minutes later, Rivka received a telephone call from Chaim, informing her that he was being treated at the hospital after a rocket had exploded near his car.  After the children fell asleep, Rivka left them in her sister-in-law's care to visit Chaim at the hospital.  When she arrived, Chaim's left eye and other "parts of his head were heavily bandaged."  Rivka stayed with her husband until he was discharged the following morning.

The following day, Rivka and Chaim made plans to leave their home until the rocket attacks ceased.  They stayed with friends in Jerusalem for the remainder of the conflict.  Rivka

describes that time as one of "great confusion and uncertainty.  We did not know from day to day what would happen or when we would ever get home."  Rivka explains she and her husband were concerned for the safety of their children, their home, their property and their community.

According to Rivka, her family continues to struggle with the trauma they suffered as a result of the rocket attacks.  She notes Chaim's "head and eye took a very long time to heal.  He also suffered a very serious hearing loss as a result of the missile attack."  She explains Chaim has difficulty hearing and speaking in public which affects his ability to discharge his rabbinical obligations to his congregation.  Rivka observes that Chaim experiences ringing and an itching sensation in his ear which he has been unable to treat.  Notwithstanding the doctors' recommendation that Chaim undergo surgery for his ear, Chaim refused, fearing an operation could further damage his hearing.

Rivka testifies that her children "had trouble sleeping for a long time" and "for many months afterwards they did not want to be alone in a room by themselves."  She observes that, as of the time she executed her Declaration, "they still don't like to be alone, even at home" and that they become anxious following any loud noise which triggers memories of the bombing. Rivka admits she "still gets tense" when thinking about the war.  She testifies: "It is very scary to think that we could again be subjected to the terror we experienced during the 2006 war, but we are staying here because this is our home and where our kids go to school and have friends. Giving up means Hezbollah has achieved its goals."

**The Kaplan Children**

Although named plaintiffs, the five Kaplan children supplied no declarations and provided no medical or psychiatric reports in support of their claims.

**ANALYSIS**

Plaintiffs, in their complaints, seek damages under 28 U.S.C. §§ 1605A(c) and (d) for harms and injuries resulting from Defendants' "extreme, wanton, willful and malicious" conduct (09-646 (ECF No. 1) and 10-483 (ECF No. 3)), including "disfigurement; loss of physical and mental functions; extreme pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium" (10-483 (ECF No. 3)).

It is beyond the remit of the Special Master to consider the viability of plaintiffs' common-law claims, much less ascribe damages for any breach thereof. Rather, the Special Master's inquiry is confined to analyzing plaintiffs' entitlement to those damages delineated in the Foreign Sovereign Immunities Act ("FSIA"), namely, pain and suffering, solatium and economic damages. 28 U.S.C. 1605A(c)(4).

To recover under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill v. Republic of Iraq,* 328 F.3d 680, 683-84 (D.C. Cir. 2003) (citation omitted). In the context of a default judgment, courts in this jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages." *Rhodes v. U.S.*, 967 F.Supp.2d 246, 313 (D.D.C. 2013) (emphasis in original) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)). Accordingly, plaintiffs must prove future damages to a "reasonable certainty," or by a preponderance of the evidence, and must prove the amount of damages by a "reasonable estimate." *Hill*, at 684. For past losses, a plaintiff must, similarly, "prove the fact of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997), yet need only "reasonably

prove" the amount of damages. *Hill*, at 684. In fashioning an award, the Special Master may consider any "special problems of proof arising from the defendant's absence." *Id.*, at 685.

Upon consideration of the facts presented, and in light of the aforementioned legal framework, the Special Master finds, for the reasons set out below: (1) that Chaim and Rivka are each entitled to compensatory damages for the pain and suffering they endured; (2) that Chaim and Rivka Kaplan are each entitled to solatium damages; (3) that Chaim Kaplan is not entitled to damages for past or future economic losses; (4) that the Kaplan children are entitled to no award of damages for pain and suffering or for loss of solatium.

## Pain and Suffering

In determining a proper damage award for members of the Kaplan family, the Special Master is guided by prior decisions awarding damages to victims of terrorism, mindful of the inherent difficulty in "assess[ing] the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Valencia v. Islamic Republic of Iran*, 774 F.Supp.2d 1, 14 (D.D.C. 2010). The Special Master is similarly cognizant that previous damages awards, while instructive guidelines, "are not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010), and, therefore, "strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009) (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

Courts consider a "myriad of factors" when assessing damages for surviving victims of terrorist hostilities. These factors include: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson v. Islamic Republic of Iran* ("*Peterson II*"), 515

F.Supp.2d 25, 52 n. 26 (D.D.C. 2007) (citing *Blais*, 459 F.Supp.2d at 59). Calculating damages

begins with the baseline assumption that persons suffering injuries in terrorist attacks are entitled

to $5 million in damages." *Davis v. Islamic Republic of Iran*, 882 F.Supp.2d 7 (D.D.C. 2012)

(citing *Peterson II*). This amount serves as a lodestar and can deviate upward in the presence of

"severe instances of physical and psychological pain, such as where victims suffered relatively

more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing,

or were mistaken for dead," *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 84 (D.D.C.

