# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHAIM KAPLAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 09-00646 (RCL) |
| | ) | |
| HEZBOLLAH, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| CHAIM KAPLAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 10-00483 (RCL) |
| | ) | |
| THE CENTRAL BANK OF THE | ) | |
| ISLAMIC REPUBLIC OF IRAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT OF SPECIAL MASTER
## PURSUANT TO ORDER OF REFERENCE
## REGARDING THE CLAIMS OF
## CHAYIM AND NECHAMA KUMER

This action is brought by Chayim and Nechama Kumer, under 28 U.S.C. § 1605A, who are seeking damages for injuries sustained on July 13, 2006 as a result of a barrage of rockets fired by Hezbollah from Lebanon into northern Israel.  Under the Administrative Plan Governing Special Masters, and pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received testimony and reviewed documentary evidence to assist in determining any damages to which Chayim and Nechama Kumer may be entitled.

**BACKGROUND**

On July 12, 2006, Hezbollah launched a surprise attack against Israel killing eight Israeli Defense Force soldiers and kidnapping two others at the Israeli/Lebanese border.  Israel responded with airstrikes against Hezbollah-held positions in Southern Lebanon; Hezbollah retaliated with katyusha rockets and mortars fired against Israeli communities located close to the border.  One of those cities was Safed ("Tzfat"). A United Nations-brokered cease-fire took effect on August 14, 2006.  *See* U.S. Congressional Research Services, *Lebanon: The Israel-Hamas-Hezbollah Conflict* (RL3356, Updated September 15, 2006) by Jeremy M. Sharp.

**The Islamic Republic of Iran**

The statutory scheme underpinning actions against the Islamic Republic of Iran has been exhaustively recounted in *In re: Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31 (D.D.C. 2009), obviating the need for recapitulation.  This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for facilitating, financing and providing material financial and logistical support to help carry out attacks on United States citizens.  *See, e.g.*, *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 45-46 (D.D.C. 2012); *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007) ("*Valore I*"); *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp. 2d 229, 254 (D.D.C. 2006) (*Heiser I*); *Peterson v. Islamic Republic of Iran*, 264 F.Supp. 2d 46, 61 (D.D.C. 2003) ("*Peterson I*").  This Court found so in this case, as well.  *See* Memorandum Opinion (July 23, 2014), at 2 (Case No. 1:10-cv-00483 (ECF No. 54)) ("July 23 Memorandum").

**The Democratic People's Republic of Korea**

In 1988, the State Department designated the Democratic People's Republic of Korea ("North Korea") as a "state sponsor of terrorism."  *See Notice, Determination Pursuant to*

*Section 6(j) of the Export Administration Act of 1979; North Korea*, 53 Fed. Reg. 3477 (Feb. 5,

1988).  The State Department subsequently rescinded that designation on June 26, 2008.  *See*

*Certification of Rescission of North Korea's Designation as a State Sponsor of Terrorism*, 73

Fed. Reg. 37351.  Courts have held North Korea responsible for offering direct support to

terrorist organizations that have carried out attacks in Israel.  S*ee, e.g., Calderon-Cardona v.*

*Dem. People's Republic of Korea*, 723 F. Supp. 2d 441, 452 (D.P.R. 2010); *Massie v.*

*Government of Democratic People's Republic of Korea* 592 F.Supp.2d 57, 73 (D.D.C. 2008).  In

the July 23 Memorandum, this Court found that North Korea provided "material aid to

Hezbollah in three ways: weapons, training, and tunnels to help carry out the attacks."  July 23

Memorandum, at 6.

## PROCEDURAL HISTORY

Based on the events of July and August, 2006, Plaintiffs filed a complaint on April 8,

2009 against Hezbollah under the Antiterrorism Act, 18 U.S.C. § 2333(a), and against North

Korea under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c) (Case No. 1:09-cv-

00646 (ECF No.1)).  On March 23, 2010, Plaintiffs filed a second complaint, this time against

the Central Bank of the Islamic Republic of Iran; Bank Saderat, Iran; Bank Saderat, PLC and the

Islamic Republic of Iran, alleging these entities provided "extensive material support and

resources to Hezbollah, that caused, enabled and facilitated" the Hezbollah rocket attacks.

