## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CHAIM KAPLAN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-00646 (RCL)** |
| | ) | |
| **HEZBOLLAH, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

| | | |
|---|---|---|
| **CHAIM KAPLAN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10-00483 (RCL)** |
| | ) | |
| **THE CENTRAL BANK OF THE** | ) | |
| **ISLAMIC REPUBLIC OF IRAN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT OF SPECIAL MASTER
## PURSUANT TO ORDER OF REFERENCE
## REGARDING THE CLAIMS OF
## AVISHAI REUVANE AND ELISHEVA ARON

This action is brought by Avishai Reuvane and Elisheva Aron, under 28 U.S.C. § 1605A, who are seeking damages for injuries sustained on July 13, 2006 as a result of a barrage of rockets fired by Hezbollah from Lebanon into northern Israel.  Under the Administrative Plan Governing Special Masters, and pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received testimony and reviewed documentary evidence to assist in determining any damages to which Avishai Reuvane and Elisheva Aron may be entitled.

## BACKGROUND

On July 12, 2006, Hezbollah launched a surprise attack against Israel killing eight Israeli Defense Force soldiers and kidnapping two others at the Israeli/Lebanese border.  Israel responded with airstrikes against Hezbollah-held positions in Southern Lebanon; Hezbollah retaliated with katyusha rockets and mortars fired against Israeli communities located close to the border.  One of those cities was Safed ("Tzfat"). A United Nations-brokered cease-fire took effect on August 14, 2006.  *See* U.S. Congressional Research Services, *Lebanon: The Israel-Hamas-Hezbollah Conflict* (RL3356, updated September 15, 2006) by Jeremy M. Sharp.

### The Islamic Republic of Iran

The statutory scheme underpinning actions against the Islamic Republic of Iran has been exhaustively recounted in *In re: Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31 (D.D.C. 2009), obviating the need for recapitulation.  This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for facilitating, financing and providing material financial and logistical support to help carry out attacks on United States citizens.  *See, e.g.*, *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 45-46 (D.D.C. 2012); *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007) ("*Valore I*"); *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp. 2d 229, 254 (D.D.C. 2006) (*Heiser I*); *Peterson v. Islamic Republic of Iran*, 264 F.Supp. 2d 46, 61 (D.D.C. 2003) ("*Peterson I*").  This Court found so in this case, as well.  *See* Memorandum Opinion (July 23, 2014), at 2 (Case No. 1:10-cv-00483 (ECF No. 54)) ("July 23 Memorandum").

### The Democratic People's Republic of Korea

In 1988, the State Department designated the Democratic People's Republic of Korea ("North Korea") as a "state sponsor of terrorism."  *See Notice, Determination Pursuant to*

*Section 6(j) of the Export Administration Act of 1979; North Korea*, 53 Fed. Reg. 3477 (Feb. 5,

1988). The State Department subsequently rescinded that designation on June 26, 2008. *See*

*Certification of Rescission of North Korea's Designation as a State Sponsor of Terrorism*, 73

Fed. Reg. 37351. Courts have held North Korea responsible for offering direct support to

terrorist organizations that have carried out attacks in Israel. S*ee, e.g., Calderon-Cardona v.*

*Dem. People's Republic of Korea*, 723 F. Supp. 2d 441, 452 (D.P.R. 2010); *Massie v.*

*Government of Democratic People's Republic of Korea* 592 F.Supp.2d 57, 73 (D.D.C. 2008). In

the July 23 Memorandum, this Court found that North Korea provided "material aid to

Hezbollah in three ways: weapons, training, and tunnels to help carry out the attacks." July 23

Memorandum, at 6.

## PROCEDURAL HISTORY

Based on the events of July and August, 2006, Plaintiffs filed a complaint on April 8,

2009 against Hezbollah under the Antiterrorism Act, 18 U.S.C. § 2333(a), and against North

Korea under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c) (Case No. 1:09-cv-

00646 (ECF No.1)). On March 23, 2010, Plaintiffs filed a second complaint, this time against

the Central Bank of the Islamic Republic of Iran; Bank Saderat, Iran; Bank Saderat, PLC and the

Islamic Republic of Iran, alleging these entities provided "extensive material support and

resources to Hezbollah, that caused, enabled and facilitated" the Hezbollah rocket attacks.

