# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **CHAIM KAPLAN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-00646 (RCL)** |
| | ) | |
| **HEZBOLLAH, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **CHAIM KAPLAN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10-00483 (RCL)** |
| | ) | |
| **THE CENTRAL BANK OF THE** | ) | |
| **ISLAMIC REPUBLIC OF IRAN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT OF SPECIAL MASTER
## PURSUANT TO ORDER OF REFERENCE
## REGARDING THE CLAIMS OF
## BRIAN, KARENE, MAYAN, NOA, NETIYA AND ARIEL ERDSTEIN

This action is brought by Brian and Karene (spelled alternatively in the complaint as "Keren") Erdstein (spelled alternatively in the complaint as "Ardstein") and their children, Mayan (spelled alternatively in the complaint as "Ma'ayan or in the medical report as Maayan"), Noa, Netiya and Ariel, under 28 U.S.C. § 1605A. The Erdsteins are seeking damages for injuries they sustained as a result of a barrage of rockets fired by Hezbollah from Lebanon into northern Israel in July 2006. Under the Administrative Plan Governing Special Masters, and pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received testimony

and reviewed documentary evidence to assist in determining any damages to which the Erdstein family may be entitled.

## BACKGROUND

On July 12, 2006, Hezbollah launched a surprise attack against Israel killing eight Israeli Defense Force soldiers and kidnapping two others at the Israeli/Lebanese border.  Israel responded with airstrikes against Hezbollah-held positions in Southern Lebanon; Hezbollah retaliated with katyusha rockets and mortars fired against Israeli communities located close to the border.  One of those cities was Safed ("Tzfat").  A United Nations-brokered cease-fire took effect on August 14, 2006.  *See* U.S. Congressional Research Services, *Lebanon: The Israel-Hamas-Hezbollah Conflict* (RL3356, updated September 15, 2006) by Jeremy M. Sharp.

### The Islamic Republic of Iran

The statutory scheme underpinning actions against the Islamic Republic of Iran has been exhaustively recounted in *In re: Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31 (D.D.C. 2009), obviating the need for recapitulation.  This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for facilitating, financing and providing material financial and logistical support to help carry out attacks on United States citizens.  *See, e.g.*, *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 45-46 (D.D.C. 2012); *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007) ("*Valore I*"); *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229, 254 (D.D.C. 2006) (*Heiser I*); *Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d 46, 61 (D.D.C. 2003) ("*Peterson I*").  This Court found so in this case, as well.  *See* Memorandum Opinion (July 23, 2014), at 2 (Case No. 1:10-cv-00483 (ECF No. 54)) ("July 23 Memorandum").

**The Democratic People's Republic of Korea**

In 1988, the State Department designated the Democratic People's Republic of Korea ("North Korea") as a "state sponsor of terrorism." *See Notice, Determination Pursuant to Section 6(j) of the Export Administration Act of 1979: North Korea*, 53 Fed. Reg. 3477 (Feb. 5, 1988). The State Department rescinded that designation on June 26, 2008. *See Certification of Rescission of North Korea's Designation as a State Sponsor of Terrorism*, 73 Fed. Reg. 37351. Courts have held North Korea responsible for offering direct support to terrorist organizations that have carried out attacks in Israel. S*ee, e.g., Calderon-Cardona v. Dem. People's Republic of Korea*, 723 F.Supp.2d 441, 452 (D.P.R. 2010); *Massie v. Government of Democratic People's Republic of Korea* 592 F.Supp.2d 57, 73 (D.D.C. 2008). In the July 23 Memorandum, this Court found that North Korea provided "material aid to Hezbollah in three ways: weapons, training, and tunnels to help carry out the attacks." July 23 Memorandum, at 6.

**PROCEDURAL HISTORY**

Based on the events of July and August, 2006, Plaintiffs filed a complaint on April 8, 2009 against Hezbollah under the Antiterrorism Act, 18 U.S.C. § 2333(a), and against North Korea under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c) (Case No. 1:09-cv-00646 (ECF No.1)). On March 23, 2010, Plaintiffs filed a second complaint, this time against the Central Bank of the Islamic Republic of Iran; Bank Saderat, Iran; Bank Saderat, PLC and the Islamic Republic of Iran, alleging these entities provided "extensive material support and resources to Hezbollah, that caused, enabled and facilitated" the Hezbollah rocket attacks. Plaintiffs are asking for damages under 28 U.S.C. §§1605A(c) and (d) and 18 U.S.C. § 2333(a) (Case No. 1:10-00483 (ECF No. 3)). This Court subsequently dismissed the statutory claims against Hezbollah on August 20, 2013, (09-646 (ECF No. 50)), and against Bank Saderat of Iran and Bank Saderat, PLC on November 5, 2010 (10-483 (EFC No. 16)). On August 20, 2015,

plaintiffs voluntarily dismissed their common-law claims against Hezbollah (09-646 (ECF No. 63)).

Neither North Korea nor Iran responded to the complaints and plaintiffs subsequently moved for entry of default on May 12, 2014 (09-646 (ECF No. 53) and 10-483 (ECF No. 51)). A hearing was convened on May 27, 2014 to determine defendants' liability during which plaintiffs produced expert witnesses who, in accordance with 28 U.S.C. § 1608(e) (requiring plaintiffs to establish their right to relief by "evidence that is satisfactory to the court"), attested to Iran's and North Korea's complicity in Hezbollah's 2006 attacks against Israel.  Based on this testimony, the Court entered judgment by default against the two nations (09-646 (ECF No. 57) and 10-483 (ECF No. 54)).

On October 1, 2014, this Court appointed the undersigned as special master to be governed by the Administrative Plan Governing Special Masters previously adopted in *O'Brien v. Islamic Republic of Iran*, Case No. 1:06-cv-0690 (RCL).  *See* 09-646 (ECF No. 58) and 10-483 (EFC No. 55)) ("Order of Reference").  The Court specifically directed the Special Master to issue reports recommending the amount of compensatory damages to which he believed each plaintiff was entitled and to "take and report on evidence of each plaintiff's qualification for relief under § 1605A(c) and the familial relationships between plaintiffs and victims of the rocket attacks in Israel committed between July 12, 2006 and August 14, 2006."  *Id.*

Pursuant to these directives and in keeping with the Federal Rules of Evidence, the Special Master makes these findings and recommendations.

