## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHAIM KAPLAN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 09-00646 (RCL)** |
| ) | |
| **HEZBOLLAH, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| **CHAIM KAPLAN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 10-00483 (RCL)** |
| ) | |
| **THE CENTRAL BANK OF THE** ) | |
| **ISLAMIC REPUBLIC OF IRAN, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## REPORT OF SPECIAL MASTER
## PURSUANT TO ORDER OF REFERENCE
## REGARDING THE CLAIMS OF
## JARED AND DANIELLE SAUTER

This action is brought by Jared and Danielle Sauter under 28 U.S.C. § 1605A. The

Sauters are seeking damages for injuries they sustained as a result of a barrage of rockets fired by

Hezbollah from Lebanon into northern Israel in July 2006. Under the Administrative Plan

Governing Special Masters and pursuant to the provisions of Federal Rule of Civil Procedure 53,

the Special Master has received testimony and reviewed documentary evidence to assist in

determining any damages to which Jared and Danielle Sauter may be entitled.

## BACKGROUND

On July 12, 2006, Hezbollah launched a surprise attack against Israel killing eight Israeli Defense Force soldiers and kidnapping two others at the Israeli/Lebanese border.  Israel responded with airstrikes against Hezbollah-held positions in Southern Lebanon; Hezbollah retaliated with katyusha rockets and mortars fired against Israeli communities located close to the border.  One of those cities was Safed ("Tzfat"). A United Nations-brokered cease-fire took effect on August 14, 2006.  *See* U.S. Congressional Research Services, *Lebanon: The Israel-Hamas-Hezbollah Conflict* (RL3356, updated September 15, 2006) by Jeremy M. Sharp.

### The Islamic Republic of Iran

The statutory scheme underpinning actions against the Islamic Republic of Iran has been exhaustively recounted in *In re: Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31 (D.D.C. 2009), obviating the need for recapitulation.  This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for facilitating, financing and providing material financial and logistical support to help carry out attacks on United States citizens.  *See*, *e.g.*, *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 45-46 (D.D.C. 2012); *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007) ("*Valore I*"); *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229, 254 (D.D.C. 2006) (*Heiser I*); *Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d  46, 61 (D.D.C. 2003) ("*Peterson I*").  This Court found so in this case, as well.  *See* Memorandum Opinion (July 23, 2014), at 2 (Case No. 1:10-cv-00483 (ECF No. 54)) ("July 23 Memorandum").

### The Democratic People's Republic of Korea

In 1988, the State Department designated the Democratic People's Republic of Korea ("North Korea") as a "state sponsor of terrorism."  *See Notice, Determination Pursuant to*

*Section 6(j) of the Export Administration Act of 1979: North Korea*, 53 Fed. Reg. 3477 (Feb. 5, 1988).  The State Department rescinded that designation on June 26, 2008.  *See Certification of Rescission of North Korea's Designation as a State Sponsor of Terrorism*, 73 Fed. Reg. 37351. Courts have held North Korea responsible for offering direct support to terrorist organizations that have carried out attacks in Israel.  S*ee, e.g., Calderon-Cardona v. Dem. People's Republic of Korea*, 723 F.Supp.2d 441, 452 (D.P.R. 2010); *Massie v. Government of Democratic People's Republic of Korea* 592 F.Supp.2d 57, 73 (D.D.C. 2008).  In the July 23 Memorandum, this Court found that North Korea provided "material aid to Hezbollah in three ways: weapons, training, and tunnels to help carry out the attacks."  July 23 Memorandum, at 6.

