UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHAIM KAPLAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 09-00646 (RCL) |
| | ) | |
| HEZBOLLAH, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ————————————— | ) | |
| | ) | |
| CHAIM KAPLAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 10-00483 (RCL) |
| | ) | |
| THE CENTRAL BANK OF THE | ) | |
| ISLAMIC REPUBLIC OF IRAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ————————————— | ) | |

## <u>MEMORANDUM OPINION</u>

I.   BACKGROUND

This action arises out of the July and August 2006 rocket attacks launched by Hezbollah into northern Israel.  Plaintiffs, victims of these attacks, include: Brian, Karene, Mayan, Noa, Netiya and Ariel Erdstein; Chaim, Rivka, Mushka, Reuven, Menachem, Chana and Efraim Kaplan; Theodore and Moreen Greenberg; Jared and Danielle Sauter; Myra Mandel; Michael Fuchs; Dvora Kaszemacher and Chaya Alkareif; Chayim and Nechama Kumer; Laurie and Margalit Rappeport; and Avishai Reuvane and Elisheva Aron.  Together, they bring this suit against The Islamic Republic of Iran ("Iran") and The Democratic People's Republic of Korea ("North Korea") under the state-sponsored terrorism exception to the Foreign Sovereign

Immunities Act, 28 U.S.C. §§ 1330, 1602 *et seq.* ("FSIA").   Codified at 28 U.S.C. § 1605A, the exception provides "a federal right of action against foreign states" that sponsor terrorist acts. *Haim v. Islamic Republic of Iran,* 784 F.Supp.2d 1, 4 (D.D.C. 2011).

## II.   PROCEDURAL HISTORY

Based on the events of July and August, 2006, Plaintiffs filed a complaint on April 8, 2009 against Hezbollah and North Korea under the Antiterrorism Act, 18 U.S.C. § 2333(a) and the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c) (Case No. 1:09-cv-00646) (ECF No.1).  On March 23, 2010, Plaintiffs filed a second complaint, this time against the Central Bank of the Islamic Republic of Iran; Bank Saderat, Iran ("BSI"); Bank Saderat, PLC ("BSPLC"), the Central Bank of Iran ("CBI"), 40 "John Does" as well as Iran under the same statutory schemes, alleging these entities and individuals provided "extensive material support and resources to Hezbollah, that caused, enabled and facilitated" the Hezbollah rocket attacks. (Case No. 1:10-cv-00483) (ECF No. 3)

The Court dismissed the claims against BSI and BSPLC on November 5, 2010, treating the banks' unopposed motion to dismiss as conceded (10-cv-483) (ECF No. 16).  On August 20, 2013, the Court dismissed the statutory claims against Hezbollah (09-cv-646) (ECF No. 50) as well as the claims against the 40 John Does (10-cv-483) (ECF 42).  On August 20, 2015, plaintiffs voluntarily dismissed their common-law claims against Hezbollah (09-cv-646) (ECF No. 63).  Remaining are plaintiffs' FSIA claims against North Korea (09-cv-646) and Iran (10-cv-483).

## III.   LIABILITY

In an order and accompanying memorandum opinion dated July 23, 2014, (09-cv-646) (ECF No. 57), the Court concluded that it had subject matter jurisdiction over this action and that

it could properly exercise personal jurisdiction over the defendants.  The Court reasoned,

"[b]ased on the allegations in Plaintiffs' Amended Complaint and the evidence presented by

plaintiffs," that "there can be no doubt that North Korea and Iran provided material support to

Hezbollah," and that both nations were subject to suit under 28 U.S.C. § 1605A(c).  *Id.* at 4.  In

accordance with its liability determination and pursuant to its authority under Federal Rule of

Civil Procedure 53, the Court appointed Alan Balaran as Special Master for the purpose of taking

evidence and filing reports and recommendations regarding the amount of individual damages to

be awarded each plaintiff.  Order Appointing Special Master, at 2 (09-cv-646) (ECF 58).

## IV.   STANDING UNDER THE FSIA

The Special Master determined, at the outset, that two of the plaintiffs, Myra Mandel and

Michael Fuchs lacked standing to bring any claims under the FSIA and that plaintiff Danielle

Sauter lacked standing to claim an award for pain and suffering.  The Court's review of these

determinations follow.

### Myra Mandel

Myra Mandel, a Canadian citizen, owned an art gallery that was shuttered as a result of

the rocket attacks.  She asserts both a claim for pain and suffering as well as economic damages.

The Special Master recommended that Ms. Mandel's claims be dismissed, finding that her

Canadian citizenship placed her outside the ambit of 28 U.S.C. § 1605A(c), as she is not a

United States citizen, a member of the military, a United States employee, or a legal

representative of the aforementioned as required by 28 U.S.C. § 1605A(2)(A)(ii)(I-III).  The

Special Master also found that Ms. Mandel's claims did not derive from "injuries suffered by

victims who meet the statute's requirements." *Worley v. Islamic Republic of Iran*, 75 F.Supp.3d

311, 327 (D.D.C. 2014) (citing *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 572 (7th

Cir. 2012)). And in accordance with the principle that foreign nationals "*must* [] base their claims on injuries suffered by victims who meet the statute's requirements", *Worley*, 75 F.Supp.3d at 326 (emphasis added), the Special Master recommended that Ms. Mandel's claims be dismissed for lack of standing.

The Court concurs with the Special Master's finding that Myra Mandel lacks standing under the FSIA and **ADOPTS** his recommendation that Ms. Mandel's claims be dismissed.

<u>Michael Fuchs</u>

Michael Fuchs, an Israeli citizen, seeks compensation for injuries sustained as a result of an exploding shell. The Special Master recommended that Mr. Fuchs' claims be dismissed on evidence that Mr. Fuchs neither is a United States citizen, a member of the military, a United States employee, nor a legal representative of the aforementioned. And, as Mr. Fuchs' claims are not derivative of those brought by any person meeting the statutory criteria of the FSIA, the Special Master dismissed Mr. Fuchs' action for lack of standing.