2010) ("*Valore II*"), or downward in the face of "minor shrapnel injuries or minor injury from

small-arms fire." *Id.*

  The Special Master finds that Chaim and Rivka Kaplan, through testimony and

supporting documentation, have established a cause of action and demonstrated a right to recover

against the defendants. The record amply reflects that the two-month siege by Hezbollah was

emotionally devastating for both Chaim and Rivka. Chaim not only underwent psychological

trauma, he lost part of his hearing in his left ear after a rocket struck very near his vehicle on the

roadway. His doctors have advised that any hope for improvement would require surgical

intervention, with no guarantee of success. Rivka describes the trauma of shrapnel flying into

her kitchen landing where she stood only moments earlier. She recalls the duration of the rocket

attacks as one "great confusion and uncertainty and professes that she still "gets tense" when she

thinks about the war or contemplates the possibility that she and her family might experience

similar hostilities in the future.

  For victims such as Rivka Kaplan, who "suffer[ed] severe emotional injury without

physical injury, this Court has typically awarded . . . $1.5 million." *Harrison v. Republic of

Sudan*, 882 F.Supp.2d 23, 49 (D.D.C. 2012) (citing *Valore II*, 700 F.Supp.2d at 85). *See also*

*Peterson II*, 515 F.Supp.2d at 56; *Brown v. Islamic Republic for Iran*, 872 F.Supp.2d 37, 42 (D.D.C. 2012); *O'Brien*, 853 F.Supp.2d at 47.  The Special Master finds no evidence in the record compelling a departure from this baseline.

For victims such as Chaim Kaplan, whose injuries manifested both emotionally as well as physically, this Court has found $2 million to be an appropriate award.  *See, e.g., Davis v. Islamic Republic of Iran*, 882 F.Supp. 2d 7, 13 (D.D.C. 2012) (awarding $2 million to serviceman who suffered hearing loss and severe PTSD as a result of the bombing); *Bland v. Islamic Republic of Iran*, 831 F.Supp.2d 150 (D.D.C. 2011) (awarding $2 million to victim of Beirut bombing who suffered "lacerations on his left arm, bruising, blurred vision, impaired hearing and a sore head from being hit by concrete" as well as "post-traumatic stress disorder").  Again, the Special Master finds no evidence in the record to deviate from that amount.

The evidence supporting the claims for the Kaplans' five children, however, is less compelling.  None of the children provided testimony describing the trauma the experienced as a result of the Hezbollah attacks.  They similarly supplied no medical documentation or psychological evaluations from which the Special Master can render an informed opinion.  The *only* evidence on record concerning their injuries consists of the observations of their parents, the majority of which are entirely subjective.  Chaim and Rivka claim their children have displayed various symptoms such as being "introverted"; having "trouble sleeping" following the attacks; experiencing "night terrors"; being "clingy" or "obsessed with safety"; having difficulty toilet training; or trouble "socializing with peers."

The Special Master does not doubt the Kaplan children endured some degree of trauma.  In the context of a terrorist attack, this jurisdiction recognizes such a presumption.  *See Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002) ("acts of terrorism are by their

very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience"). *See also Greenbaum v. Islamic Republic of Iran*, 451 F.Supp.2d 90, 104 (D.D.C. 2006) ("Terrorists seek to cause extreme suffering in order to achieve political ends; accordingly, they perpetrate acts that are deliberately outrageous").

This presumption, however, does not relieve claimants from proving their claim. As "default winner[s]," Mushka, Reuven, Menachem, Chana and Efraim Kaplan "must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill*, 328 F.3d at 683-84 (citation omitted). And to satisfactorily demonstrate their entitlement to an award, they must "prove the fact of injury with *reasonable certainty*." *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (emphasis added). The Kaplan children have failed to demonstrate such an entitlement.

Inexplicably, there appear no "special problems of proof" which might explain the Kaplan children's failure to testify on their own behalf. They refer to no "extraordinary circumstances" preventing them from obtaining a psychological evaluation which might have crystallized their parents' subjective impressions. It appears, instead, that the decision not to provide testimony and not to have their trauma professionally evaluated was deliberate. And it is that decision that renders it regrettably impossible for the Special Master to be "reasonably certain" that Mushka, Reuven, Menachem, Chana and Efraim Kaplan were "severely injured" as a result of the Hezbollah rocket attacks.