Plaintiffs are asking for damages under 28 U.S.C. §§1605A(c) and (d) and 18 U.S.C. § 2333(a)

(Case No. 1:10-00483 (ECF No. 3)).  This Court subsequently dismissed the statutory claims

against Hezbollah on August 20, 2013, (09-646 (ECF No. 50)), and against Bank Saderat of Iran

and Bank Saderat, PLC on November 5, 2010 (10-483 (EFC No. 16)).  On August 20, 2015,

plaintiffs voluntarily dismissed their common-law claims against Hezbollah (09-646 (ECF No.

63)).

Neither North Korea nor Iran responded to the complaints and plaintiffs subsequently moved for entry of default on May 12, 2014 (09-646 (ECF No. 53) and 10-483 (ECF No. 51)). A hearing was convened on May 27, 2014 to determine defendants' liability during which plaintiffs produced expert witnesses who, in accordance with 28 U.S.C. § 1608(e) (requiring plaintiffs to establish their right to relief by "evidence that is satisfactory to the court"), attested to Iran's and North Korea's complicity in Hezbollah's 2006 attacks against Israel. Based on this testimony, the Court entered judgment by default against the two nations (09-646 (ECF No. 57) and 10-483 (ECF No. 54)).

On October 1, 2014, the Court appointed the undersigned as special master to be governed by the Administrative Plan Governing Special Masters previously adopted in *O'Brien v. Islamic Republic of Iran*, Case No. 1:06-cv-0690 (RCL). *See* 09-646 (ECF No. 58) and 10-483 (EFC No. 55)) ("Order of Reference"). The court specifically directed the Special Master to issue reports recommending the amount of compensatory damages to which he believed each plaintiff was entitled and to "take and report on evidence of each plaintiff's qualification for relief under § 1605A(c) and the familial relationships between plaintiffs and victims of the rocket attacks in Israel committed between July 12, 2006 and August 14, 2006." *Id.*

Pursuant to these directives, and in keeping with the Federal Rules of Evidence, the Special Master makes these findings and recommendations.

**FINDINGS OF FACT**

1.      Chayim Kumer was born on February 27, 1976 in Canada. A copy of his passport, filed with this Court on May 10, 2012, confirms that, at all relevant times, Chayim was a United States citizen.

2.      Nechama Kumer was born on September 4, 1976 in Tennessee.  A copy of her passport, filed with this Court on May 10, 2012, confirms that, at all relevant times, Nechama was a United States citizen.

3.      In July 2006, Hezbollah launched a series of rocket attacks against Israel.  One of the cities shelled was Tzfat, where Chayim and Nechama Kumer and four of their children were residing.

4.      None of the Kumer children are named plaintiffs in this action.

**Testimony of Chayim Kumer**

Chayim Kumer provided his testimony by Declaration dated March 29, 2012.  *See Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 163 (D.D.C. 2013) (accepting proof of damages in FSIA by affidavit and documentary evidence).   Chayim affirms he is an American citizen currently residing in Tzfat, Israel with his wife, Nechama, and their children.  Chayim and Nechama met in Tzfat and married on September 9, 1997.  The couple has seven children – four of whom were born prior to the Hezbollah rocket attacks. Chayim is currently employed as a teacher and musician although, in 2006, he worked for a non-profit organization.

According to his Declaration, Chayim was in the kitchen of his home feeding lunch to his children on the afternoon of July 13, 2006 when "five rockets suddenly exploded nearby in rapid succession.  It was absolutely terrifying."  Nechama was at work at the time.  Chayim and his children immediately proceeded to the communal bomb shelter accessible from the basement of their home.  The shelter was "ill equipped" to adequately house the families congregated there as it had been used as a storage area and was "full of junk," contained a limited supply of food and water, had no bathroom, and offered only a few mattresses on the floor.  Chayim "began feeling

an overwhelming concern for Nechama," not knowing where she was or why she had not yet returned home from work.  He could neither contact Nechama nor leave his children to locate her.  According to Chayim, Nechama arrived at the shelter some time later.

While in the shelter, Chayim felt "extremely claustrophobic" as it was now full of people.  The "tension inside the shelter was badly affecting us all," Chayim recalls.  After a few hours, the Kumers and other families left.  Chayim was aware of the risk involved but felt staying in the shelter for any length of time "was not a viable solution."  The attacks continued for the next six weeks.