Plaintiffs are asking for damages under 28 U.S.C. §§1605A(c) and (d) and 18 U.S.C. § 2333(a)

(Case No. 1:10-00483 (ECF No. 3)). This Court subsequently dismissed the statutory claims

against Hezbollah on August 20, 2013, (09-646 (ECF No. 50)), and against Bank Saderat of Iran

and Bank Saderat, PLC on November 5, 2010 (10-483 (EFC No. 16)). On August 20, 2015,

plaintiffs voluntarily dismissed their common-law claims against Hezbollah (09-646 (ECF No.

63)).

Neither North Korea nor Iran responded to the complaints and plaintiffs subsequently moved for entry of default on May 12, 2014 (09-646 (ECF No. 53) and 10-483 (ECF No. 51)). A hearing was convened on May 27, 2014 to determine defendants' liability during which plaintiffs produced expert witnesses who, in accordance with 28 U.S.C. § 1608(e) (requiring plaintiffs to establish their right to relief by "evidence that is satisfactory to the court"), attested to Iran's and North Korea's complicity in Hezbollah's 2006 attacks against Israel. Based on this testimony, the Court entered judgment by default against the two nations (09-646 (ECF No. 57) and 10-483 (ECF No. 54)).

On October 1, 2014, this Court appointed the undersigned as special master to be governed by the Administrative Plan Governing Special Masters previously adopted in *O'Brien v. Islamic Republic of Iran*, Case No. 1:06-cv-0690 (RCL). *See* 09-646 (ECF No. 58) and 10-483 (EFC No. 55)) ("Order of Reference"). The Court specifically directed the Special Master to issue reports recommending the amount of compensatory damages to which he believed each plaintiff was entitled and to "take and report on evidence of each plaintiff's qualification for relief under § 1605A(c) and the familial relationships between plaintiffs and victims of the rocket attacks in Israel committed between July 12, 2006 and August 14, 2006." *Id.*

Pursuant to these directives and in keeping with the Federal Rules of Evidence, the Special Master makes these findings and recommendations.

**FINDINGS OF FACT**

1.      Avishai Reuvane was born in Los Angeles, California on June 29, 1972. A copy of his passport, filed with this Court on May 10, 2012, confirms that, at all relevant times, Mr. Reuvane was a United States citizen.

2.      Elisheva Aron, was born in Houston, Texas on February 11, 1973.  A copy of her passport, filed with this Court on May 10, 2012, confirms that, at all relevant times, Ms. Aron was a United States citizen.

3.      In July 2006, Hezbollah launched a series of rocket attacks against Israel.  One of the cities shelled was Tzfat, where Avishai and Elisheva were residing.

**Testimony of Avishai Reuvane**

Avishai provided his testimony by Declaration dated March 29, 2012.  *See Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 163 (D.D.C. 2013) (accepting proof of damages under the Foreign Sovereign Immunities Act by affidavit and documentary evidence).  Avishai affirms he was born in Los Angeles, California on June 29, 1972.

According to Avishai's Declaration, he and Elisheva met in Israel where they were married in 2003.  The couple divorced in 2005 but, at the time of the rocket attacks, "were living together in Tzfat . . . making an attempt at reconciliation."  Prior to the July 2006 Hezbollah rocket attacks, Avishai was employed as a handyman and was trying to establish himself as a plumber.

On July 13, 2006, a katyusha rocket hit the roof of the house next door to where Avishai and Elisheva were living.  "The noise was deafening," Avishai recalls, "smoke and debris entered our home in plumes.  Although we obviously felt, and were, very unsafe in our home, we believed we did not have any viable options" but to stay.  Later that day, Avishai was in his home office when another rocket "hit the neighbor's house directly adjacent to the wall next" to where Avishai was standing.  "The intensity of the impact, which occurred less than 10 feet from me, threw me up in the air and across the room, smashing me against the opposite wall.  This

caused me to lose consciousness and sustain several injuries." When Avishai awoke, he "was in great shock, and started to feel intense pain as a result of [his] injuries. [He] experienced an overwhelming fear for [his] life and the life of Elisheva."