**FINDINGS OF FACT**

1.      Brian Erdstein was born on September 30, 1970 in Michigan.  A copy of his passport, filed with this Court on May 10, 2012, confirms that, at all relevant times, Brian was a United States citizen.

2.      Karene Erdstein was born on January 22, 1976 in Ohio.  A copy of her passport, filed with this Court on May 10, 2012, confirms that, at all relevant times, Karene was a United States citizen.

3.       Brian and Karene Erdstein's children, Mayan, Noa and Netiya Erdstein were born in Tel Aviv in 1996, 1997 and 2001, respectively.  Copies of their passports, filed with this Court on May 10, 2012, confirm that, at all relevant times, each was a United States citizen.

4.      A copy of Ariel's passport was neither filed with this Court nor provided to the Special Master.

5.      In July 2006, Hezbollah launched a series of rocket attacks against Israel.  One of the cities shelled was Tzfat, where the Erdsteins were residing.

**Testimony of Brian Erdstein**

Brian Erdstein provided his testimony by Declaration dated March 29, 2012.  *See Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F.Supp.2d 152, 163 (D.D.C. 2013) (accepting proof of damages under the Foreign Sovereign Immunities Act by affidavit and documentary evidence).  Brian affirms he is an American citizen, residing in Tzfat, Israel with his wife, Karene and their five children – "four of whom were alive" during the 2006 rocket attacks.  Brian and Karene met in Jerusalem and were married on April 1, 1996.

Brian recalls hearing "several loud explosions" on July 13, 2006 which he believed, based on his experience, were the result of jets breaking the sound barrier.  That afternoon, Brian

was standing in his courtyard when a rocket "passed right over [his] head." He "could actually feel the heat of the rocket" on his skin, an experience he describes as "surreal and terrifying." The rocket exploded a few houses away and was followed by several more explosions in quick succession. Brian realized the community was under siege. Still in a state of shock, Brian climbed atop his roof to survey the nearby damage. He recalls observing "a plume of smoke two stories high just down the road."

Approximately twenty minutes later, another rocket barrage began. "This time after the loud explosions made by impact, [Brian] heard complete silence, which was then followed by a very eerie sound – a person wailing in grief." Neither Brian's house nor any of the homes nearby were equipped with bomb shelters, so Brian, his wife and children huddled inside their home hoping the rockets would not land in their vicinity. Brian characterizes his experience as "horrific," and recounts how he was "scared to leave the house and felt like we could be killed any moment." He recalls: "[E]veryone was crying and fearful."

After that initial barrage ended, Brian and Karene decided to flee to safety. Their neighbors, who were packing their car to leave the area, invited the Erdsteins to join them. Brian recalls leaving hastily with only a few essential items of clothing, money and cell phones.

The Erdstein family stayed initially with friends in Bat Ayin, a town about two and a half hours from Tzfat. Concerned their stay was burdensome to their friends, the Erdsteins left for Ra'anana, a town approximately 150 km from Tzfat, where they rented an apartment. Brian recounts how they were running low on money and how the family was forced to eat at a shelter for the needy, an experience he describes as "emotionally devastating." Brian "felt very embarrassed about not being able to work" or "provid[e] for [his] family." He "could see the negative impact it was having on [his] wife and children as well."

Brian testifies: "I was completely in shock from the traumatic events I had witnessed firsthand and from the fact that my family had suddenly turned into a wandering group of refugees." He was constantly "on edge" and would jump "right out of [his] skin" at the sound of a car door slamming. Under great pressure to try to provide for his family, Brian ultimately succumbed to depressive episodes during which he would be unable to get out of bed for several days. Brian recalls having difficulty "retaining a lucid thought," becoming "frustrated, short-tempered and angry" and, for the first time, starting to smoke to calm his nerves.

Brian describes the impact the rocket attacks and sudden evacuation had on his wife and children. Karene, who had "been having a perfectly healthy pregnancy," until the attacks began, suffered a miscarriage – a complication Brian attributes to the rocket attacks. According to Brian, Karene "was just too overextended by the trauma of being in a rocket attack and having to flee, then take care of all the kids when they were anxious and upset and I was out of commission and not of very much help." Brian's emotional distress rendered him unable to "accompany her to her medical operation." He stayed home and watched over the children, leaving Karene "to struggle with this trauma on her own."

Brian was also traumatized by the financial hardship his family was forced to endure as a result of the attacks. In Tzfat, Brian was the household "bread winner." He worked as a tour guide and relied on his income from the "summer tourist season" to sustain his family for the "entire year." As a result of the attacks, Brian had to cancel the tours scheduled for July and August 2006 which left him with "no money [] in the bank." His financial difficulties were aggravated by the additional expenses he incurred renting an apartment, buying new clothing, purchasing extra food and paying for transportation costs. Notwithstanding the family's attempt to economize, Brian felt compelled to ask his parents for a $4,000 loan. His inability to repay

that debt has caused "considerable tension" between Brian and his parents.  He notes that the Israeli government offered no support at all.

Following their return home, it took several months for Brian to earn a steady income. Having "learned the hard way that we just can't be in a situation where we are forced to flee our home again," Brian secured a bank loan for $10,000 and built a bomb shelter under their house.

Brian believes his emotional state has improved since the rocket attacks, yet characterizes himself as "less positive and friendly."  He experiences "difficulty concentrating," and suffers from flashbacks of "rockets whizzing" over his head.  Brian avoids "all media" as he is "afraid of hearing" something which will remind him of the 2006 rocket attacks.

Brian recounts how the events of July 2006 traumatized his eldest daughter Mayan, who was ten-years old at the time.  Brian observes that, "[s]ince the war she became very tense; loud noises make her jumpy and cause her to act aggressively."  Mayan "refused therapy" and "kept her feelings bottled up inside."  It is now clear to Brian "how detrimental an impression the war made on her."  Brian notes that Maya wrote a "beautiful song" called "War," in which she recounts "the pain she feels about war." At the time Brian provided his testimony, Mayan was living at a boarding school "better equipped to provide her with the help she needs."