### PROCEDURAL HISTORY

Based on the events of July and August, 2006, Plaintiffs filed a complaint on April 8, 2009 against Hezbollah under the Antiterrorism Act, 18 U.S.C. § 2333(a), and against North Korea under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c) (Case No. 1:09-cv-00646 (ECF No.1)).  On March 23, 2010, Plaintiffs filed a second complaint, this time against the Central Bank of the Islamic Republic of Iran; Bank Saderat, Iran; Bank Saderat, PLC and the Islamic Republic of Iran, alleging these entities provided "extensive material support and resources to Hezbollah, that caused, enabled and facilitated" the Hezbollah rocket attacks. Plaintiffs are asking for damages under 28 U.S.C. §§1605A(c) and (d) and 18 U.S.C. § 2333(a) (Case No. 1:10-00483 (ECF No. 3)).  This Court subsequently dismissed the statutory claims against Hezbollah on August 20, 2013, (09-646 (ECF No. 50)), and against Bank Saderat of Iran and Bank Saderat, PLC on November 5, 2010 (10-483 (EFC No. 16)).  On August 20, 2015, plaintiffs voluntarily dismissed their common-law claims against Hezbollah (09-646 (ECF No. 63)).

Neither North Korea nor Iran responded to the complaints and plaintiffs subsequently moved for entry of default on May 12, 2014 (09-646 (ECF No. 53) and 10-483 (ECF No. 51)). A hearing was convened on May 27, 2014 to determine defendants' liability during which plaintiffs produced expert witnesses who, in accordance with 28 U.S.C. § 1608(e) (requiring plaintiffs to establish their right to relief by "evidence that is satisfactory to the court"), attested to Iran's and North Korea's complicity in Hezbollah's 2006 attacks against Israel.  Based on this testimony, the Court entered judgment by default against the two nations (09-646 (ECF No. 57) and 10-483 (ECF No. 54)).

On October 1, 2014, this Court appointed the undersigned as special master to be governed by the Administrative Plan Governing Special Masters previously adopted in *O'Brien v. Islamic Republic of Iran*, Case No. 1:06-cv-0690 (RCL).  *See* 09-646 (ECF No. 58) and 10-483 (EFC No. 55)) ("Order of Reference").  The Court specifically directed the Special Master to issue reports recommending the amount of compensatory damages to which he believed each plaintiff was entitled and to "take and report on evidence of each plaintiff's qualification for relief under § 1605A(c) and the familial relationships between plaintiffs and victims of the rocket attacks in Israel committed between July 12, 2006 and August 14, 2006."  *Id.*

Pursuant to these directives and in keeping with the Federal Rules of Evidence, the Special Master makes these findings and recommendations.

**FINDINGS OF FACT**

1.      Jared Sauter was born in New Mexico on July 30, 1983.  A copy of his passport, filed with this Court on May 10, 2012, confirms that, at all relevant times Jared was a United States citizen.

2.      Danielle Sauter was born in Brazil on September 12, 1985.  Danielle is an Israeli citizen.

3.      Jared and Danielle were married in 2003 and residing in Rosh Pina at the time of the Hezbollah rocket attacks in 2006.

**Testimony of Jared Sauter**

Jared Sauter provided his testimony by Declaration dated March 29, 2012.  *See Lanny J. Davis & Associates LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 163 (D.D.C. 2013) (accepting proof of damages in FSIA by affidavit and documentary evidence, holding that "[c]ourts are not required to hold an evidentiary hearing before determining the amount of damages").  Jared affirms he is a U.S. citizen; married Danielle on November 26, 2003; moved to Israel in 2006; and has two daughters – one of whom was born before the Hezbollah attacks.

According to Jared's Declaration, in July 2006, Jared and Danielle and their eldest daughter were living in Rosh Pina, where Jared was employed as an agricultural landscaper and in the process of starting his own greenhouse construction business.  Jared was at work when he heard sirens warning of an imminent rocket attack.  He returned home "to quite a panicked situation and did [his] best to calm [his] wife and young daughter who were afraid of the loud explosions of the rockets falling all around."  The following morning, Jared and his family fled their home, taking refuge at Danielle's aunt's house for the remainder of the war.  Jared recalls: "[T]he drive from Rosh Pina was very tense as well.  Rockets were falling all around us."  He remembers taking "cover under highway overpasses as we felt the earth shake with the rocket's impact."  Jared feared they would be killed on the highway.