The Court concurs with the Special Master's finding that Michael Fuchs lacks standing under 28 U.S.C. § 1605A(c) and **ADOPTS** the recommendation that Mr. Fuchs' claims be dismissed.

<u>Danielle Sauter</u>

Danielle Sauter seeks compensatory damages for pain and suffering and solatium. The Special Master denied Ms. Sauter's claim for pain and suffering in light of her Israeli citizenship and the fact that, unlike her claim for solatium, her pain and suffering did not arise from the claims of a U.S. national. *See Owens v. Republic of Sudan*, 826 F.Supp.2d 128, 149 (D.D.C. 2011).

The Court **ADOPTS** the Special Master's recommendation that Danielle Sauter's status as an Israeli citizen precludes her from pursuing an award for pain and suffering under the FSIA.

## V.  DAMAGES

Damages available under the FSIA include "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c).  To demonstrate entitlement to damages under the FSIA, a claimant "must prove that the consequences of the defendants' conduct were 'reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate consistent with this [Circuit's] application of the American rule on damages.'" *Salazar v. Islamic Republic of Iran*, 370 F.Supp.2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotations omitted). *See also O'Brien v. Islamic Republic of Iran,* 853 F.Supp.2d 44, 46 (D.D.C. 2012).

### A.    Pain and Suffering

In its review of the Special Master's recommendations, the Court is guided by prior decisions awarding damages to victims of terrorism, mindful of the difficulties associated with "assess[ing] the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Valencia v. Islamic Republic of Iran*, 774 F.Supp.2d 1, 14 (D.D.C. 2010).

Courts consider a "myriad of factors" when assessing damages for surviving victims of terrorist hostilities.  These factors include: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25, 52 n. 26 (D.D.C. 2007) (citing *Blais*, 459 F.Supp.2d at 59).  Calculating damages begins with the

baseline assumption that "persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Davis v. Islamic Republic of Iran*, 882 F.Supp.2d 7, 12 (D.D.C. 2012) (citing *Peterson*, 515 F.Supp.2d at 54). This lodestar is "not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010), and can deviate upward in the presence of "severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, [including] partially lost vision and hearing, or were mistaken for dead," *Valore v. Islamic Republic of Iran,* 700 F.Supp.2d 52, 84 (D.D.C. 2010), or downward in the face of "minor shrapnel injuries or minor injury from small-arms fire." *Id.* These deviations defer to the principle that "strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009) (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

For victims who "suffer[ed] severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million." *Harrison v. Republic of Sudan*, 882 F.Supp.2d 23, 49 (D.D.C. 2012) (citing *Valore*, 700 F.Supp.2d at 85). Notwithstanding the "presumption" that emotional trauma is a natural consequence of terrorist activity, *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002), claimants "must prove damages in the same manner and to the same extent as any other default winner," *Hill,* 328 F.3d at 683-84 (internal quotation marks and citation omitted), which, in turn, requires that they "prove the fact of injury with reasonable certainty." *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997).

In keeping with the guidelines set out in *Harrison*, 582 F.Supp.2d at 49, the Special Master recommended that Rivka Kaplan, Brian Erdstein, Nechama Kumer, Laurie Rappeport,

Margalit Rappeport, Theodore Greenberg, Maureen Greenberg, Jared Sauter, Dvora

Kaszemacher, Chaya Kaszemacher Alkareif, Avishai Reuvane, and Elisheva Aron each receive

$1.5 million. The Court **ADOPTS** all of the Special Master's recommendations regarding these

claimans. Those instances where the Special Master either denied an award or departed from the

established framework are discussed below.

1. Denial of Compensatory Damages for Pain and Suffering

### (a) *Mushka, Reuven, Menachem Chana and Efraim Kaplan*

The Special Master recommended that no damages for pain and suffering be awarded to

Chaim and Rivka Kaplan's children – Mushka, Reuven, Menachem, Chana and Efraim.  The

Special Master reasoned that the children supplied no testimony describing the trauma they

experienced as a result of the events of July and August 2006 nor did they agree to undergo a

psychological evaluation from which an informed opinion could be rendered.  Accordingly, the

Special Master concluded that he was unable to be "reasonably certain" that Mushka, Reuven,

Menachem, Chana and Efraim Kaplan were "severely injured" as a result of the Hezbollah

rocket attacks.

Plaintiffs contest the Special Master's recommendation that Mushka, Reuven,

Menachem, Chana and Menachem Kaplan receive no compensatory damages for pain and

suffering.  The Court will address those challenges in Section VI(B)(3), below.

### (b) *Noa, Netiya and Ariel Erdstein*

The Special Master recommended that Noa and Netiya Erdstein receive no award.  The

Special Master did not consider Ariel Erdstein because Plaintiffs' counsel failed to confirm

Ariel's citizenship by supplying a passport to the Court or the Special Master.  The Special

Master's recommendation was based, in great measure, on Noa's and Netiya's failure to supply

any testimony or provide any expert report bolstering their claim for pain and suffering.  The Special Master found the testimony of Brian and Karene particularly fatal to their children's claims.  According to their affidavits, dated May 2012, neither was able to "point to a direct change in [Noa's and Netiya's] behavior" as a result of the attacks "since [the children] were very little" at the time of the bombing.

Plaintiffs seek reconsideration of the Special Master's decision to deny compensatory damages for pain and suffering to Noa and Netiya Erdstein.  The Court will address those challenges in Section VI(C), below.