**Solatium Damages**

Chaim's and Rivka's prayers for solatium raise issues of first impression in the context of the Foreign Sovereign Immunities Act. To date, FSIA solatium claims have been filed by family members not in proximity the terrorist activity. Chaim and Rivka, however, were together with

their children during the attacks.  Each member of the family was a victim potentially entitled to recover for his or her own pain and suffering as well as a victim with a potentially colorable claim to recover for the emotional trauma they endured as a result of the "extreme and outrageous conduct" visited on the others.

Solatium damages are designed "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as well as the harm caused by the loss of the decedent's society and comfort." *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379, 402 (D.D.C. 2015) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 25 (D.D.C. 2011)) (internal quotation marks and alterations omitted).  Solatium awards have "also been applied to cases where the victim survived a terrorist attack." *Oveissi*, 768 F.Supp.2d at 26 n. 10.  Unlike lost wages which may easily be calculated, however, solatium damages do not readily lend themselves to quantification using "models and variables." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000) (*quoting Flatow v. Islamic Republic of Iran*, 999 F.Supp.2d 1, 32 (D.D.C. 1998)).  Courts, therefore, look for guidance in "prior decisions." *Acosta v. The Islamic Republic of Iran*, 574 F.Supp.2d 15, 29 (D.D.C. 2008).

A review of "prior decisions" reveals that family members in direct lineal relationship are "presume[d] . . . to suffer compensable mental anguish[,] . . . and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Kim v. Democratic People's Republic of Korea*, 87 F.Supp.3d 286, 290 (D.D.C. 2015) (quoting *Oveissi*, 768 F.Supp.2d at 25).  The presumption of mental anguish arises given terrorists' acknowledged aim of causing "the highest degree of emotional distress, literally, terror." *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002).  *See also Greenbaum v. Islamic Republic of Iran*, 451 F.Supp.2d 90, 104 (D.D.C. 2006) ("Terrorists seek to cause

extreme suffering in order to achieve political ends; accordingly, they perpetrate acts that are deliberately outrageous").

For family members of deceased victims of terrorism, this Court has established a framework whereby the amount of the award is contingent upon the "'nature of the relationship' between the family member and victim" and "'the severity of the pain suffered by the family member.'" *Heiser I,* 466 F.Supp. 2d at 269 (quoting *Haim*, 425 F.Supp.2d at 75). To lend uniformity to the analysis and avoid disparate awards, this Court has approved the following awards: $8 million for spouses; $5 million for parents and $2.5 million for siblings. *Id.* Children of a deceased victim typically receive an award of $3 million. *O'Brien*, 853 F.Supp.2d at 46–47.

For relatives of surviving victims who have been physically injured as a result of terrorist attacks, courts have applied a similar framework whereby "awards are 'valued at half of the awards to family members of the deceased' – $4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively," *Anderson v. Islamic Republic of Iran*, 839 F.Supp.2d 263, 266 (D.D.C. 2012) (quoting *Oveissi*, 768 F.Supp.2d at 26 n. 10 (D.D.C. 2011)), and $1.5 million for children. *Id.*, 839 F.Supp.2d at 266. *Cf. Onsongo v. Republic of Sudan*, 60 F.Supp.3d 144, 151 (D.D.C. 2014) (awarding $2.5 million to children of injured victims of terrorism); *Peterson II*, 515 F.Supp.2d at 51) ($2.5 million to child of injured victim). Finally, this Court has held that relatives of surviving victims presenting with emotional trauma and no physical injury should receive amounts proportionally less than those with physical injuries, namely, $1 million for spouses; $850,000 for parents; $750,000 for children, and $500,000 for siblings. *See Davis v. Islamic Republic of Iran*, 882. F.Supp.2d 7, 16 (D.D.C. 2012).

The testimony given by Chaim amply reveals the emotional anguish he experienced as a result of trauma experienced by his wife. He was alarmed at his wife's "hysteria" and "panic"

and concerned with the additional responsibilities Rivka had to shoulder as a result of their children's increased attachment to their mother.

Rivka's testimony similarly depicted the anguish she experienced as a result of Chaim's injuries.  She recalls being "terrified that Chaim would get caught up in the attacks"; being "scared and nervous" and "in a panic" upon hearing that her husband was in the hospital receiving treatment; and being "shocked" at seeing his "left eye and other parts of his head [] heavily bandaged."

In considering the amount of such an award, the Special Master is mindful that it is "inappropriate for the solatium awards of family members to exceed the pain and suffering awards of the surviving servicemen."  *Fain III v. Islamic Republic of Iran*, 885 F. Supp. 2d 78, 82 (D.D.C. 2012) (citing *O'Brien*, 853 F.Supp.2d at 47).  The Special Master will, therefore, adhere to the monetary guidelines established in *Davis* in deference to this principle.