Chayim recalls how the rocket fire "occurred suddenly and without notice, which made the experience especially traumatic."  Eventually a warning siren was established but it only gave 30 seconds notice of incoming attacks.  Having no friends or family to stay with and lacking funds for hotel rooms, the Kumers "resigned [them]selves to staying in [their] home."

Chayim recalls praying at his local synagogue one day when "a wave of rockets started to rain down upon us."  Chayim was "frozen with fear" and although unhurt in the barrage, was traumatized by the event and began experiencing flashbacks of the "haunting whistle of the rockets."  These flashbacks prevented him from returning to that synagogue for "three years."  As the attacks continued, Chayim "resigned [himself] that [he] might die at any moment."  Chayim relates how, "[it] is a most horrible feeling to know that at any moment a rocket can land on your home and kill you and your loved ones in one fell swoop, and that there is nothing you can do to prevent this from happening."  Chayim's anxiety began to manifest physically when, on three separate occasions, his "digestive system became blocked," rendering him "unable to relieve [him]self or to throw up, and the pain increased and quickly became unbearable until [he] was writhing in pain on the ground."  Each time he had to be hospitalized and medicated,

eventually learning there was a problem with his gallbladder "caused by [his] state of psychological stress."

Chayim testifies that he began suffering from "increased feelings of being trapped and constrained" resulting in his inability later on to teach in a room with the door closed.  Similarly, "[c]rowded places also started to exacerbate" his anxiety and if Chayim knows he will be in such a situation, he "always immediately plan[s] a route out and continue[s] to recalculate various escape routes."

Chayim describes Tzfat as a "ghost town" during the Hezbollah attacks, with most residents fleeing south.  He recalls feeling "extremely isolated and vulnerable, and that no one would come to our aid (or even know what had occurred) should something happen to us." Moreover, there "were no governmental services" - "no trash pick-up, transportation services, regular doctors, banks, etc."  In addition, there were "packs of large dogs," abandoned by their owners, displaying "erratic and aggressive behavior," which "terrified" Chayim's children. During the siege, one small grocery was open, which Chayim would visit only when the family was in need of essential items.  Chayim recounts how, on one of his trips back from the store, another attack occurred.  Fortunately, he had previously mapped the locations of all the communal shelters, quickly found the nearest one and waited out the barrage.

According to Chayim, "the psychological damage [he] suffered from being subjected to six weeks of incessant rocket attacks has affected [him] very much, and continues to affect [him] today, some six years later."  He is unable to listen to the radio or attend his local synagogue without experiencing "flashbacks of the horrible experience I had there."

Chayim sought professional counseling after the war – once every week for six months and "on a less regular schedule" thereafter, until "just a few months" before he executed his

Declaration on March 29, 2012. Chayim testifies that he is "still suffering various lingering effects from the trauma [he] experienced and that [he] needs to schedule further counselling sessions. [He] still experience[s] debilitating fear in certain circumstances and need[s] to get this under control."

Chayim states that his eldest children, Malka and Chana Liba, "were severely traumatized by the war," as well, for which they were "treated intensively with various therapies for six months after the war ended, and have continued to be counselled since then." According to Chayim, both have been diagnosed with "degrees of PTSD and Anxiety, which manifest[] in panic attacks, their inability to sleep, nightmares and an exaggerated stress response" and "difficulty learning and remembering."

### Report of Dr. Rael Strous re: Chayim Kumer

Dr. Rael Strous is the Director of the Chronic Inpatient Unit of the Be'er Yaakov Mental Health Center and Associate Professor of Psychiatry at the Sackler Faculty of Medicine of the Tel Aviv University. Dr. Strous submitted a Declaration dated January 30, 2012 in support of Chayim Kumer's claims. Dr. Strous has testified in similar cases in this circuit concerning the psychological trauma suffered by victims of terrorism. *See, e.g., Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56, 60 (D.D.C. 2006); *Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d 258, 267-78 (D.D.C. 2003). Attached to his Declaration, Dr. Strous included a copy of his *curriculum vitae*; a Psychiatric Evaluation report of Chayim Kumer; and two pre-evaluation forms Chayim completed at his request.

According to Dr. Strous, "Mr. Kumer displays some form of PTSD and Anxiety disorder either currently or in the past as a result of being directly exposed to rocket fire and its aftermath during the second Lebanon war." Based on his evaluation of Mr. Kumer," Dr. Strous "believe[s]

that many of his symptoms with which he has been diagnosed are likely to be present in varying

degrees for a significant time to come and while it is impossible to state for any absolute

certainty, many of the symptoms may even be permanent."