Even though the attack took place at night, the couple immediately left Tzfat for Jerusalem. The couple had no friends or family from whom they could seek assistance and were unable to withdraw money as their bank in Tzfat was closed due to the war.

In Jerusalem, Avishai got into a violent altercation with two Arab men at the Western Wall in the Old City which resulted in his arrest and incarceration for one year. Avishai testified that his time in prison was made even more difficult by "the thought of Elisheva all alone having to deal with the situation" and that there was no one in jail to help him or with whom he could talk to about the rocket attacks.

Since July 2006, Avishai claims to be in a "constant state of anxiety," living in "constant fear, wondering when it might happen again." He has been unable to "concentrate on the future" or rebuild his life. Avishai describes himself as a "nervous, constantly on edge" individual who experiences "extreme sensitivity to even minor things," has difficulty concentrating and is "often depressed." Avishai admits "receiving some help" which he believe has resulted in an "improvement, but there is still much work to be done." According to Avishai, his "symptoms since the rocket attacks mirror those associated with Post Traumatic Stress Disorder."

After serving his sentence, Avishai returned to Tzfat where he is "confronted on a daily basis" with the fact that Hezbollah can fire rockets at the city any time.

**Dr. Rael Strous re: Avishai Reuvane**

Dr. Rael Strous is the Deputy Director of the Be'er Yaakov Mental Health Center and Professor of Psychiatry at the Sackler Faculty of Medicine of the Tel Aviv University, submitted

an evaluation entitled "Expert Report," dated July 26, 2015, in support of Avishai Reuvane's

claims.  Dr. Strous' testimony concerning the psychological trauma suffered by victims of

terrorism has been accepted by courts in this circuit.  *See, e.g., Haim v. Islamic Republic of Iran*,

425 F.Supp.2d 56, 60 (D.D.C. 2006); *Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d

258, 267-78 (D.D.C. 2003).  Attached to his Expert Report, Dr. Strous included a copy of his

evaluation notes from his session with Avishai on June 29, 2015.

According to the Expert Report, "Avishai Reuvane displays some form of Post-traumatic

Stress Disorder and Persistent Depressive Disorder currently and in the past as a result of him

being exposed to and being injured from falling rockets (katyushas) during the second Lebanon

War in 2006."  He believes "many of [Avishai's] symptoms with which he has been diagnosed

are likely to be present in varying degrees for a significant time to come and while it is

impossible to state for any absolute certainty, many of the symptoms may even be permanent."

Dr. Strous' evaluation notes describe Avishai's experiences during the war in

considerable detail.   Dr. Strous reports that Avishai "was at home while his wife was somewhere

else in the city when 2 katyushas (rockets) hit his and his neighbor's house."  Avishai

subsequently telephoned Elisheva and instructed "her to stay where she was."  A few hours later,

Avishai was looking through window when he observed "a line of katyushas coming towards his

neighborhood and apartment.  He remembers it vividly "as if the rockets were coming in a

straight line from out of the sky right at him."  Avishai was suddenly "blown across the room."

He reports losing consciousness.  When he revived and realized what happened, he was "dazed"

and in "great shock."

Avishai informed Dr. Strous that he was "injured during the blast and sustained a large painful hematoma on the left side of his body." Avishai fled to be with Elisheva and to get to safety. He believed "he was going to die that day."

According to Dr. Strous, Avishai attributes the incident leading to his arrest and incarceration to "the enormous distress and tension that he had experienced in the previous days," which had "taken a serious toll on him." Upon his release from prison, Avishai began "drinking heavily every day to deal with his anxiety and frequent mood swings." The drinking was followed by "heavy drug use," for which he later sought treatment at a rehabilitation facility for six months. It was during Avishai's period of drug abuse that Elisheva left him "for good."

Avishai informed Dr. Strous that he was experiencing "nuclear Holocaust" nightmares and "flashbacks to the event with the Katyusha whenever he hears any sirens or loud noise. Immediately he feels palpitations and sweating as if it were recurring." Avishai also reported feeling "jumpy" and noted that his self-esteem was affected.