Mayan attempted suicide in 2012.  Brian did not specify whether this occurred while she was at boarding school or at home.  Brian is "hopeful that getting professional help now will enable her to come away from the brink, though we know that any kind of normal life for her is likely to require a lot of work and time for healing."

Brian testified that his other children, "were very little at the time," and although he "can't point to a direct change in their behavior," he believes "the effects of the period of rocket attacks undoubtedly dramatically influenced their lives. We changed from a happy, functioning

home to a trauma-struck family; their parents and older sister changed almost without recognition."

Brian provided a Supplemental Declaration dated July 21, 2015 attesting to the fact that a $4,000 loan he secured from his mother remains unpaid due to his "physical, emotional and financial distress."  In support, Brian enclosed a letter from his mother, Janice Erdstein, dated January 31, 2012, "certify[ing]" that "Baruch [Brian] and Batya [Karene] Erdstein borrowed the sum of $4,000 US (Four Thousand and no/100 Dollars) from me during the summer of 2006 to cover family living expenses."  According to Ms. Erdstein, the "expenses were the necessary result of the Hezbolla shelling of norther Israel cities and towns, including Zefat, the Erdstein family home."  She confirms that "as of [January 31, 2012], the debt remains unpaid."

### Dr. Rael Strous re: Brian Erdstein

Dr. Rael Strous is the Director of the Chronic Inpatient Unit of the Be'er Yaakov Mental Health Center and an Associate Professor of Psychiatry at the Sackler Faculty of Medicine of the Tel Aviv University.  Dr. Strous submitted a Declaration dated January 30, 2012 in support of Brian Erdstein's claims.  Dr. Strous' testimony concerning the psychological trauma suffered by victims of terrorism has been accepted by courts in this circuit.  *See, e.g., Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56, 60 (D.D.C. 2006); *Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d 258, 267-78 (D.D.C. 2003).  Attached to his Declaration, Dr. Strous included a copy of his evaluation notes from his January 26, 2012 session with Brian.

In his Declaration, Dr. Strous observes: "Mr. Erdstein displays some form of PTSD, depression and Adjustment disorder either currently or in the past as result of being directly exposed to rocket fire and its aftermath of fleeing his home town during the second Lebanon war."  Dr. Strous predicts that "many of [Brian's] symptoms with which he has been diagnosed

are likely to be present in varying degrees for a significant amount of time to come and while it is impossible to state for any absolute certainty, many of the symptoms may even be permanent."

During his session with Dr. Strous, Brian expressed how "he felt the reverberations of the rocket which comes back to haunt him in flashbacks" of that day in his courtyard.  Brian informed Dr. Strous that that, "[f]or months [after the rocket attacks] any loud noise would make him jump," and how these noises "would precipitate a major stress response (as he reports) with associated sweating and intense anxiety."  Brian described "his mood as being very low during this time due to intense stress, guilt about not being able to do something about the problem, and guilt about not being able to care appropriately for his wife and children."  According to Brian, "[h]is depression and stress resolved slowly over a period of 4 months (2 months after the war)."

Brian informed Dr. Strous "that his life irreversibly changed" – he suffers from "chronic depression," has difficulty concentrating, is "more impatient and irritable," is "fatalistic about his future" and is "claustrophobic."

Dr. Strous' stated prognosis is that Brian Erdstein "in many ways" has "returned to some form of normality in function," although "continues to harbor some anxiety and residual PTSD symptomology affecting his function."  He concludes: "It is not expected that these scars will resolve too soon, at least not in the short to medium term, and they will continue to affect his function in the near future as described above."

Dr. Strous diagnosed Brian as suffering from "Chronic dysthymia (moderate), Adjustment Disorder with Depressed Mood and Partial PTSD."

**Testimony of Karene Erdstein**

Karene Erdstein provided her testimony by Declaration filed with this Court on May 10, 2012.  Karene affirms she was born in Ohio in 1976, is a United States citizen, and currently resides in Tzfat, Israel with her husband, Brian and their five children.

According to her Declaration, Karene was in her kitchen preparing a meal on the afternoon of July 13, 2006, when "a series of rocket explosions rocked our house." One of Karene's neighbors was killed as a result.  Her children were "obviously frightened" and Karene's oldest daughter, Mayan, "who was eight at the time, was completely hysterical." Karene recalls Mayan "clinging on to me tightly, shrieking and crying at the same time, and could not be consoled."  Karene's other children "were also quite afraid and were latching on" to her.  Karene recalls "doing everything [she] could to calm them down, and to keep [her]self calm especially as [she] was four months pregnant at the time."

Following a second barrage of explosions, Karene and Brian decided to evacuate their home.  They did not own a car but were able to share a ride with their neighbors who were also fleeing Tzfat.  They left quickly with only a few articles of clothing and very little money.

Having no "close family" in Israel, the Erdsteins opted to stay with friends in Bat Ayin, "a community near Jerusalem."  After a few days "it became abundantly clear that we were imposing on the goodwill of our hosts, and we resolved to move on even though we had nowhere to turn."  Informed that many refugees from the rocket attacks were fleeing to a city called Ra'anana "where relatively inexpensive monthly rentals could be obtained," the Erdsteins rented a one-bedroom apartment with the help of a $4,000 loan from Brian's parents.  To save money, the family ate their meals at a shelter for "indigent families."  Karene explains that Brian suffered "terribly" during this time "to the point of being incapacitated – from the trauma of

witnessing one of the rocket attacks and from being forced from our home." Brian "was unable to help out with the kids," according to Karene.

Karene recounts how her health began deteriorating. She was "becoming increasingly over-extended" and was "depressed and had extremely low energy." She found it "hard to breathe fluidly" and experienced "heart palpitations." At one point she began bleeding and "immediately made an appointment for an ultrasound" which revealed that her unborn child had "no heartbeat." Karene, who was able to discern the baby's "hand and feet" on the monitor, was devastated. "I felt like someone had just punched me hard in the stomach and I was gasping for breath. My head was spinning." The doctor advised her to return the following day for a dilatation and curettage procedure ("D&C"). Karene ran from the doctor's office and stood on the street "sobbing uncontrollably." She remembers feeling sick and "so alone" as Brian remained at home to watch the children. According to Karene, he was "barely managing even that."