Jared and Danielle never returned to Rosh Pina to live.  Jared testifies: "The thought of moving back caused us too much stress and anxiety," and "even thinking about it filled me with

feelings of fear." When the family returned home to collect their belongings, they found several

of Jared's tools, "the combined estimated value of [which] was $15,000," were missing.

The family subsequently settled in a city in central Israel, where Jared found a "low-

paying job" as a mechanic. Jared states that, as a result of the war, he was able only to work

sporadically, forcing the family to spend their accumulated savings of $10,000. Jared remembers

that time as "very stressful": "I had my future dreams all planned out in my new business and

now I had to start from square one. Instead of being able to move forward as I planned I was

concerned with the basics of putting food on the table for my family." Jared also began

experiencing "panic attacks which were set off by being in large crowds or hearing loud noises"

– anxieties which persist to the present day. He describes suffering from "extreme anxiety

manifest with sudden fear and nervousness, as well as physical symptoms such as sweating and

my heart racing" which "affects [his] daily functioning and general quality of life." Jared also

complains of insomnia, which he had not experienced before the rocket attacks.

Jared testifies that he and his wife saw a therapist to help them deal with his "stress,

insomnia and panic attacks which were caused by the barrage of rocket attacks and subsequent

business setback that [he] had experienced resulting from the Second Lebanon War." Jared

estimates the couple spent "about $5,000 out of pocket" and attended weekly sessions for "the

first couple of years." He testifies that, over the last two years, however, he and Danielle have

only been able to afford therapy once every six months.

### Report of Dr. Rael Strous re: Jared Sauter

Dr. Rael Strous is the Director of the Chronic Inpatient Unit of the Be'er Yaakov Mental

Health Center and an Associate Professor of Psychiatry at the Sackler Faculty of Medicine of the

Tel Aviv University. Dr. Strous submitted a Declaration dated February 27, 2012 in support of

Jared Sauter's claims.  Dr. Strous' testimony concerning the psychological trauma suffered by

victims of terrorism has been accepted by courts in this circuit.  *See, e.g., Haim v. Islamic*

*Republic of Iran*, 425 F.Supp.2d 56, 60 (D.D.C. 2006); *Campuzano v. Islamic Republic of Iran*,

281 F.Supp.2d 258, 267-78 (D.D.C. 2003).  In addition to his Declaration, Dr. Strous provided a

copy of his *curriculum vitae* and two pre-evaluation forms Jared completed at his request.

According to Dr. Strous "Mr. Sauter displays some form of PTSD, depression and

Adjustment disorder either currently or in the past as a result of being directly exposed to rocket

fire and its aftermath during the second Lebanon war."  He believes "many of [Jared's]

symptoms with which he has been diagnosed are likely to be present in varying degrees for a

significant time to come and while it is impossible to state for any absolute certainty, many of the

symptoms may even be permanent."  Dr. Strous' evaluation notes reflecting his session with

Jared were neither attached to his Declaration nor supplied independently to the Special Master.

**Testimony of Danielle Sauter**

Danielle Sauter provided her testimony in the form of a Declaration dated March 29,

2012.  Danielle affirms she is an Israeli citizen who was born in Brazil on September 12, 1985;

that she and Jared met in Taos, New Mexico and were married on November 26, 2003; and that

she and Jared moved to Israel in 2006.

According to Danielle's Declaration, at the time of the attacks, the Sauters were living in

the town of Rosh Pina.  When the sirens first sounded, Danielle and her daughter were at home.

She recalls being "scared and nervous for our safety since our house did not have a bomb shelter

and it was a great distance to the nearest one."  Danielle describes the sound of the rockets as

"horrifying" and recalls trying to keep her "petrified" daughter calm.