Departures from Award Guidelines

The Special Master recommended a downward departure with respect to Mikimi Steinberg, distinguishing Ms. Steinberg's claim for emotional distress from those brought by other plaintiffs who were professionally diagnosed with recognized psychological ailments such as: "Chronic dysthymia (moderate)," "Adjustment Disorder with Depressed Mood," "PTSD," "Depression," and "Adjustment disorder NOS."  Unlike those claimants who were traumatized out of concern for their personal safety or the safety of their children, Ms. Steinberg's testimony reveals that she was distressed over the state of her apartment following the attacks and the thought of what "might have happened" had she remained home.  The Special Master, therefore, recommended that Mikimi Steinberg receive $850,000 in compensatory damages for pain and suffering.

The Special Master also recommended a downward departure for Yair Mor based on Mr. Mor's testimony that the primary source of his "mental anguish" was his loss of income.  The Special Master noted that, in the six pages comprising his sworn statement, Mr. Mor failed to capture the emotional impact the Hezbollah attack had on him and his family except in broad

generalizations which, for most part, referenced his business losses. Unlike other claimants, Mr. Mor was able to relocate his family to safety in Tel Aviv and was not forced to remain in shelters, care for and protect young children from repeated rocket barrages much less navigate strategic routes to purchase groceries. Moreover, Mr. Mor submitted no psychological evaluation reports supporting his claim for emotional trauma. Based on the foregoing, the Special Master recommended that Yair Mor receive $850,000 in compensatory damages for pain and suffering.

The Special Master similarly recommended a downward departure for Rabbi Kaplan from the $5 million baseline established in *Peterson*, 515 F.Supp.2d at 54 to $2 million, given the absence of any medical records supporting what plaintiffs have characterized as a "permanent hearing loss." The Special Master's recommendation as well plaintiffs' objections thereto are discussed more fully in Section VI(B)(1), below.

Conversely, the Special Master recommended an enhancement for Karene Erdstein in light of testimony offered up by Dr. Strous and others that the rocket attacks contributed to her miscarriage. The Special Master therefore recommended that Ms. Erdstein receive $2.5 million in compensatory damages for pain and suffering.

The Special Master also recommended an enhancement for Chayim Kumer. The evidence reveals that Mr. Kumer was traumatized to the point of being unable to attend his local synagogue for three years following the attacks due to recurring flashbacks of ongoing rocket blasts which took place while he was praying. And in addition to being professionally diagnosed with PTSD and an anxiety disorder, medical evidence reveals that Mr. Kumer's stress manifested in gallbladder problems requiring three separate hospitalizations. Finally, Dr. Strous confirmed that, as of 2012 when he conducted his evaluation, Mr. Kumer's psychological problems had not

- 9 -

subsided.  Accordingly, the Special Master recommended that Chayim Kumer receive $2 million in compensatory damages for pain and suffering.

The Court **ADOPTS** the Special Master's recommendation that Mikimi Steinberg and Yair Mor each receive $850,000.  The Court further **ADOPTS** the Special Master's recommendation that Karene Erdstein receive $2.5 million and that Chayim Kumer receive $2 million.

### B.   Solatium

Solatium damages are designed "to compensate persons for mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as well as the harm caused by the loss of the decedent's society and comfort." *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379, 402 (D.D.C. 2015) (quoting *Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 25 (D.D.C. 2011)) (internal quotation marks and alterations omitted).  Solatium awards have "also been applied to cases where the victim survived a terrorist attack." *Oviessi*, 768 F.Supp.2d at 26 n. 10.  Unlike economic losses which may easily be calculated, however, solatium damages do not readily lend themselves to quantification using "models and variables." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000) (*quoting Flatow v. Islamic Republic of Iran*, 999 F.Supp.2d 1, 32 (D.D.C. 1998)).  Courts, therefore, look for guidance in "prior decisions." *Acosta v. The Islamic Republic of Iran*, 574 F.Supp.2d 15, 29 (D.D.C. 2008).

The guidelines emerging from prior decisions begin with the "presumption" that family members in direct lineal relationship "suffer compensable mental anguish[,] . . . and testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages." *Kim v. Democratic People's Republic of Korea*, 87 F.Supp.3d 286, 290 (D.D.C.

2015) (quoting *Oveissi*, 768 F.Supp.2d at 25). This presumption, in turn, is a direct reaction to

terrorists' acknowledged aim of causing "the highest degree of emotional distress, literally,

terror." *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002). *See also*

*Greenbaum v. Islamic Republic of Iran*, 451 F.Supp.2d 90, 104 (D.D.C. 2006) ("Terrorists seek

to cause extreme suffering in order to achieve political ends; accordingly, they perpetrate acts

that are deliberately outrageous.").

For relatives of victims physically injured by terrorist attacks, courts have applied a

framework whereby "awards are 'valued at half of the awards to family members of the

deceased'—$4 million, $2.5 million and $1.25 million to spouses, parents, and siblings,

respectively," *Anderson v. Islamic Republic of Iran*, 839 F.Supp.2d 263, 266 (D.D.C. 2012)

(quoting *Oveissi*, 768 F.Supp.2d at 26 n. 10 (D.D.C. 2011)), and $1.5 million for children. *Id.* at

266. *Cf. Onsongo v. Republic of Sudan*, 60 F.Supp.3d 144, 151 (D.D.C. 2014) (awarding $2.5

million to children of injured victims of terrorism); *Peterson*, 515 F.Supp.2d at 51) ($2.5 million

to child of injured victim). Courts similarly have held that relatives of surviving victims

presenting with emotional trauma and no physical injury receive amounts proportionally less

than those with physical injuries, namely, $1 million for spouses; $850,000 for parents; $750,000

for children, and $500,000 for siblings. *Davis*, 882. F.Supp.2d at 16.