Finally, the Special Master finds, for the reasons set forth above, that none of the Kaplan children has demonstrated an entitlement to solatium damages.  Notwithstanding the "presumption" that family members "suffer compensable mental anguish," *Kim*, 87 F.Supp.3d at 290, "[l]ines must be drawn in the award of this form of damages and one such line includes a situation like this, where no evidence is offered to show injury that an award of solatium damages might compensate."  *Roth*, 78 F.Supp.3d at 406 (emphasis in original).  Apropos of the claims brought by Mushka, Reuven, Menachem, Chana and Efraim, no such evidence exists.

The Special Master finds, therefore, that both Chaim and Rivka have colorable claims to an award of solatium damages arising from the injuries suffered by the other.

**Economic Loss**

Chaim Kaplan also seeks remuneration for the economic losses he suffered as a result of the Hezbollah bombing.  His request is bolstered by statements he made in his Supplemental Declaration as well as three of the exhibits attached thereto.  As discussed above, these exhibits are one-page documents, written entirely in Hebrew, that purport to demonstrate that his income before the attacks, was an "estimated" 100,000 and declined to 2,590 NIS in 2013.  Based on this evidence, Chaim seeks $230,375.43 in damages for the nine-year loss of income between 2006 and 2015 – the year he submitted the financial information to the Special Master.  Based on this "evidence" as well as an additional $639,931, representing the income he projects he will forfeit due to his "inability to work."

The Special Master finds that the economic damages sought by Chaim Kaplan lack the requisite evidentiary support and are, thus, "too speculative to credit." *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 230 (D.D.C. 2012).

Section 1605A(c) contemplates recovery of economic damages.  *See Moradi v. Islamic Republic of Iran*, 77 F.Supp.3d, 57, 71 (D.D.C. 2015) ("as a general rule, lost earnings – past and future – are compensable damages").  Such damages, however, must be proven "by a reasonable estimate," *Reed v. Islamic Republic of Iran,* 845 F.Supp.2d 204, 213 (D.D.C.2012), supported by corroborative evidence.  *See Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 230 (D.D.C. 2012) (where this Court denied claims of economic harms where "plaintiffs [] failed to introduce any evidence of what costs specifically were incurred"; sought damages for a "lost business opportunity" based on a "speculative" conjecture; and sought reimbursement for "travel expenses" without "any evidence supporting this claim").

The Special Master is unable to decipher the three one-page documents supplied by Chaim in support of his prayer for economic damages, nor was a translation supplied.  Even were the Special Master to accept that these documents are what Chaim purports them to be, namely, an income statement for June 2006 (Exhibit 1); a tax-return form for 2007 (Exhibit 2) and a tax-return form for 2013 (Exhibit 3), they would be insufficient to sustain a request for past losses between 2006 and 2015.   And without this "evidence," Chaim's request rests solely on his own statements as set out in the Supplemental Declaration.  These statements, as a matter of law, are simply "insufficient to support any award of economic damages" because, "[u]nlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings with competent evidence."  *Moradi*, 77 F.Supp.3d at 71 (footnote omitted).

The proof supporting Chaim's request for future damages is even more dubious. Without any supporting documentation, income reports or financial projections, Chaim estimates he will lose $639,931 (not counting "any increases, raises or bonuses") in future income due to his "permanent incapacity."   In short, there is nothing in the record indicating that the amount Chaim seeks in losses is based on a forensic analysis rendered by a qualified economist or similar expert.  *See, e.g., Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012) (finding the report of a forensic economist a reasonable basis for determining the amount of economic damages in an FSIA case); *Belkin v. Islamic Republic of Iran*, 667 F.Supp.2d 8, 24 (D.D.C. 2009) (relying on forensic economic expert in award of economic damages).  Without a firmer footing, Chaim's projected future losses cannot form the basis for an award of damages.

In sum, Chaim has provided no competent evidence supporting his request for past or future losses.  The Special Master declines, therefore, to recommend that damages for economic losses be awarded.

**CONCLUSION**

In light of the foregoing, the Special Master recommends that Chaim Kaplan receive $2,000,000 (Two Million Dollars) and that Rivka Kaplan receive $1,500,000 (One Million Five Hundred Dollars) as compensatory damages for pain and suffering.  The Special Master further recommends that Chaim and Rivka Kaplan each receive One Million Dollars ($1,000,000) in compensatory damages for loss of solatium.

Dated: April 2, 2016                                  Respectfully submitted,

                                                                By:*/s/ Alan L. Balaran*
                                                                Alan L. Balaran, Esq.
                                                                Special Master