In his evaluation notes, Dr. Strous recorded that Chayim felt he was a "target waiting to

be eliminated."  Chayim described his fear following the bombing attack near his synagogue

which prevented him from attending daily services as he had in the past.  Chayim also described

experiencing "intense headaches and stomachaches" which, at times, "were associated with

panic attacks – intense anxiety attacks during which he thought he was going to die."  Dr. Strous

noted that Chayim was hospitalized on three occasions for intense stomach cramps – ailments he

never experienced before the war.

Dr. Strous observes that Chayim sought psychiatric treatment for six months following

the war but was never prescribed any medication.  Chayim reported working hard to overcome

his fear and anxieties, yet continues to struggle with flashbacks and responds anxiously to loud

noises.  Dr. Strous reports, "[d]ue to his anxiety and diminished functioning as a result, he

reports his ability to support his family during the war and after was affected.  This was

compounded by the fact that there were fewer tourists for that period of time."

Dr. Strous diagnosed Chayim as suffering from "Chronic PTSD (mild)" and "Anxiety

disorder NOS" – conditions directly related to the Hezbollah attacks of June 2006.

**Testimony of Nechama Kumer**

Nechama Kumer provided testimony by Declaration dated March 29, 2012.  Nechama

affirms she is a United States citizen born in Nashville, Tennessee on September 4, 1976.  She

and Chayim wed on September 9, 1977; they have seven children, four of whom were born prior

to the 2006 Hezbollah rocket attacks.  Nechama was five months pregnant when the attacks began.

According to her Declaration, Nechama was at work when the first rockets hit the town; she could hear them pass overhead and land near her office, which did not have a shelter. Nechama was "very worried about Chayim and the children" and began to make her way home as quickly as possible.  Despite no available taxis or buses, she secured a ride home and located Chayim and her children in a community shelter.  She remembers the shelter as "crowded and all around us there was mass confusion, people were hysterical and in shock."

Nechama recounts how she attempted to explain the situation to their two eldest children – Malka, then six years old and Chana Liba, then five years old – a process she describes as "gut wrenching."  She recalls them asking many questions, such as why Hezbollah wanted to kill people and why their friends and neighbors were fleeing south while the Kumer family remained in Tzfat.

Nechama remembers "hundreds of sirens and barrages of rockets over the next six weeks."  She expresses particular concern for her husband who, "was not in a good state of mind and seemed to be deteriorating as the war dragged on."  According to Nechama, Chayim was experiencing "regular panic attacks and anxiety" that were physically debilitating to him and impacting their children, as well.  Chayim's debilitated state "worked against my efforts to try and make the kids feel as stable and secure as possible, which given our situation, was already a losing proposition."

Nechama recalls how Chayim suffered "excruciating, recurring abdominal pain which required him to be rushed to the hospital" on three occasions.  He was twice caught outside of their home during a rocket attack, experiences which "devastated him."  Nechama states: "I had

heard the expression 'shell-shocked' before but only now began to really understand its meaning."  The family experienced "numerous other traumatic experiences."  Nechama recounts how their babysitter, with whom the girls were close, ran into the Kumer home one day screaming that the building in which she lived had been directly hit by a rocket.  Nechama's daughters understood that their babysitter was frightened and shaken.  Malka and Chana Liba were also "terrified" by the "canines roaming the streets in packs," as people had fled the city and "simply left their dogs outside."

Nechama testifies that both girls suffer "from the traumatic experience of living through rocket attacks, even after intensive counseling," and were diagnosed with "degrees of Post-Traumatic Stress Disorder (PTSD) and anxiety," which "manifest[] in panic attacks, their inability to sleep, nightmares, and an exaggerated stress response."  Both children also "exhibit symptoms of low attention, and difficulty learning and remembering."

Nechama observes that Malka's trauma "is more severe" than that suffered by her sister and that Malka's ability to "function socially has been affected."  Nechama describes how Malka frequently experiences "anxiety and panic attacks" which she never experienced before the war. Malka also suffers from "unexplained stomach aches" and refuses to "participate in any activity more than a block from her home."  Nechama observes how Malka's performance at school has deteriorated.  Nechama remembers a trip she and Malka took to America in 2011 and how Malka was "prone to panic attacks if she wasn't with me all the time."  According to Nechama, Malka feels "much safer in the United States and plans to move there as soon as she is old enough."