Dr. Strous diagnosed Avishai with "Post-traumatic Stress Disorder, moderate to severe"; "Persistent Depressive Disorder; mild severity with pure dysthymic syndrome"; and "Polysubstance dependence, sustained remission."

**Testimony of Elisheva Aron**

Elisheva Aron provided her testimony by Declaration dated March 29, 2012. Elisheva affirms she was born in Houston, Texas on February 11, 1973, immigrated to Israel in 2001, met Avishai in Israel, married him in 2003, divorced in 2005, attempted a reconciliation in 2006, and had a son in 2008.

Elisheva recalls the Hezbollah rocket attacks began in Tzfat on July 12, 2006 and "feeling truly afraid of our well-being." Sirens and explosions "were heard constantly around

us" but their home did not have a bomb shelter nor was there one in the vicinity. Elisheva was

"utterly terrified." The following day, a katyusha rocket hit their neighbors' roof. The close

proximity of the rocket's landing further deepened Elisheva's "anxiety and fear."

Elisheva confirms that Avishai was thrown across the room and lost consciousness when

a rocket hit a wall abutting their house. She states the "impact of the rocket broke many of the

windows in our home." Elisheva recalls the overwhelming fear that led them to flee Tzfat in the

"middle of the night." According to Elisheva, "the government" advised them "to leave

everything as it was" – as the broken windows could not be repaired until the war ended. "It was

impossible to stay there in the condition our home was in." Having no family, few friends and

little money, the couple fled to Jerusalem where they were given a key to a friend's apartment.

The apartment was "completely empty and unfurnished" and Elisheva "had to sleep on the floor

the entire duration of the war."

The night they arrived in Jerusalem, Avishai got into an altercation with two Arab men in

the Old City which "led to his arrest and ultimately to his year-long incarceration." According to

Elisheva, Avishai "just lost control," which she said was "uncharacteristic" and a reaction to the

events of that stressful day. Following Avishai's imprisonment, Elisheva felt a sense of

helplessness that was "almost too great to bear." Her despair was exacerbated by the fact that,

"on top of barely speaking the Hebrew language and not knowing anyone who could help or

assist [her], [her] life partner had been thrown in jail and [she] was left to deal with the situation

completely on [her] own."

Prior to the war, Elisheva worked for a Tzfat company organizing conventions for

visiting tourists. The war, however, "brought tourism in Tzfat to a grinding halt and the Tzfat

branch of our company that had previously been extremely successful, especially in the summer

months, was forced to completely shut down." As a result, Elisheva's employer was unable to pay her salary "or any compensation even later on," resulting in "substantial financial difficult[y]," as she was paying for her living expenses in Jerusalem while simultaneously paying rent in Tzfat. Following the war, Elisheva was unable to return to Tzfat, as "[t]he feeling of safety and peace I once had there was now lost forever."

Elisheva sums up the impact the rocket attacks had on her life as follows: Her "family was destroyed" as Avishai became a "changed man – for the worse"; she lost her "sense of security"; and "suffered great emotional, financial and mental trauma." According to Elisheva, her precarious financial situation coupled with her preoccupation with relocating and finding new employment made it impossible to seek psychological or other professional help. "Without this help, I continue to feel the effect of the trauma I underwent every day and probably will for many years to come."

**ANALYSIS**

Plaintiffs, in their complaints, seek damages under 28 U.S.C. §§ 1605A(c) and (d) for harms and injuries resulting from Defendants' "extreme, wanton, willful and malicious" conduct (09-646 (ECF No. 1) and 10-483 (ECF No. 3)), including "disfigurement; loss of physical and mental functions; extreme pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium" (10-483 (ECF No. 3)).

It is beyond the remit of the Special Master to consider the viability of plaintiffs' common-law claims, much less ascribe damages for any breach thereof. Rather, the Special Master's inquiry is confined to analyzing plaintiffs' entitlement to those damages delineated in

the Foreign Sovereign Immunities Act ("FSIA"), namely, pain and suffering, solatium and economic damages.  28 U.S.C. 1605A(c)(4).