Karene spent that night with a friend and took the medication prescribed by her doctor which produced "a labor-like response" and "terrible cramps." Karene barely slept as she suffered from the cramping and the distress over losing her child. Karene underwent the D&C procedure the next day. Karene attributes the loss of her baby to "the extra trauma of surviving a rocket attack, being chased out of our home, being homeless and cash strapped, imposing on friends and eating in shelters, and having to take care of the children essentially all on my own – it was simply too much for me."

After she was discharged from the hospital, Karene returned to the rental apartment. She immediately fell ill with a high fever and began vomiting. Karene was diagnosed with tonsillitis and prescribed medication which resulted in even more nausea. She experienced "heavy uterine

bleeding" and "started experiencing post-partum depression." Karene had difficulty coping with her children and "at times . . . wanted to die."

Following the cease fire, the Erdsteins returned to Tzfat. Karene explains that the loss of income caused by the interruption of the tourist season was financially devastating. In addition, Karene and Brian both "fought with depression and constant nervousness, the loss of our baby and our damaged relationship with each other due to the tremendous stress this whole ordeal has put on our marriage." According to Karene, Brian became "increasingly anxious about another bomb attack" and "borrowed a large sum from the bank – that we're still paying off six years later – to build a bomb shelter" under their home. Karene describes Brian as "compulsive" about maintaining the shelter.

Karene testifies that the rocket attacks impacted her professional career, as well. After the war, she enrolled in "two extra years of nursing school" to become a midwife and then studied for "a very challenging exam" to earn her credentials. Karene abandoned her career, however, testifying: "I just can't handle the stress of this type of work anymore. My nerves are shot now. The miscarriage also created some long term images that continue to haunt me. So sadly, I just don't feel capable of following through anymore with what, prior to the war, had been one of my major life goals."

Karene describes the impact the rocket attacks had on her daughter Mayan, who, at the time Karene executed her Declaration, was living at a boarding school that offers "counseling for teens with issues like hers." She observes that, since the war, Mayan has "been caught in a downward spiral." Mayan became "moody and extremely jumpy," which Karene attributes to the war. Mayan initially refused therapy and "stayed very closed." Karene reports that Mayan attempted suicide, following which she agreed to see a psychiatrist.

Karene was unable to "point to a direct change in the[] behavior" of her other children resulting from the Hezbollah attacks, "since they were very little." She believes, nonetheless, "the effects of the war undoubtedly dramatically influenced their lives. Previously a happy, functioning home, we became a trauma-struck family, with parents and an older sister changed almost beyond recognition."

**Dr. Rael Strous re: Karene Erdstein**

Dr. Strous provided a Declaration dated January 30, 2012 in addition to two "Psychiatric Evaluations" ("PEs") in support of Karene's claims. The first PE is dated January 26, 2012 ("PE1"); the second, denominated as an "addendum," is dated July 26, 2015 ("PE2").

In his Declaration, Dr. Strous states that he examined Karene and found she "displays some form of PTSD, depression and Adjustment disorder either currently or in the past as a result of being directly exposed to rocket fire and its aftermath with fleeing her home town and undergoing a miscarriage 2 weeks after leaving her home during the second Lebanon War." He predicts Karene's symptoms "are likely to be present in varying degrees for a significant time to come and while it is impossible to state for any absolute certainty, many of the symptoms may even be permanent."

Dr. Strous reports that Karene informed him that, "following the war and the resolution of the intensity of her depression, she completed her dream of passing midwifery examinations. However due to her persistent anxiety and stress levels she feels she could not function as a midwife." Psychological tests administered by Dr. Strous revealed a "presence of moderate depression." He notes that, "[w]hile in many ways she has returned to some form of normality in function, she continues to harbor residual dysthymia and partial PTSD following the events of 2006." Dr. Strous further observes that, "[m]emories of the time affect her function both

emotionally and occupationally" and that "[t]he scars of this period are expected to remain with her for a significant period of time."

Karene informed Dr. Strous that she suffers from "chronic depression since the event," resulting in her inability to pursue her chosen career due to "chronic anxiety."  She also described how the Hezbollah attacks had an "adverse [] impact" on her marriage and that she reports an increased sensitivity to loud noise and experiences "flashbacks of the event of the war and the miscarriage."

Dr. Strous notes in PE1 that Karene was "4 months pregnant at the time and remembers the intense shock and bewilderment she experienced."  Karene reported suffering from uterine bleeding which ultimately led to a miscarriage.  In Dr. Strous' opinion, Karene's "uterine bleeding" was "clearly due to the fear, anxiety and stress of the move" after fleeing from the rocket attacks.  He further observes that Karene also "has no doubt that the miscarriage was due to her stress from the rocket explosions and having to move suddenly out of her home city with her family."

Following her miscarriage, Karene continued to feel traumatized, suffering from a "low mood which only worsened over time in the months after the event" and described, what Dr. Strous characterized as, "aspects of post-partum depression which is not uncommon after miscarriage similar to post-partum depression after a normal healthy delivery."

Dr. Strous diagnosed Karene as suffering from "Chronic dysthymia (moderate), Adjustment Disorder with Depressed Mood and Partial PTSD."

In PE2, Dr. Strous reports that he receive a letter from Karene's midwife, Meredith Benzion.  In her letter, Ms. Benzion informed Dr. Strous that she has known Karene for ten years; that she served as her midwife in 2007-2008; and that Karene had a "normal obstetrical

history prior to the devastating miscarriage she suffered in late July of 2006, during which time she was a war refugee." A copy of this letter was supplied to the Special Master on July 28, 2015. In Ms. Benzion's "professional opinion," the "terror of suddenly being a war-zone, the trauma of having to flee with her family, the stress of being homeless and without support, very likely caused or greatly contributed to the loss of her pregnancy, which in her case proved life-threatening." According to Ms. Benzion, Karene has never "fully recovered."