Jared returned from work quickly and, for the rest of the day, the family was "frightened and unsure" what would happen to them. Concluding it was unsafe to remain in Rosh Pina, the Sauters fled the following morning. Danielle testifies that, "with rockets falling all around us, we sped away running for our lives. When sirens went off we had to take cover under highway overpasses as we felt the earth shake with the rocket's impact." She characterizes her "sense of anxiety" as "overwhelming as I witnessed Jared's sense of helplessness." She remembers there being "no way of hiding the fact that he had no idea what was going to happen to us. He felt vulnerable and ill-equipped to protect his family."

The Sauters moved in with Danielle's aunt for the next two months. Danielle describes the experience imposing on someone for such a length of time as "creat[ing] feelings of constant anxiety and instability for us." While staying with Danielle's aunt, the Sauters decided not to live in Rosh Pina again. They did return to collect their belongings and in so doing discovered that "power tools and equipment" worth "approximately $15,000" that Jared had purchased for his new business venture were missing. According to Danielle, the loss of equipment meant Jared could not pursue his plans of opening his own greenhouse construction business. And with Jared out of work, the family quickly drew down their $10,000 savings and Jared was compelled to work as a mechanic.

According to Danielle, Jared suffers panic attacks triggered "by large crowds or loud noises." The rocket barrage impacted Jared's ability "to function at work . . . affected his emotional ability to deal with everyday tasks and situations" and has taken "a significant toll on our marriage and created a lot of stress and uncomfortable feelings between us." Danielle added that Jared suffers from insomnia and is frequently irritable.

Danielle recounts how she and Jared sought counseling, spending "about $5,000" for weekly sessions.  Danielle finds it difficult to witness her husband feeling helpless and inadequate.  She feels "depressed and anxious and unable to function properly."  Danielle describes how her health has deteriorated; she attributes the subsequent surgeries she underwent for a "burst appendix and removal of a femoral cyst" to the stress induced by the rocket attacks.  According to Danielle, her belief was "substantiated by the emergency room staff."

**ANALYSIS**

Plaintiffs, in their complaints, seek damages under 28 U.S.C. §§ 1605A(c) and (d) for harms and injuries resulting from Defendants' "extreme, wanton, willful and malicious" conduct (09-646 (ECF No. 1) and 10-483 (ECF No. 3)), including "disfigurement; loss of physical and mental functions; extreme pain and suffering; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium" (10-483 (ECF No. 3)).

It is beyond the remit of the Special Master to consider the viability of plaintiffs' common-law claims, much less ascribe damages for any possible breach.  Rather, the Special Master's inquiry is confined to analyzing plaintiffs' entitlement to those damages delineated in the Foreign Sovereign Immunities Act ("FSIA"), namely, pain and suffering, solatium and economic damages.  28 U.S.C. 1605A(c)(4).

To recover under the FSIA, Jared and Danielle Sauter "must prove damages 'in the same manner and to the same extent' as any other default winner."  *Hill v. Republic of Iraq,* 328 F.3d 680, 683-84 (D.C. Cir. 2003) (citation omitted).  In the context of a default judgment, courts in this jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages."  *Rhodes v. U.S.*,

967 F.Supp.2d 246, 313 (D.D.C. 2013) (emphasis in original) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)).  Accordingly, the Sauters must prove future damages to a "reasonable certainty," or by a preponderance of the evidence, and must prove the amount of damages by a "reasonable estimate."  *Hill*, 328 F.3d at 684.  For past losses, they must, similarly, "prove the fact of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997), yet need only "reasonably prove" the amount of damages.  *Hill*, 328 F.3d at 684.  In fashioning an award, the Special Master may consider any "special problems of proof arising from the defendant's absence."  *Id.*, at 685.

Upon consideration of the facts presented, and in light of the aforementioned legal framework, the Special Master finds, for the reasons set out below, Jared entitled to compensatory damages for the pain and suffering he endured.  The Special Master further finds Danielle Sauter entitled to solatium damages only.