The prayers for solatium brought by Brian and Karene Erdstein; Chaim and Rivka

Kaplan; Theodore and Moreen Greenberg; Jared and Danielle Sauter; Dvora Kaszemacher and

Chaya Alkareif; Chayim and Nechama Kumer; Laurie and Margalit Rappeport; and Avishai

Reuvane and Elisheva Aron raise issues not normally found in solatium claims. In the main,

solatium claims are brought by family members of victims who were terrorized overseas. Here,

however, each of the aforementioned plaintiffs was with their respective families during the

attacks and, as such, each is a victim potentially entitled to recover for his or her own pain and suffering as well as a claimant with a potentially colorable claim to recover for the emotional trauma they endured as a result of the "extreme and outrageous conduct" visited on their loved ones.

In recommending an award of solatium for two members of the same family, the Special Master was careful to avoid any duplication of damages which potentially might run afoul of the holding in *Wultz v. Islamic Republic of Iran*, 864 F.Supp.2d 24 (D.D.C. 2012). There, the Court was asked to resolve the question whether "a family member entitled to a solatium award should receive an independent award for each family member killed or injured," *id.* at 39, and held that "the better practice" would be "to establish the family member's baseline at the higher of the figures." *Id.* In keeping with this holding, the Special Master recommended solatium awards for Brian and Karene Erdstein yet denied an additional solatium award for the trauma endured by their daughter Mayan. The Special Master was equally careful to ensure that "the solatium awards of family members not exceed the pain and suffering awards of the surviving [family members]." *O'Brien*, 853 F.Supp.2d at 47–48.

In deference to these principles and the guidelines articulated in *Davis*, 882. F.Supp.2d at 16, the Special Master recommended that Chaim Kaplan, Rivka Kaplan, Brian Erdstein, Karene Erdstein, Nechama Kumer, Theodore Greenberg and Danielle Sauter each receive $1 million in compensatory damages for solatium.. Adhering further to these guidelines, the Special Master recommended solatium awards to Laurie Rappeport and Dvora Kaszemacher in the amount of $850,000, each, and $750,000 to Chaya Kaszemacher Alkareif.

Finally, the Special Master recognized that, notwithstanding the presumption that emotional trauma is a natural consequence of terrorist activity, "[l]ines must be drawn in the

award of damages and one such line includes a situation . . . where *no* evidence is offered to show injury that an award of solatium damages might compensate." *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379, 406 (D.D.C. 2015) (emphasis in original).  On this principle, the Special Master denied the solatium claim of Mayan Erdstein due to the complete absence of any testimony demonstrating she suffered any anguish over the hardships endured by her parents.

The Court finds the Special Master's recommendations in keeping with well-established guidelines and, accordingly, **ADOPTS** the Special Master's recommended awards.

### C.   Economic Damages

Chaim Kaplan, Theodore and Maureen Greenberg, Jared Sauter, Elisheva Aron, and Dvora Kaszemacher seek economic damages for financial losses they purportedly sustained as a result of the 2006 rocket attacks.

Section 1605A(c) contemplates recovery of economic damages.  *See Moradi v. Islamic Republic of Iran*, 77 F.Supp.3d, 57, 71 (D.D.C. 2015) ("as a general rule, lost earnings – past and future – are compensable damages").  These damages, however, must be proven "by a reasonable estimate," *Reed v. Islamic Republic of Iran,* 845 F.Supp.2d 204, 213 (D.D.C.2012), supported by corroborative evidence. *See Wyatt v. Syrian Arab Republic*, 908 F.Supp.2d 216, 230 (D.D.C. 2012) (denying claims for economic damages where "plaintiffs [] failed to introduce any evidence of what costs specifically were incurred"; sought damages for a "lost business opportunity" based on a "speculative" conjecture; and requested reimbursement for "travel expenses" without "any evidence supporting this claim").

The Special Master denied the claims of Chaim Kaplan, Theodore and Maureen Greenberg, Jared Sauter, and Elisheva Aron for economic damages on the grounds that each request lacked the evidentiary support necessary to ground an award.  Conversely, the Special

Master recommended that Dvora Kaszemacher be awarded damages reflecting the losses she successfully demonstrated.  The Court examines these determinations, in Section VI(B)(2), below.

In the proceeding before the Special Master, Rabbi Kaplan requested $230,375.43 in damages for loss of income between 2006 and 2015 as well as an additional $639,931 for future income he anticipates will be forfeited due to his "inability to work."  In support, plaintiffs provided the Special Master with three one-page documents written in Hebrew: the first, purporting to be an income statement for June 2006; the second, a tax-return form for 2007; and the third, a tax-return form for 2013.  No accounting statements or forensic income projections verifying Rabbi Kaplan's prayer for relief were supplied.  The Special Master's recommendation and plaintiffs' objections thereto are discussed more fully in Section VI(B)(2), below.

Theodore Greenberg seeks damages for a "business loss of about $2,500 - $3,000" during the rocket attacks as well as a monthly projected business loss of $15,000 to $20,000.  He also seeks reimbursement for the rent he paid for an apartment in Jerusalem where his family took shelter during the attacks, as well as for transportation costs.  Mr. Greenberg supplied no records of past earnings, bank records, accounting statements, tax returns, rent receipts or forensic reports supporting his claimed losses.  In the absence of these documents, the Special Master recommended that Theodore Steinberg receive no award for economic losses.

Jared Sauter testifies that he lost tools with a "combined estimated value of ... $15,000"; that his family was compelled to spend their life savings of "about $10,000" when they fled their home; and that he spent "about $5,000 out of pocket" for therapy sessions.  He provided no receipts verifying the value of the stolen tools or for the expenses the family incurred during their time away from home.  Mr. Sauter similarly supplied no bank statements verifying his alleged

withdrawals from the family savings account and no invoices for the therapy his family underwent. Accordingly, the Special Master recommended that Jared Sauter receive no award for economic damages.