Nechama testifies that Chana Liba is similarly "prone to anxiety and panic attacks."  It was only in 2011 – five years after the attack – that Nechama was able to convince Chana Liba and Malka to sleep in separate beds. "They are both still scared to walk alone into a dark room,

or the bathroom, by themselves." According to Nechama, she and Chayim "understood that the trauma [their children] suffered has really been impeding on their quality of life and on their ability to function normally," so they retained the services of "a specialist in post-trauma disorder who is working with them now and teaching them new skills."

Apart from the impact of the rocket attacks on her husband and two daughters, Nechama remains "burdened with the responsibilities of supporting what have become their extensive sets of special needs. From sleeping in the same bed with them, to frequently being woken up at night, to managing their anxieties on a day to day basis – it has been quite taxing on [her] physical, emotional and mental health."

Nechama attaches to her Declaration a psychiatric evaluation prepared by Dr. Rael Strous on January 27, 2012 for both Malka and Chana Liba. Dr. Strous diagnosed each with "Anxiety disorder" and "Post-traumatic stress disorder."

**ANALYSIS**

Plaintiffs, in their complaints, seek damages under 28 U.S.C. §§ 1605A(c) and (d) for harms and injuries resulting from Defendants' "extreme, wanton, willful and malicious" conduct (09-646 (ECF No. 1) and 10-483 (ECF No. 3)), including "disfigurement; loss of physical and mental functions; extreme pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium" (10-483 (ECF No. 3)).

It is beyond the remit of the Special Master to consider the viability of plaintiffs' common-law claims, much less ascribe damages for any breach thereof. Rather, the Special Master's inquiry is confined to analyzing plaintiffs' entitlement to those damages delineated in

the Foreign Sovereign Immunities Act ("FSIA"), namely, pain and suffering, solatium and economic damages.  28 U.S.C. 1605A(c)(4).

To recover under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent' as any other default winner."  *Hill v. Republic of Iraq,* 328 F.3d 680, 683-84 (D.C. Cir. 2003) (citation omitted).  In the context of a default judgment, courts in this jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages."  *Rhodes v. U.S.*, 967 F.Supp.2d 246, 313 (D.D.C. 2013) (emphasis in original) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)).  Accordingly, plaintiffs must prove future damages to a "reasonable certainty," or by a preponderance of the evidence, and must prove the amount of damages by a "reasonable estimate."  *Hill*, at 684.  For past losses, a plaintiff must, similarly, "prove the fact of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997), yet need only "reasonably prove" the amount of damages.  *Hill*, at 684.  In fashioning an award, the Special Master may consider any "special problems of proof arising from the defendant's absence."  *Id.*, at 685.

Upon consideration of the facts presented and in light of the aforementioned legal framework, the Special Master finds that both Chayim and Nechama Kumer are entitled to compensatory damages for the pain and suffering they endured.  The Special Master further finds that Nechama Kumer is also entitled to solatium damages.

### Pain and Suffering

In determining a proper damage award for Chayim and Nechama Kumer, the Special Master is guided by prior decisions awarding damages to victims of terrorism, mindful of the inherent difficulty in "assess[ing] the amount of compensatory damages for the pain and

- 13 -

suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Valencia v. Islamic Republic of Iran*, 774 F.Supp.2d 1, 14 (D.D.C. 2010).  The Special Master is equally mindful that previous damages awards, while instructive guidelines, "are not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010), and, therefore, "strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009) (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

Courts consider a "myriad of factors" when assessing damages for surviving victims of terrorist hostilities.  These factors include: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson v. Islamic Republic of Iran* ("*Peterson II*"), 515 F.Supp.2d 25, 52 n. 26 (D.D.C. 2007) (citing *Blais*, 459 F.Supp.2d at 59). Calculating damages begins with the baseline assumption that persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Davis v. Islamic Republic of Iran*, 882 F.Supp.2d 7 (D.D.C. 2012) (citing *Peterson II*).  This amount serves as a lodestar and can deviate upward in the presence of "severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 84 (D.D.C. 2010) ("*Valore II*"), or downward in the face of "minor shrapnel injuries or minor injury from small-arms fire." *Id.*

For victims, such as Chayim and Nechama Kumer, who "suffer[ed] severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million." *Harrison v. Republic of Sudan*, 882 F.Supp.2d 23, 49 (D.D.C. 2012) (citing *Valore II*, 700

F.Supp.2d at 85).  *See also Brown v. Islamic Republic for Iran*, 872 F.Supp.2d 37, 42 (D.D.C. 2012); *O'Brien*, 853 F.Supp.2d at 47 (D.D.C. 2012); *Peterson II,* 515 F.Supp.2d at 56.