To recover under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent' as any other default winner."  *Hill v. Republic of Iraq,* 328 F.3d 680, 683-84 (D.C. Cir. 2003) (citation omitted).  In the context of a default judgment, courts in this jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages."  *Rhodes v. U.S.*, 967 F.Supp.2d 246, 313 (D.D.C. 2013) (emphasis in original) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)).  Accordingly, plaintiffs must prove future damages to a "reasonable certainty," or by a preponderance of the evidence, and must prove the amount of damages by a "reasonable estimate."  *Hill*, at 684.  For past losses, a plaintiff must, similarly, "prove the fact of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997), yet need only "reasonably prove" the amount of damages.  *Hill*, at 684.  In fashioning an award, the Special Master may consider any "special problems of proof arising from the defendant's absence."  *Id.*, at 685.

Upon consideration of the facts presented, and in light of the aforementioned legal framework, the Special Master finds, for the reasons set out below, that Avishai Reuvane and Elisheva Aron are entitled to compensatory damages for the pain and suffering they have endured.  The Special Master also finds that neither Avishai nor Elisheva is entitled to solatium damages or damages for economic loss.

### Pain and Suffering

In determining a proper damage award for Avishai and Elisheva, the Special Master is guided by prior decisions awarding damages to victims of terrorism, mindful of the inherent

difficulty in "assess[ing] the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Valencia v. Islamic Republic of Iran*, 774 F.Supp.2d 1, 14 (D.D.C. 2010). The Special Master is equally mindful that previous damages awards, while instructive guidelines, "are not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010), and, therefore, "strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009) (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

Courts consider a "myriad of factors" when assessing damages for surviving victims of terrorist hostilities. These factors include: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson v. Islamic Republic of Iran* ("*Peterson II*"), 515 F.Supp.2d 25, 52 n. 26 (D.D.C. 2007) (citing *Blais*, 459 F.Supp.2d at 59). Calculating damages begins with the baseline assumption that persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Davis v. Islamic Republic of Iran*, 882 F.Supp.2d 7 (D.D.C. 2012) (citing *Peterson II*). This amount serves as a lodestar and can deviate upward in the presence of "severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 84 (D.D.C. 2010) ("*Valore II*"), or downward in the face of "minor shrapnel injuries or minor injury from small-arms fire." *Id.*

For victims such as Avishai and Elisheva, who "suffer[ed] severe emotional injury without physical injury, this Court has typically awarded . . . $1.5 million." *Harrison v. Republic*

*of Sudan*, 882 F.Supp.2d 23, 49 (D.D.C. 2012) (citing *Valore II*, 700 F.Supp.2d at 85).  *See also*

*Brown v. Islamic Republic for Iran*, 872 F.Supp.2d 37, 42 (D.D.C. 2012); *O'Brien*, 853

F.Supp.2d at 47; *Peterson II*, 515 F.Supp.2d at 56 (D.D.C. 2007*).*

 The Special Master finds that Avishai Reuvane and Elisheva Aron, through testimony

and supporting documentation, have established a cause of action and demonstrated a right to

recover against the defendants.  The evidence confirms that Avishai was impacted directly by the

rockets launched against the city.  One of those rockets hit the roof of a neighboring house while

another landed on the house directly adjacent, throwing him across the room and rendering him

unconscious.  Avishai describes being overcome by an "overwhelming fear" which forced

Elisheva and him to abandon their home in the middle of the night.  Avishai attributes his

altercation in Jerusalem and subsequent incarceration to the fragility of his mental state and to

his sensitivity to "even minor things."  He claims to experience a "constant state of anxiety," to

live in "constant fear" and to be unable to "concentrate on the future" or "rebuild his life."

 Elisheva was equally traumatized by the bombings, she recalls the overwhelming fear

that made them flee Tzfat the first night of the rocket attacks, being forced to relocate to an

unfurnished apartment in Jerusalem and losing her only source of income while simultaneously

incurring greater expenses.  She also describes her sense of solitude as a result of Avishai's

incarceration.

 The Special Master finds that both Avishai and Elisheva suffered "severe emotional

injury" as a direct result of the Hezbollah rocket attacks.