Dr. Strous concludes that "[t]his statement by Ms. Erdstein's midwife only adds further support to and strengthens my professional evaluation and diagnostic formulation in my original 2012 report." Dr. Strous also references an article entitled "Post-Disaster Reproductive Health Outcomes," published in the July 2013 issue of Maternal and Child Health Journal, as "support[ing] such an association in certain cases."

## Mayan Erdstein

Dr. Rael Strous evaluated Mayan on June 29, 2015. At the time, Mayan was 19 years old and five months into her year of post-high-school national service. According to Dr. Strous, Mayan, who "was 10 years old at the time," remembers little of the rocket attacks except for going to a shelter with her family and that one of her neighbors was injured as a result of the bombing.

Dr. Strous reports that, after the cease fire, Mayan suffered a "strong anxiety response," manifesting in "terrible nightmares," "bedwetting," "fear of closed spaces" and an "intense fear of loud noises." Mayan described an "inordinate amount of stress" in the house which caused her to leave home when she was 15 years old because she "simply could not deal and cope with the tense atmosphere at home." Mayan reported being placed in a "therapeutic dormitory based on an agricultural facility in the Jordan valley," at which time she stopped communicating with

her parents.  After two years at the agricultural facility, Mayan transferred to another facility in the "south of the country," "for children at risk."  She remained at this facility for one year and then moved in with "an aunt in Ra'anana."

Mayan describes her teenage years as a time during which she suffered from depression which manifested in a "chronic inability to sleep," "poor memory," "intense sadness," "social withdrawal," "associated intense anxiety," and an inability to continue "her favorite hobby – playing music."  Mayan reports "feeling so depressed at times that she would cut herself on an infrequent basis."  Mayan also "unequivocally" believes that the "mood and anxiety problems began with the war and continued after."  According to Dr. Strous, Mayan "feels it is a miracle that she is still alive due to her frequent thoughts of suicide in the past."

Dr. Strous reports that, "[a]fter suffering for a long time," Mayan sought "and was granted help in the form of psychiatric hospitalization in the Be'er Sheba Mental Health Center. There she spent a period of 2 weeks intensive impatient treatment."  At Be'er Sheba, Mayan was "diagnosed with depression" and was prescribed medication which she took for "approximately 18 months."  Mayan's Discharge Summary from Be'er Sheba "confirmed psychiatric hospitalization from 21/10/13 until 3/11/13."  Dr. Strous states that the summary "indicated initially that she had issues of violence in her house in early teens.  However she later denied this and that any of that occurred."

Dr. Strous concludes his evaluation report with the following observation: "[Mayan] suffered considerable distress and anxiety following exposure to rocket blasts in Safed [Tzfat] during the war in 2006.  Due to her resultant anxiety, low mood and interpersonal difficulties, it appears that her life trajectory has been significantly affected.  It is not expected that her strong

feelings of anxiety affecting many areas of her personal and interpersonal functioning will resolve in the short term, and they will continue to affect her for a long period of time."

Dr. Strous diagnosed Mayan with "Post-traumatic Stress Disorder, moderate" and "Persistent Depressive Disorder; mild severity, early onset with pure dysthymic syndrome."

## Noa, Netiya and Ariel Erdstein

Noa, Netiya and Ariel Erdstein neither testified nor supplied any documentation in support of their individual claims. And, as noted earlier, plaintiffs' counsel did not supply a copy of Ariel's passport, either to the Court or to the Special Master, confirming his citizenship.

## ANALYSIS

Plaintiffs, in their complaints, seek damages under 28 U.S.C. §§ 1605A(c) and (d) for harms and injuries resulting from Defendants' "extreme, wanton, willful and malicious" conduct (09-646 (ECF No. 1) and 10-483 (ECF No. 3)), including "disfigurement; loss of physical and mental functions; extreme pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium" (10-483 (ECF No. 3)).

It is beyond the remit of the Special Master to consider the viability of plaintiffs' common-law claims, much less ascribe damages for any possible breach. Rather, the Special Master's inquiry is confined to analyzing plaintiffs' entitlement to those damages delineated in the Foreign Sovereign Immunities Act ("FSIA"), namely, pain and suffering, solatium and economic damages. 28 U.S.C. 1605A(c)(4).

To recover under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill v. Republic of Iraq,* 328 F.3d 680, 683-84 (D.C. Cir. 2003) (citation omitted). In the context of a default judgment, courts in this

jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages." *Rhodes v. U.S.*, 967 F.Supp.2d 246, 313 (D.D.C. 2013) (emphasis in original) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)). Accordingly, plaintiffs must prove future damages to a "reasonable certainty," or by a preponderance of the evidence, and must prove the amount of damages by a "reasonable estimate." *Hill*, at 684. For past losses, a plaintiff must, similarly, "prove the fact of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997), yet need only "reasonably prove" the amount of damages. *Hill*, at 684. In fashioning an award, the Special Master may consider any "special problems of proof arising from the defendant's absence." *Id.*, at 685.

Upon consideration of the facts presented and in light of the aforementioned legal framework, the Special Master finds, for the reasons set out below: (1) that Brian, Karene and Mayan Erdstein are each entitled to compensatory damages for pain and suffering; (2) that Brian and Karene are each entitled to solatium damages; (3) that Brian is entitled to economic damages; and (4) that Noa, Netiya and Ariel Erdstein are entitled to no award of damages for pain and suffering or for loss of solatium.

### Pain and Suffering

In determining a proper damage award for Brian, Karene and Mayan Erdstein, the Special Master is guided by prior decisions awarding damages to victims of terrorism, mindful of the inherent difficulty in "assess[ing] the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Valencia v. Islamic Republic of Iran*, 774 F.Supp.2d 1, 14 (D.D.C. 2010). The Special Master is similarly cognizant that previous damages awards, while instructive guidelines,

"are not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010),

and that "strict application of precedent could lead to conflicting conclusions about an

appropriate award."  *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009)

(*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

Courts consider a "myriad of factors" when assessing damages for surviving victims of

terrorist hostilities including "the severity of the pain immediately following the injury, the

length of hospitalization, and the extent of the impairment that will remain with the victim for

the rest of his or her life."  *Peterson v. Islamic Republic of Iran* ("*Peterson II*"), 515 F.Supp.2d

25, 52 n. 26 (D.D.C. 2007) (citing *Blais*, 459 F.Supp.2d at 59).   Calculating these damages

begins with the baseline assumption that persons suffering injuries in terrorist attacks are entitled

to $5 million in damages."  *Davis v. Islamic Republic of Iran*, 882 F.Supp.2d 7 (D.D.C. 2012)

(citing *Peterson II*).  This amount serves as a lodestar and can deviate upward in the presence of

"severe instances of physical and psychological pain, such as where victims suffered relatively

more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing,

or were mistaken for dead," *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 84 (D.D.C.