### Pain and Suffering

In determining a proper award pain and suffering for Jared and Danielle, the Special Master is guided by prior decisions awarding damages to victims of terrorism, mindful of the inherent difficulty in "assess[ing] the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved."  *Valencia v. Islamic Republic of Iran*, 774 F.Supp.2d 1, 14 (D.D.C. 2010).  The Special Master is similarly cognizant that previous damages awards, while instructive guidelines, "are not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010), and that "strict application of precedent could lead to conflicting conclusions about an

appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009)

(*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

A review of previous damages awards reveals that courts consider a "myriad of factors"

when assessing damages for surviving victims of terrorist hostilities including "the severity of

the pain immediately following the injury, the length of hospitalization, and the extent of the

impairment that will remain with the victim for the rest of his or her life." *Peterson v. Islamic*

*Republic of Iran* ("*Peterson II*"), 515 F.Supp.2d 25, 52 n. 26 (D.D.C. 2007) (citing *Blais*, 459

F.Supp.2d at 59).  Calculating damages begins with the baseline assumption that persons

suffering injuries in terrorist attacks are entitled to $5 million in damages." *Davis v. Islamic*

*Republic of Iran*, 882 F.Supp.2d 7 (D.D.C. 2012) (citing *Peterson II*).  This amount serves as a

lodestar and can deviate upward in the presence of "severe instances of physical and

psychological pain, such as where victims suffered relatively more numerous and severe injuries,

were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," *Valore*

*v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 84 (D.D.C. 2010) ("*Valore II*"), or downward in

the face of "minor shrapnel injuries or minor injury from small-arms fire." *Id.*

The Special Master finds that Jared Sauter, through testimony and supporting

documentation, has established a cause of action and has demonstrated a right to recover against

the defendants.  The record amply reflects that the Hezbollah incursion was emotionally

devastating for him.  The Special Master further finds that Danielle Sauter lacks the requisite

standing under the FSIA to bring an action in damages for pain and suffering on her own behalf

and, therefore, may not recover.

Jared amply describes the "panicked situation" accompanying "the loud explosions of the

rockets falling all around" as well as the falling rockets and the earth shaking when they were

fleeing their home.  He relates the family's decision not to move back to their home due to the "stress and anxiety" and "feelings of fear."  Jared recalls his "panic attacks" triggered by crowds and loud noises as well as his "extreme anxiety manifest with sudden fear and nervousness." Jared's stated anguish over the events of July 2006 and its aftermath are confirmed by Dr. Strous who diagnosed Jared as suffering from "PTSD, depression and Adjustment disorder."

For victims, such as Jared Sauter, who "suffer[ed] severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million."  *Harrison v. Republic of Sudan*, 882 F.Supp.2d 23, 49 (D.D.C. 2012) (citing *Valore II*, 700 F.Supp.2d at 85).  *See also Petersen II*, 515 F.Supp.2d at 56; *Brown v. Islamic Republic for Iran*, 872 F.Supp.2d 37, 42 (D.D.C. 2012); *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 47 (D.D.C. 2012).  The Special Master finds nothing in the record compelling a departure from this baseline award.

Danielle Sauter similarly describes her fear while under attack as well as her subsequent "feelings of constant anxiety and instability" while staying with her aunt for two months.  She describes being "depressed and anxious and unable to function properly" and attributes her subsequent "burst appendix and removal of a femoral cyst" to the stress induced by the rocket attacks – a belief, she maintains, was "substantiated the emergency room staff."  The Special Master does not dispute that Danielle was, and remains, traumatized by her experiences.  That said, Ms. Sauter's status as an Israeli citizen prevents her from collecting damages under the FSIA for that trauma.

Jurisdiction under the FSIA is statutorily prescribed.  The general grant of immunity afforded sovereign nations is subject only to the exceptions expressly provided in the statute, which is the "sole basis for obtaining jurisdiction over a foreign state in federal court."  *Hwang*

*Geum Joo v. Japan*, 332 F.3d 679, 682 (D.C. Cir. 2003) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989)).