Yair Mor describes in detail the losses he purportedly sustained as a result of the 2006 Hezbollah rocket attacks. He seeks compensation for his projected business loss of "a minimum of 350,000 Shekels ($100,000)" in income for the "six months" his business was "standing practically vacant until the tourists began returning to Tzfat"; "approximately $18,000" he spent on hotels while in Tel Aviv; lost inventory which "amounted to approximately 95,000 Shekels (a little over $27,000); and "150,000 Shekels (approximately $44,000)," in wages he claims to have paid his skilled workers while his business was closed. The Special Master observed, however, that Mr. Mor supplied no documents supporting these losses. He submitted no tax returns, bank statements, certified accounting reports lending credence to his loss of income. Mr. Mor similarly supplied no receipts or credit card statements verifying his hotel expenditures; no receipts or ledgers supporting his claimed loss of inventory; and no payroll records or bank statements substantiating his alleged payments to his "skilled workers." Based on the lack of supporting documentation, the Special Master recommended that Yair Mor receive no award for economic damages.

Elisheva Aron alludes circumspectly to the financial hardships she endured as a result of the forced shutdown of her employer's business and her subsequent unemployment. She testifies that the rocket attacks required her to temporarily abandon her home which, in turn, forced her to pay living expenses in two locations. Ms. Aron quantifies none of those losses, however and appends no documentation from which an award can be fashioned. Accordingly, the Special Master recommended that Elisheva Aron receive no award for economic damages.

Conversely, the Special Master recommended that Dvora Kaszemacher receive financial compensation due to the losses she incurred when her art gallery was forced to close. The Special Master noted that Ms. Kaszemacher supported her claim with financial records that included "spreadsheets" for years 2005, 2006 and 2007, indicating the gallery's gross and net income as well as a letter from her accountant certifying both to the accuracy of the calculations contained in her submissions as well as to the fact that these numbers were identical to those supplied to the Israeli tax authorities. Accordingly, the Special Master recommended that Dvora Kaszemacher received $11,966.67 in economic damages for lost income.

It is a well-settled proposition of law that, "[u]nlike damages for pain and suffering, lost earnings are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings with competent evidence." *Moradi*, 77 F.Supp.3d at 71 (citation omitted). In keeping with this principle, the Court concurs with the Special Master's finding that Theodore Greenberg, Jared Sauter, Elisheva Aron and Yair Mor failed to meet the minimum evidentiary threshold supporting their respective claims for economic damages. The Court similarly concurs with the Special Master's finding that the evidence supplied by Dvora Kaszemacher amply quantified her financial losses. Accordingly, the Court **ADOPTS** the Special Master's recommendations that Theodore Greenberg, Jared Sauter, Yair Mor, and Elisheva Aron receive no award for economic damages. The Court similarly **ADOPTS** the Special Master's recommendation that Dvora Kaszemacher receive compensation in the amount of $11,966.67 for the economic losses she sustained.

## D.   Punitive Damages

The FSIA also permits the recovery of punitive damages, 28 U.S.C. § 1605A(c), aimed "not at compensation but principally at retribution and deterring harmful conduct." *Exxon*

- 16 -

*Shipping Co.* v. *Baker,* 554 U.S. 471, 492 (2008). This Court has repeatedly observed that "recurrent awards in case after case arising out of the same facts can financially cripple a defendant, over-punishing the same conduct through repeated awards with little deterrent effect." *Murphy,* 740 F.Supp.2d at 81. The risk of overly punishing a defendant, however, must be balanced against the need to deter "the brutal actions of defendants in planning, supporting, and aiding the execution of terrorist attacks." *O'Brien,* 853 F.Supp.2d at 48 (quoting *Rimkus* v. *Islamic Republic of Iran*, 150 F.Supp.2d 163, 184 (D.D.C. 2010)).  To that end, this Court has held that the calculation of punitive damages in cases arising out of terrorist activity should adhere to the ratio of punitive to compensatory damages set forth in earlier cases arising out of the similar events.  In the past, the Court has awarded $3.44 in punitive damages for each compensatory dollar awarded. *Murphy,* 740 F.Supp.2d at 82-83.  The Court will apply that ratio here and award plaintiffs a total of $126,633,268.54 in punitive damages.

## VI.   PENDING MOTIONS

Following the issuance of the Special Master reports, plaintiffs filed two motions.  The first, is captioned Motion to Special Master to Reconsider/Modify his Recommendations with Regard to the Kaplan Plaintiffs was filed on April 18, 2016 ("Kaplan Motion for Reconsideration") (09-cv-646) (ECF 81).  In the Kaplan Motion for Reconsideration, plaintiffs seek to revisit several of the Special Master's decisions, particularly, his recommendations: (1) that Rabbi Kaplan be awarded compensatory damages for pain and suffering in the amount of $2 million; (2) that Rabbi Kaplan receive no economic damages; and (3) that Mushka, Reuven and Menachem Kaplan receive no damages for pain and suffering.  Plaintiff do not seek review of the Special Master's recommendation that Chana and Efraim Kaplan receive no damages for pain and suffering.

Plaintiffs' second motion, filed on April 19, 2016 is captioned Motion to Special Master to Reconsider/Modify his Recommendations with Regard to Plaintiffs Noa and Netiya Erdstein (09-cv-646) (ECF 82) ("Erdstein Motion for Reconsideration"). There, plaintiffs seek reconsideration of the Special Master's recommendation that no damages be awarded to Mushka, Reuven, and Menachem Kaplan.

Plaintiffs do not challenge the Special Master's findings of facts in either of their motions. They similarly take no issue with the Special Master's application of the law. Instead, they ask that additional information be considered – information that not only was available prior to the issuance of the Special Master's reports, but was not tendered in response to numerous requests by the Special Master for clarification.

The Court is constrained, at the outset, to observe that Rule 53(f) sets forth procedures to be followed by parties who object to the recommendations of the Special Master and by the district court judge to whom the case is assigned. It does not provide for the Special Master's reconsideration of his own dispositions. The Court will therefore consider the two motions as if directed to this Court, in the first instance.