The Special Master finds that Chayim and Nechama Kumer, through testimony and supporting documentation, have established a cause of action and demonstrated a right to recover against the defendants.  With respect to Nechama, the Special Master sees no need to deviate from the baseline award established in *Valore II*.  The Special Master finds, however, an upward deviation warranted for Chayim.

The testimony supporting Chayim's claims, corroborated by Dr. Strous, reveals that Chayim developed claustrophobia from being an overcrowded shelter which, in turn, compelled him to remove his family from the safety and remain at home despite the risks.  The evidence further demonstrates that Chayim was traumatized to the point of being unable to attend his local synagogue for three years following the attacks due to reoccurring flashbacks of ongoing rocket attacks which took place while he was praying.  And in addition to being diagnosed with PTSD and an anxiety disorder, Chayim's stress manifested in gallbladder problems which resulted in three separate hospitalizations.  Dr. Strous confirms that Chayim's psychological problems have not subsided since the war.

Both Chayim and Nechama took great pains to detail the anguish experienced by their eldest daughters, Malka and Chana Liba as a result of the attacks.  To that end, they submitted Dr. Strous' psychological evaluations attesting to the trauma these children underwent. While the events that befell Malka and Chana Liba were tragic and regrettable, they are not parties to this action.  A default judgment was not entered on their behalf and neither has standing to pursue their claims under the FSIA.

**Solatium Damages**

Chayim and Nechama's prayers for solatium raise issues of first impression in the context of the Foreign Sovereign Immunities Act.  To date, FSIA solatium claims have been filed by family members not in proximity to the terrorist activity.  Chayim and Nechama, however, were together during the attacks.  As such, each was a victim potentially entitled to recover for his or her own pain and suffering as well as a victim with a potentially colorable claim to recover for the emotional trauma they endured as a result of the "extreme and outrageous conduct" visited on the other.

Solatium damages are designed "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as well as the harm caused by the loss of the decedent's society and comfort." *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379, 402 (D.D.C. 2015) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 25 (D.D.C. 2011)) (internal quotation marks and alterations omitted).  Solatium awards have "also been applied to cases where the victim survived a terrorist attack." *Oviessi*, 768 F.Supp.2d at 26 n. 10.  Unlike lost wages which may easily be calculated, however, solatium damages do not readily lend themselves to quantification using "models and variables." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000) (*quoting Flatow v. Islamic Republic of Iran*, 999 F.Supp.2d 1, 32 (D.D.C. 1998)).  Courts, therefore, look for guidance in "prior decisions." *Acosta v. The Islamic Republic of Iran*, 574 F.Supp.2d 15, 29 (D.D.C. 2008).

A review of "prior decisions" reveals that family members in direct lineal relationship are "presume[d] . . . to suffer compensable mental anguish[,] . . . and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Kim v. Democratic People's Republic of Korea*, 87 F.Supp.3d 286, 290 (D.D.C. 2015) (quoting

*Oveissi*, 768 F.Supp.2d at 25).  The presumption of mental anguish arises given terrorists'
acknowledged aim of causing "the highest degree of emotional distress, literally, terror."
*Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002).  *See also Greenbaum
v. Islamic Republic of Iran*, 451 F.Supp.2d 90, 104 (D.D.C. 2006) ("Terrorists seek to cause
extreme suffering in order to achieve political ends; accordingly, they perpetrate acts that are
deliberately outrageous").

For family members of deceased victims of terrorism, this Court has established a
framework whereby the amount of the award is contingent upon the "'nature of the relationship'
between the family member and victim" and "'the severity of the pain suffered by the family
member.'" *Heiser I,* 466 F.Supp. 2d at 269 (quoting *Haim*, 425 F.Supp.2d at 75). To lend
uniformity to the analysis and avoid disparate awards, this Court has approved the following
awards: $8 million for spouses; $5 million for parents and $2.5 million for siblings.  *Id.*  Children
of a deceased victim typically receive an award of $3 million.  *O'Brien*, 853 F.Supp.2d at 46–47.