### Solatium Damages

 Avishai and Elisheva's prayers for solatium raise issues of first impression in the context

of the Foreign Sovereign Immunities Act.  To date, FSIA solatium claims have been filed by

family members not in proximity to the terrorist activity. Avishai and Elisheva, however, were together during the attacks. As such, each was a victim potentially entitled to recover for his or her own pain and suffering as well as a victim with a potentially colorable claim to recover for the emotional trauma they endured as a result of the "extreme and outrageous conduct" visited on the other.

Solatium damages are designed "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as well as the harm caused by the loss of the decedent's society and comfort." *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379, 402 (D.D.C. 2015) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 25 (D.D.C. 2011)) (internal quotation marks and alterations omitted). Solatium awards have "also been applied to cases where the victim survived a terrorist attack." *Oviessi*, 768 F.Supp.2d at 26 n. 10. Unlike lost wages which may easily be calculated, however, solatium damages do not readily lend themselves to quantification using "models and variables." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000) (*quoting Flatow v. Islamic Republic of Iran*, 999 F.Supp.2d 1, 32 (D.D.C. 1998)). Courts, therefore, look for guidance in "prior decisions." *Acosta v. The Islamic Republic of Iran*, 574 F.Supp.2d 15, 29 (D.D.C. 2008).

A review of "prior decisions" reveals that family members in direct lineal relationship are "presume[d] . . . to suffer compensable mental anguish[,] . . . and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Kim v. Democratic People's Republic of Korea*, 87 F.Supp.3d 286, 290 (D.D.C. 2015) (quoting *Oveissi*, 768 F.Supp.2d at 25). The presumption of mental anguish arises given terrorists' acknowledged aim of causing "the highest degree of emotional distress, literally, terror." *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002). *See also Greenbaum*

*v. Islamic Republic of Iran*, 451 F.Supp.2d 90, 104 (D.D.C. 2006) ("Terrorists seek to cause extreme suffering in order to achieve political ends; accordingly, they perpetrate acts that are deliberately outrageous").

For family members of deceased victims of terrorism, this Court has established a framework whereby the amount of the award is contingent upon the "'nature of the relationship' between the family member and victim" and "'the severity of the pain suffered by the family member.'" *Heiser I,* 466 F.Supp. 2d at 269 (quoting *Haim*, 425 F.Supp.2d at 75). To lend uniformity to the analysis and avoid disparate awards, this Court has approved the following awards: $8 million for spouses; $5 million for parents and $2.5 million for siblings. *Id.* Children of a deceased victim typically receive an award of $3 million. *O'Brien*, 853 F.Supp.2d at 46–47.

For relatives of surviving victims who have been physically injured as a result of terrorist attacks, courts have applied a similar framework whereby "awards are 'valued at half of the awards to family members of the deceased' – $4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively," *Anderson v. Islamic Republic of Iran*, 839 F.Supp.2d 263, 266 (D.D.C. 2012) (quoting *Oveissi*, 768 F.Supp.2d at 26 n. 10 (D.D.C. 2011)), and $1.5 million for children. *Id.*, 839 F.Supp.2d at 266. *Cf. Onsongo v. Republic of Sudan*, 60 F.Supp.3d 144, 151 (D.D.C. 2014) (awarding $2.5 million to children of injured victims of terrorism); *Peterson II*, 515 F.Supp.2d at 51) ($2.5 million to child of injured victim). Finally, this Court has held that relatives of surviving victims presenting with emotional trauma and no physical injury should receive amounts proportionally less than those with physical injuries, namely, $1 million for spouses; $850,000 for parents; $750,000 for children, and $500,000 for siblings. *See Davis v. Islamic Republic of Iran*, 882. F.Supp.2d 7, 16 (D.D.C. 2012).

Notwithstanding the "presumption" that family members "suffer compensable mental anguish," *Kim*, 87 F.Supp.3d at 290, "[l]ines must be drawn in the award of this form of damages and one such line includes a situation like this, where *no* evidence is offered to show injury that an award of solatium damages might compensate." *Roth*, 78 F.Supp.3d at 406 (emphasis in original).  Apropos of Avishai's claims, no such evidence exists.  Avishai's testimony focused exclusively on the trauma he suffered personally due to the 2006 rocket attacks.  He offers no testimony, directly or through his statements to Dr. Strous, explaining how he was impacted by Elisheva's suffering.