2010) ("*Valore II*"), or downward in the face of "minor shrapnel injuries or minor injury from

small-arms fire." *Id.*

The Special Master finds that Brian, Karene and Mayan, through testimony and

supporting documentation, have established a cause of action and demonstrated a right to recover

against the defendants.  The record amply reflects that the Hezbollah incursion was emotionally

devastating for them.

<u>Brian Erdstein</u>

Brian's testimony vividly describes the impact the Hezbollah attacks had on him both during and following the Hezbollah attacks.  He recounts the "surreal and terrifying" experience feeling the heat of a rocket passing directly overhead, hearing people "wailing in grief."  He recalls his "horr[or]" that he and his family "could be killed any moment" and his devastation, being forced to flee his home; losing his trade as well as his inability to provide for his family; being forced to borrow money from his parents; being forced to find food in a shelter for indigents.  Brian amply describes his bouts of depression accompanied by his difficulty "retaining a lucid thought" and becoming increasingly "frustrated, short-tempered and angry."  Brian's fragile emotional state as a result of the Hezbollah attacks were corroborated by Dr. Strous who diagnosed Brian with "Chronic dysthymia (moderate), Adjustment Disorder with Depressed Mood and Partial PTSD."

<u>Karene Erdstein</u>

Karene's testimony was equally detailed.  Karene recounts the initial rocket attacks which "rocked [her] house" and killed one of her neighbors.  She described the family's flight, first to Bet Ayin and then to Ra'anana, as well as their need to borrow money and being compelled to eat in shelters due to their dire financial straits.  Karene's testimony described her deteriorating health: "becoming increasingly over-extended," "depressed" with "extremely low energy"; finding it "hard to breathe fluidly"; and experiencing "heart palpitations."   Karene, who was four months pregnant at the time of the attack, recalls suffering from uterine bleeding which ultimately required that she undergo a dilation and curettage.  Karen vividly describes the "trauma of surviving a rocket attack, being chased out of our home, being homeless and cash strapped, imposing on friends and eating in shelters, and having to take care of the children

essentially all on [her] own." She further attested to being forced to abandon her chosen profession as a midwife, fighting "with depression and constant nervousness," mourning "the loss of [her] baby," and grappling with her "damaged relationship" with Brian "due to the tremendous stress this whole ordeal has put on our marriage." Dr. Strous clinically diagnosed Karene with "Chronic dysthymia (moderate), Adjustment Disorder with Depressed Mood and Partial PTSD."

<u>Mayan Erdstein</u>

Mayan did not provide a declaration supporting her claim. Her parents did, however, describe Mayan's reaction to the war and the trauma she later suffered. Mayan was also evaluated by Dr. Strous to whom she gave a detailed account of her experiences.

Brian testifies that, as a result of the rocket attacks Maya became "very tense" and sensitive to "loud noises" which "ma[d]e her jumpy and cause[d] her to act aggressively." Karene recounts how Mayan was "completely hysterical," "shrieking and crying" and inconsolable. She described how Mayan has "been caught in a downward spiral" and has become "moody and extremely jumpy," which Karene attributes to the war. Karene describes the impact the rocket attacks had on Mayan, who, at the time Karene executed her Declaration, was living at a boarding school that offers "counseling for teens with issues like hers.

While Mayan did not provide direct testimony, she was evaluated by Dr. Strous who reported Mayan describing a "strong anxiety response" to the rocket attacks which manifested in "terrible nightmares," "bedwetting," a "fear of closed spaces" and an "intense fear of loud noises." Mayan informed Dr. Strous that her teenage years were marked with depression, a "chronic inability to sleep," "poor memory," "intense sadness," "social withdrawal," and self-mutilation. Dr. Strous reports how Mayan was hospitalized in a psychiatric ward where she was

"diagnosed with depression" and prescribed medication.  Following his consultation with Mayan

and after reviewing her medical history, Dr. Strous diagnosed Mayan with "Post-traumatic Stress

Disorder, moderate" and "Persistent Depressive Disorder; mild severity, early onset with pure

dysthymic syndrome."

For victims such as Brian and Mayan, who "suffer[ed] severe emotional injury without

physical injury, this Court has typically awarded . . . $1.5 million."  *Harrison v. Republic of

Sudan*, 882 F.Supp.2d 23, 49 (D.D.C. 2012) (citing *Valore II*, 700 F.Supp.2d at 85).  *See also

Peterson II*, 515 F.Supp.2d at 56; *Brown v. Islamic Republic for Iran*, 872 F.Supp.2d 37, 42

(D.D.C. 2012); *O'Brien*, 853 F.Supp.2d at 47.  The Special Master finds no evidence in the

record compelling a departure from this baseline.  For Karene Erdstein, however, the Special

Master finds an enhancement appropriate.  Before recommending an award, however, some

discussion is necessary.

Aside from Karene and Brian's observations, the only evidence on record establishing a

nexus between the Hezbollah attacks and Karene's miscarriage is contained in a single statement

by Dr. Strous to the effect that Karene's "uterine bleeding" was *clearly due* to the fear, anxiety

and stress of the move."  (Emphasis added.)  Dr. Strous offers no authority for his supposition

nor does he provide any more detail.  In PE2, however, Dr. Strous elaborates by referring to a

letter from Karene's former midwife, Meredith Benzion, who attests to Karene's normal

obstetric history prior to the loss of pregnancy and who offers her "professional opinion" that the

terror, trauma and stress Karene endured as a result of the rocket attacks "greatly contributed to

the loss of her pregnancy."  In addition to Ms. Benzion's "professional opinion," Dr. Strous cites

to a single article published in the July 2013 issue of Maternal and Child Health Journal "MCHJ

Article," as one "support[ing] such an association in certain cases," adding "further support to

and strengthens my professional evaluation and diagnostic formulation in my original 2012 report."