28 U.S.C. § 1605A(c) specifies those categories of claimants who may pursue a private action against a designated "state sponsor" of terrorism.  These categories include: (i) United States Citizens; (ii) members of the military; (iii) United States employees; and (iv) the legal representatives of a person described in (i), (ii), or (iii).  In addition, 28 U.S.C. § 1605A(a)(2)(A)(ii) provides in pertinent part that, "[t]he court shall hear a claim under this section if the *claimant or the victim* was, at the time the act . . . (I) a national of the United States; (II) a member of the armed forces; or (III) otherwise an employee of the Government of the United States."  (Emphasis added.)  Section 1605A defines "national of the United States" in accordance with section 101(a)(22) of the Immigration and Nationality Act and include: "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22).

Based both on the legislative history of the FSIA, *see* H.R. Rep. 105-48 at 2 (1997) ("[t]he intent of the drafters was that a family should have the benefit of these provisions if either the victim of the act or the survivor who brings the claim is an American national") as well as Congress' use of the disjunctive phrase "*claimant or the victim*," courts have held that 1605A does not require *both* the claimant and the victim to be U.S. nationals, but extends jurisdiction to either.  *See*, *e.g.*, *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 570-72 (7th Cir. 2012) (interpreting section 1605A(a)(2)(A)(ii) as allowing the court to hear intentional infliction of emotional distress claims under the FSIA brought by foreign family members of terrorism victims on the basis of those victims meeting one of section 1605A(a)(2)'s four categories); *Owens v. Republic of Sudan*, CA Nos. 01-2244; 08-1349; 08-1361; 08-1377; 08-1380; 10-

356;12-1224 (JDB), — F.Supp.3d —, 2016 WL 1170919, at *31 (March 23, 2016) (holding that

FSIA does not "foreclose[] jurisdiction over family members' claims"); *Thuneibat v. Syrian*

*Arab Republic*, CA No. 12-cv-00020 (BAH), — F.Supp.3d —, 2016 WL 829870, at *6 (D.D.C.

March 1, 2016) (holding that foreign nationals may assert their claims for emotional anguish

resulting from the extrajudicial killing of a U.S. national at the time of the attacks); *Worley v.*

*Islamic Republic of Iran*, 75 F.Supp.3d 311, 327 (D.D.C. 2014) (holding that claims of foreign

plaintiffs can be heard when based on "injuries suffered by victims who meet the statute's

requirements") (citing *Leibovitch*, 697 F.3d at 572 ); *Owens v. Republic of Sudan*, 826 F.Supp.2d

128, 149 (D.D.C. 2011) (holding that plaintiffs whose cause of action arose from the claims of

U.S. nationals at the time of the attacks satisfied section 1605A(a)(2)(A)(ii)); *Estate of Doe v.*

*Islamic Republic of Iran*, 808 F.Supp.2d 1, 11 (D.D.C.  2011) (holding non-U.S. national

plaintiffs entitled to compensation § 1605A).

Section 1605A's inclusion of non-U.S. nationals does nothing to further Danielle Sauter's

claim for compensatory damages for her own injuries.  While the aforementioned cases

acknowledge the rights of foreign nationals to press an action under the FSIA, these rights must

arise out of injuries sustained by a U.S. national.  *See, e.g., Owens* 826 F.Supp.2 at 149 (plaintiffs

who provided evidence that "their claims are derived from claims where the victims were either

U.S. nationals or U.S. Government employees at the time of the attacks" satisfied section

1605A(a)(2)(A)(ii)); *Worley*, 75 F.Supp.3d at 326 (foreign nationals "must [] base their claims

on injuries suffered by victims who meet the statute's requirements")(citing *Leibovitch*, 697 F.3d

at 572).

While the evidence demonstrates that Danielle is Jared's "immediate family member," as

defined by this Court in *Murphy*, 740 F.Supp.2d at 75, the injuries for which she is seeking

compensation are personal and independent of those suffered by her husband. These claims for pain and suffering thus fall outside the ambit of 28 U.S.C. 1605A and cannot be considered.