### A.    Standard of Review

Before delving into the relative merits of plaintiffs' reconsideration requests, a few prefatory comments are in order. The Court's review of the Kaplan and Erdstein Motions for Reconsideration is guided by Fed. R. Civ. P. 53(f)(1) which provides, in relevant part, that, "[i]n acting on a master's order, report, or recommendations, the court must afford an opportunity to be heard and *may* receive evidence, and may: adopt or affirm; modify; wholly or partly reject or reverse; or resubmit to the master with instructions." (Emphasis added.) Findings of fact and conclusions of law are reviewed *de novo*. Fed. R. Civ. P. 53(f)(3)(4). Significantly, *de novo*

review "does not necessarily mean a review that includes the submission of new evidence, particularly when, as in the instant case, evidentiary proceedings previously occurred before the Special Master," *Commissariat %22a l'Energie Atomique v. Samsung Electronics Co.*, 245 F.R.D. 177, 179 (D. Del. 2007), and the record is "sufficiently developed" to permit the Court to "merely conduct a *de novo* review" of the challenged decisions and make "its own independent determination." *Luby v. Teamsters Health, Welfare and Pension Trust Funds*, 944 F.2d 1176, 1185 (3d Cir. 1991)).

The plain language of Rule 53(f) coupled with the "sufficiently developed" record before the Special Master compels the conclusion that the Court, faced with objections to the Special Master reports, is under no obligation to consider new evidence. The Court is guided by the fact that the rules governing review of a Special Master's determinations are analogous to those which guide federal district courts sitting in an appellate capacity of rulings by magistrates and bankruptcy courts. In those situations, courts need not consider new evidence.

For example, Rule 72(b)(3) provides that, upon reviewing rulings of a federal magistrate, "[t]he district judge *may* accept, reject, or modify the recommended disposition; [or] receive further evidence." *Id.* The Advisory Committee Notes explain that "[t]he term "*de novo*" . . . does not indicate that a second evidentiary hearing is required." Similarly, 28 U.S.C. § 636(b)(1)(C) provides that the district judge "may accept, reject, or modify" the findings made by the magistrate and "*may* receive further evidence," (emphasis added), and requires only that a district court "'consider the record which has been developed before the magistrate [judge] and make his own determination on the basis of *that record,* without being bound to adopt the findings and conclusions of the magistrate [judge].'" *Taberer v. Armstrong World Industries, Inc.*, 954 F.2d 888, 904 (3d Cir.1992) (emphasis added) (quoting *United States v. Raddatz*, 447

U.S. 667, 675 (1980)).  In those instances, an objecting party is not permitted "to present new initiatives to the district judge." *Taylor v. District of Columbia*, No. 15-685 (RBW), --- F.Supp.3d ---, 2016 WL 4687326 *1 (D.D.C. September 07, 2016)).

Objections to rulings by the Bankruptcy Court are subject to similar review.  Bankruptcy Rule 9033(d) provides, that a "district judge *may* accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions." (Emphasis added.)  This rule has been interpreted as one "which may be solely on the record and without any additional hearing or evidence." *Matter of Hipp, Inc.*, 895 F.2d 1503, 1519 (5th Cir.1990).

Beyond the plain language of Rule 53(f)(2), the consequences of allowing a party to supplement the record while on appeal before the district court are not insignificant.  At minimum, it frustrates all of the "systemic efficiencies" inherent in the Special Master's appointment, *Net2Phone, Inc. v. Ebay, Inc.*, No. 06–2469 (KSH), 2008 WL 8183817, *4 (D. N.J. June 26, 2008), and effectively renders all of the proceedings before Special Master wholly redundant.  Indeed, "it would be fundamentally unfair to permit a litigant to set its case in motion before the [Special Master] . . . and—having received an unfavorable recommendation—shift gears before the [reviewing] judge." *Dunkin' Donuts Franchised Restaurants LLC v. Mehta*, Civ. No. 07–0423, 2007 WL 2688710, at *1–2 (W.D. Pa. 2007) (citing *Paterson–Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 991 (1st Cir. 1988)).  These concerns are particularly acute here, as plaintiffs' reconsideration requests challenge neither the Special Master's findings of fact nor his application of the law and seek only to introduce new evidence in the hope of a different outcome.

In light of the foregoing, the Court is disinclined to allow a party to introduce new evidence at this juncture. It will make an exception, in this instance, for no other reason than to demonstrate that the supplemental information plaintiffs seek to insert into the record does nothing to undermine the Special Master's recommendations.

### B.     Kaplan Motion for Reconsideration

1.     <u>Compensatory Damages for Rabbi Kaplan's Pain and Suffering</u>

Plaintiffs ask the Court to increase the $2 million award for pain and suffering recommended by the Special Master. The Court's review of the record indicates that the Special Master recommended a downward departure from the $5 million baseline established in *Davis*, 882 F.Supp.2d at 12, and *Peterson*, 515 F.Supp.2d at 547, after Rabbi Kaplan failed to supply any original medical records, emergency room notes, or the audiological exams referenced in Dr. Alan Friedman's report, diagnosing Rabbi Kaplan with permanent hearing loss. The Court further notes that the one paragraph "memorandum" submitted by Dr. Ronald Korman in support of Rabbi Kaplan's disability failed not only to include Dr. Korman *curriculum vitae* but did not include the "attached hearing test from April 16, 2012" referenced in his report. It bears mention that the Special Master afforded plaintiffs numerous opportunities to supplement the record and that plaintiffs did, indeed, file several such supplements, none of which filled these gaps. Plaintiffs concede their failure to produce the aforementioned medical records – attributing their omissions to "inadvertence." Kaplan Motion for Reconsideration, at 3.