For relatives of surviving victims who have been physically injured as a result of terrorist
attacks, courts have applied a similar framework whereby "awards are 'valued at half of the
awards to family members of the deceased' – $4 million, $2.5 million and $1.25 million to
spouses, parents, and siblings, respectively," *Anderson v. Islamic Republic of Iran*, 839
F.Supp.2d 263, 266 (D.D.C. 2012) (quoting *Oveissi*, 768 F.Supp.2d at 26 n. 10 (D.D.C. 2011)),
and $1.5 million for children.  *Id.*, 839 F.Supp.2d at 266.  *Cf. Onsongo v. Republic of Sudan*, 60
F.Supp.3d 144, 151 (D.D.C. 2014) (awarding $2.5 million to children of injured victims of
terrorism); *Peterson II*, 515 F.Supp.2d at 51) ($2.5 million to child of injured victim).  Finally,
this Court has held that relatives of surviving victims presenting with emotional trauma and no
physical injury should receive amounts proportionally less than those with physical injuries,

namely, $1 million for spouses; $850,000 for parents; $750,000 for children, and $500,000 for siblings.  *See Davis v. Islamic Republic of Iran*, 882. F.Supp.2d 7, 16 (D.D.C. 2012).

The testimony given by Chayim and Nechama coupled with the observations of Dr. Strous confirm the close bond between them.  There is no evidence, however, supporting a finding that Chayim suffered vicariously as a result of the trauma that befell his wife.  Evidence that Chaim was concerned for Nechama's safety is not the equivalent of evidence that Chaim was anguished over the trauma Nechama experienced.

Notwithstanding the "presumption" that family members "suffer compensable mental anguish," *Kim*, 87 F.Supp.3d at 290, "[l]ines must be drawn in the award of this form of damages and one such line includes a situation like this, where no evidence is offered to show injury that an award of solatium damages might compensate."  *Roth*, 78 F.Supp.3d at 406 (emphasis in original).  Apropos of Chayim's claim, no such evidence exists.

Nechama, in comparison, testifies extensively about the trauma she experienced as a result of Chayim's injuries.  She describes her anguish over Chayim's deteriorating state of mind, the bouts of "excruciating, recurring abdominal pain which required him to be rushed to the hospital," as well as his panic attacks.

On this evidence, the Special Master finds Nechama entitled to an award of solatium damages arising from the anguish she endured due to Chayim's trauma.  In considering the amount of such an award, the Special Master is mindful that it is "inappropriate for the solatium awards of family members to exceed the pain and suffering awards of the surviving servicemen." *Fain III v. Islamic Republic of Iran*, 885 F. Supp. 2d 78, 82 (D.D.C. 2012) (citing *O'Brien*, 853 F.Supp.2d at 47).

Finally, the Special Master infers, given the submission of Dr. Strous' psychological evaluations for Malka and Chana Liba, that Chayim and Nechama Kumer are seeking solatium damages as compensation for their anguish over the trauma suffered by their children. Unfortunately, the children's lack of standing disqualifies Chayim and Nechama from seeking damages for loss of solatium, as such an award would run afoul of the aforementioned principle precluding solatium damages of family members to exceed the pain and suffering damages awarded to the victim. Any award of solatium damages to Chayim or Nechama would, by definition, exceed an award to Malka and Chana Liba.  Accordingly, the Special Master cannot recommend that the Chayim and Nechama Kumer be awarded solatium damages for the impact the 2006 rocket attacks had on their two children.

**CONCLUSION**

In light of the foregoing, the Special Master recommends that Chayim Kumer be awarded Two Million Dollars ($2,000,000) in compensatory damages for pain and suffering and that Nechama Kumer received One Million Five Hundred Thousand Dollars ($1,500,000) in compensatory damages for pain and suffering.  The Special Master further recommends that Nechama Kumer receive One Million Dollars ($1,000,000) in compensatory damages for loss of solatium.

Dated:  April 2, 2016                                Respectfully submitted,

By:*/s/ Alan L. Balaran*
Alan L. Balaran, Esq.
Special Master