Elisheva's testimony is similarly unsupportive of her request for solatium damages.  Her financially precarious position and lost sense of security appear a direct result of the rocket attacks not her husband's emotional state.  Similarly, the "destr[uction]" of Elisheva's family coupled with her sense of alienation and loneliness is not ascribed to Avishai's trauma but to his conduct, namely, his violent altercation with two Arab men in Jerusalem which led to a year-long incarceration.  And aside from their personal speculation, neither Avishai nor Elisheva has demonstrated a causative link between Avishai's experience during the Hezbollah incursion and the violent conduct which led to his imprisonment.  Nor is such a connection supported by Dr. Strous' Expert Report.

Even had Dr. Strous suggested such a connection, the supposition that the rocket attacks caused Avishai's criminal behavior which, in turn, caused Elisheva's feelings of alienation, is simply too tenuous,  To find liability under the FSIA, the offending state sponsor of terrorism must have "caused" a plaintiff's injury. 28 U.S.C. § 1605A(c).  The word "caused" in this context has been defined as "proximate cause," meaning, "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered."  *Brewer v.*

*Islamic Republic of Iran*, 664 F.Supp.2d 43, 54 (D.D.C. 2009) (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir .2004)).  Courts in this jurisdiction have applied the laws of the District of Columbia as "an appropriate model for the development of a federal standard with respect to liability in actions against state sponsors of terrorism." *In re Terrorism Litig.*, 659 F.Supp.2d at 100.

The District of Columbia Court of Appeals defines proximate causation "as that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *District of Columbia v. Zukerberg*, 880 A.2d 276, 281 (D.C. 2005) (internal quotation marks and citation omitted).  An "intervening negligent or criminal act," however, "breaks the chain of causation if it is not reasonably foreseeable." *McKethean v. Wash. Metro. Area Transit Auth.*, 588 A.2d 708, 716 (D.C. 1991).  Here, aside from Elisheva's financial instability and lost sense of security, which were directly attributable to the rocket attacks, the evidence suggests that Elisheva's trauma over her isolation and the dissolution of her relationship arose as a result of Avishai's criminal actions, his resulting detention and his subsequent drinking and drug abuse – none of which could be considered a "reasonably foreseeable" consequence of the Hezbollah incursion. Accordingly, the Special Master finds Elisheva not entitled to receive solatium damages.

**Economic Damages**

Section 1605A(c) contemplates recovery of economic damages.  *See Moradi v. Islamic Republic of Iran*, 77 F.Supp.3d, 57, 71 (D.D.C. 2015) ("as a general rule, lost earnings – past and future – are compensable damages").  Such damages, however, must be proven "by a reasonable estimate," *Reed v. Islamic Republic of Iran,* 845 F.Supp.2d 204, 213 (D.D.C.2012), supported by corroborative evidence.  *See Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 230 (D.D.C.

2012) (where this Court denied claims of economic harms where "plaintiffs [] failed to introduce any evidence of what costs specifically were incurred" and sought damages for a "lost business opportunity" based on a "speculative" conjecture and sought reimbursement for "travel expenses" without "any evidence supporting this claim").

Elisheva makes several allusions in her testimony to the financial hardships she endured beginning with the shutdown of her employer's business, her subsequent unemployment and being compelled to simultaneously pay for living expenses in two locations. Elisheva quantifies none of those losses, however and appends no documentation from which an award can be fashioned.

Accordingly, the Special Master recommends no economic damages be awarded.

**CONCLUSION**

In light of the foregoing, the Special Master recommends that Avishai Reuvane and Elisheva Aron each be awarded One Million Five Hundred Dollars ($1,500,000) in compensatory damages for pain and suffering.

Dated: April 2, 2016                                      Respectfully submitted,

                                                         By:*/s/ Alan L. Balaran*
                                                         Alan L. Balaran, Esq.
                                                         Special Master