The problems with Dr. Strous' analysis are twofold.  In the first instance, there is no evidence in the record suggesting that Ms. Benzion is qualified to render a "professional opinion" on the etiology of miscarriages, in general, or on the causative links between emotional trauma and loss of pregnancy, more specifically.  Beyond this, the MCHJ Article simply does not stand for the proposition Dr. Strous states.  *See* Attachment A. The article is merely a compendium of abstracts from 15 studies – *none* of which discuss trauma-induced miscarriages. Its authors' sole reference to pregnancy loss alludes to a single study where "the investigators examined the relationship between physical exposure [to toxicants] and spontaneous abortion." Marianne E. Zotti, et al., *Post-Disaster Reproductive Health Outcomes*, 17 Matern. Child Health J. 783 (2013).

The Special Master will, however, defer to Dr. Strous' expertise and assume his conclusions are based on studies other than the MCHJ Article and on expertise more authoritative than Karene's midwife.  Accordingly, the Special Master recommends that Karene Erdstein's injuries merit an enhancement.

<u>Noa, Netiya and Ariel Erdstein</u>

As stated, neither Noa, Netiya nor Ariel Erdstein provided testimony describing their injuries as a result of the Hezbollah attacks.  They similarly supplied no medical documentation or psychological evaluations from which the Special Master can render an informed finding. The only evidence alluding to any trauma Noa, Netiya and Ariel may have experienced were statements by Brian and Karene who acknowledge that they "can't point to a direct change in

their behavior" yet believe "the effects of the period of rocket attacks undoubtedly dramatically influenced their lives."

The Special Master does not doubt the Erdstein children may have endured some degree of trauma.  In the context of a terrorist attack, this jurisdiction recognizes such a presumption. *See Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002) ("acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience").  *See also Greenbaum v. Islamic Republic of Iran*, 451 F.Supp.2d 90, 104 (D.D.C. 2006) ("Terrorists seek to cause extreme suffering in order to achieve political ends; accordingly, they perpetrate acts that are deliberately outrageous").

This presumption, however, does not relieve the Erdstein children from proving their claim.  As "default winner[s]," Noa, Netiya and Ariel must prove damages 'in the same manner and to the same extent' as any other default winner."  *Hill*, 328 F.3d at 683-84 (citation omitted).  And to satisfactorily demonstrate their entitlement to an award, they must "prove the fact of injury with *reasonable certainty*."  *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (emphasis added).  They have failed to demonstrate such an entitlement.  Ariel's claim independently fails as there is no proof he is either a U.S. citizen or U.S. national entitled to recover under 28 U.S.C. 1605A.  Absent such proof, the Special Master must conclude he lacks the requisite standing to air his grievances before this forum.

### Solatium Damages

Brian, Karene and Mayan's prayers for solatium raise issues of first impression in the context of the Foreign Sovereign Immunities Act.  To date, FSIA solatium claims have been filed by family members not in proximity the terrorist activity.  Brian and Karene, however, were

together with their children during the attacks. Each member of the family was a victim potentially entitled to recover for his or her own pain and suffering as well as a victim with a potentially colorable claim to recover for the emotional trauma they endured as a result of the "extreme and outrageous conduct" visited on the others.

Solatium damages are designed "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as well as the harm caused by the loss of the decedent's society and comfort." *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379, 402 (D.D.C. 2015) (quoting *Oviessi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 25 (D.D.C. 2011)) (internal quotation marks and alterations omitted). Solatium awards have "also been applied to cases where the victim survived a terrorist attack." *Oviessi*, 768 F.Supp.2d at 26 n. 10. Unlike lost wages which may easily be calculated, however, solatium damages do not readily lend themselves to quantification using "models and variables." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000) (*quoting Flatow v. Islamic Republic of Iran*, 999 F.Supp.2d 1, 32 (D.D.C. 1998)). Courts, therefore, look for guidance in "prior decisions." *Acosta v. The Islamic Republic of Iran*, 574 F.Supp.2d 15, 29 (D.D.C. 2008).

A review of "prior decisions" reveals that family members in direct lineal relationship are "presume[d] . . . to suffer compensable mental anguish[,] . . . and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Kim v. Democratic People's Republic of Korea*, 87 F.Supp.3d 286, 290 (D.D.C. 2015) (quoting *Oveissi*, 768 F.Supp.2d at 25). This presumption of mental anguish arises in light of terrorists' acknowledged aim of causing "the highest degree of emotional distress, literally, terror in their targeted audience." *Stethem*, 201 F.Supp.2d at 89.

For family members of deceased victims of terrorism, this Court has established a framework whereby the amount of the award is contingent upon the "'nature of the relationship' between the family member and victim" as well as "'the severity of the pain suffered by the family member.'" *Heiser I,* 466 F.Supp.2d at 269 (quoting *Haim,* 425 F.Supp.2d at 75). To lend uniformity to the analysis and avoid disparity, this Court has approved the following awards: $8 million for spouses; $5 million for parents and $2.5 million for siblings. *Id.* Children of a deceased victim typically receive an award of $3 million. *O'Brien*, 853 F.Supp.2d at 46–47.

For relatives of surviving victims who have been physically injured as a result of terrorist attacks, courts have applied a similar framework whereby "awards are 'valued at half of the awards to family members of the deceased' – $4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively," *Anderson v. Islamic Republic of Iran*, 839 F.Supp.2d 263, 266 (D.D.C. 2012) (quoting *Oveissi*, 768 F.Supp.2d at 26 n. 10 (D.D.C. 2011)), and $1.5 million for children. *Id.*, 839 F.Supp.2d at 266. *Cf. Onsongo v. Republic of Sudan*, 60 F.Supp.3d 144, 151 (D.D.C. 2014) (awarding $2.5 million to children of injured victims of terrorism); *Peterson II*, 515 F.Supp.2d at 51) ($2.5 million to child of injured victim). Finally, this Court has held that relatives of surviving victims presenting with emotional trauma and no physical injury should receive amounts proportionally less than those with physical injuries, namely, $1 million for spouses; $850,000 for parents; $750,000 for children, and $500,000 for siblings. *See Davis v. Islamic Republic of Iran*, 882. F.Supp.2d 7, 16 (D.D.C. 2012).