## Solatium Damages

Jared and Danielle's prayers for solatium damages raise issues of first impression in the context of the Foreign Sovereign Immunities Act. To date, FSIA solatium claims have been filed by family members who were not present during the terrorist attacks that precipitated their claims. Jared and Danielle, however, were together during the attacks. Each, as such, was a victim potentially entitled to recover for his or her own pain and suffering as well as a victim with a potentially colorable claim to recover for the emotional trauma they endured as a result of the "extreme and outrageous conduct" visited on the others.

Solatium damages are designed "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as well as the harm caused by the loss of the decedent's society and comfort." *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379, 402 (D.D.C. 2015) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 25 (D.D.C. 2011)) (internal quotation marks and alterations omitted). Solatium awards have "also been applied to cases where the victim survived a terrorist attack." *Oviessi*, 768 F.Supp.2d at 26, n. 10. Unlike lost wages, which may easily be calculated, however, solatium damages do not readily lend themselves to quantification using "models and variables." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000) (*quoting Flatow v. Islamic Republic of Iran*, 999 F.Supp.2d 1, 32 (D.D.C. 1998)). Courts, therefore, look for guidance in "prior decisions." *Acosta v. The Islamic Republic of Iran*, 574 F.Supp.2d 15, 29 (D.D.C. 2008).

A review of "prior decisions" reveals that family members in direct lineal relationship are "presume[d] . . . to suffer compensable mental anguish[,] . . . and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Kim v. Democratic People's Republic of Korea*, 87 F.Supp.3d 286, 290 (D.D.C. 2015) (quoting *Oveissi*, 768 F.Supp.2d at 25). This "presumption" flows from terrorists' acknowledged aim of causing "the highest degree of emotional distress, literally, terror in their targeted audience." *Stethem*, 201 F.Supp.2d at 89.

For family members of deceased victims of terrorism, this Court has established a framework whereby the amount of the award is contingent upon the "'nature of the relationship' between the family member and victim" and "'the severity of the pain suffered by the family member.'" *Heiser I,* 466 F.Supp.2d at 269 (quoting *Haim*, 425 F.Supp.2d at 75). To lend uniformity to the analysis and avoid disparate awards, this Court has approved the following awards: $8 million for spouses; $5 million for parents and $2.5 million for siblings. *Id.* Children of a deceased victim typically receive an award of $3 million. *O'Brien*, 853 F.Supp.2d at 46–47.

For relatives of surviving victims who have been physically injured as a result of terrorist attacks, courts have applied a similar framework whereby "awards are 'valued at half of the awards to family members of the deceased' – $4 million, $2.5 million and $1.25 million to spouses, parents, and siblings, respectively," *Anderson v. Islamic Republic of Iran*, 839 F.Supp.2d 263, 266 (D.D.C. 2012) (quoting *Oveissi*, 768 F.Supp.2d at 26 n. 10 (D.D.C. 2011)), and $1.5 million for children. *Id.*, 839 F.Supp.2d at 266. *Cf. Onsongo v. Republic of Sudan*, 60 F.Supp.3d 144, 151 (D.D.C. 2014) (awarding $2.5 million to children of injured victims of terrorism); *Peterson II*, 515 F.Supp.2d at 51) ($2.5 million to child of injured victim). Finally, this Court has held that relatives of surviving victims presenting with emotional trauma and no

physical injury should receive amounts proportionally less than those with physical injuries, namely, $1 million for spouses; $850,000 for parents; $750,000 for children, and $500,000 for siblings.  *See Davis v. Islamic Republic of Iran*, 882. F.Supp.2d 7, 16 (D.D.C. 2012).

The testimony given by Jared and Danielle confirms the close bond between them.  There is no testimony, however, in the record which might support a finding that Jared suffered vicariously due to the trauma that befell his wife.  Other than "calm[ing]" his wife and daughter when the first rockets launched, the remainder of Jared's testimony focuses solely on his personal anguish to the point where he describes consulting with a therapist "to help deal with *my* stress, insomnia and panic attacks." (Emphasis added.)  There is nothing in the record suggesting that Jared was adversely impacted by Danielle's anguish.