On the record before him, the Special Master evaluated Rabbi Kaplan's injuries against previous awards made to victims with similar injuries. In *Davis*, for example, the Court found the Special Master's recommendation of $5 million to a serviceman who suffered hearing loss and severe PTSD as a result of a terrorist attack, to be excessive and reduced the award to $2

million. *Id.*, 882 F.Supp.2d at 13. Again, in *Bland v. Islamic Republic of Iran*, 831 F.Supp.2d 150, 156 (D.D.C. 2011), the Court reduced the Special Master's recommendation that serviceman Robert Rucker, who suffered "lacerations on his left arm, bruising, blurred vision, impaired hearing and a sore head from being hit by concrete" as well as "post-traumatic stress disorder," from $5 million to $2 million. It should be noted that, both in *Davis* and *Bland*, the claimants submitted ample medical documentation corroborating their injuries.

The Special Master applied the rationale adopted by the Court in these cases and concluded that Rabbi Kaplan was entitled to a $2 million award.

According to plaintiffs, the records they now supply in support of Rabbi Kaplan's appeal confirm that he suffers from "otosclerosis"; "partial hearing loss"; and "tinnitus." These records do not, however, contradict Dr. Friedman's initial prognosis that "the functional implications" of Rabbi Kaplan's "moderate conductive hearing loss" in his left ear "include difficulty localizing sirens while driving (or walking), as well as being unable to perform certain jobs" which "may require one or more hearing aids at a younger age than he would have otherwise." Kaplan Report, at 10. Plaintiffs' latest submissions similarly do not undercut Dr. Friedman's prognosis that the hearing lost could be surgically remedied – a procedure Rabbi Kaplan chose not to undergo. *Id.* at 8.

As to Rabbi Kaplan's back pain, the Court agrees with the Special Master that the six-month hiatus between the rocket blast and the first appearance of symptoms calls into serious question any nexus between the two events. Indeed, none of the records before the Special Master or this Court purport to make such a connection. Even crediting the possibility that Rabbi Kaplan's back pain was somehow caused by the rocket blast, Dr. Friedman observation that Rabbi Kaplan revealed a "full range of motion in the cervical and lumbosacral spines," does

not support his request for an increase in the $2 Million damage award recommended by the Special Master.

Equally unavailing is plaintiffs' attempt to compare Dr. Kaplan's hearing impairment to the traumas suffered by Stuart Hersh and Abraham Mendelson in *Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d 258 (D.D.C. 2003).  Mr. Hersh suffered permanent injuries which included: "60 percent hearing loss, tinnitus, back pain, chronic ear infections, burn scars, and difficulty walking". *Id.* at 267.  He further exhibited "symptoms common to PTSD, including irritability, insomnia, anger, frustration, flashbacks, nightmares, and depression"; was diagnosed with "permanent psychomotor retardation [and] a speech impediment"; and attempted suicide as "a result of his emotional instability." *Id.*

Mr. Mendelson, in turn, suffered "multiple shrapnel-caused entry wounds in his legs, burns that included a burned cornea, and a partially-severed ear."  His permanent injuries "include[d] a perforated right eardrum, a partially-severed ear, partial hearing loss, tinnitus, large scars, and chronic headaches." *Id.* at 266.

In sum, plaintiffs' invocation of *Campuzano*, serves only to underscore the inherent weakness of their position and to bolster the propriety of the Special Master's recommended award.  The Court therefore **ADOPTS** the Special Master's recommendation that Rabbi Kaplan receive $2 Million in compensatory damages for pain and suffering.

2.     Rabbi Kaplan's Economic Damages

Plaintiffs next ask the Court to reconsider the Special Master's decision denying economic damages to Rabbi Kaplan.  A review of the record reveals that the Special Master's predicated his recommendation on the fact that Rabbi Kaplan's request for nearly $1 million was speculative and without evidentiary foundation.

On appeal, plaintiffs attach a report captioned: "Expert Opinion [t]he Plaintiff Rabbi Chaim Kaplan" drafted by CPA Dov Weinstein.  In his report, Mr. Weinstein sets forth a series of calculations and concludes that the injuries sustained by Rabbi Kaplan during the 2006 rocket attacks resulted in a total economic loss to Rabbi Kaplan of 7,238,307 New Israeli Shekels or 1,912,367 in US Dollars.  As superficially appealing as Mr. Weinstein's charts and calculations may be, an examination of his report reveals that his conclusions are grounded on statements given by Rabbi Kaplan in the Declaration he supplied to the Special Master and a single "Form 106 salary summary from 2013."  In other words, plaintiffs ask the Court to award almost $2 Million in lost economic opportunities based on unconfirmed testimony and a "salary summary" from 2013 – seven years after the Hezbollah rocket attacks.

The Court declines plaintiffs' invitation, finding nothing in plaintiffs' latest submissions to warrant overturning the Special Master's recommendation.  The Court therefore **ADOPTS** the Special Master's recommendation that Rabbi Kaplan receive no economic damages.

3.      <u>Compensatory Damages for Mushka, Reuven, and Menachem's Pain and Suffering</u>

Plaintiffs seek reconsideration of the Special Master's recommendation that Mushka, Reuven, and Menachem Kaplan receive no compensatory awards for pain and suffering.  The Court's review of the record reveals that the Special Master's recommendation followed his finding that the only evidence attesting to the trauma suffered by the Kaplan children was statements made by their parents to the effect that, following the rocket attacks, Mushka, Reuven, and Menachem became "introverted"; had "trouble sleeping"; experienced "night terrors"; became "clingy"; "obsessed with safety"; had "difficulty toilet training"; and trouble "socializing with peers."  Plaintiffs supplied neither direct testimony from the children nor any psychological evaluation reports.