These guidelines notwithstanding, this Court has imposed several equitable rules limiting the amount of solatium damages that may be received by an individual claimant. The more overarching of these rules makes "it inappropriate for the solatium awards of family members to exceed the pain and suffering awards of the surviving servicemen." *O'Brien*, 853 F.Supp.2d at

47–48.  The other principle is triggered in those instances, such as here, where a family member may be entitled to solatium damages for the trauma they suffered as a result of the injuries inflicted on more than one family member.  This question was resolved in *Wultz v. Islamic Republic of Iran*, 864 F.Supp.2d 24 (D.D.C. 2012), where this Court was asked to decide, for the first time, whether "a family member entitled to a solatium award should receive an independent award for each family member killed or injured."  *Id.*, at 39.  "Concerned" that "combining multiple solatium awards" would offend the well-established principle enunciated in *O'Brien*, this Court held that, "the better practice" would be "to establish the family member's baseline at the higher of the figures."  *Id.*

The testimony given by Brian and Karene Erdstein confirms the close bond between each other and with their children.  Brian testified how he was devastated over the "profound effect" the loss of their baby had on Karene and how guilty he felt being "unable to be with [her] during this traumatic time."  Karene similarly recalls how she was impacted by the fact that Brian suffered "terribly" during this time "to the point of being incapacitated – from the trauma of witnessing one of the rocket attacks and from being forced from our home."  She describes having to cope with Brian's "depression and constant nervousness," as well as his increased "anxi[ety] about another bomb attack" to the point where she had to undergo an ultrasound and D&C procedure by herself.

With respect to Mayan, Brian relates the anguish he felt over the "detrimental" impact the war had on his daughter.  He refers to a song she wrote about the experience and notes "it is heart-wrenching" for him to hear it because it exposes the trauma she experienced and continues to experience.  Karene recalls Mayan "clinging" to her, "shrieking and crying at the same time,

and could not be consoled" when the first rockets struck.  She describes feeling distraught over

Mayan's "deep trauma" that had "a very significant influence on her life."

The Special Master is not inclined, however, to recommend that Mayan Erdstein be

awarded solatium damages.   As stated, Mayan provided no direct testimony and there is nothing

captured in Dr. Strous' evaluation that reflect that she anguished over the hardships experienced

by her parents.  Notwithstanding the "presumption" that family members "suffer compensable

mental anguish," *Kim*, 87 F.Supp.3d at 290, "[l]ines must be drawn in the award of this form of

damages and one such line includes a situation like this, where *no* evidence is offered to show

injury that an award of solatium damages might compensate."  *Roth*, 78 F.Supp.3d at 406

(emphasis in original).  Apropos of Mayan's claims, no such evidence exists.  The only

testimony concerning Mayan focused exclusively on the trauma she suffered personally both

during and in the aftermath of the 2006 rocket attacks.  Accordingly, the Special Master is

constrained to deny Mayan damages for loss of solatium.

The Special Master therefore finds Brian and Karene Erdstein theoretically entitled to an

award of solatium damages arising both from the anguish they suffered due to each other's

trauma as well as due to the trauma endured by Mayan.  The Special Master interjects the word

"theoretical" to underscore that, although Brian and Karene have demonstrated legal entitlement

to damages for each other and for Mayan, any such duplication of damages would potentially run

afoul of the principles articulated in *O'Brien* and in *Wultz*.  With respect to *O'Brien*, the Special

Master must ensure any award for solatium damages not exceed the pain and suffering of the

injured party.  *O'Brien*, 853 F.Supp.2d at 47–48.  In deference to *Wultz*, the Special Master will

fashion an award representing the "higher of the figures," *Wultz*, 864 F.Supp.2d at 39 and

recommend that Brian and Karene each receive solatium damages for the trauma suffered by the other in accordance with the guidelines this Court established in *Davis*.

**Economic Loss**

Brian and Karene have made general reference to the financial straits they found themselves in as a result of the Hezbollah incursion.   These allusions, without more, cannot ground an award of economic damages.   While "lost earnings – past and future – are compensable damages."  *Moradi v. Islamic Republic of Iran*, 7 F.Supp.3d, 57, 71 (D.D.C. 2015).   These losses, however, must be proven "by a reasonable estimate," *id.*, supported by the evidence.   With one exception, the Erdsteins have presented no such evidence.   That exception concerns the $4,000 Brian was compelled to borrow from his parents to cover expenses while the family was living in Ra'anana.   That loan was verified in a letter, put into evidence, from Janice Erdstein, Brian's mother, who further attested that the loan had not been paid back.   Given the nature of personal loans, Ms. Erdstein's letter may be the only competent proof available.   Unfortunately, it is Janice Erdstein who suffered an economic loss, not Brian.   Absent evidence that Brian repaid the loan, he has only encumbered a debt.   The Special Master thus recommends that no economic damages be awarded.

## CONCLUSION

In light of the foregoing, the Special Master recommends that Brian Erdstein be awarded One Million Five Hundred Thousand Dollars ($1,500,000) in compensatory damages for pain and suffering and One Million Dollars ($1,000,000) in compensatory damages for loss of solatium.   The Special Master also recommends that Karene Erdstein be awarded Two Million Five Hundred Thousand Dollars ($2,500,000) in compensatory damages for pain and suffering and One Million Dollars ($1,000,000) in compensatory damages for loss of solatium.   Finally,

the Special Master recommends that Mayan Erdstein be awarded One Million Five Hundred

Thousand Dollars ($1,500,000) in compensatory damages for pain and suffering.

Dated: April 4, 2016                              Respectfully submitted,

                                                  /s/ Alan L. Balaran
                                                  Alan L. Balaran, Esq.
                                                  Special Master