This lack of evidence rebuts the "presumption" that family members "suffer compensable mental anguish." *Oveissi*, 768 F.Supp.2d at 25.  As this Court made clear: "Lines must be drawn in the award of this form of damages and one such line includes a situation like this, where *no* evidence is offered to show injury that an award of solatium damages might compensate." *Roth*, 78 F.Supp.3d at 406 (emphasis in original).  Apropos of Jared Sauter's claim, no such evidence exists.

Danielle, on the other hand, testifies extensively about her overwhelming "sense of anxiety" as she witnessed "Jared's sense of helplessness."  Danielle describes her difficulty witnessing her husband's feelings of inadequacy and relates her anguish due to Jared's "panic attacks," "frequently irritability" and insomnia.  She observes how the ordeal of the rocket attacks "will continue to influence me, both directly and through my husband for many years to come."  The Special Master finds this evidence sufficient.  And given the derivative nature of Danielle's solatium claim, the Special Master finds she has standing under 28 U.S.C. §

1605A(a)(2)(A)(ii) to compensatory damages arising from the anguish she suffered due to

Jared's trauma.

## Economic Damages

Economic damages can be recovered pursuant to section 1605A(c) and "as a general rule,

lost earnings – past and future – are compensable damages." *Moradi v. Islamic Republic of Iran*,

7 F.Supp.3d, 57, 71 (D.D.C. 2015). Such damages must be proven "by a reasonable estimate,"

*Reed v. Islamic Republic of Iran,* 845 F.Supp.2d 204, 213 (D.D.C.2012), such as the submission

of a forensic economist's expert report. *Roth v. Islamic Republic of Iran* (D.D.C. 2015) 78

F.Supp.3d 379, 402 (citing *Belkin v. Islamic Republic of Iran,* 667 F.Supp.2d 8, 24 (D.D.C.

2009).

It appears Jared is asking to be compensated for his financial losses. According to his

Declaration, when the family returned to Rosh Pina to collect their belongings, an assortment of

tools and equipment he had purchased in anticipation of a new business venture with a

"combined estimated value of … $15,000" were missing. Jared also notes the family expended

their life savings "about $10,000" when they fled their home and spent "about $5,000 out of

pocket" for therapy sessions. Jared, however, provides no receipts – either for the stolen

equipment and tools or for the expenses the family incurred during their time away from Rosh

Pina. He similarly supplies no bank statements memorializing his withdrawals from the family

savings account during this time period and no invoices for the therapy sessions he and Danielle

attended.

In short, Jared has introduced no evidence supporting his request for $30,000 in

economic losses. His failure to do so is fatal to his claim as courts are uniformly unsympathetic

to unsupported claims for economic damages. In *Wyatt v. Syrian Arab Republic*, 908 F. Supp.

- 19 -

2d 216 (D.D.C. 2012), for example, this Court denied claims of economic harms where "plaintiffs [] failed to introduce any evidence of what costs specifically were incurred" and sought damages for a "lost business opportunity" based on a "speculative" conjecture and sought reimbursement for "travel expenses" without "any evidence supporting this claim." *Id.*, at 30. Similarly, in *Moradi v. Islamic Republic of Iran* 77 F.Supp.3d 57 (D.D.C. 2015), the court made clear that, "[u]nlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings with competent evidence." In keeping with this precedent, the Special Master denies Jared Sauter's claim for economic damages.

**CONCLUSION**

In light of the foregoing, the Special Master recommends Jared Sauter receive One Million Five Hundred Thousand Dollars ($1,500,000) as damages for pain and suffering. The Special Master further recommends that Danielle Sauter be awarded One Million Dollars ($1,000,000) for loss of solatium.

Dated: April 12, 2016                           Respectfully submitted,

                                                By:*/s/ Alan L. Balaran*
                                                Alan L. Balaran, Esq.
                                                Special Master