The Special Master could find no reason for the absence of direct evidence. There was nothing in the record suggesting any "special problems of proof," *Hill*, 328 F.3d at 685, which might explain and perhaps mitigate, plaintiffs' failure either to supply the children's declarations or to have them professionally evaluated. Accordingly, the Special Master concluded that plaintiffs failed either to "prove damages 'in the same manner and to the same extent' as any other default winner," *Hill*, 328 F.3d at 683-84, or to "prove the fact of injury with reasonable certainty," *Samaritan Inns, Inc.*, 114 F.3d at 1235, and denied their claims.

Plaintiffs concede "that Special Master Balaran is correct in that they did not sufficiently detail those injuries and they should consult an expert." Kaplan Motion for Reconsideration, at 7. Rather than remedy this deficiency by securing the sworn statements of the Kaplan children or have them assessed professionally, plaintiffs supplied psychological reports by Dr. Rael Strous who never met with or formally evaluated any of the Kaplan children, diagnosed all three children as "exhibit[ing] some form of 'unspecified anxiety disorder and PTSD.'" Relying exclusively on the observations of Chaim and Rivka Kaplan and despite never having observed the Kaplan children's behavior, tested their reactions, taken any notes or made further inquiries, Dr. Strous concluded that, "with the trauma coming as it did so early in their development . . . it is expected that many aspects of the trauma and its repercussions will continue to affect these children for a significant period of time." *Id.* at 8.

The Court finds Dr. Strous' "expert" testimony singularly unpersuasive. The Court's inquiry into the probative value of Dr. Strous' diagnoses necessarily requires an examination into the material from which his opinion is fashioned and the reasoning by which Dr. Strous evolved from that material to his conclusion. It does not rest in his mere expression of conclusion. And as the only bases for Dr. Strous' conclusions are the observations of Chaim and Rivka Kaplan –

witnesses who could hardly be characterized as "disinterested" – the Court is disinclined to credit Dr. Strous' diagnoses.  Stated alternatively, repeating observations made by parties with an interest in the outcome of the case and shrouding those observations in an expert report does not transform them into competent evidence.  Plaintiffs' attempt to repackage evidence that did not pass evidentiary muster in the first instance does not alter the Special Master's finding that Mushka, Reuven and Menachem failed to "prove the fact of injury with reasonable certainty."

For the foregoing reasons, the Court **ADOPTS** the Special Master's recommendation that no compensatory damages for pain and suffering be awarded to Mushka, Reuven and Menachem Kaplan.

### C.     Erdstein Motion for Reconsideration

Plaintiffs seek reconsideration of the Special Master's recommendation that two of Brian and Karene Erdstein's children, Noa and Netiya, receive no compensatory damages for pain and suffering.  As with the Kaplan Motion for Reconsideration, plaintiffs do not contest the Special Master's finding of facts or his application of the law.  They seek, instead, to supplement the record by filling in the evidentiary gaps highlighted in the April 4, 2016 Report of Special Master Pursuant to Order of Reference Regarding the Claims of Brian, Karene, Mayan, Noa, Netiya and Ariel Erdstein  (09-cv-646) (ECF 75) ("Erdstein Report").

The Court's review of the record reveals that the Special Master's decision was based, in large part, on the May 2012 Declarations of Brian and Karene Erdstein who testified being unable to "point to a direct change in [Noa's, Netiya's and Ariel's] behavior" as a result of the attacks "since they were very little" at the time of the bombing."  Plaintiffs explain that Brian and Karene Erdstein "now, after speaking to their children "understand that even they did not fully understand the extent of the emotional trauma," and that they "only had their children's best

interests at heart when they previously decided not to probe their emotional trauma." Erdstein

Motion for Reconsideration, at 2.  According to plaintiffs, both parents, "in hindsight [] realize

that Special Master Balaran is correct in that they did not adequately detail those injuries," *id.* at

2, and they "now understand both that more evidence was required by Special Master Balaran,

and that their girls have suffered greatly and deserve to present that to the Court." *Id.* at 3-4.

Neither Brian nor Karene Erdstein submitted affidavits in support of these assertions.

Instead, they supplied the affidavits of their children as well as the psychological evaluation

reports of Dr. Strous, who diagnosed Noa with "moderate to severe post-traumatic stress

disorder" as well as "mild unspecified anxiety" and Netiya with "moderate post-traumatic stress

disorder" and "mild unspecified anxiety disorder."

The Court finds plaintiffs' representations less than compelling.  When they executed

their Declarations in 2012 – six years after the rocket attacks – Brian and Karene each testified

being unable to "point to a direct change in [Noa's, Netiya's and Ariel's] behavior."  In their

submissions before this Court filed in 2016, plaintiffs assert that Brian and Karene, in fact, knew

or suspected their children were traumatized, but "had their children's best interests at heart

when they previously decided not to probe their emotional trauma." Erdstein Motion for

Reconsideration, at 4.  The Court finds it implausible that Brian and Karene Erdstein observed

no discernible change in their children in six years after the bombings only to be alerted to the

possible trauma they may have suffered ten years after the rocket attacks – more specifically

after the Special Master issued his report.  It is plain that plaintiffs used the Erdstein Report as a

roadmap to correct and supplement their initial submissions hoping the glaring inconsistencies in

the record would go unnoticed.  The Court did, however, notice and finds neither the statements

made by Noa and Natiya nor the expert report of Dr. Strous, who relied on those statements, an adequate basis to overturn the Special Master's recommendations.

The Court therefore **ADOPTS** the Special Master's recommendation not to award any compensatory damages for pain and suffering to Noa and Netiya Erdstein.

VII.    CONCLUSION

For the foregoing reasons, the Court denies both the Kaplan Motion for Reconsideration and the Erdstein Motion for Consideration and **ADOPTS** all of the recommendations set forth in his reports and awards plaintiffs $38,161,966.67 in compensatory damages and $131,277,165.34 in punitive damages, in the proportions set forth in the Order and Judgment accompanying this opinion, issued this date.

**SO ORDERED.**

_____
Royce C. Lamberth
United States District Judge

DATE: 9/29/16